# EXHIBIT 1

## 1

```
                        Volume:   1
                        Pages:  1-154
                        Exhibits:  1-4
          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
                    EL PASO DIVISION
                        NO. 08-CV-00215-FM
                        Judge Frank Montalvo
- - - - - - - - - - - - - - - - - - - - - x
NEMESIO CASTRO, on behalf of himself
and all others similarly situated,
                        Plaintiffs,
        v.
COLLECTO, INC., doing business as
COLLECTION COMPANY OF AMERICA
and US ASSET MANAGEMENT INC.,
                        Defendants.
- - - - - - - - - - - - - - - - - - - - - x
        DEPOSITION OF JOHN F. BURNS, JR.
        Wednesday, April 29, 2009 at 9:09 a.m.
                    HOLIDAY INN
                929 Hingham Street
                Rockland, Massachusetts
Reporter:  Lori-Ann London, RPR
```

## 2

1  A P P E A R A N C E S :

2

3  By Cathleen M. Combs, Esquire

4  EDELMAN, COMBS, LATTURNER & GOODWIN, LLC

5  120 South LaSalle Street

6  Chicago, Illinois 60603

7  312.739.4200

8  Appearing for the Plaintiff

9

10  By Keith Wier, Esquire

11  BUSH & RAMIREZ, L.L.C.

12  24 Greenway Plaza, Suite 1700

13  House, Texas 77046

14  713.626.1555

15  Appearing for the Defendant

16

17

18

19

20

21

22

23

24

## 3

```
1               I N D E X

2

3   DEPOSITION OF:                   PAGE

4   JOHN F. BURNS, JR.

5   EXAMINATION BY MS. COMBS          4

6 _____X

7           E X H I B I T S

8   NO.                           PAGE

9   1  Notice of 30(b)(6) Depositions    33

10  2  Complaint - Class Action with attachments  34

11  3  Defendants' Answer and Affirmative   110

12     Defenses to Plaintiff's Original

13     Complaint

14  4  Packet of Documents             138

15

16

17

18

19

20

21

22

23

24      *Original exhibits returned to Ms. Combs
```

## 4

```
1           P R O C E E D I N G S

2

3           JOHN F. BURNS, JR.,

4   a witness called for examination by the Plaintiff,

5   having been satisfactorily identified by the

6   production of his Massachusetts driver's license,

7   and duly sworn by the Notary Public, was examined

8   and testified as follows:

9               EXAMINATION

10  BY MS. COMBS:

11      Q   Will you state your name for the record?

12      A   John F. Burns, Jr.

13      Q   And where are you employed?

14      A   I'm employed at Collecto, Incorporated.

15      Q   What is your business address?

16      A   700 Longwater Drive, Norwell,

17  Massachusetts 02061.

18      Q   Okay.  What is your position at Collecto?

19      A   Vice president of corporate services.

20      Q   Do you also hold a position at US Assets?

21      A   Yes.

22      Q   And what is that position?

23      A   Vice president.

24      Q   What is the business of Collecto, Inc.?
```

5

1    A    Collecto, Inc. is a collection agency.
2    Q    How long have you been employed there?
3    A    In various capacities since 1993.
4    Q    How long has Collecto been in business?
5    A    Since 1991.
6    Q    And what is the business of US Assets?
7    A    Debt purchasing.
8    Q    And how long has it been in existence?
9    A    Since the year 2006.
10    Q    And how long have you been associated or
11   employed by US Assets?
12    A    Since its inception.
13    Q    Is there any relationship between --
14   ownership relationship between US Assets and
15   Collecto, Inc.?
16    A    The stock of US Asset is owned by
17   Collecto.
18    Q    And it's true that Collecto is a
19   subsidiary of another business; is that correct?
20    A    Yes.
21    Q    And what is that business?
22    A    EOS Holding USA.
23    Q    And what is the business of EOS Holding,
24   USA?

6

1    A    It's a holding company.
2    Q    And other than US Assets and Collecto,
3    what other kinds of businesses does EOS Holding
4    own?
5    A    That's it.
6    Q    Okay.  Are you a -- an officer of EOS
7    Holding USA?
8    A    No.
9    Q    Now, who do you report to at Collecto,
10   Inc.?
11    A    I report to the CEO.
12    Q    And who is that?
13    A    His name is Paul Leary, Jr.
14    Q    And who does Paul Leary -- does Paul
15   Leary report to anybody at EOS?
16    A    Well, he would report to the board of
17   directors of Collecto.
18    Q    Does he own -- okay.  Does he have any
19   ownership interest in EOS?
20    A    No.
21    Q    Who has ownership interest in EOS?
22    A    The ownership interest in EOS is a German
23   company, EOS Holding International.
24    Q    How long has EOS Holding International

7

1    had an interest in Collecto?
2    A    Since 2001, I believe.
3    Q    Prior to that who owned Collecto?
4    A    The stock was owned by a family trust.
5    Q    And is that the Leary family?
6    A    Yes, yeah.
7    Q    And the family trust sold it to EOS
8    Holding International --
9    A    That's correct.
10    Q    -- in 2001?
11    A    Yeah.
12    Q    Does Paul Leary, Jr. have a position at
13   US Assets?
14    A    Yes.
15    Q    And what is his position?
16    A    He's the president and treasurer.
17    Q    And looking at your position at
18   US Assets, who do you report to at US Assets?
19    A    To Paul Leary.
20    Q    Okay.  Can you describe your duties as a
21   vice president of corporate service at US As --
22   no -- at Collecto.
23    A    Right.  My duties would include oversight
24   of our facilities, human resources department, the

8

1    compliance department, risk management.
2    Q    Are there any -- is there a legal
3    department at Collecto?
4    A    A legal department?
5    Q    Yes, separate legal department.
6    A    No.
7    Q    Are there any lawyers in the compliance
8    department?
9    A    Yes.
10    Q    Okay.  Who at the compliance department
11   reports to you?
12    A    Susan Giordano.
13    Q    And what is her position?
14    A    Vice president of compliance and risk
15   management.
16    Q    Is she an attorney?
17    A    Yes.
18    Q    Okay.  And are there any other attorneys
19   at -- in the compliance department at Collecto?
20    A    The compliance manager is a woman by the
21   name of Mianne Schall.  I believe she also has a --
22    Q    Could you spell her first name?
23    A    M-I-A-N-N-E.
24    Q    And what did you describe her position

9

1 as?

2    A   Compliance manager is her title.

3    Q   How many people are in the compliance
4 department?

5    A   On regular staff, three people.

6    Q   Besides Susan Giordano and Mianne Shaw
7 [sic], who else is in the compliance --

8    A   There's one other gentleman, his name is
9 Uri Spann.

10    Q   Can you spell his first name?

11    A   U-R-I.

12    Q   And how do you spell the last name?

13    A   S-P-A-N-N.

14    Q   And what are the duties of Uri Spann?

15    A   To complete the licensing documents
16 required to log and respond to consumer complaints
17 and generally provide assistance to the compliance
18 manager.

19    Q   And what are the duties of the compliance
20 manager, Mianne Shaw?

21    A   Logging in all of the consumer
22 complaints, better business complaints, any
23 correspondence from licensing authorities.  She's
24 also responsible for dealing with audits, you know,

10

1 from licensing authorities and, you know, will --
2 anything else related to licensing and compliance.

3    Q   Okay.  And what generally are the duties
4 of Susan Giordano?

5    A   She'll look at all of the operating
6 procedures and processes, and on an ongoing basis
7 obtain information relative to industry information
8 or legal information that would be relevant to our
9 operating procedures and systems.  Any of the
10 litigations that might get filed against the
11 company, she would take the oversight and
12 management of that in determining who -- who would
13 be utilized as defense counsel in cases of that
14 nature.

15    Q   Okay.  And what is your involvement in
16 the compliance department?

17    A   Basically setting all the procedures and
18 guidelines for the operation of the department,
19 final determination as to things relative to
20 contracts and procedures.

21    Q   Okay.  Are you involved in management of
22 any of the actual collectors at Collecto?

23    A   No.

24    Q   Who would be responsible for that?

11

1    A   Any of the collectors?

2    Q   Well, who's generally the management
3 authority for the collection -- the collectors?

4    A   Okay.  The senior manager at this point
5 is a woman whose name is Brittany Leary.

6    Q   Maybe I should ask you this.  Is there a
7 department at Collecto that is in charge of the
8 collection area?

9    A   Well, the operations department.

10    Q   Operations department.

11       And is there an officer in charge of
12 the operations department?

13    A   Brittany Leary is the senior vice
14 president of operations.

15    Q   Okay.

16    A   But -- okay.

17    Q   And how many collectors does Collecto
18 have currently?

19    A   I would say about 450.

20    Q   Are they all in the Massachusetts area?

21    A   No.

22    Q   Where else are they located?

23    A   They're in Brockton, Massachusetts;
24 they're in Rochester, New York; they're in Tinley

12

1 Park, Illinois; they're in Denver, Colorado; and
2 they're in Dallas, Texas.

3    Q   Okay.  Does Collecto do the collection
4 for the assets owned by US Assets?

5    A   It does -- it does collect for US Asset,
6 yeah.

7    Q   Does US Assets use any other collector?

8    A   Yes.

9    Q   What other collector does -- or
10 collection agency --

11    A   There's been several over the years, so I
12 don't know if you want me to try to identify every
13 collection agency that's ever --

14    Q   No.

15    A   -- done work for them.

16    Q   Let's focus on June of 2007 through July
17 of 2008.  Do you know what agencies, besides
18 Collecto, Inc., did collection work for US Assets?

19    A   And what was the timeframe again?

20    Q   Mid -- June -- June of 2007 to July of
21 2008.

22    A   In that timeframe it might have been
23 strictly Collecto.

24    Q   Okay.  Who reports to you with respect to

13

1  your job responsibilities at Collecto in the human
2  resources department?
3      A   The director of human resources.
4      Q   And what is the name of that person?
5      A   Linda DiLorenzo.
6      Q   And in risk management, again, with
7  respect to your duties at Collecto, who reports to
8  you?
9      A   That would be Susan Giordano.
10     Q   And is it correct to say that Susan
11 Giordano held her -- a similar position in -- from
12 June 2007 to June -- July 2008 that she currently
13 holds?
14     A   Yes.
15     Q   And the same thing with -- oh, yeah,
16 she's -- she's the risk management person.
17         All right.  With respect to your
18 duties as vice president of US Assets, could you
19 generally describe your responsibilities?
20     A   The general responsibilities would be to
21 obtain information about debt packages that are
22 being placed for sale, do an evaluation of those
23 for purchase by the company, and, furthermore,
24 would be the -- involved in the strategy as far as

14

1  the collection of those accounts, and also involved
2  in the monitoring of the results in reporting to
3  the various parties, board of directors or
4  otherwise, the results of our efforts in this area.
5      Q   Besides the board of directors, who else
6  would you discuss the monitoring results with
7  respect to your purchase of assets for US Assets?
8      A   Just senior management at the company.
9      Q   Other than Paul Leary, is there anyone
10 else you would discuss these --
11     A   Well, we have executive meetings where
12 there's the vice presidents of the company; it may
13 be discussed at that meeting what the results are,
14 because it's an operating division of the company.
15     Q   Is there anyone, other than yourself,
16 that would have decisional authority over what
17 packages or portfolios of debts are purchased by
18 US Assets?
19     A   The decision -- ultimate decision on the
20 packages is in board of directors.
21     Q   Do you run every purchase past the board
22 of directors?
23     A   Yes.
24     Q   Is there a committee of the board of

15

1  directors who is responsible for evaluating the
2  portfolios purchased by US Assets?
3      A   Yes.
4      Q   And what -- what is the name of that
5  committee?
6      A   EOS risk management.
7      Q   Oh, when you were referring to the board,
8  are you referring to the board of directors of EOS?
9      A   No, I'm referring to the board of
10 directors for Collecto.
11     Q   Okay.  And in your responsibility at
12 US Assets for evaluating portfolios for purchase,
13 would you also have contact with any employees or
14 board members of EOS International?
15     A   Yes.
16     Q   And who would that be?
17     A   They have a risk management group, and,
18 you know, there's various people that are on that
19 committee, which changes from time to time.
20     Q   And when you say it's a risk management
21 group, is that part of the board of directors of
22 EOS International?
23     A   Yes, correct.
24     Q   Are there any employees of EOS

16

1  International that you would work with directly in
2  the purchase of portfolios for US Assets?
3      A   Well, we need to have their review and
4  approval of the package.
5      Q   And who do you deal with in the review
6  and approval of a portfolio purchase, who would you
7  directly deal with?
8      A   Well, that -- the individuals change,
9  there's different people that are there.  So it's
10 whoever they have responsible at any given time,
11 and that's been several individuals.  So I can't --
12 it's not a specific person.  It's really you send
13 it to EOS risk for an evaluation, and then whatever
14 -- whoever they assign it to handles that.
15     Q   Okay.  And where are they located?
16     A   They're in Germany.
17     Q   Where in Germany?
18     A   Hamburg.
19     Q   Does US -- does US Assets have -- how
20 many employees, other than yourself, does US Assets
21 actually have, employees?
22     A   None.
23     Q   Okay.  So is it fair to say that you are
24 the only employee of US Assets?

17

1  A  Well, I'm also employed by Collecto.  But
2  in terms of who has a paycheck that says "US Asset
3  Management," I'm the only employee.
4  Q  So you actually have a paycheck from
5  US Assets?
6  A  Not on me, but...
7  Q  No.  I'll rephrase that question.
8    Do you actually receive a paycheck
9  from US Assets?
10  A  Yes.
11  Q  Do you also receive a paycheck from --
12  A  No.
13  Q  -- Collecto?
14    Okay.  So your paycheck comes from
15  US Assets?
16  A  That's what's on the check.
17  Q  So there is -- strike that.
18    Can you describe for me your
19  educational background?
20  A  Graduated from Weymouth High School and
21  attended Columbia College in New York, and after
22  Columbia, I attended Babson College in Wellesley,
23  Mass.
24  Q  Did you receive a degree from Columbia?

18

1  A  Yes.
2  Q  And what was that?
3  A  That was a bachelor of arts degree.
4  Q  In what subject area?
5  A  My major was anthropology.
6  Q  Okay.  And at Babson did you receive a
7  degree?
8  A  No.
9  Q  Okay.  What year did you graduate from
10  Columbia?
11  A  1968.
12  Q  And what course areas -- course areas did
13  you study at Babson?
14  A  Financial management.
15  Q  Prior to being employed at Collecto,
16  where were you employed?
17  A  Let me think.  I guess just prior to that
18  a company called Constructo.
19  Q  And where was that company located?
20  A  In Pembroke, Massachusetts.
21  Q  What was the business of Constructo?
22  A  Real estate development.
23  Q  How long were you there?
24  A  About three years.

19

1  Q  And generally what were your job duties?
2  A  I was the executive vice president, so I
3  had oversight of the business; it was real estate
4  development and home building company.
5  Q  And prior to being employed at
6  Constructo, where were you employed?
7  A  I was employed at Workingmen's
8  Cooperative Bank.
9  Q  Workingmen's?
10  A  Yes.
11  Q  And where is that located?
12  A  Boston.
13  Q  And what was your position?
14  A  Senior vice president, chief lending
15  officer.
16  Q  And generally could you describe your
17  duties as chief lending officer at Workingmen's
18  Bank?
19  A  The overall management of the residential
20  and commercial lending departments.
21  Q  How long were you at Workingmen's Bank?
22  A  Seven years.
23  Q  During the entire time you were there,
24  were you the Chief Lending Officer?

20

1  A  Initially I was vice president of
2  residential lending, and then subsequently I was a
3  senior vice president in charge of commercial and
4  residential.
5  Q  And prior to that, where were you
6  employed?
7  A  Let's see.  I was employed at a company
8  called Relocation Resources.
9  Q  And where was that located?
10  A  Norwell, Massachusetts.
11  Q  And what was your position?
12  A  Vice president.
13  Q  What is the business of Relocation
14  Resources?
15  A  It provides services to corporations that
16  transfer employees throughout the US.
17  Q  And generally could you describe your job
18  duties as vice president at Relocation Resources?
19  A  Well, during the later stages I was
20  running a mortgage company that we had called
21  Relocation Capital Group, I was the chief operating
22  officer of Relocation Capital Group, provided
23  mortgage services to companies for their relocating
24  employees.

## 21

1  Q   Was that as a broker or an originator?
2  A   Both.
3  Q   And then you said -- that was the later
4  stage.  What in the earlier stages were your
5  responsibilities?
6  A   I'm trying to think of what they called
7  the division.  I was a vice president, information
8  services I think was the title.
9  Q   And generally what were your job duties?
10  A   Recruiting and evaluating brokers to
11  handle relocation transferees' business.
12  Q   And how long were you at Relocation
13  Resources?
14  A   I think it was about four years.
15  Q   Where does this take us back to, what
16  year?
17  A   Oh, you're back now to the 1970s.
18  Q   Okay.  Well, I'm getting there.
19       Prior to Relocation Resources, where
20  were you employed?
21  A   I was employed at Ferioli, F-E-R-I-O-L-I,
22  Real Estate.
23  Q   And where was that located?
24  A   In Plymouth, Massachusetts.

## 22

1  Q   And what was your position?
2  A   I was a general manager.
3  Q   And can you generally describe your
4  duties?
5  A   I had oversight over the real estate
6  brokerage operation and the home building division
7  of the company.
8  Q   How long were you at Ferioli?
9  A   Three years.
10  Q   Prior to that, where were you employed?
11  A   I was employed by the Town of Hanover,
12  Massachusetts.
13  Q   What was your position?
14  A   I was the town appraiser and assistant
15  assessor.
16  Q   How long did you hold that position?
17  A   Really about a year and a half.
18  Q   And prior to that, where were you
19  employed?
20  A   With the Hall Institute of Real Estate.
21  Q   And what is the Hall Institute of Real
22  Estate?
23  A   It was an organization that sold real
24  estate licensing schools.

## 23

1  Q   What was your position at Hall?
2  A   Geez, I can't remember what my title was.
3  Associate, I guess.
4  Q   And can you generally describe your job
5  duties?
6  A   Teaching real estate licensing courses,
7  assisting other companies in setting up curriculum
8  for real estate licensing courses.
9  Q   Do you have a real estate license?
10  A   I did, yeah.
11  Q   When did you acquire that?
12  A   1971.
13  Q   And for what time period did you actually
14  have it?
15  A   Oh, up until probably the year 2000.
16  Q   And how long were you at Hall Institute?
17  A   That was about a year, I would say.
18  Q   Prior to that, where were you employed?
19  A   I worked for Dun & Bradstreet.
20  Q   Where was it located?
21  A   I was in Boston, Massachusetts.
22  Q   And what was your position?
23  A   I was a marketing representative.
24  Q   And can you generally describe what your

## 24

1  duties were?
2  A   I would sell collection and credit
3  services.
4  Q   What was your market?
5  A   Commercial accounts.  It's commercial
6  collection services.
7  Q   Would that involve collecting from
8  consumers?
9  A   It was collecting from commercial
10  accounts, business to business.
11  Q   Only business accounts?
12  A   Right.
13  Q   Did you actually do any of the
14  collection?
15  A   No.
16  Q   And how long did you have that position?
17  A   It was about three years.
18  Q   Did you have any other positions at Dun &
19  Bradstreet?
20  A   No.
21  Q   Okay.  Prior to that, where were you
22  employed?
23  A   I was a school teacher.
24  Q   Where were you a school teacher?

25

1    A   Rockland High School.
2    Q   And what was your area of teaching?
3    A   I was a history -- social studies I guess
4  is the official area.
5    Q   During what time period were you a
6  teacher?
7    A   From 1968, one year, teaching and
8  coaching, I was assistant football coach also.
9    Q   Okay.  That takes us back to college,
10  correct?
11   A   Yeah.
12   Q   Now, during what time period did you
13  attend --
14   A   Babson.
15   Q   -- Babson?
16   A   That was -- I was in the MBA program, but
17  it was the night school.
18   Q   Yeah.  During what time period?
19   A   That was 1969 to 1971.
20   Q   And how many credits did you receive?
21   A   I had about half of the credits necessary
22  for the MBA.
23   Q   Okay.  All right, does that take us
24  through your employment up to college -- back to

26

1  college?
2    A   I think that's it, yeah.
3    Q   Okay.  Great.  Have you actually had any
4  direct experience in debt collection yourself?
5    A   You mean have I talked to consumers
6  about --
7         MR. WIER:  Object to form, but go
8  ahead.
9    Q   All right.  Let me rephrase that.
10        Have you actually done any debt
11  collecting?
12   A   Where I've talked to a consumer and said,
13  Would you please pay your bill?
14   Q   Right.
15   A   Yes.
16   Q   And during what time period?
17   A   During the time that I've been with
18  Collecto.
19   Q   Under what circumstances would you
20  actually be involved in the debt collection at
21  Collecto?
22   A   Usually when a consumer wanted to speak
23  to the boss or speak to the president or the senior
24  person to discuss their account.

27

1    Q   But as you describe it, you don't
2  actually have direct responsibility for operations;
3  is that correct?
4    A   That's correct.
5    Q   So how is it that they would end up with
6  you?
7    A   Well, because it would be perceived that
8  when -- when there are consumer complaints or a
9  consumer grievance relative to an account, it's not
10  unusual for a compliance person to take on the
11  responsibility of listening to the person's
12  comments and trying to, you know, deal with them.
13  So that they want to be out of operations, they've
14  talked to the collection person or the collection
15  manager, and now they want to speak to somebody at
16  a different position, so...
17   Q   So is it fair to say that your debt
18  collection experience at Collecto has been as a
19  result of your being responsible for the compliance
20  department?
21   A   That's probably safe to say, yeah.
22   Q   Okay.  I'm not sure I got from you the
23  name of the person who's in charge of the
24  operations department at Collecto.

28

1    A   Right now that person is Brittany Leary.
2    Q   Oh, okay.  I did get that.  All right.
3         How long has Brittany Leary been in
4  charge of operations?
5    A   About two weeks, three weeks.
6    Q   And prior to that, where was she
7  employed?
8    A   She was employed at Collecto.
9    Q   In what capacity?
10   A   She was in charge of our operations for
11  the contract we have with the US Department of
12  Education.
13   Q   And how long was she in charge of that
14  contract?
15   A   Three years.
16   Q   Prior to Brittany Leary being senior
17  management of the operations department, who was in
18  that position?
19   A   Candice O'Brien.
20   Q   Is she still employed by Collecto?
21   A   Yes.
22   Q   What is her current position?
23   A   Senior vice president of business
24  development.

29

1    Q   Does she work directly with you?

2    A   Would you describe what you mean by

3 directly with me?

4    Q   Does she report to you?

5    A   No.

6    Q   Who does she report to?

7    A   To the president.

8    Q   In her position as senior vice president

9 of business development, what kind of business is

10 she trying to develop?

11    A   People that have bad debt that want to

12 hire a collection agency.

13    Q   I see.  What, if you can give me an

14 estimate, and I guess we should focus on the time

15 period June of 2007 to July of 2008, what

16 percentage of Collecto's business was US --

17 collecting for US Assets?

18    A   2 percent.

19    Q   Oh.  And does Collecto -- and, again, in

20 this time period, June of 2007 to July of 2008, did

21 Collecto have a specialty of collection?

22    A   No.

23    Q   You've already mentioned that it

24 collected US Department of Education debt?

30

1    A   Um-hm.

2    Q   Did it handle health bills, health debt?

3    A   Yeah.

4    Q   How about credit card debt?

5    A   Yeah.

6    Q   Any other kinds of debt?

7    A   Telecommunications, government debt,

8 retail, you know, XM radio, whatever that would be

9 categorized, commercial kind of debt.

10    Q   And for how long has Collecto collected

11 telecommunication debt?

12    A   Oh, since its inception --

13    Q   And that would --

14    A   -- 1991.

15    Q   Is the operations department divided up

16 based on the type of debt being collected?  For

17 example, is there a subset of the collection

18 department that would collect health-related debt?

19    A   Yes.

20    Q   Is there specifically a portion of the

21 collections department that collects telecom debt?

22    A   Yes.

23    Q   Is there a name for that department, or a

24 section?

31

1    A   I guess we have various telecom clients,

2 and collector groups are set up based on -- based

3 on the clients.

4    Q   Okay.

5    A   So I don't know.  In terms of a group,

6 you know, it's -- there's various groups that

7 handle specific clients.  The assignment of the

8 collector is done mostly on a client basis.

9    Q   Okay.  So focusing on the assignment of

10 clients to areas of the collection department, is a

11 client assigned to a particular manager?

12    A   Yes.

13    Q   And then does that manager have

14 responsibility for a certain number of collectors?

15    A   Typically, yeah.

16    Q   Okay.  And who is the -- what are the

17 current managers that have responsibility for

18 telecom debt?

19    A   The assistant manager, the collection

20 manager, the regional manager, the regional vice

21 president are all -- it's all within their group.

22 I mean, there are specific collectors that handle

23 purchased accounts; they report to a line manager,

24 who reports to a collection manager, who reports to

32

1 a district manager.

2    Q   And from July -- June of 2007 to July of

3 2008, was Candice O'Brien directly responsible for

4 any aspect of telecommunication debt other than --

5 well, any aspect of tele --

6    A   Yes.

7    Q   What was her responsibility?

8    A   She was the senior person responsible for

9 the overall collections of the company, and that's

10 one aspect -- one type of collection.

11    Q   And below her, was there a district --

12 were there district managers who reported to her

13 that were primarily responsible for telecom

14 clients?

15    A   Well, there'd be an eastern regional vice

16 president who would be responsible for any business

17 in the region, not just for telecom, and then under

18 him would be a collection manager who would have

19 responsibility for that one specific office where

20 that business may have been collected, and then

21 under him there would be a collection manager for

22 that group that might manage 10 people or 12

23 people, whatever is in the collection group.

24    Q   Why don't we look at, let's go in order,

33

1   Exhibit 1.
2            (Document exhibited to witness.)
3       Q   Have you ever seen this document before?
4   It's the notice --
5       A   Yes.  Excuse me for a second, I'm going
6   to get my glasses.
7       Q   Okay.
8            (Off record.)
9            MS. COMBS:  Okay.  Back on the
10  record.
11      Q   Exhibit 1 is titled Notice of 30(b)(6)
12  Depositions.
13      A   Um-hm.
14      Q   You have been produced in response to
15  this notice.
16           (Brief interruption.)
17      Q   So looking at the Notice of 30(b)(6)
18  Depositions, you've been produced in response to
19  that.  Are you the person who is responding to the
20  Section 3, the person most knowledgeable with
21  respect to drafting, authorizing or approving the
22  use of collection letters in the form of Exhibit A
23  to Plaintiff's Complaint?
24      A   Yes.

34

1       Q   And are you also the person who is being
2   produced for Section 4, the person most
3   knowledgeable about Collecto, Inc.'s policies and
4   procedures for compliance with the Fair Debt
5   Collection Practices Act?
6       A   Yes.
7       Q   Okay.  And are you also the person
8   produced as the most knowledgeable about US Asset
9   Management's policies and procedures for compliance
10  with the Fair Debt Collection Practices Act?
11      A   Yes.
12      Q   Okay.  All right.  Then I'm going to hand
13  you what's been marked as Deposition Exhibit 2,
14  which is titled "Complaint - Class Action."  Have
15  you ever seen this document before?
16      A   Yes.
17      Q   Okay.  If you could look to Exhibit A of
18  Exhibit 2, which is a two-page document, the first
19  page of which is titled "Notice of Legal Placement
20  Review."  Do you see that?
21      A   Um-hm.
22      Q   Do you recognize the form of this
23  document?
24      A   Yes.

35

1       Q   Now, you'll note that the address from
2   which this document purports to come from is the
3   Collection Company of America in Norwell,
4   Massachusetts.
5       A   Um-hm.
6       Q   What is the Collection Company of
7   America?
8       A   That's the trade name for Collecto, Inc.
9       Q   And you'll note, if you look in the
10  bottom left-hand corner, that this document is
11  addressed to Nemesio, N-E-M-E-S-I-O, Castro in
12  El Paso, Texas.  Do you see that?
13      A   Um-hm.
14      Q   So this is a Texas debt.  And in the
15  hierarchy of Collecto's structure, who would be the
16  district manager responsible for the sending of
17  this letter?
18      A   Well, because of the client, that would
19  be in Norwell.
20      Q   Okay.  And who is the client that hired
21  Collecto to collect this debt?
22      A   US Asset Management.
23      Q   So is it fair to say that if Collecto is
24  collecting debts for US Asset Management, that

36

1   collection effort will be centered in Norwell,
2   Massachusetts?
3            MR. WIER:  I'm going to object to
4   form.  I can clarify if you --
5            MS. COMBS:  Oh, yeah, if you could.
6            MR. WIER:  I wasn't sure whether you
7   were making that as a general overall statement or
8   just with regard to this collection effort as
9   identified by Exhibit A.
10           MS. COMBS:  My first question is
11  generally and then my --
12           MR. WIER:  Okay.
13      Q   So, generally, would the -- let me
14  rephrase it.
15           Generally, would the collection
16  efforts of Collecto with respect to US Asset
17  Management debts originate out of the Norwell,
18  Massachusetts office?
19      A   Exclusively?
20      Q   Exclusively.
21      A   No.
22      Q   All right.  Where else would it center?
23      A   It could be one of our other branch
24  offices.

37

1    Q   And how is that determined?
2    A   Usually by whatever the portfolio -- we
3   might have a portfolio, we might break it into
4   three pieces or two pieces and have one of the
5   other offices work on it; they'd have a dedicated
6   group; it depends on how much business there is.
7    Q   And who would make that determination as
8   to what offices of Collecto would manage the
9   collection of a portfolio for a US Asset Management
10  debt?
11   A   Probably the vice president of
12  operations.
13   Q   Would that vice president of operations
14  consult with you in making that determination?
15   A   Possibly, yeah.
16   Q   And -- all right, let's focus on this
17  particular debt.
18   A   Um-hm.
19   Q   Are you familiar with what offices of
20  Collecto was involved in collecting the portfolio
21  which Mr. Castro's debt was a part of?
22   A   I believe it was our main office in
23  Norwell.
24   Q   And what is the portfolio that

38

1   Mr. Castro's debt came from?
2       MS. COMBS:  Off the record again.
3       (Off record.)
4    Q   With respect to the US Asset debt, what
5   entity owns the debts?
6    A   US Asset Management, Inc.
7    Q   Okay.  And where does the money come from
8   to buy the debt?
9    A   Either from the parent company in Germany
10  through a loan or from the resources of Collecto,
11  Inc.
12   Q   So it is fair to say that the credit of
13  Collecto, Inc. is used to secure loans to buy debts
14  for US Asset Management, Inc.?
15   A   Yeah.
16   Q   Does US Asset Management, Inc. have a
17  line of credit?
18   A   No.
19   Q   It would be Collecto, Inc. that has the
20  line of credit -- or has the credit line?
21   A   Right, yeah.
22   Q   Does it have a line of credit?
23   A   It does, yeah.
24   Q   Does -- okay.  I want to go back a little

39

1   bit with respect to your experience.  Do you have
2   any experience in communications or utility
3   regulation?
4    A   No.
5    Q   Any educational background in that area?
6    A   No.
7    Q   Does anyone at Collecto, Inc. have
8   experience in communications or utility
9   regulations?
10   A   No.
11   Q   Did you ever hear of the Federal
12  Communications Act before this case?
13   A   Yes.
14   Q   In what circumstances?
15   A   I guess, just that was the enabling act
16  for the Federal Communications Commission, so I've
17  seen it, heard about it, read about it.
18   Q   Have you ever become aware of the Federal
19  Communications Act having any impact on the
20  collection of telecommunications debt by Collecto,
21  Inc.?
22       MR. WIER:  Object to form, but you
23  may answer, if you understand the question.
24   A   Yeah, you'd have to say the question

40

1   again.
2    Q   Let's start all over.  Okay.
3    Q   Specifically with respect to the
4   business of Collecto, Inc., have you ever become
5   aware that the Federal Communications Act had some
6   impact on the collection of telecommunication debts
7   by Collecto, Inc.?
8    A   No.
9       MR. WIER:  Object to form, but you
10  can answer.
11   Q   Are you aware that there is a two-year
12  federal statute of limitation on cell phone debt in
13  the Federal Communications Act?
14   A   No.
15      MR. WIER:  Object to form, but you
16  can answer.
17   Q   As of today's date?
18   A   No.
19   Q   Okay.  All right.
20   A   You said with respect to
21  telecommunications; is that correct?
22   Q   Yes.
23   A   The answer is no.
24   Q   Okay.  All right.  Do you belong --

41

1    A   If you want to point it out to me, I'd be
2  happy to take a look at it.
3    Q   Okay.  Do you belong to any professional
4  organizations?
5    A   Yes.
6    Q   What are they?
7    A   The Debt Buyers Association, the American
8  Collectors Association, Asset Buyers Division, New
9  England Collectors Association.
10    Q   Do you receive any publications from any
11  of these organizations?
12    A   Yes.
13    Q   What publications?
14    A   They have newsletters, informational
15  pieces, they conduct and run seminars, trade
16  programs, I've attended conferences and training
17  and workshops.
18    Q   Do you actually regularly receive any
19  particular collection publication?
20    A   Yeah, there's a couple of publications,
21  Credit and Collection Risk I think might be what
22  one of them is called, and I know we get the Fast
23  Facts, which is a publication from the American
24  Collectors Association.

42

1    Q   Any other?
2    A   I get several trade magazines; I just
3  don't recall the names of them exactly.
4    Q   All right.  You said that you've attended
5  seminars.  What's the most recent seminar that
6  you've attended?
7    A   Let's see, I was in -- the last one I
8  think I was in Las Vegas with the Debt Buyers
9  Association and attended some seminars put on then.
10    Q   When was that?
11    A   February of this year.
12    Q   February this year.  Is it your practice
13  to regularly attend the Debt Buyers Association
14  meetings?
15    A   Pretty much.
16    Q   And do you recall what seminars you
17  attended in Las Vegas in February?
18    A   Not the exact names of them, no.
19    Q   Do you recall whether -- and prior to
20  that, other than Debt Buyers Association seminars,
21  what kinds of seminars have you attended?
22    A   FDCPA compliance, health care, HIPAA
23  compliance, mostly compliance-related type
24  seminars.

43

1    Q   And these are put on by whom?
2    A   Usually by different trade organizations,
3  you know, the Regional Collectors Association or
4  the National ACA.
5    Q   Have you ever attended a seminar where
6  the question of what the statute of limitations on
7  telecommunications debt was discussed?
8    A   No.
9    Q   Have you ever had any discussions with
10  anyone at Collecto with respect to the -- other
11  than counsel or anyone, other than in connection
12  with your counsel, with respect to what the statute
13  of limitations is on telecommunication debt?
14    A   Yes.
15        MR. WIER:  Okay.  You can answer
16  that.  And I don't want him to go into any
17  privileged communication with regard to this case.
18    Q   Okay.  I'm just going to ask you dates of
19  conversations, who was present, and the subject
20  areas.  Beyond that, I don't want to know what was
21  said, okay.
22        So when did you first have any
23  discussions with anyone at Collecto with respect to
24  the question of the statute of limitations on

44

1  telecommunication debt?
2    A   I don't recall the date.
3    Q   Was it in -- before 2008?
4    A   When was this litigation filed?
5    Q   June of 2008.
6    A   So it was not prior to 2008.
7    Q   So did you have discussions after June of
8  2008 about the statute of limitations on
9  telecommunication debt?
10    A   Yes.
11    Q   And, again, I don't want to know what the
12  discussions were, but who did you have the
13  discussions with?
14        MR. WIER:  I don't really think
15  that's -- I think that's going too far.  I don't
16  think that you get to get that.  Because if it's
17  privilege discussion, what difference does it make
18  who he talked to?  You're not going to get to ask
19  him anything about it.  So I'm going to instruct
20  him not to answer that.
21        MS. COMBS:  Well, it's in the nature
22  of a privilege log, and the privilege log requires
23  you to list the date of the communication, who made
24  the communication, and the subject area, but not --

45

1          MR. WIER:  Okay.  I can see where
2   you're going.  All right, you can answer that, but
3   be sure to not divulge anything; and, you know, if
4   you recall the, as she asks you the questions, just
5   dates, who, and in general the subject, but that's
6   it.
7      A   Yeah, I can't -- I don't have a log which
8   tells me specific dates, but when that lawsuit was
9   filed, there were discussions with our compliance
10  department and with our in-house counsel who
11  handles various aspects of compliance, you know,
12  for us.
13     Q   But prior to the filing of this lawsuit,
14  you had no -- you personally had no discussions
15  with anyone at Collecto about the question of the
16  statute of limitations on telecommunication debt;
17  is that fair to say?
18     A   That's correct.
19     Q   Okay.  Does Collecto, Inc. have a license
20  to collect debts in Texas --
21         MR. WIER:  Object to form.
22     Q   -- currently?
23     A   A license to collect debt?  I don't
24  believe a license is required in Texas.

46

1          MR. WIER:  That's why I objected.
2      Q   Okay.  But -- so it doesn't; is that
3   correct?
4      A   It doesn't exist.
5      Q   Okay.
6      A   So we can't have one if it doesn't exist.
7      Q   All right.  When did US Asset begin to
8   acquire telecom debts?
9      A   I believe it was in the year 2006.
10     Q   And were you involved in the decision to
11  purchase -- for US Asset to purchase telecom debt
12  back in 2006?
13     A   Yes.
14     Q   Do you recall, beginning in 2006, where
15  US Asset obtained telecommunication debt, from what
16  companies?
17     A   Prior to 2006?
18     Q   Well, beginning in 2006 when it started
19  to buy telecom debt.
20     A   Why don't you re-ask the question,
21  please?
22     Q   Okay.  You testified that in 2006
23  US Asset purchased telecom debts for collection --
24     A   Um-hm.

47

1      Q   -- correct?
2          Do you recall where those first debts
3   were purchased, meaning from what --
4      A   From what source?
5      Q   Source, yeah.
6      A   The first purchase was from another
7   collection agency.
8      Q   Do you recall what agency that was?
9      A   That was a -- DRS, debt collection
10  services.
11     Q   And do you recall what the creditor of
12  those debts was?
13     A   Sprint.
14     Q   Okay.  But prior to 2006, Collecto was
15  doing collections on telecom debts, correct?
16     A   Correct.
17     Q   And do you recall what debt buyer or
18  creditors Collecto was collecting for prior to
19  2006?
20     A   Verizon, Alltel --
21     Q   What was that?
22     A   Alltel.
23     Q   Can you spell that?
24     A   A-L-L-T-E-L.

48

1      Q   Okay.
2      A   AT&T, Cingular, U.S. Cellular, T-Mobile.
3   I think that's most of it, yeah.
4      Q   Okay.  And when Collecto was collecting
5   for these various debts originated by the creditors
6   you just listed, was it collecting for the
7   creditors or for debt buyers?
8      A   For the creditors.
9      Q   Okay.  At any time subsequent to 19 --
10  you said 1993, I believe, when Collecto started
11  collecting telecommunications debt.
12     A   That was 2006.
13     Q   Oh.  Collect --
14     A   Oh, are you --
15     Q   Collecto generally.
16     A   Okay.  I'm sorry, yeah.
17     Q   Let's focus on Collecto generally.
18     A   Right.
19     Q   Your testimony was that in 1993 Collecto
20  started collecting on telecom debt, correct?
21     A   About that time, right.
22     Q   Okay.  And in 1993 is it fair to say that
23  most of the collection done by Collecto was with
24  respect to the originators of the debt?

49

1    A  Yes, yeah.
2    Q  And did that change at any point whereby
3  Collecto started collecting for people who had
4  purchased the debt from the creditors?
5    A  Not -- not really.
6    Q  Currently is Collecto collecting
7  telecommunication debt for other debt buyers?
8    A  No.
9    Q  Okay.  Is it currently collecting debt
10  for telecommunication creditors?
11    A  Yes.
12    Q  Okay.  And going back to 1993, how was it
13  determined what the statute of limitations was with
14  respect to the debt, for example, a Cingular
15  telecommunication debt?
16    A  Well, there was no determination.
17    Q  There was no determination?
18    A  Right.  In 1993, the debt was -- we were
19  collecting was a primary placement, and there was
20  no follow through with legal on any of those
21  accounts.  We were handling the accounts for six
22  months as a first placement and returned them to
23  the creditor, so we had no responsibility for any
24  litigation.

50

1    Q  And at any point did that change with
2  respect to Collecto's collection of debt for
3  telecommunication creditors?
4    A  I don't believe so.  I think all of the
5  work for creditors in telecom has been principally
6  primary or secondary placement, you know,
7  short-term placements returned to the creditor.
8    Q  So, again, with respect to Collecto's
9  collection of telecommunication debt, is it fair to
10  say that the only debts that Collecto has collected
11  on behalf of a debt buyer, rather than the original
12  creditor, is with respect to the debts owned by
13  US Asset?
14    A  Yes.
15    Q  Okay.  And when did that
16  telecommunication collection process begin by
17  Collecto for US Asset telecommunication debt?
18    A  In 2006.
19    Q  And what -- what portfolios of debt did
20  US Asset purchase in 2006 that was collected by
21  Collecto?
22    A  I don't know the -- I can't recall the
23  exact date that the purchase was made, because I
24  started in 2006, and for -- since 2006 to the

51

1  current time, we've bought six or seven different
2  portfolios, not all of which are Sprint, but some
3  of the initial portfolios were Sprint.
4    Q  Okay.  So do you recall -- so other than
5  Sprint, do you recall the names of the original
6  creditors of portfolios purchased by US Asset of
7  telecommunication debt?
8    A  Verizon Wireless -- you said
9  telecommunications, right?
10    Q  Right, just telecommunications.
11    A  Yeah.
12    Q  Okay.  So is it fair to say that between
13  2006 and the present, the only telecommunication
14  debt -- the only creditors for which US Asset
15  purchased debt was Sprint or Verizon Wireless?
16    A  No.
17    Q  Any others?  Telecommunication only.
18    A  Telecommunication, yes.  That wasn't what
19  you asked me.
20    Q  I'm sorry.  Okay.
21        Focusing on the portfolios involving
22  Sprint beginning in 2006, was there an average
23  amount of the debt that was purchased in connection
24  with these portfolios, or did it vary?

52

1    A  Would you ask the question again, please?
2    Q  Okay.  Is it fair to say that when you
3  are evaluating a portfolio on behalf of US Asset
4  Management, Inc. to purchase, one of the
5  considerations you are informed about is the
6  average size of the debt in the portfolio?
7    A  You mean the average balance on an
8  individual account?
9    Q  Correct.
10    A  Okay, yes, yeah.
11    Q  Okay.  And so with respect to debt,
12  Sprint debt, do you recall over the six to seven
13  different portfolios what the average amount of a
14  debt was, if there was one?
15    A  There were four Sprint portfolios --
16    Q  Okay.
17    A  -- I guess, first of all, and the average
18  debt was approximately $400.
19    Q  And what about Verizon Wireless, how many
20  portfolios involving those?
21    A  One, one so far, I guess.
22    Q  Okay.  During what -- what other
23  characteristics do you inquire about with respect
24  -- characteristics of debt do you inquire about

## 53

1  with respect to your purchase of a portfolio,
2  besides the average size of the debt?
3      A   We would generally want to know the
4  charge-off date; we'd want to know the work
5  standards that have been applied to the account;
6  we'd want to know if they have complete data on the
7  consumers, including Social Security numbers; we'd
8  want to know if they've offered any special
9  settlement or any other terms to the consumer prior
10  to the placement with the agency; we'd want to know
11  if there had been a scrub done to determine
12  bankruptcies and deceased and information of that
13  type that would make the account ineligible for
14  purchase; geographic distribution would be of
15  interest.
16      Q   Any other aspects?
17      A   I guess we'd want to know the
18  availability of itemized bills from the creditor;
19  we'd want to know the contract and the provisions
20  for put-backs and buy-backs in the contract.
21      Q   When you're referring to the "contract,"
22  you're talking about the contract with the creditor
23  to buy the debt or between the creditor and the
24  consumer?

## 54

1      A   I was referring to the contract with the
2  creditor.
3      Q   To buy -- between -- I still don't know.
4      A   The purchase and sale agreement between
5  the creditor and our company.
6      Q   Okay.
7      A   I should mention one of those portfolios
8  or two of the portfolios that I referred to of the
9  four were actually purchased from another
10  collection agency, not directly from Sprint, but it
11  was at the time that the accounts were being sold
12  by Sprint.
13      Q   Do you recall what that collection agency
14  was?
15      A   NCO.
16      Q   And did you say that NCO had actually
17  worked the debts or no?
18      A   No.
19      Q   Okay.
20      A   They purchase -- we were on like a joint
21  venture kind of a situation with another agency, so
22  there were three agencies, and the portfolio was
23  over $200 million, so there was agreement that we'd
24  split it into three parts.

## 55

1      Q   So is it fair to say the five
2  telecommunication portfolios that you purchased,
3  none of them had actually been worked by another --
4  or had ever been purchased by another debt buyer?
5      A   The first one, that was DRS, was
6  purchased by them; they didn't work the portfolio,
7  but they didn't sell it immediately to us.  So
8  there's, I'm sure, a possibility that people called
9  in to pay accounts or payments made to creditors
10  that were passed along.  So I would have to
11  consider that as being partially worked.
12      Q   And do you know how long DRS had those
13  accounts?
14      A   I think like six months.
15      Q   Are there any other factors or --
16  informational factors that you would want to know
17  with respect to a portfolio before US Asset
18  purchased it?
19      A   Well, we'd want to know if there was any
20  credit scoring that had been done on it and
21  information that would provide us with scores on
22  the accounts.  We would look at, you know, the
23  service agreements that the creditor would have
24  with their customers for, you know, general

## 56

1  information.  That would be it for the most part.
2      Q   Okay.  And in connection with the
3  purchase of these five telecommunication
4  portfolios, did you prepare some kind of document
5  to present to the board at US Asset with respect to
6  each of those portfolios?
7      A   To US Asset Management?
8      Q   US Asset Management, right.
9      A   When you say "you present," we are -- US
10  Asset Management --
11      Q   Strike -- let me rephrase it.
12      A   Yeah.
13      Q   Did you prepare any documents to present
14  to the board of US Asset Management when you were
15  considering purchasing a particular -- any of these
16  portfolios?
17      A   I guess the answer would be -- in a
18  roundabout way the answer would be yes.
19      Q   And why is it a roundabout way?
20      A   Well, the preparation of analysis goes to
21  risk management, not to the board.  The board
22  ultimately would have to make the decision, because
23  of the funding required is a board decision, but in
24  terms of looking at the analysis, then they may

## 57

1  not, you know, study the analysis; it's really to
2  the risk management group.
3    Q   Okay.  So there are written documents --
4  does currently US Asset Management, Inc. have
5  written documents with respect to the analysis made
6  with respect to the portfolios purchased, those
7  five portfolios of telecommunications debt?
8    A   Yes.
9    Q   Okay.  And so those have not been
10  destroyed?
11    A   No.
12    Q   Okay.
13      MS. COMBS:  Have those been produced,
14  Keith?
15      MR. WIER:  I don't believe so.  I'm
16  making a list here as we go.
17    Q   Okay.  All right, again, going back to
18  Exhibit 2 and the debt -- the portfolio that
19  contained Mr. Castro's debt.
20    A   Um-hm.
21    Q   Do you know what portfolio that was?
22    A   Yes.
23    Q   What was it?
24    A   It's what we refer to as Sprint 3.

## 58

1    Q   Before -- when was the Sprint 3 portfolio
2  purchased?
3    A   I think it was December of '06.
4    Q   Were any other portfolios, other than
5  Sprint 3, of telecommunication debts collected by
6  Collecto in Texas between June of 2007 and July of
7  2008?
8    A   I -- I don't know -- I don't know
9  exactly.  I couldn't -- I couldn't give you a yes,
10  because I didn't look at that information.
11    Q   Okay.  Could you go back and look at
12  that?
13    A   Yes, yeah.
14    Q   Okay.  And do you recall when you
15  purchased -- strike that -- when US Asset purchased
16  Sprint 3 whether the geographic distribution of the
17  debts was a factor in your consideration of whether
18  or not it should be purchased?
19    A   Was it a factor?  I guess you could say
20  yes.
21    Q   Okay.  And how did that factor into your
22  analysis?
23    A   We would want to know what -- you know,
24  where the debtors were, whether it was just

## 59

1  isolated as to one state or whether it was, you
2  know, a broad distribution nationally.
3    Q   And does that affect the price, would
4  that affect the price that you would offer to pay?
5    A   It might, yeah.
6    Q   In what way would it affect the price?
7    A   It just depends on what our histories are
8  in certain zip codes or geographic areas.  You
9  know, we have clients with portfolios that are very
10  specific to one area, and the liquidation results
11  may vary depending upon what that area is.
12    Q   Again, focusing on Sprint 3, do you
13  actually get zip code areas -- are you informed
14  about zip codes?
15    A   State by state is the way it's
16  identified, yeah.
17    Q   Now, you said that you get the charge-off
18  date.  Does that impact -- the charge-off date of
19  the debt in a portfolio, would that impact your
20  analysis with respect to pricing of the debt?
21    A   Yes.
22    Q   And how would that affect it?
23    A   Well, I guess, you know, part of the
24  assumption is that the older the debt is, the more

## 60

1  touches it's had by collection agencies or by the
2  creditor, that the probability of getting a payment
3  is lower the older that the account is from the
4  date of charge off.
5    Q   And the question about the work standards
6  applied to a portfolio, what is involved in that
7  with respect to pricing?
8    A   I think that relates somewhat to the
9  average balance size.  You know, if the balances
10  are $50, you know, the general procedure would not
11  be to spend $50 to collect $50, but if the balance
12  is $5,000, there might be more done in the work
13  standards.
14    Q   And you mentioned the question of whether
15  any special settlement was offered to the consumer.
16  How would that affect the pricing of the portfolio?
17    A   If we felt that a very liberal settlement
18  had been offered, then it might influence us to the
19  fact that the consumer is most likely not going to
20  pay anything more than what they already have been
21  offered, you know, by the creditor, so...
22    Q   The question of the availability of
23  itemized bills from the creditor, how does that
24  affect pricing?

61

1    A    The more readily available, the
2  assumption is that, you know, documentation that
3  the consumer might want, if that's available
4  readily and easily obtained, could have a positive
5  impact on what the valuation is.
6        Q    And what kind of contractual provisions
7  in the purchase and sale agreement would impact on
8  the pricing of that portfolio?
9        A    What kind of contract provisions?
10       Q    Yeah, between US Asset Management and the
11  original owner.
12       A    The contracts might be 20 pages, and
13  there might be several hundred provisions that are
14  in the contract, so...
15       Q    I understand that.
16       A    You know, when do we have to pay them?
17  How much do we have to pay them?  Are we going to
18  have access to the backup material?  If the
19  accounts are bankrupt or deceased or disputed or
20  have some other blemish on them, can we return them
21  for a credit; if so, what's the amount?  If they
22  get payments from the creditor, are they forwarding
23  those to us?  Are they going to charge us for that?
24  How long are they going to do that?  Is there

62

1  someone at the creditor who is going to be a
2  liaison to help us with information?  Do we have,
3  you know, access to the data through their system
4  or do we have to make inquiries and wait 30 or 60
5  days to get that information?  So, I mean, there's
6  a hundred different aspects in the contract, all of
7  which influence the pricing.
8        Q    All right, again, if I can refer you to
9  Exhibit 2, Exhibit A, and the debt of Mr. Castro,
10  the title of Exhibit A is "Notice of Legal
11  Placement Review."  When US Asset Management
12  purchases a debt and refers it to Collecto, in the
13  normal course of the processing of that debt, would
14  it be referred to attorneys for the filing of
15  lawsuits?
16       A    All accounts or -- some accounts are.
17       Q    What accounts -- what factors will
18  determine whether an account was referred for
19  collections?
20       A    I would say we include things such as the
21  balance of the account, whether or not the consumer
22  is perceived -- you know, what the issue is
23  relative to payment, are they disputing the bill or
24  are they just saying that they can't pay.  Some

63

1  evaluation would be made as to whether the consumer
2  has assets that could potentially indicate that
3  they have the resources to pay but have been
4  unwilling to pay through the usual normal
5  collection efforts.
6        Q    If it was determined that it was
7  appropriate to refer an account for collection, who
8  would determine where that account was referred?
9        A    The -- the collector responsible for the
10  account.
11       Q    And that would be an employee of
12  Collecto, correct?
13       A    Yeah, yeah.
14       Q    And do you know whether Collecto has
15  attorneys in El Paso that it uses to collect debts?
16       A    I don't know.  I don't know all the
17  attorneys.
18       Q    Who would be able to determine the
19  attorneys in Texas that were used to -- for
20  collecting debts on behalf of US Asset Management,
21  Inc.?
22       A    It would be one of our legal collectors.
23       Q    When you say "legal collector," is that
24  someone who -- is that a title or a type of

64

1  collector at --
2        A    There's -- when the account goes to legal
3  review, the collector responsible at that point
4  will evaluate the account for placement with an
5  attorney, and then they would determine, you know,
6  where -- where it would be placed, who it would be
7  placed with.
8        Q    Generally, if you know, what size of debt
9  would be referred to a collection attorney?
10       A    It's -- it depends somewhat on the
11  jurisdiction that it's in and, you know, it would
12  probably have to be at least $400.
13       Q    Is there any determination of statute of
14  limitations in the analysis of the legal review?
15       A    Yes.
16       Q    Who makes that determination?
17       A    The legal collector.
18       Q    And how is that determination made?
19       A    Based on information that we receive from
20  American Collectors Association and our attorneys.
21       Q    And when you say your attorneys, who are
22  you referring to?
23       A    Most likely it's the attorney that would
24  handle the litigation would review the case and the

65

1  circumstances.
2      Q   Any other attorney -- would any other
3  attorney -- other than the referring attorney for
4  collection, would anyone else review the debt for
5  purposes of determining statute of limitations?
6      A   No.
7      Q   Okay.  How is it determined who would
8  receive a document of the form of Exhibit A to
9  Exhibit 2, the Notice of Legal Placement?
10     A   I think that would be based on the
11 disposition that the accounts had been placed into;
12 it's a status reference.
13     Q   And what do you mean by that?
14     A   I mean that if we initiate collections
15 and there has been contact with the consumer and
16 the consumer has agreed to a payment plan or has
17 made a promise to pay, it's put into a disposition
18 which shows that a certain kind of follow-up is
19 going to be done on the account.  If the contact
20 with the consumer is that the consumer is not
21 willing to pay, unable to pay, or there is some
22 reason that the regular collector would determine
23 that they would not make follow-up, they could put
24 it into a legal review category, and then the legal

66

1  collector would look at a case and collect
2  information and make a determination.
3      Q   Okay.  Is Exhibit A to Exhibit 2 a first
4  letter to a debtor?
5      A   No.
6      Q   Okay.  How many -- what -- if you know,
7  what was the -- is the process that the debt would
8  pass through before Exhibit A is sent?
9      A   The process generally would be that an
10 initial collection letter would be sent requesting
11 payment, providing validation notice, and then a
12 period of time would go by, and then depending upon
13 the balance of the account, a second letter could
14 be sent out, which may be 45 days to 60 days after
15 the first letter, and, again, depending upon the
16 results and the response, this type of a letter,
17 you know, might be six to nine months into the
18 cycle of collections before we reach this
19 particular stage.
20     Q   Prior to the sending of Exhibit -- a
21 document in the form of Exhibit A to Exhibit 2, is
22 there any analysis as to the statute of limitations
23 of that particular debt?
24     A   No.

67

1      Q   And, again, I'm not sure I quite
2  understand, if this Castro debt, you said that --
3  is it fair to say Mr. Castro would have received an
4  initial letter, correct?
5      A   Yeah.
6      Q   45 to 60 days later he would have
7  received a second letter, correct?
8      A   Most likely, yeah.
9      Q   At that -- at the time of the sending of
10 the first letter, was the debt actually assigned to
11 a particular collector?
12     A   I would say --
13         MR. WIER:  Let me object to form, but
14 you can answer.  I'll clarify if you'd like but...
15         MS. COMBS:  Well, if you want to
16 clarify.
17         MR. WIER:  Well, when you say a
18 particular collector, a lot of times these things
19 just pop up in the queue.  I don't know that there
20 is going to be a particular collector that handles
21 an account start to finish.
22     A   That was my hesitation.
23     Q   Oh, okay.
24     A   There's a pool, there's a group of

68

1  collectors, and if somebody calls in on a specific
2  account, then anyone that's available can, you
3  know, respond to that person's inquiry.
4      Q   Okay.  So let me rephrase the question.
5          When the Sprint 3 was purchased, is
6  it fair to say that everyone -- every debtor in
7  that account received the initial collection
8  letter?
9      A   Yes, yeah.
10     Q   And then --
11     A   Go back.  The people who were on that,
12 could have had -- we could have had erroneous
13 addresses or, you know, letters were returned, so
14 the tactic would be to send initial notices to all
15 of the consumers, but 70 percent of them were
16 probably returned.
17     Q   And prior to the sending of that initial
18 letter, would there be any review of a particular
19 debt?
20     A   Not really.
21     Q   Okay.  And then 45 to 60 days later there
22 would be a sending of a second letter, correct?
23     A   Well, if the account had not paid or if
24 the letter had not been bounced back as being an

69

1   erroneous address, so assuming we had a good
2   address, we would follow up with another
3   communication to the consumer, yeah.
4       Q   And at that time was there any analysis
5   of a particular debt and its collectibility?
6       A   Not based on the age of the accounts, no.
7       Q   Okay.  All right, then subsequent to that
8   45 to 60 day letter, if there had been any
9   response, what would happen next?
10      A   A phone attempt or phone communications
11  would be attempted.  From the inception to that
12  point, there would also have been attempts to call
13  whatever we had as a good phone number.
14      Q   Okay.
15      A   Or there may have been an attempt to, you
16  know, update and get new information, directory
17  assistance or something of that nature.
18      Q   All right.  Again, other than phone
19  communications, were there any other letters sent
20  before the sending of Exhibit A to Exhibit 2?
21      A   I'd have to look at the notes on the
22  account to tell you exactly if there was another
23  letter prior to that.  We're talking generally
24  about the process, so I wasn't speaking necessarily

70

1   specifically about this gentleman's case.
2       Q   Okay.  So I'm still talk -- I really
3   am --
4       A   Right.
5       Q   -- still speaking about the general
6   procedures.
7       A   Um-hm.
8       Q   And each account would have notes made
9   when any action was taken?
10      A   Yes, yeah.
11      Q   Okay.  And, generally, again, not with
12  respect to Castro's, but other than phone
13  communications, before the mailing of Exhibit A to
14  Exhibit 2, would there be any other -- generally
15  would there be any other letters sent, before
16  Exhibit A?
17      A   It would depend on the results to that
18  point.  If there was a phone communication with the
19  consumer and the consumer just said, I'm not going
20  to pay this bill, don't call me again, I don't want
21  to respond to this or whatever -- whatever the
22  communication is, is evaluated by the collector and
23  a determination is made as to what is the status of
24  this account and what category should it be placed

71

1   in for appropriate follow-up at that point.
2       Q   Okay.  And what -- would -- if someone
3   communicated by telephone and said, I'm not going
4   to pay it, would it immediately go to Notice of
5   Legal Placement Review?
6       A   It might go into that disposition, but it
7   doesn't necessarily mean that the letter is sent
8   immediately.
9       Q   Okay.  All right.
10          MS. COMBS:  Did we get the records
11  for the Castro debt, the debt collection records?
12          MR. WIER:  You know what, I thought
13  we had produced those, and I had talked to Zach and
14  Vogelmeier about that and I never heard back.
15          MS. COMBS:  No, we haven't gotten
16  anything; the only thing we got was the insurance.
17          MR. WIER:  Okay.
18          MS. COMBS:  So we'll need that, too.
19          MR. WIER:  Okay.
20          MS. COMBS:  All right.  So we don't
21  have that in that pile?
22          MR. WIER:  No, but we can probably
23  get a copy of it, I would think.  At a break we'll
24  talk about it.

72

1           MS. COMBS:  Okay.  All right.
2       Q   So after the sending of Exhibit A to
3   Exhibit 2, and if there is no response, what would
4   happen next?
5       A   The collector responsible would review, I
6   guess, you know, what the criteria is; there may be
7   a determination made that a secondary or a
8   follow-up communication is done.
9       Q   And do you know what criteria the
10  collector would review in determining what
11  follow-up should take place after the sending of
12  Exhibit A?
13      A   It might look at the size of the debt, it
14  might look at any information we receive relative
15  to assets that the consumer might have, which might
16  be based on whether they have a mortgage or they
17  have a car loan or other things that would be
18  identified as being indicative of a consumer having
19  assets.  And if the determination was made that
20  there might be a value to further -- taking the
21  account further, then they might go to a secondary
22  follow-up letter.
23      Q   And looking at Exhibit B --
24      A   Um-hm.

73

1      Q    -- to Exhibit 2, is that a secondary
2  follow-up letter?
3      A    Yes, yeah.
4      Q    Let me -- before we get to that, in the
5  analysis made by the collector after the sending of
6  Exhibit A to Exhibit 2, is there any analysis of
7  the statute of limitations of the debt by the debt
8  collector?
9      A    By the debt collector, no.
10      Q    By anyone at that point?
11      A    Well, the -- when the accounts are
12  initiated, we know from the charge-off dates what
13  is relevant as far as statute of limitation.  So
14  there's a determination made as to how the accounts
15  are going to be worked, in general, based on
16  whether it's viewed to be in statute or out of
17  statute.  So the individual collector is only given
18  accounts that are assumed to have been qualified
19  for that.
20      Q    Okay.  All right.  Who makes that
21  determination when the -- after the portfolio is --
22  strike that.
23           Who makes the determination as to
24  whether or not a portfolio is in statute or out of

74

1  statute?
2      A    Who makes that determination?  I guess my
3  comment is we don't collect any accounts that are
4  out of statute.  So that determination is made by
5  the collection manager from the beginning.
6      Q    So with respect to the portfolio where
7  the Castro debt was purchased --
8      A    Um-hm.
9      Q    -- what person would have made that
10  determination as to whether or not that portfolio
11  was in statute or out of statute?
12      A    Probably the vice president of
13  operations.
14      Q    And you said that the Castro portfolio
15  was purchased in 2006?
16      A    Um-hm.
17      Q    Do you recall who that would have been?
18      A    Candice O'Brien.
19      Q    And when you purchased -- when you made
20  -- presented the decision for US Assets to purchase
21  the portfolio, Sprint 3, was there any
22  consideration as to whether or not that portfolio
23  was in statute or out of statute?
24      A    Yes, yeah.

75

1      Q    And what was your -- what was the
2  analysis used to determine whether this portfolio
3  was in statute or out of statute?
4      A    We knew the charge-off dates, and then we
5  -- we understand what the statute of limitation is
6  on a state by state basis, and then make a
7  determination whether it's all in statute or it's
8  out of statute based on the age of the account.
9      Q    And is there a chart on statute of
10  limitations on a state-by-state basis that is used
11  by you or someone from US -- from Collecto -- well,
12  strike it.  It would be by you to determine whether
13  or not the portfolio was out of statute?
14      A    Yes, yeah.
15           MS. COMBS:  And have you produced
16  that chart?
17      A    You say "chart."  It's a document that's
18  produced by the American Collectors Association
19  that discusses what the statute is on a state-by-
20  state basis.
21      Q    And does it specifically address the
22  question of telecommunications debt?
23      A    No.
24           MS. COMBS:  I would need that

76

1  document produced.
2           MR. WIER:  We talked about that
3  yesterday.  They -- they prohibit disclosure,
4  without their consent.  So I'll have to get their
5  consent first, or we'll have to go to the court,
6  but I'll certainly ask them whether that's okay.
7           MS. COMBS:  You're talking about the
8  ACA?
9           MR. WIER:  Yes.
10           MS. COMBS:  That's probably something
11  we're going to have to fight about if we can't get
12  it worked out.
13      Q    And who would actually refer to this ACA
14  document in determining -- in evaluating the
15  portfolio?
16      A    In evaluating a portfolio?  That would be
17  myself.
18      Q    And in -- is there anyone else at
19  Collecto, when working an account, who would refer
20  to this ACA document in making a decision as to
21  what to do with a particular account?
22      A    Well, if the account is going to be
23  considered for legal, then the legal collector or
24  the prelegal collector would look at the state and

77

1 would make a determination, you know, as to what
2 the statute would be, and then in referring it to
3 an attorney, the attorney would also look at the
4 period of time to determine, you know, the statute
5 of limitation.
6    Q   Did US Asset, you representing
7 US Assets -- Asset, or anyone at Collecto, confer
8 with an outside counsel with respect to evaluating
9 the accuracy of the ACA statute of limitations
10 document?
11    A   No.
12    Q   Again, I'm not sure I've got it clear at
13 what point in the process there would be an
14 evaluation involving the statute of limitations
15 question.  For example, would there be, with
16 respect to Exhibit B to Exhibit 2, would there be
17 an evaluation of a particular debt prior to the
18 sending of Exhibit B with respect to the question
19 of whether or not the statute of limitations
20 applies?
21    A   Yes, yeah.
22    Q   Who would make that evaluation?
23    A   Well, the evaluation would have been made
24 at the beginning of the cycle.  So it would have

78

1 been the collection manager or the regional vice
2 president.  Whoever -- whoever is handling the
3 portfolio would look at the age of the accounts
4 relative to the jurisdictions that they're in and
5 make a determination as to what the collection
6 procedure is going to be.
7    Q   Now, are there any records kept with
8 respect to that analysis with respect to a
9 particular portfolio?
10    A   No.
11    Q   Okay.  Is there any mechanism by which
12 the collectors who are working an account is made
13 -- is let -- is told what the statute of
14 limitations is with respect to a debt, a particular
15 debt, that he or she is collecting?
16    A   Well, the collectors are trained, and
17 they have the material that tells them what the
18 statute of limitations is on a state-by-state
19 basis.  They're told also that, you know, if the
20 statute -- if it had run through the statute, but,
21 you know, we rarely have accounts that have run
22 through statute, so...
23    Q   If -- again, looking back hypothetically,
24 when you were evaluating the Sprint portfolio,

79

1 Sprint 3 portfolio, back in 2006, if you had been
2 aware that the statute of limitations on that debt
3 was two years, would that have affected your -- the
4 price that you offered for that debt?
5         MR. WIER:  I'm going to object to the
6 form of that question.  I'm wrestling around
7 whether to even let him answer it or not.  Let me
8 just say that by your question you assume that we
9 agree that the two-year statute applies, which we
10 do not.  So you're assuming facts not in evidence,
11 and you're asking -- anyway, that's the basis of my
12 objection.
13    Q   Okay.  Well --
14    A   The facts as we understood them was that
15 the statute of limitations in Texas was four years.
16    Q   Okay.
17    A   Which is still the facts as we understand
18 them.
19    Q   Okay.
20    A   So in determining whether we purchase the
21 account and whether they're in statute or out of
22 statute, the basis we used were the facts as they
23 were known at that time.
24    Q   Okay.  My question is:  If the facts as

80

1 you understood them at the time was that the
2 statute was at two years, would that have affected
3 the pricing?
4    A   Yeah.  If the facts were different, then
5 it would affect the pricing, yeah.
6    Q   Okay.
7    A   Charge-off dates are important and
8 whether they're in statute or not are important.
9    Q   And is there any written document that
10 would identify, for a particular account like the
11 Castro account, how much time was left until the
12 statute of limitations expired for the collectors?
13    A   Well, they have the document that tells
14 them what the statute of limitations is for all
15 jurisdictions, and to the extent that they had
16 accounts that might be pushing some time element,
17 then they might look at that.  But as I say, as a
18 general rule, most of our debt, third-party debt,
19 is most recent charge-offs.  Purchase debt is a
20 little bit different, but, again, these are
21 normally two years from the point of charge-off
22 when we start on the accounts, and the shortest
23 period of time that I'm aware of, of any of the
24 states or jurisdictions is three years.  So,

81

1   consequently, it's not an issue a collector is
2   looking at because it's not relevant to the
3   account.
4       Q   Okay.  To make sure I understand, are you
5   saying that when you purchase the debts, generally
6   they are already two years out from the charge-off
7   date?
8       A   Some of them are.  Not all of them, but
9   just, you know, some are.
10      Q   And do you recall whether or not the
11  Sprint 3 debts were more than two years since
12  charge off?
13      A   Some of them might have been, but, you
14  know, they were 18 months to two years, I believe,
15  is what they had represented in the portfolio, but
16  some were maybe a little bit older and some were
17  fresher.
18      Q   Okay.  If you can look at Exhibit 2
19  again, and specifically paragraph 9.  It states,
20  "Defendant US Asset Management, Inc. is engaged in
21  the business of collecting debts originally owed to
22  others, using the mails and telephones for that
23  purpose."
24          That allegation was denied in

82

1   connection -- in the answer filed by the defendants
2   in this matter.  Is it not true that US Asset
3   Management is engaged in the business of collecting
4   debts originally owed to others?
5       A   Asset -- US Asset Management is not the
6   entity that does the collection work that --
7       Q   Go ahead.
8       A   Yeah.
9       Q   Finish your answer.  Sorry.
10      A   The answer was that US Asset Management
11  acquires the assets, and that the collection work
12  is done by collection agencies that they hire to do
13  the work.
14      Q   Is it fair to say that US Asset
15  Management actually receives back moneys collected
16  by Collecto in connection with the debts owned by
17  US Asset Management?
18      A   By Collecto and any other agency that
19  would do collection work for them, yes.
20      Q   And in the process of others collecting
21  those debts, is it fair to say that mail and
22  telephone are used for that purpose?
23      A   I'm assuming that's what they do, yeah.
24      Q   And what other entities have collected on

83

1   behalf of US Asset Management telecom debts?
2       A   Since 2006?
3       Q   Correct.
4       A   It's probably at least 10 other agencies.
5       Q   In Texas as well?
6       A   No.
7       Q   Okay.  So no other entity has collected
8   debts for US Asset Management, Inc. since 2007 --
9   between 2007 and 2008 with respect to Texas telecom
10  debts, correct?
11      A   Well, I think I said before I don't know
12  in the portfolio what is or is not in Texas.  I
13  mean, we have other agencies that work for us
14  currently, but I can't tell -- one of them is in
15  California.  So I can't tell you whether the agency
16  in California is working debts that are in Texas.
17  I'm assuming -- I think the portfolio they're
18  working on is a Verizon, which is California only,
19  so that might answer that question.  So the only
20  activity in Texas would have been by Collecto, to
21  my knowledge.
22      Q   Okay.  Does the entity in California
23  that's collecting for US Asset Management, would it
24  use the collection letters of which Exhibit A is an

84

1   example, or would they use their own collection
2   letters?
3       A   They'd use their own letters.
4       Q   Looking at paragraph 12 of the complaint,
5   it states:  "All actions of Defendant Collecto,
6   Inc. referred to herein were taken as authorized
7   agent of Defendant US Asset Management, Inc."
8           That was denied in the answer.  What
9   about that statement is not correct?
10      A   I guess the question is, what is an
11  authorized agent.
12      Q   Well, is it fair to say that US Asset
13  Management, and since you are the only employee of
14  US Asset Management --
15      A   Yeah.
16      Q   -- that you on behalf of US Asset
17  Management authorized Collecto to collect a
18  US Asset debt?
19      A   Right, we gave them -- we gave them a
20  placement to collect the debt.
21      Q   Okay.
22      A   But we didn't appoint them as an
23  authorized -- whatever the term "authorized agent"
24  is referring to.

85

1    Q   Okay.  All right.  But you did --
2    A   It's not like a principal agency
3    relationship, it's a contractual relationship.
4    Q   Okay.
5    A   They weren't employees of US Asset
6    Management.
7    Q   Okay.  All right.  Again, going back to
8    the Sprint 3 portfolio, were there -- if you recall
9    as you're sitting here today, were there any
10   representations made by Sprint with respect to that
11   portfolio?
12   A   Yes.
13   Q   What kinds of representations?
14   A   There's a clause in the contract, which I
15   can paraphrase but obviously I can't recite, that
16   says that the accounts are valid accounts, that
17   they originated in compliance with laws, and that
18   to their knowledge, they're legitimate debts, that
19   the consumers, you know, owe the balances.
20   Q   Okay.  And were there any warranties made
21   by Sprint with respect to that portfolio in
22   connection with US Assets' purchase of them, again
23   Sprint 3?
24   A   Yeah, again, there are warranties, which

86

1    I'm not sure what specifically is in the warranty
2    provision, but, generally, if the accounts are
3    deemed to be ineligible for sale, which is
4    determined subsequent to the time of sale, we have
5    the right to return the account to them for a
6    refund on that account.  So if it's discovered that
7    there was a -- there was fraud and the consumer was
8    not the debt -- you know, the debtor, or the --
9    there was some error in billing or some reason why
10   the account should be recalled, then they would
11   recall the account or we would identify the reason
12   for the put-back, and we would send the account
13   back to them.
14   Q   Would one of the considerations made for
15   a put-back or return be a misunderstanding or a
16   misstatement as to the statute of limitations?
17   A   No.
18   Q   Were there any attorneys involved in the
19   negotiations of the -- for the purchase of
20   Sprint 3?
21   A   Any attorneys involved?  Yes, yes.
22   Q   And who would that be?
23   A   NCO had an attorney, I believe, who was
24   involved in drafting the purchase contract.

87

1    Q   And do you recall who that was?
2    A   No.
3    Q   Okay.  And were there any opinions issued
4    by -- written opinions issued by attorneys with
5    respect to the purchase of the Sprint 3 --
6    A   No.
7    Q   -- account?
8    Okay.  Is there any information with
9    respect to the statute of limitations -- or strike
10   that.
11   Does US -- start all over.
12   Does Collecto use computers to keep
13   records of any collection activity with respect to
14   a particular portfolio?
15   A   Yes.
16   Q   And does it use a computer to keep
17   records with respect to a particular debt?
18   A   Yes.
19   Q   Is the statute of limitations programmed
20   into the consumer with respect -- into the computer
21   with respect to a particular portfolio?
22   A   I don't believe so.
23   Q   And is the information regarding the
24   statute of limitations programmed into a consumer

88

1    with -- computer with respect to the statute of
2    limitations as to a particular account?
3    A   I don't believe so.
4    Q   Okay.  What about the charge-off date, is
5    that indicated with respect to a particular account
6    in the computer?
7    A   Yes.
8    Q   And is it indicated with respect to a
9    portfolio?
10   A   No.
11   Q   Is the purchase date of a particular
12   account also programmed into the computer?
13   A   No.
14   Q   But what about the purchase date of the
15   portfolio, is that somehow programmed into the
16   computer?
17   A   No.
18   Q   Is the date of last payment of a
19   particular debt programmed into the computer or
20   entered into the computer program?
21   MR. WIER:  Object to form.  You mean
22   for every single account within that portfolio?
23   MS. COMBS:  Correct.
24   A   Do you mean for all payments that the

89

1   consumer made to the creditor prior to the time
2   that it was purchased, or only for those payments
3   that were made to Collecto acting as the agency
4   collecting for US Asset Management?
5       Q   Good questions and let me rephrase.
6           The question -- the first question
7   is, is there a date of last payment to the original
8   creditor included on the computer screen for a
9   particular debt?
10      A   Yes.
11      Q   And is there a date of last payment to
12  US Asset included on the screens of a particular
13  account?
14      A   Yes.
15      Q   Okay.  Is it fair to say that US Asset
16  purchases debts at a deep discount from their face
17  value?
18      A   Yes.
19      Q   Is it fair to say that all of the loans,
20  telecommunication debts, that US Asset purchased
21  were in default when they were purchased?
22      A   Yes.
23      Q   Okay.  Has US Asset ever purchased
24  out-of-statute-of-limitation debts?

90

1       A   No.
2       Q   Does Collecto purchase -- strike that.
3           Does Collecto ever collect
4   out-of-statute debt?
5       A   No.
6       Q   What is the process whereby information
7   about a particular debt is entered into the
8   Collecto computer?
9       A   What is the process?
10      Q   Yeah.
11      A   A data file is received from the client
12  with various fields of information, and those
13  fields of information are converted into our data
14  system to provide the information relative to the
15  account.
16      Q   And then the collectors would add data,
17  correct?
18      A   Then from that information that's
19  provided, the collector would add notes, and any --
20  any other actions that are taken on the account
21  would be identified in the notes.
22          THE WITNESS:  Do you need a break?
23          MS. COMBS:  Fine, let's take a break.
24          (Off record.)

91

1           MS. COMBS:  Okay, back on the record.
2       Q   Does US Asset Management have any written
3   documents that govern how a portfolio was analyzed?
4       A   No.
5       Q   Okay.  Are you familiar with the phrase,
6   Capital O-O-S Days?
7       A   "OOS Days"?
8       Q   Does that mean anything to you --
9       A   No.
10      Q   -- in connection with statute of
11  limitations?
12      A   No.
13      Q   Okay.  Can you -- can someone search on
14  the Collecto computer any date field?
15      A   I would assume so, yeah.
16      Q   Okay.  Did anyone -- did you yourself do
17  any research on the statute of limitations of cell
18  phone debts at any time, you yourself?
19      A   On cell phone?
20      Q   Strike that.  Telecommunication debts.
21  I'll start all over.
22          Did you yourself ever do any research
23  on the statute of limitations for tele-
24  communications debts?

92

1       A   Specifically for telecommunications
2   debts?
3       Q   Right.
4       A   No.
5       Q   Have you done any research on the statute
6   of limitations, you, yourself, for any other types
7   of debts?
8       A   Yes, yeah.
9       Q   What kind of research?
10      A   I've reviewed the materials provided to
11  us by the American Collectors Association relating
12  to statute of limitations.
13      Q   Anything else?
14      A   I think I've referred to reference books
15  that have been published that talk about
16  collection, consumer and commercial collection
17  laws.
18      Q   Do you recall any that specifically
19  address that that you reviewed, statute of
20  limitations?
21      A   Any of the books?
22      Q   The names of the books.
23      A   Yeah, I don't -- it's been a few years
24  back.  I can't recall a specific book.

93

1  Q   Have you ever had any discussions with
2  anyone about what the statute of limitations was on
3  the debt in the Castro portfolio?
4          MR. WIER:  You can answer that yes or
5  no.  If it's -- I don't want you to disclose any
6  privileged conversations.
7  A   Discussions regarding that specific
8  portfolio?
9  Q   Correct.
10  A   No.
11  Q   Are you familiar with the organization
12  NARCA, the National Association of Retail
13  Collection Attorneys?
14  A   Um-hm.
15  Q   Have you ever attended any of their
16  meetings?
17  A   No.
18  Q   Did -- prior to July of 2008, did
19  US Asset or Collecto receive a written opinion from
20  outside counsel as to what the statute of
21  limitations was on telecommunications debt?
22  A   No.
23  Q   Okay.  Going back to Exhibit 2,
24  Exhibit A, do you know who drafted this document,

94

1  the form of this document?
2  A   Who drafted it?
3  Q   Yes.
4  A   I believe it would have been the vice
5  president of operations --
6  Q   And --
7  A   -- in conjunction with the collection
8  manager; usually they put it together as a group
9  and...
10  Q   Was this form of Exhibit A used for
11  collecting debts other than telecommunication debt?
12  A   I would say yes; but, again, I don't know
13  what -- I didn't research what accounts, other than
14  these accounts, this was used for, but I'm going to
15  assume that the answer is that it's used for
16  other...
17  Q   And, specifically, who was the person who
18  was the vice president of operations who
19  participated in drafting Exhibit A?
20  A   Who was it?
21  Q   Yeah.
22  A   Candice O'Brien.
23  Q   And do you know what person, collection
24  managers, Candice O'Brien consulted with in

95

1  drafting Exhibit A?
2  A   I don't know specifically who it would
3  have been at that time.
4  Q   Okay.  And did you participate at all in
5  the process of drafting Exhibit A?
6  A   No.
7  Q   Did you par -- did you authorize the
8  sending of Exhibit A?
9  A   The sending of the letter?
10  Q   I don't mean to this particular person,
11  but the sending of this form document in connection
12  with the collection activities of Collecto?
13  A   Do you mean did the compliance department
14  review the letter for purposes of okaying the
15  letter to be used?
16  Q   You can answer that question.  Is that --
17  A   The answer is yes, yeah.
18  Q   And who in compliance would have reviewed
19  it?
20  A   Myself and Susan Giordano.
21  Q   Anyone else?
22  A   Not in the compliance department.
23  Q   Anyone else review it for --
24  A   It might be our attorney may have

96

1  reviewed it, our in-house counsel.
2  Q   Who is your in-house counsel?
3  A   Michael Kraft.
4  Q   Do you recall whether he specifically did
5  review this?
6  A   I can't tell you in this letter, because
7  there's various letters that get done, there's a
8  process to get a letter approved to be used, so...
9  Q   Are there any written documents kept with
10  respect to the approval process of a document, form
11  document, to be used to be sent to debtors?
12  A   Usually just the draft of the letter is
13  done, it's approved and okayed, then it's
14  programmed or set up through the letter vendor
15  through our IT department, but there's no, you
16  know, formal document per se that -- that...
17  Q   Do you know whether or not there would be
18  any notes existing showing that approval process
19  with respect to Exhibit A?
20  A   I don't think so.
21  Q   Okay.  Anyone else, besides you, Susan
22  Giordano, and the in-house counsel, Michael Kraft,
23  would anyone else be involved in approving a form
24  document for mailing to debtors?

97

```
 1      A  No.
 2      Q  And specifically with respect to
 3  Exhibit A, was there anyone else involved in
 4  approving the mailing of Exhibit A to debtors,
 5  other than you, Susan Giordano and Michael Kraft?
 6      A  Not that I'm aware of.
 7      Q  Okay.  And with respect to Exhibit B as
 8  well, is that the same process that would have been
 9  followed with respect to Exhibit B?
10      A  Yeah.
11      Q  Would anyone else -- oh, who drafted
12  Exhibit B?
13      A  The same, same as Exhibit A.
14      Q  And do you recall when Exhibit A and B
15  were approved for use?
16      A  I can't recall exactly.  I'm going to say
17  it's 2006, but...
18      Q  And what is the basis for that?
19      A  Well, I'm looking at the codes down below
20  which talk about, you know, PDP-2064597-58.  We
21  would refer to this as letter 58 in the system, but
22  I believe that it was 2006 is the...
23         MS. COMBS: Okay.  For the record,
24  we're referring to Exhibit A, and about two-thirds
```

98

```
 1  down, above the return address at the bottom third
 2  of the paper, there are some digits on the
 3  left-hand side, PDP-2064597 and so on.  That's what
 4  he's referring to.  Okay.
 5      Q  So what statute of limitations is
 6  Collecto using for cell phone debts in Texas
 7  currently?
 8      A  For cell phone debts?
 9      A  Strike that.  Telecommunication debt.
10      A  Four years.
11      Q  Have you done any examination of
12  Collecto's records to determine how many letters of
13  the form of Exhibit A were mailed to debtors in
14  Texas between the time period of June 18, 2007 to
15  July 8, 2008?
16      A  Yes.
17      Q  And what did you find?
18      A  There's approximately 17,400 letters.
19      Q  Okay.  And would it be possible to
20  generate from Collecto's computers a list of names
21  and addresses of people who received those letters?
22      A  I would assume it would be, yeah.
23      Q  And would it be possible -- those 17,400
24  letters, are those all with respect to
```

99

```
 1  telecommunication debts?
 2      A  I believe they are, yeah.
 3      Q  Again, with respect to the
 4  telecommunication debts, can you ascertain whether
 5  or not the debts are cellular debts as opposed to
 6  land line debts?
 7      A  Yes.
 8      Q  And how would you determine that?
 9      A  Well, Sprint doesn't do land lines, so if
10  it's a Sprint debt, I know it's telecom.
11      Q  Okay.  And the other portfolio, during
12  the time -- possible portfolio during the time
13  period was what other creditor you earlier
14  testified?  You had three Sprint debt -- three
15  Sprint portfolios, and the other one was what?
16      A  Well, recently we purchased a Verizon
17  Wireless.
18      Q  Oh, but that was long after.
19      A  Well, yeah, like three months ago.
20      Q  Oh, okay.  All right.  So they're all
21  Sprint?
22      A  And those are all California accounts.
23      Q  Okay.  All right.  In the process of
24  purchasing the Sprint portfolios, did you discuss
```

100

```
 1  with anyone at Sprint what the statute of
 2  limitations was for that debt?
 3      A  In the process of purchasing?  No.
 4      Q  Who did you deal with in the purchase of
 5  the Sprint 3 portfolio?
 6      A  A gentleman by the name of Brian Day.
 7      Q  Is that B-R-I-A-N?
 8      A  Um-hm.
 9      Q  And is it D-I-G-G?
10      A  No, Day, D-A-Y.
11      Q  Okay.  All right.  And was he an employee
12  of Sprint?
13      A  Yes, yeah.
14      Q  And where is he out of?
15      A  He's out of Kansas City, I believe.
16  Overlook, Kansas.  Overton Park.  Maybe it's
17  Overton.
18      Q  Overland Park?
19      A  Overland Park, yeah.
20         MS. COMBS:  Off the record.
21         (Off record.)
22      Q  Do you recall what his job title was?
23      A  No, he was -- I don't recall his exact
24  title; he was in the collection area.
```

101

1    Q   Okay.  What is the basis for your
2  conclusion that the statute of limitations in Texas
3  for telecommunication debt is four years?
4    A   My basis?  Based on the information from
5  the summary provided by the American Collectors
6  Association, based on my discussion with our
7  counsel, based on discussion with other counsel who
8  specialize in telecom communications, based on
9  information, discussion with other collection
10  agencies who had similar experiences, and my
11  reading of the Federal Communications Act of 1934.
12    Q   What counsel did you discuss this statute
13  of limitations for telecommunication debt in Texas?
14    A   Which counsel?
15    Q   Yeah.
16    A   Manny Newburger, Keith Wier, Michael
17  Kraft, Glen Menashian.
18    Q   Can you spell that?
19    A   M-E-N-A-S-H-I-A-N.
20    Q   Where is he located?
21    A   He's in Washington, D.C.
22        Elizabeth Simon.
23    Q   And where is she?
24    A   She's an attorney for Sprint, and I --

102

1  she might be in Kansas, I don't know.  I've got --
2  there's another attorney that does work for Sprint
3  that I've spoken to also; I can't recall his name
4  right at the moment.
5    Q   Did all of these discussions with counsel
6  take place after June -- July of 2008?
7    A   Yes, yeah.
8    Q   How would you de -- based on your
9  understanding of the statute of limitations on
10  telecommunication debt in Texas, how would you
11  determine what state's law applied if a phone call
12  was made from Texas to Louisiana?
13    A   First of all, you're talking about the
14  statute of limitations as it relates to telecom
15  debt in Texas.
16    Q   Correct.
17    A   I don't believe there is a specific
18  statute that refers only to telecom with respect to
19  the state of Texas.  I have not seen any document
20  that would tell me that that, in fact, is the case.
21  So to try to answer your other question about who
22  somebody is calling in Louisiana from Texas, it
23  would be -- the statute of limitations would relate
24  to whatever jurisdiction was going to be used for

103

1  whatever the -- you know, if there was a suit to be
2  brought, it would be the jurisdiction appropriate
3  for the case.
4    Q   Well, what if someone had a tele -- a
5  Texas cell phone, incurred a debt, and then moved
6  to Michigan, what statute of limitations would you
7  apply?
8        MR. WIER:  Object to --
9    A   That would be up to the attorney.
10        MR. WIER:  Object to the form.  You
11  may answer.
12    A   That would be up to the attorney to
13  determine.  I don't determine the statute of
14  limitations.  The attorney understands the law,
15  that's what they're paid to do, is to know the law,
16  and then they would make the determination as to
17  what the proper venue would be.
18    Q   All right.  But, again, is it fair to say
19  that the question of the statute of limitations on
20  a particular portfolio is a determination -- is a
21  question that you use in determining how much
22  you're going to pay for debt?
23    A   Well, only with respect to how much --
24  you know, what is the age of the portfolio.  And if

104

1  the age is two years or 18 months, then we assume
2  that, from our information, that the earliest date
3  for a running into a statute of limitations is
4  three years, then we look at it on that basis.
5        We are not tracking it as the most
6  important thing with respect to the individual
7  debts, because our assumption is that all of the
8  accounts within that portfolio are within statute,
9  that none of them are out of statute.  So the issue
10  of statute is not a factor until it gets to the
11  point where we're going to own the debt long enough
12  to start running into those time barriers.
13    Q   Okay.  But for the purposes of the
14  sending of Exhibits A and B --
15    A   Um-hm.
16    Q   -- to Exhibit 2, there has to be a
17  determination -- is it fair to say that there needs
18  to be a determination as to whether or not that
19  debt is still collectable before those letters are
20  sent?
21    A   Well, the debt is always potentially
22  collectable, but it might be barred from litigation
23  if the statute of limitations applies.  So in this
24  case where it's Texas, four years is the basis

---

105

1  under which we make our decisions.
2    Q  Okay.  And my question for you is:
3  Assume that Mr. Castro is now living in Texas --
4    A  Um-hm.
5    Q  -- but the debt was incurred when he was
6  living in Michigan.
7    A  Right.
8    Q  Is that going to impact your decision as
9  to whether or not Exhibit A and B should be sent?
10    A  I think where he's residing would be the
11  determining factor as to whether the letter would
12  be sent.  But, again, we're not -- we don't feel
13  that we're running into that point in time with
14  either of those jurisdictions, so it isn't really a
15  factor.
16    Q  And what is the legal analysis that
17  Collecto currently has with respect to the FCA
18  provision, 415, which says that communication debt
19  must be collected within two years?
20    A  I don't believe it says communication
21  debt.
22    Q  What does it say?
23    A  Do you want to read what it says?
24    Q  Yes.  Section 4 -- 47 USC Section 415(a)

---

106

1  states:  Recovery of charges by carrier, all
2  actions at law by carriers for recovery of their
3  lawful charges or any part thereof shall be begun
4  within two years from the time the cause of action
5  accrues and not after.
6      Why is it that you, representing
7  Collecto, believes that that statute does not
8  apply?
9    A  A, because the carrier charges they're
10  referring to are charges between carriers, and
11  nowhere does it say telecommunications and nowhere
12  does it say consumer debt.  These are debts that
13  would be owed between carriers, which is what the
14  -- this is what this law relates to.
15      Also, in the -- in the beginning of
16  the act, where it refers to application of the act,
17  it specifically says the application is for wire
18  and radio.  Nowhere does it mention tele-
19  communications, wireless or any such charges.
20    Q  And --
21    A  So since it does not specifically address
22  the issue at hand, and based on people more
23  knowledgeable in the law than myself giving me the
24  same conclusion, that's what our basis is.

---

107

1    Q  And did you make this analysis prior to
2  June of 2007?
3    A  No.
4    Q  Was this a consideration at all in your
5  purchase of the Sprint 3 portfolio?
6      MR. WIER:  Object to form.  You can
7  answer.
8    A  No.
9    Q  Was any analysis of 47 USC Section 415(a)
10  considered by anyone at Collecto prior to the
11  mailing of Exhibit A to Exhibit 2 for the purpose
12  of collecting telecommunications debt?
13    A  No.
14    Q  Is there any other basis for your
15  conclusion that 47 USC Section 415(a) does not
16  apply to the telecommunications debt?
17      MR. WIER:  Object to form, but you
18  can answer.
19    A  Any basis?
20    Q  Yeah.
21    A  I guess I've been in this industry and
22  business for 15 years, and I've seen attorneys sue
23  agencies for every reason conceivable, whether real
24  or unreal, and I've never seen a case where federal

---

108

1  -- enabling statute that set up the Federal
2  Communications Commission was used as a basis for
3  establishing consumer contract law in any state.
4      So since, I guess, experience in this
5  business and with other companies having similar
6  circumstances, I've never seen a case where this
7  law has applied or has been attempted to be applied
8  for a limitation on a consumer transaction
9  involving a contract.
10      This law was created in 1934, you
11  know, prior to the time that the cell phones or
12  telecommunications, as you want to refer to them,
13  even existed.  So to stretch and say that this
14  single statement, one sentence out of an act that's
15  many hundreds of pages, somehow applies to consumer
16  debt, to me is just a false premises.  Other than
17  that, I'm...
18    Q  Would you concede that if Sprint is
19  governed by this statute of limitations set forth
20  in 47 USC Section 415(a), then US Assets when it
21  purchased the debts would be governed by the same
22  statute?
23      MR. WIER:  Object to form.
24    A  You're asking me to draw a legal

109

1  conclusion?
2     Q   I think in the process of your
3  determining what statute of limitations you're
4  going to use in a portfolio you are making a
5  determination.
6     A   Um-hm.  Well --
7        MR. WIER:  I'm going to -- don't
8  answer that.
9        THE WITNESS:  Yeah.
10     Q   Okay.  In connection with your analysis
11  and your determination that US Asset and Collecto
12  will continue to use state statutes to determine
13  the statute of limitations for telecommunication
14  debt, did you consider the Dreamscape Design versus
15  Affinity Network case out of the 7th Circuit?
16     A   No.
17     Q   Are you familiar with that case?
18     A   No.
19     Q   Okay.
20     A   Not by that name.  If you told me what
21  the case involved, it might be something that I
22  might have heard of, but I don't remember the names
23  always in these.
24     Q   It was a case where the 7th Circuit held

110

1  that post-tariffing customer agreements are to be
2  treated as legally equivalent to tariff customer
3  agreements.
4     A   Yeah.  No.
5     Q   You're not familiar with that.
6        Did you consider the fact that
7  although the statute has been on the books since
8  1934, it has been amended many times and that
9  provision has not been deleted; was that part of
10  your analysis?
11     A   I knew it was amended and I know it had
12  not been deleted, so I guess it was part of my
13  analysis.
14     Q   Okay.  Now, if you could look at
15  Exhibit 3.  Oh, here is Exhibit 3.
16        (Document exhibited to witness.)
17     Q   And, particularly -- in particular, I
18  want you to look at the Affirmative Defense No. 4.
19     A   Section 4?
20     Q   Section 4.
21     A   Yeah.
22     Q   Feel free to review that.  Actually, I
23  want you to look at Exhibit 3.
24        MR. WIER:  You mean No. 3?

111

1     Q   I mean Affirmative Defense 3 is what I
2  mean in Exhibit 3.
3        MR. WIER:  Just the prior one --
4        MS. COMBS:  Correct.
5        MR. WIER:  -- to the one we were
6  looking at.
7        THE WITNESS:  This here?
8        MR. WIER:  Yeah, this one right here.
9  (Indicating.)
10        THE WITNESS:  Okay.
11        MR. WIER:  It goes down to the bottom
12  of the page.
13        THE WITNESS:  Yeah.
14        (Witness perusing document.)
15     A   Yeah.
16     Q   It says, "To the extent that any
17  violation occurred, any such violation was
18  unintentional and rose from -- arose from a bona
19  fide error, notwithstanding the Defendants'
20  maintenance of procedures reasonably adapted to
21  avoid such errors."
22        In connection with that affirmative
23  defense, what was the error that is being referred
24  to?

112

1     A   What is the error?
2     Q   Correct.
3     A   I guess the error is that based on
4  information provided to us from legal counsel and
5  information available we operated our business
6  assuming that the statute of limitations for
7  consumer contract transactions in Texas was four
8  years.
9     Q   But now --
10     A   So to the extent that your claim is
11  accurate, it would be an error.  We're still
12  contesting and don't agree with your premises or
13  your allegation that that law applies.
14     Q   But it is fair to say that you didn't
15  consult with an attorney prior to the sending of
16  Exhibit A or B with respect to telecommunication
17  debts until after the lawsuit was filed, correct?
18     A   Well, you're referring specifically to
19  telecommunication debt?
20     Q   Right.
21     A   So we wouldn't have consulted with an
22  attorney over a specific type of consumer debt.  We
23  would refer to the statute of limitations, which is
24  established by -- for contract law on a state-by-

113

1   state basis.
2       Q   In the ACA document?
3       A   Well, among the things, the ACA document.
4   I mean, they're not -- they're just a summary of
5   other documents that are -- that are done or other
6   legal references that are done.
7       Q   Okay. Why was that error bona fide?
8       A   I'm not the attorney, so I can't tell you
9   what the legal explanation of that is.
10      Q   So do you have any understanding as you
11  sit here today why it was a bona fide error?
12      A   Well, I guess my --
13          MR. WIER: Object to form, but you
14  can answer.
15      A   I guess to the extent that we're
16  operating under the information provided to us as
17  to what is legal and what is not legal. So to the
18  extent that we were given information that was
19  incorrect, I guess our error is listening to legal
20  counsel and looking at the source of information
21  and assuming we had correct information.
22      Q   But, again, focusing on the sending of
23  Exhibit A and B to Exhibit 2 to debtors with
24  telecommunications debt, you didn't have any

114

1   attorney advice prior to the filing of this lawsuit
2   in 2008, correct?
3       A   Attorney advice as to what?
4       Q   As to what the statute of limitations was
5   for telecommunication debt?
6       A   No, the issue of telecom as one type of
7   debt was never a separate and specific discussion
8   apart from other debt in general. The broad
9   application of the statute of limitations is not --
10  or the application of the statute of limitations in
11  my mind has never been identified on a product-
12  by-product basis.
13      Q   What procedures did US Asset or Collecto
14  have in place to avoid making errors with respect
15  to the statute of limitations used to collect debt?
16          MR. WIER: Object to form, but you
17  can answer.
18      A   What procedures?
19      Q   (Counsel nodded.)
20      A   The ongoing process is to refer to any --
21  any training materials, any materials that are
22  produced that relate to the collection agency
23  business obtained through our attorneys, through
24  publications, directories, information sources such

115

1   as the American Collectors Association. We have a
2   part-time in-house counsel who constantly monitors
3   issues in the industry, legal opinions, legal
4   cases. And based on the information and knowledge
5   of those reliable sources, we draw our conclusions
6   as to, you know, what we should do and how we
7   should do it.
8       Q   And who is the part-time legal counsel?
9       A   Michael Kraft.
10      Q   And where else does he work?
11      A   He has offices in Massachusetts. He has
12  other clients, and -- but is on retainer with us
13  and comes to our office once a week to discuss any
14  matters we have or any assignments we have for him.
15      Q   And what kind of practice does he have?
16      A   I think he's a sole practitioner
17  specializing in the collection area of law.
18      Q   Does he do collection litigation himself?
19      A   No.
20      Q   Does he have any expertise in
21  telecommunications law?
22      A   Not that I'm aware of.
23          MR. WIER: Object to form, but you
24  can answer.

116

1       A   Yeah, I don't know.
2       Q   How much experience -- legal experience
3   does he have, if you know?
4       A   I think he's been an attorney for 20
5   years. I don't know. If that's good experience or
6   not, I don't know.
7       Q   How long has he been consulting with --
8       A   With us?
9       Q   -- Collecto?
10      A   I would say six years.
11      Q   All right, if you could look to
12  Affirmative Defense No. 5 in Exhibit 3.
13          (Witness perusing document.)
14          MR. WIER: Do you have a question?
15          MS. COMBS: I thought I was waiting
16  for you.
17      Q   Okay, in paragraph 5, it states:
18  "Plaintiff have, by reasonable effort,
19  mitigated damages alleged."
20          What is your understanding as to the
21  factual basis for that assertion; how could the
22  plaintiff have mitigated the damages?
23          MR. WIER: Object to form, but you
24  can answer.

---

117

1     A   I don't really have an answer.
2     Q   Okay.  All right.
3         MS. COMBS:  All right.  We're going
4  to take a break, and I'm going to go look at the
5  documents.
6         (Lunch recess taken at 12:00 p.m.)
7         (Back on the record at 1:05 p.m.)
8  BY MS. COMBS:
9     Q   Mr. Burns, specifically prior to the
10 filing of this lawsuit, did you ever get an opinion
11 in writing from any attorney regarding the question
12 of statute of limitations for telecommunications
13 debt?
14    A   No.
15    Q   And did you ever get an opinion orally
16 from any attorney regarding telecommunications debt
17 statute of limitations?
18    A   No.
19    Q   You had testified that your procedures
20 for determining statute of limitations were by
21 referencing -- and when I mean "you," I mean
22 Collecto -- referencing the ACA document that
23 refers to state statute of limitations, correct?
24    A   That's correct.

---

118

1     Q   And when did you first begin relying on
2  that ACA document to determine statute of
3  limitations?  And when I say "you," I mean
4  Collecto.
5     A   Since the inception of the company.
6     Q   Okay.  And did you ever consult with any
7  attorney about whether or not it was appropriate to
8  rely on the ACA's statute of limitations document
9  in order to determine statute of limitations for
10 pursuing debts?
11    A   Not specifically, no.
12    Q   Okay.  Were there any procedures in place
13 from the beginning of the company until the filing
14 of this lawsuit to review the procedures for
15 determining statute of limitations?
16        MR. WIER:  I'm going to object to
17 form.  I didn't understand that question.  If you
18 did, you can answer it.  But -- well, actually
19 could you rephrase?  Because I didn't understand
20 it.
21    Q   Why don't I try that.
22        From the time of the beginning of
23 Collecto starting to collect debts until the filing
24 of this lawsuit, were there any procedures in place

---

119

1  at Collecto to review the procedures for
2  determining statute of limitations on the
3  collection of debt?
4         MR. WIER:  Object to form, but you
5  can answer it.
6     A   I think, you know, based on that
7  question, I would say yes.
8     Q   And what were those procedures?
9     A   The procedures were to look and review
10 and study any material that's published that
11 relates to any aspect of the collection industry
12 business, including, but not limited to, trade
13 publications, books, manuals, training courses,
14 conversation with counsel relative to any case that
15 may have developed.  So it's an ongoing process of
16 obtaining information that's relevant to our
17 industry and putting that information into practice
18 by modifying and changing any practices or
19 procedures or standards or letters or script that
20 the company might use in handling its job.
21    Q   And who's responsible for making this
22 review?
23    A   That would be my -- myself and the
24 compliance department.

---

120

1     Q   And have there been any conversations
2  with any attorney with respect to the question of
3  statute of limitations case law or law since --
4  between the beginning of Collecto and the filing of
5  this lawsuit?
6     A   Yes.
7     Q   When was -- when was the most recent?
8     A   It happens all the time.  As far as
9  general issues as far as statute of limitations,
10 it's a common issue, common topic, that comes up
11 virtually every month, so to speak, you know, in
12 conversation about various businesses or accounts
13 or strategies that the company might entertain.
14 The issue of statute of limitations is important in
15 looking at debt, so it's a common conversation
16 piece.
17    Q   And what attorneys did you have these
18 conversation with?
19    A   Any of our counsel that might have
20 represented us over the period of time from the
21 beginning of the company to the current time.
22 Maybe there's 300 attorneys that there's been
23 conversation with.
24    Q   As you sit here today, can you recall any

121

1  attorney where you've had -- let's narrow it.  Have
2  you had any discussions with any attorney with
3  respect to the question of the statute of
4  limitations in Texas?
5     A  Specifically discussing Texas statute of
6  limitations?
7     Q  Yes.
8     A  Not specifically.
9     Q  Any -- as you sit here today, can you
10  recall the last time you had a conversation with an
11  attorney about the statute of limitations, prior to
12  the filing of this lawsuit?
13     A  I can't give you an exact date.
14     Q  Can you recall a conversation?
15     A  Yes, yeah.
16     Q  What was it about?
17     A  About, you know, if we are -- let me
18  think.  I mean, now you're going back like more
19  than a year in conversation that you have every day
20  with people relative to accounts.  I can't give you
21  a specific example.
22     Q  So as you sit here today, you can't think
23  of any example where you've spoken with an attorney
24  about the statute of limitations prior to July of

122

1  2008?
2     A  Regarding Texas?
3     Q  Regarding any state.
4     A  Yeah, I can recall conversations.  I
5  mean, I can recall in general conversations, but
6  these conversations happen every day, every week.
7  It's not unusual or uncommon to have conversations
8  about various aspects of debt collection --
9     Q  Have you --
10     A  -- so it's -- okay, sorry.
11         MR. WIER:  No, go ahead and finish.
12     Q  Go ahead, you answer.
13     A  So when you ask me did I specifically
14  talk to somebody about, you know, some aspect of
15  the law which is just in general discussion, you
16  know, that's common and usual.  I mean, I wouldn't
17  identify it as a separate specific event with any
18  specific attorney, because I talk to attorneys
19  frequently that represent us in various situations
20  or circumstances or contracts or whatever it might
21  be, and that issue is a common topic that comes
22  into the conversations.  So it's not like I can
23  just say, Oh, yeah, on June 3rd of 2006 I talked to
24  this attorney in Texas about that aspect of the

123

1  law.  We're talking about all various things.  We
2  never had a specific opinion from an attorney that
3  relates to the statute of limitations issue as it
4  relates to, you know, telecom debt or otherwise.
5     Q  Have you ever had a written opinion from
6  any attorney about any statute of limitations
7  question?
8     A  No.
9     Q  And what attorneys have you consulted
10  about the question of statute of limitations?
11         MR. WIER:  Objection.
12     Q  And when I say "you," I mean Collecto.
13         MR. WIER:  Objection, form.
14     A  I can't recall their names.
15     Q  Did -- has any attorney -- has Collecto
16  referred any collection cases to any attorney in
17  Texas to file a lawsuit?
18     A  Yes.
19     Q  Has -- as you sit here today, can you
20  recall whether any attorney has ever turned down a
21  case because it was outside the statute of
22  limitations in Texas?
23     A  I wouldn't have that information.
24     Q  And you don't recall as you sit here?

124

1     A  I don't, no.
2     Q  And do you know of anyone who might have
3  that information?
4     A  I would have to do some research.
5     Q  What kind of research would you have to
6  do?
7     A  I'd have to find out who might have been
8  handling that -- I mean, there's been different
9  people in the role of the legal referral person in
10  our office.  I don't directly manage that person.
11  There's been different people in that area of
12  responsibility, so I'd probably have to talk to one
13  of the managers to get general idea as far as that
14  area is concerned.
15     Q  The legal referral person, what
16  department is that person in?
17     A  Part of operations.
18     Q  Part of operations.  And do you know who
19  the legal referral person was between June of 2007
20  and July of 2008?
21     A  I'd have to go back and find out.
22         MS. COMBS:  We're going to want the
23  name of the person who's the legal referral
24  attorney during that time period, Keith, and also a

---

125

1  list of all attorneys who have been referred
2  litigation in Texas.
3         MR. WIER:  Wait a minute, when you
4  say "legal referral" --
5         MS. COMBS:  There's a person he
6  described as --
7         MR. WIER:  Yeah, but you said
8  attorney.  He's not necessarily --
9         MS. COMBS:  No-no, I didn't --
10        MR. WIER:  -- an attorney.
11        MS. COMBS:  No.
12        MR. WIER:  The legal referral person.
13        MS. COMBS:  The legal referral
14  person, and a second request is, a list of all
15  attorneys that Collecto has referred collection
16  accounts to in Texas.
17        THE WITNESS:  From when?
18        MR. WIER:  During that time period,
19  June of '06 to July of '07?
20        MS. COMBS:  No, at any time I think
21  that might be relevant.
22        MR. WIER:  Since the beginning of the
23  company?
24        MS. COMBS:  Yeah.  Well, it's only

---

126

1  been...
2         THE WITNESS:  18 years.
3         MS. COMBS:  Well, if they gave you
4  any opinion about statute of limitations, that's
5  relevant.
6         MR. WIER:  Well, we can argue about
7  whether that's --
8         THE WITNESS:  Any attorney in the
9  last 18 years?
10        MR. WIER:  -- too broad.
11        MS. COMBS:  Yeah.  Right.
12        MR. WIER:  I'll try to get the
13  information from him, but that's probably going to
14  be too broad, but we'll see what we can do.
15     Q   Okay.  Does Collecto have a routine
16  review of any issues under the FDCPA; do they
17  routinely review them?
18     A   Routinely review them?  I guess the
19  answer is yes.
20     Q   Can you describe what are the procedures
21  for review of FDCPA issues?
22     A   That would consist of the review of
23  materials, information, publications obtained or
24  seminars attended, any source of information that

---

127

1  would talk about the interpretations and compliance
2  with the FDCPA.  So it's part of compliance's on
3  going day-to-day business routine, any new
4  information that comes to our attention from
5  whatever source it might be is reviewed and
6  considered for its relevance to our operation.
7     Q   And who is responsible for that?
8     A   The compliance department.
9     Q   And that would be Susan Giordano?
10    A   Or myself, or -- you know, if one of us
11  gets information that's relevant for discussion,
12  then it's brought to the attention of, you know,
13  our department, we would review it, we'd have
14  discussions with operations if it necessitated any
15  modification or change or rethinking about, you
16  know, what our tactics or policies or procedures
17  might be.
18    Q   All right.  Specifically with regard to
19  your conversations with Manny Newburger about the
20  statute of limitations, did you initiate
21  communication or did he?
22    A   I think our attorney, Michael Kraft,
23  sought him out for some consultation.
24    Q   And when did that occur?

---

128

1     A   I think it was soon after this case was
2  filed.
3     Q   And did -- were any written opinions
4  issued as a result of this?
5         MR. WIER:  I'm going to object.
6  That's privileged.  Well, you can answer that
7  question, if you know.
8     A   Written, I'm not aware of any written
9  opinions.
10    Q   Okay.  What did Michael Kraft say to
11  Manny Newburger in those conversations?
12        MR. WIER:  That's privileged.
13    A   I can't comment.
14        MR. WIER:  Don't answer that.
15    A   I wasn't there.  I don't know what he
16  said.
17    Q   You're being presented as a 30(b)(6)
18  witness.  So the question is whether or not the
19  corporation itself has any information.  So
20  information that Michael Kraft had, you're --
21    A   You asked me what Michael Kraft asked
22  Manny Newburger.
23    Q   Yes.
24    A   I wasn't there when the conversation took

129

```
 1  place.
 2         MR. WIER:  Yeah, objection to --
 3     A  So how can I tell you what he said to
 4  him?
 5         MR. WIER:  Objection to form, and
 6  it's also asking him to disclose privileged
 7  communications.
 8         MS. COMBS:  Are you instructing him
 9  not to answer?
10         MR. WIER:  Well, he already did
11  answer over my objection, so I'm not instructing
12  him because he did answer.
13     Q  Did you yourself have any conversations
14  with Manny Newburger?
15     A  Yes.
16     Q  And what did you say to him and what did
17  he say to you?
18         MR. WIER:  Don't answer that.  Those
19  are privileged communications.
20     Q  Are you going to follow your attorney's
21  instructions?
22     A  Yes, yeah.
23     Q  Did you have any conversations with Keith
24  Wier about what the statute of limitations in Texas
```

130

```
 1  for -- I mean the statute of limitations for cell
 2  phone debt is in Texas?
 3     A  Yes.
 4     Q  And when did you have those
 5  conversations?
 6     A  I guess it may have been phone
 7  conversations that have occurred prior to this.
 8     Q  And what did you say to him and what did
 9  he say to you?
10         MR. WIER:  I object.  That's
11  privileged.
12     A  I don't recall the exact words.
13         MR. WIER:  All these discussions were
14  after the filing of the lawsuit and after my
15  retention.  Those are privileged.
16         MS. COMBS:  Are you instructing him
17  not to answer?
18         MR. WIER:  I am.
19     Q  Are you going to abide by your
20  attorney --
21     A  I can't tell you -- yeah, I'm going to
22  abide by what he tells me.
23     Q  Okay.  All right.  Were you the person
24  who contacted Glen Menashian in Washington, D.C.?
```

131

```
 1     A  No.
 2     Q  Who was that?
 3     A  Michael Kraft.
 4     Q  Do you know when those conversations
 5  were?
 6         MR. WIER:  You can tell her the --
 7     A  Probably three months ago, maybe three
 8  months ago, two or three months ago.
 9     Q  And what law firm is he with?
10     A  I don't recall the name of it.
11     Q  And did you have conversations with
12  Michael Kraft about what Glen Menashian told him?
13     A  Yes.
14     Q  And what did Michael Kraft say to you and
15  what did you say to him?
16         MR. WIER:  Object, that's privileged.
17         MS. COMBS:  Are you instructing him
18  not to answer?
19         MR. WIER:  I'll agree to let him say
20  in general what the -- I think he already has, but
21  what the consensus is, as long as you're not going
22  to say if we reveal in general what the discussions
23  were and want to go into every minute detail, and
24  so we've been perceived to have waived the
```

132

```
 1  privilege.
 2         MS. COMBS:  Okay.  I'm going to ask
 3  the court to ask you -- to require you to answer
 4  these questions.  So if you want me to go ahead and
 5  answer the questions, you tell him not to -- or ask
 6  the questions, you tell him not to answer, and
 7  we'll lay them out for the court.
 8         MR. WIER:  You're going to ask the
 9  court to ask him to reveal attorney-client
10  confidential communications.
11         MS. COMBS:  Yes.
12         MR. WIER:  Okay, don't answer those
13  questions.
14     Q  All right.  Did you have any
15  conversations with Elizabeth Simon?
16     A  Yes.
17     Q  And when did those conversations take
18  place?
19     A  In the fall of last year, I think.
20     Q  And what did you say -- did you initiate
21  the conversations?
22     A  Yes.
23     Q  And what did you say to her and what did
24  she say to you?
```

---

133

1        MR. WIER:  Again, we're going to
2   assert privilege, so don't answer those questions.
3        THE WITNESS:  Yeah.
4     Q   And you're going to follow his advice,
5   your attorney's advice?
6     A   Absolutely, yeah.
7     Q   Okay.  And what law firm is Elizabeth
8   Simon from?
9     A   I believe she's counsel for Sprint.
10    Q   Oh, she is?
11    A   Yeah.
12    Q   She's Sprint's attorney?
13    A   One of them, yeah.
14    Q   And is she the one who's in Kansas City?
15    A   I believe so, yeah.
16    Q   So she's not your attorney?
17    A   No.
18    Q   So what did you say to her and what did
19  she say to you?
20        MR. WIER:  I'm going to -- if you
21  recall what you guys talked about in general, then
22  you can tell her that.
23    A   I guess in general I spoke to her about
24  the lawsuit that had been filed, in that I wanted

---

134

1   them to tell me if they had any knowledge or any
2   awareness of the application of the statute that
3   was being referred to relative to statute of
4   limitations for telecommunications debt, and she
5   asked some general information and indicated that
6   she would probably have counsel retained to give
7   them an opinion relative to that.
8     Q   And did you ever get a copy of an
9   opinion?
10    A   I don't have a copy of it, no.
11    Q   Was an opinion ever conveyed?
12    A   I never got it.
13    Q   Were you ever told it orally?
14    A   No.
15    Q   So you don't know what their position
16  was --
17    A   No.
18    Q   -- sprint's?
19        So they never told you what their
20  legal position was?
21    A   Right.
22    Q   Okay.  And did you ever get anything in
23  writing from Keith Wier about his legal opinion as
24  to what the statute of limitations is for

---

135

1   telecommunications debt in Texas?
2     A   No.
3     Q   Okay.  Did you ever get a written opinion
4   from Michael Kraft about what his opinion was as to
5   what the statute of limitations was for
6   telecommunications debt in Texas?
7     A   No.
8     Q   Have you ever gotten a written opinion
9   from any attorney about what the statute of
10  limitations for telecommunications debt is in any
11  state?
12    A   No.
13    Q   Okay.  Did Manny Newburger ever tell you
14  that the statute of limitations for
15  telecommunications debt is two years and you should
16  change your practice?
17        MR. WIER:  Object to form and also
18  assert privilege, don't answer that.
19    Q   Are you going to follow your attorney's
20  advice?
21    A   Yes, yeah.
22    Q   Did you ever get -- did Keith Wier ever
23  tell you that the statute of limitations for
24  telecommunications debt is two years and you should

---

136

1   change your position?
2        MR. WIER:  You do realize that's me,
3   right?
4        MS. COMBS:  Yeah, yeah, yeah.  Yeah,
5   I know.
6        MR. WIER:  I'm just trying to figure
7   out why in the world you would think that those are
8   appropriate questions.  But, in any event, I'm
9   going to assert attorney-client -- or ask the
10  client to assert attorney-client privilege and not
11  answer that question.
12    A   Yes, yeah, I'm not answering.
13    Q   Okay.  Did Glen Menashian ever give an
14  opinion or tell anybody at Collecto that the
15  statute of limitations for telecommunications debt
16  is two years and that Collecto ought to change its
17  practices?
18        MR. WIER:  I'm going to let you
19  answer that one.
20    A   That answer is no.
21    Q   Okay.  And are you aware that the court
22  ruled on the class motion in this matter, a motion
23  for class certification?
24    A   Yes.

137

1    Q    And are you aware that in ruling on that
2 decision he made a determination on the legal
3 question as to what statute applies to
4 telecommunication debt?
5    A    I don't --
6        MR. WIER:  I'll object to form.  I
7 think that mischaracterizes the dicta in that
8 opinion.
9    Q    Okay.  After reading, reviewing, the
10 opinion of the court in this matter, did you change
11 your opinion as to what the statute of limitations
12 is for telecommunications debt in Texas?
13    A    No.
14    Q    Okay.  Are there any internal memos at
15 Collecto or US Assets regarding the question of
16 statute of limitations, other than the ACA memo
17 that you've previously referred to?
18    A    Any internal memos?
19    Q    Yes.
20    A    No.
21    Q    And were you the person responsible for
22 searching for documents in connection with the
23 discovery requests that were made in this lawsuit?
24    A    I was one of them.

138

1    Q    And who else was involved?
2    A    I believe Susan Giordano.
3    Q    Are you satisfied that a thorough search
4 for any memos about the question of statute of
5 limitations for telecommunications debt has been
6 exhausted?
7    A    Yes, yeah.
8        MS. COMBS:  Off the record.
9        (Off record.)
10        MS. COMBS:  We'll put this as
11 Deposition Exhibit 4.
12        (Document marked as Exhibit No. 4.)
13    Q    Deposition Exhibit No. 4 and the section
14 titled "State & Local Collection Laws," just
15 generally who compiled this section of the manual,
16 if you know?
17    A    The person who would have been at that
18 time responsible for the training.
19    Q    And do you recall the name of that
20 person?
21    A    I don't know exactly when that was
22 created, so I couldn't tell you who that person
23 was.
24    Q    And so you don't recall whether or not

139

1 any attorney was consulted with respect to this?
2    A    I think the information came from -- a
3 lot of this information comes from the ACA, and
4 it's, you know, used from that.  It's reviewed by
5 our compliance department and also, I believe, in
6 some cases, I can't tell you specifically which --
7 what information, but certainly this information
8 would have been reviewed by Michael Kraft or -- you
9 know, relative to its accuracy.
10    Q    And do you recall whether any other
11 attorney other than Michael Kraft would have
12 reviewed that?
13    A    Well, Susan Giordano is an attorney, you
14 know, is our employee, so, I mean, she's involved
15 in looking at it.
16    Q    Okay.  Is it fair to say that that is the
17 case with all of the provisions of this manual,
18 that Michael Kraft and Susan Giordano would have
19 reviewed the manual?
20    A    At various times, yeah.  If there was a
21 legal issue, then they would have been consulted
22 for review of it.
23    Q    Does Collecto or US Assets have any other
24 outside counsel that it consults with on legal

140

1 questions?
2    A    Pertaining to the FDCPA?
3    Q    Pertaining to the FDCPA.
4    A    No.
5    Q    And does it have any other legal counsel
6 that it consults with for say contractual issues?
7    A    Yeah, yes.
8    Q    And who would that be?
9    A    Posternak, Blankstein & Lund.
10    Q    And where are they located?
11    A    Boston.
12    Q    Did you review the documents that were
13 produced today prior to their being --
14    A    These documents?  (Indicating.)
15    Q    Yes.
16    A    Yes, yeah.
17    Q    Do you recall whether there's any
18 provision in there that discusses the question of
19 statutes of limitations?
20    A    I -- I went through -- I didn't study
21 every page of that, so I can't say with any
22 certainty that there is a -- part of that training
23 material includes a discussion of statute of
24 limitations.  I know we have a separate document

141

1   with just statute of limitations information.
2       Q   In this document?
3       A   It's a -- it's material from the American
4   Collectors Association.
5       Q   The one that we previously discussed?
6       A   Right.
7       Q   But that's not -- as far as -- as you sit
8   here today, you don't recall that there's any
9   discussion of statute of limitations in this
10  material produced this morning?
11      A   I know it's part of the training, but I
12  don't know whether there's a specific page in there
13  where it's addressed, to be honest with you.
14      Q   All right.
15      A   Other than reviewing these quickly just
16  to see what was in them --
17      Q   Okay.
18      A   -- I haven't sat in the training class
19  recently.
20      Q   All right.  I'm going to hand you a
21  document that is titled "Collection Company of
22  America, Route Inventories for CNY's Group."  Okay,
23  do you recognize this document?
24      A   Yes, yeah.

142

1       Q   What is this document?
2       A   It's basically a summary document that
3   takes a specific portfolio that's being worked
4   under a specific client number, and then is doing a
5   summary as to what the status is on the various
6   accounts within -- within the portfolio.
7       Q   Okay.  Does this give a guide as to what
8   entries made on the computer would refer to?  If,
9   for example, they talked about disposition 100,
10  would that be an entry on the computer, you know,
11  on the --
12      A   Payment promised, yes, yeah.  I think
13  they're missing a digit, too.  I think it might be
14  3100.
15      Q   Oh, okay.
16      A   But there's a -- the disposition tells
17  the person looking at the screen what the present
18  status is of the account.  And if there's a payment
19  promised, such as that one, then the last
20  information was that the consumer was going to make
21  a payment on a specific date.
22      Q   Okay.  All right.  So then referring to
23  the document under the "Collect Screen Display,"
24  Collect Screen -- "Concepts, Collect Screen

143

1   Display," is the screen indicated on that document
2   the computer screen that a collect tech would have
3   for each account?
4       A   Yes, yeah.
5       Q   And what does this reference "wait date"
6   refer to?
7       A   The wait date might indicate to the
8   collector the time at which the next action might
9   be taken on the account.
10      Q   Is there any entry on this screen that
11  would show the date of last payment?
12      A   The last -- are you talking last payment
13  to us?
14      Q   To the -- to the creditor before the debt
15  is received, the default payment.
16      A   No.  Usually it's -- the service date is
17  the last payment or the charge-off date.
18      Q   All right.  Okay.  So that's where that
19  would be?
20      A   Yeah.
21      Q   Okay.  And which line is the service
22  payment?
23      A   It's this right here.  (Indicating.)
24      Q   And you're referring to...

144

1       A   Srv, then there's a date.
2       Q   Can you specifically show me?
3       A   (Witness indicating.)
4       Q   Okay, so we're looking at the -- above
5   the second set of double lines, the second entry,
6   Srv:  9/25/89, that would be the default date?
7       A   Yes, yeah.
8       Q   Okay.  And then there's an entry right
9   before that, Lst?
10      A   Um-hm.
11      Q   What does that refer to?
12      A   That's the list date, that's when the
13  account was given to us.
14      Q   Okay.  All right, I'm going to hand you
15  the section that is titled "Collect Screen
16  Windows," and there's a list of various windows.
17  What information is conveyed by this two-page
18  document?
19      A   I think in the screen, window is a
20  section of the screen, and then what that's
21  referring to is where it says "check collections,"
22  in that screen you can put in a request for
23  specific information that would show you what might
24  be relevant to these items.

145

1    Q    Okay.  And these screens would be
2  available for each account, correct?
3    A    Yes, yeah.
4    Q    Okay.
5    A    There might not be anything in the
6  screen, but the screens are generic in nature.
7    Q    Okay.  I'm going to refer you to the
8  section titled "Concepts, Account Status."  Do you
9  recognize this document?
10   A    Um-hm.
11   Q    What is this document?
12   A    This is just the listing of the various
13 dispositions that accounts can be in that a
14 collector would put on an account so it would be
15 categorized properly.
16   Q    And does it also list in these account
17 status what letters were sent or whether a letter
18 was sent?
19   A    No.
20   Q    Okay.  So this is not -- this doesn't
21 list letters?
22   A    No.  That just tells us what the status
23 of the account is.
24   Q    Okay.  I'm going to point you to the

146

1  document titled "Appendix A, Collect Screen
2  Warnings."  Do you see this list?
3    A    Um-hm.
4    Q    Do you recognize this document?
5    A    Yes.
6    Q    What is contained on this document?
7    A    Just different notes to the collector
8  that would be reminders about certain special
9  categorizations on the account.
10   Q    Do any of the areas that are listed in
11 this document refer to an entry that the statute of
12 limitations for filing litigation has passed?  And
13 you can feel free to read them.
14   A    Yeah.  No, I don't see anything in there.
15   Q    Okay.  I'm going to refer you to a
16 document called "Guidelines for Referring Accounts
17 to Legal."  Do you recognize that document?
18   A    Um-hm.
19   Q    And who were these guidelines determined
20 -- who are these guidelines for, what types of
21 employees would use them?
22   A    Collectors.
23   Q    Okay.  And what does it mean to refer an
24 account to legal?

147

1    A    It means that the collector has basically
2  reached a dead end in their collection on the
3  account; and that the -- if the account has certain
4  criteria, which is established here, then they can
5  put it into a pool that's identified as being
6  available for legal review.
7    Q    And the criteria that the collector looks
8  at are these criteria listed in one through six on
9  that page?
10   A    Yes.
11   Q    And other than the collector, who else
12 would refer a particular account, with respect to
13 this criteria, if anyone?
14   A    Well, it's pretty much the collector and
15 the collector manager.  The manager might review
16 with the collector what the status is on accounts,
17 and, you know, after a certain period of time, they
18 might have made a determination that after three
19 months or four months or six months, that if the
20 activity that's being pursued is not getting a
21 result, then what would the next step be.
22   Q    And do the collectors actually speak with
23 the litigation attorneys?
24   A    No.

148

1    Q    And who determines what litigation --
2  what litigation attorney an account will go to?
3    A    The -- there are people we have that are
4  -- that are the legal collectors, not the standard
5  collectors, the legal collectors are funneled
6  accounts from the collection floor, and they
7  evaluate the accounts, and then try to make a
8  determination as to when and who an account might
9  be referred to.
10   Q    Okay.  I think you mentioned that
11 earlier.
12   A    Yeah.
13   Q    Right.  Okay.  Now, I'm going to refer
14 you to the section titled "Letters," and there are
15 a series of collection letters, and this -- is it
16 fair to say that this is not all of the letters
17 that CCA sends out in connection with collection of
18 debt, correct?
19   A    Correct, yeah.
20   Q    Okay.  How were these notices -- how were
21 these letters selected to put in the manual?
22   A    I don't know.
23   Q    And do you know whether or not this is --
24 they've been put in as -- for the purpose of

149

1 telling the collectors, First, you send the first
2 one, then you send the second one, is that the
3 intent here, or is this just a sampling of letters?
4    A  Just a sample for talking.
5    Q  And for the purpose of training?
6    A  Yes.
7    Q  Okay.  All right.
8       MS. COMBS:  Okay, Keith, I have
9 looked at these fairly superficially.  Obviously,
10 if I have some more questions, I'll reserve the
11 right, although I won't bring him back just for
12 these.
13       MR. WIER:  Okay.
14       MS. COMBS:  All right.  Let's take a
15 break.
16       (Off record.)
17       MS. COMBS:  Back on the record.  Just
18 a few more questions.
19 EXAMINATION BY MS. COMBS:
20    Q  It shows in Exhibit 4 that, there's a
21 2004 Organizational Chart, that Otto Versand owns
22 EOS.  Is that -- was that the case between 2008 --
23 2007-2008?
24    A  Yes, yeah.

150

1    Q  And is it currently the case?
2    A  Yes, yeah.
3    Q  Okay.  And would it be possible to
4 determine from the computer records of Collecto how
5 many people paid on the Sprint 3 portfolio in Texas
6 before Exhibit A was sent; would you be able to
7 tell --
8    A  Yeah, I would imagine it's possible.
9    Q  Possible to do that.
10       And would it also be possible to
11 determine from the computer records of Collecto how
12 many people paid after Exhibit A was sent?
13    A  I imagine with computers and programming
14 you can --
15    Q  Okay.
16    A  -- get information.
17    Q  Would it be possible to determine through
18 Collecto's records how many people were actually
19 sued on these telecommunication debts in Texas?
20    A  Yes, yeah.
21    Q  And would it be possible to determine the
22 total amount of judgments?
23    A  When you say "sued," I -- I'm going to
24 expect that there's going to be -- the number is

151

1 going to most likely be zero, because we stopped
2 the -- once this case -- first of all, when the
3 case was filed, all these accounts were in the same
4 bucket, so to speak, moving through the process,
5 none of them had been assigned to attorneys, and
6 when we got notice of the case, I believe we
7 postponed or delayed or did not, you know, pursue
8 further -- did not assign the accounts to attorneys
9 to litigate in light of the fact that it was part
10 of litigation, so...
11    Q  So I can get that information from your
12 attorney?
13    A  Right.
14       MS. COMBS:  Okay.  At this time I
15 have no further questions.  I'm reserving the right
16 to recall this witness when we've gotten additional
17 documents, although I'm hopeful we'll be able to
18 work something out.  Okay?
19       MR. WIER:  Okay.
20       MS. COMBS:  And I appreciate your
21 help and your information.
22       MR. WIER:  We'll reserve our
23 questions.
24       (Off record at 2:00 p.m.)

152

1       C E R T I F I C A T E
2 COMMONWEALTH OF MASSACHUSETTS
3 BRISTOL, SS
4
5       I, Lori-Ann London, Registered
6 Professional Reporter and Notary Public in and for
7 the Commonwealth of Massachusetts, do hereby
8 certify:
9       That, JOHN F. BURNS, JR., the witness
10 whose deposition is hereinbefore set forth, was
11 duly sworn by me and that such deposition is a true
12 record of the testimony given by the witness to the
13 best of my knowledge, skill, and ability.
14       I further certify that I am neither
15 related to, nor employed by, any of the parties in
16 or counsel to this action, nor am I financially
17 interested in the outcome of this action.
18       IN WITNESS WHEREOF, I have hereunto set
19 my hand and seal of office this 30th day of April
20 2009.
21       _____
22       Lori-Ann London, RPR
23       Notary Public
24 My commission expires: 6/15/2012

153

1    ERRATA SHEET DISTRIBUTION INFORMATION

2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4    ERRATA SHEET DISTRIBUTION INFORMATION

5

6    The original of the Errata Sheet has been

7    delivered to Keith Wier, Esquire.

8    When the Errata Sheet has been completed by the

9    deponent and signed, a copy thereof should be

10   delivered to each party of record and the ORIGINAL

11   forwarded to Cathleen Combs, Esquire, to whom the

12   original deposition transcript was delivered.

13

14   INSTRUCTIONS TO DEPONENT

15

16   After reading this volume of your deposition,

17   please indicate any corrections or changes to your

18   testimony and the reasons therefor on the Errata

19   Sheet supplied to you and sign it.  DO NOT make

20   marks or notations on the transcript volume itself.

21   Add additional sheets if necessary.  Please refer

22   to the above instructions for Errata Sheet

23   distribution information.

24


154

1    ATTACH TO THE DEPOSITION OF JOHN F. BURNS, JR.

2    CASE:  Castro v. Collecto, Inc.

3    DATE TAKEN:  April 29, 2009

4        ERRATA SHEET

5    Please refer to the previous page for Errata Sheet

6    instructions and distribution instructions.

7    PAGE    LINE         CHANGE    REASON

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   I have read the foregoing transcript of my

17   deposition, and except for any corrections or

18   changes noted above, I hereby subscribe to the

19   transcript as an accurate record of the statements

20   made by me.

21   Executed this _____ day of _____, 2009.

22

23        _____

24        JOHN F. BURNS, JR.