# EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

CAUSE NO. EP08CA0215

- - - - - - - - - - - - - - - - - - - - x

NEMESIO CASTRO,

on behalf of himself and all others

similarly situated,

        Plaintiff,

V.

COLLECTO, INC., doing business as

COLLECTION COMPANY OF AMERICA

and US ASSET MANAGEMENT, INC.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF

SUSAN P. GIORDANO

May 26, 2009

11:00 a.m.


Holiday Inn

929 Hingham Street

Hingham, Massachusetts

Rosemary F. Grogan, RPR, CLNR, CSR No. 112993

---

Page 2

1        APPEARANCES OF COUNSEL

2 On Behalf of the Plaintiff:

3     EDELMAN, COMBS, LATTURNER & GOODWIN, LLC

4     BY:  CATHLEEN M. COMBS, ESQUIRE

5     120 South LaSalle Street, 18th Floor

6     Chicago, IL  60603

7     312-739-4200

8     ccombs@edcombs.com

9

10 On Behalf of the Defendants:

11    BUSH & RAMIREZ L.L.C.

12    BY: KEITH WIER, ESQUIRE

13    24 Greenway Plaza, Suite 1700

14    Houston, TX 77046-2417

15    713-626-1555

16    kwier@bushramirez.com

17

18

19

20

21

22

23

24

---

Page 3

1     INDEX OF EXAMINATION

2 WITNESS: SUSAN P. GIORDANO

3 EXAMINATION         PAGE NO.

4 By Ms. Combs      4

5

6     INDEX TO EXHIBITS

7 NO.    DESCRIPTION     PAGE NO.

8 1    Complaint - Class Action    4

9     and Attachments

10 2    Collection Company of America    4

11    Documents Bates Nos. CCA000275 - 283

12 3    Purchase and Sale Agreement    4

13    Between NCOP Capital, Inc. and

14    U.S. Asset Management, Inc.

15    Bates Nos. CCA000284 - 302

16 4    Fastfax Documents    4

17    Bates Nos. CCA000303 - 336

18 5    Welcome to CCA Document    68

19    Bates No. CCA0001 and CCA00059

20

21   (Original exhibits attached to original transcript)

22

23

24

---

Page 4

1   (Exhibit Nos. 1 - 4 premarked for identification)

2

3      SUSAN P. GIORDANO, having been

4 satisfactorily identified by the production of a

5 driver's license, and duly sworn by the Notary Public,

6 was examined and testified as follows:

7

8      EXAMINATION

9 BY MS. COMBS:

10   Q.  Could you state your name for the record?

11   A.  Susan Giordano.

12   Q.  And where are you employed?

13   A.  Collecto, Incorporated.

14   Q.  And what is your title?

15   A.  Vice president of risk management and

16 compliance.

17   Q.  How long have you held that position?

18   A.  Since November 1st of '04, so five years

19 coming up.

20   Q.  And prior to that, where were you employed?

21   A.  The MWRA, Massachusetts Water Resources

22 Authority.

23   Q.  And what was your position at Massachusetts

24 Water Resources Authority?

1   A.  Assistant contract manager.
2   Q.  How long did you hold that position?
3   A.  About seven and a half years.
4   Q.  And were you in the same position the entire
5  time?
6   A.  Yes.
7   Q.  And can you generally describe your job
8  responsibilities at MWRA?
9   A.  I reviewed large construction contracts,
10 professional services contract, went through the
11 procurement process, and put the contract out to bid.
12   Q.  And prior to that, where were you employed?
13   A.  For about four or five months at the Law
14 Office of Philip Boncore.
15   Q.  Could you spell that last name?
16   A.  B-O-N-C-O-R-E.  I had just graduated from law
17 school.
18   Q.  And what was the nature of his practice?
19   A.  Just general practice.
20   Q.  And where was he located?
21   A.  East Boston, Mass.
22   Q.  And where do you graduate from high school?
23   A.  Boston College Law School.
24   Q.  And what year was that?

1   A.  1996.
2   Q.  And prior to that, were you employed?
3   A.  I was a full-time mother, but I did go to
4  school and work part-time jobs.
5   Q.  And generally, what were the areas of the
6  part-time jobs?
7   A.  I had four part-time jobs.  I was a waitress,
8  a big yellow school bus driver, an aerobics instructor
9  and a martial arts instructor.
10   Q.  And where did you go to undergrad?
11   A.  Bentley College, part-time nights.  That's
12 when I had -- you know, juggling everything else.  I
13 graduated in '91.
14   Q.  And what about graduating from high school?
15   A.  1976 at Belmont High School.
16   Q.  Very resourceful.
17      Does that pretty much cover your --
18   A.  That's it.
19   Q.  All right.  So in your position as VP of risk
20 management and compliance at Collecto, could you
21 generally describe your job responsibilities?
22   A.  I guess trying to keep the company in
23 compliance with all the federal and state laws and
24 regulations regarding collection law; collections,

1  third-party collections, as well as trying to evaluate
2  risk for the company by doing research on different
3  issues that come up based on whatever we see coming
4  forward to our department via complaints, consumer
5  complaints or lawsuits.
6   Q.  In preparation for your deposition today, did
7  you look at any documents?
8   A.  I looked at a few related to --
9   Q.  Do you recall what you looked at?
10   A.  Probably everything that I received via -- on
11 the Castro case.  But you mean as in like ACA documents?
12      I'm not quite sure --
13   Q.  Any documents that you looked at in
14 preparation for this deposition?
15   A.  Oh, nothing in particular.  I think I looked
16 at --
17      MR. WIER:  The discovery.
18   A.  The discovery.  That's it.
19   Q.  Did you look at the ACA Statute of
20 Limitations?
21   A.  Yes.
22   Q.  And how about the complaint in this case?
23   A.  I've looked at it.  I didn't look at it today.
24   Q.  And did you look at the deposition of --

1   A.  John Burns?
2   Q.  John Burns?
3   A.  Yes.
4   Q.  Specifically, in your duties as vice president
5  of risk management and compliance at Collecto, are you
6  involved in any of the issues surrounding the purchases
7  of portfolios of debts for US Asset?
8   A.  No, not really, no.
9   Q.  So, is any portion of your job responsibility
10 include anything with respect to US Asset --
11   A.  No, not unless a lawsuit comes in, I guess, in
12 relation to the company; but in relation to Collecto, if
13 something were to come our way, then it would.
14   Q.  So if a debt or a portfolio has been referred
15 by US Asset, you might have responsibility, correct?
16   A.  Well, I don't get involved in that.  What
17 happens is that UCM (sic) the debt and gives it to
18 Collecto to collect on it.  I'm not involved in any of
19 that.
20      That's operations.
21   Q.  And who is in charge of operations?
22   A.  Well, Candice O'Brien was in charge.
23   Q.  So what, if any, situation would you be
24 involved in directly addressing issues with respect to

Page 9

1  debt referred by US Asset --
2      A.  Only if there was a lawsuit.
3      Q.  -- Management, Inc.?
4      A.  Only if there was a lawsuit because I manage
5  the litigation for the company.
6      Q.  Are you involved in determining what cases
7  being collected on by Collecto get referred to
8  attorneys?
9      A.  I'm not involved in that process.
10     Q.  And who is involved in that?
11     A.  Our Legal-Forwarding Department.
12     Q.  And who's in charge --
13     A.  My understanding is, it's Richard Manning, but
14  I know he was out on disability for some time.  So I
15  couldn't tell you who was overseeing it.
16         It reports to operations.
17     Q.  Okay.  I'm going to hand you what's been
18  marked as Deposition Exhibit No. 1.
19     A.  Okay.
20     Q.  Do you recognize this document?
21     A.  Yes.
22     Q.  And this is a complaint filed in the case that
23  brings us here today, correct?
24     A.  Yes.

Page 10

1      Q.  Now, if you can look at Exhibit A and Exhibit
2  B, those are the last four pages of Exhibit 1?
3      A.  Mm-hmm.
4      Q.  Do you recognize the form of Exhibit A?
5      A.  Yes.
6      Q.  And were you at all involved in the approval
7  process for this document?
8      A.  Yes.
9      Q.  What is the purpose of this document?
10     A.  Notice of legal placement, so it looks like
11  it's -- they're considering it for placing with an
12  attorney because probably all collection efforts were
13  exhausted.
14     Q.  Okay.  And what was your involvement, do you
15  recall when this -- strike that.
16         What was your involvement in any approval
17  process of Exhibit A?
18     A.  Typically, what would happen would be, they
19  would give me a letter -- if it's any different than
20  anything that we've had prior.
21     Q.  Okay.
22     A.  They would ask me to review it.  Operations
23  would ask me to review it.
24     Q.  Okay.  And when you review a document like

Page 11

1  this, what are you looking for?
2      A.  Well, we naturally want to make sure it's
3  compliant with the law.  And the review process would be
4  to look at any of the ACA documents that we have;
5  perhaps talk to legal counsel.
6      Q.  Let's back up a little bit.
7         Are you a member of any professional
8  organizations?
9      A.  ACA Collectors International, and the MAP List
10  Attorney Program, which is within ACA.  M-A-P List.
11  It's Members Attorney Program, but it's called the MAP
12  List Attorneys.
13     Q.  Okay.  Any other organizations?
14     A.  Mass. Bar Association.
15     Q.  Are you familiar with NARCA?
16     A.  No.
17     Q.  Do you regularly receive any publications from
18  any legal organization?
19     A.  I don't think they come -- not from a legal
20  organization.  I think we get Credit
21  & Collectors (sic) -- it's a trade publication.  I'm not
22  sure of the name.
23     Q.  Credit & Collections?
24     A.  Yes, and then there's another one, Collector.

Page 12

1  I think it's just Collector Magazine; those two
2  magazines that come to our department.
3      Q.  Any others?
4      A.  No.
5      Q.  And have you attended any ACA events?
6      A.  Yes.
7      Q.  And what was the last one?
8      A.  I've only attended -- I think I attended one a
9  couple of years ago.  That was -- I'm not sure of the
10  name of it.
11     Q.  Do you recall where it took place?
12     A.  It was in Chicago.
13     Q.  In Chicago.  And approximately what year?
14     A.  Probably 2005.
15     Q.  Any other events?
16     A.  Well, I have the Web seminars I attend via the
17  computer.
18     Q.  And approximately how often have you attended
19  Web seminars?
20     A.  Two recently, but it depends.  If something
21  seems applicable, then, you know, I put in a request.
22     Q.  What were the recent ones you attended?
23     A.  The TCPA, and the second one was the Red Flag
24  Rules; something like that.

Page 13

1    Q.   What is the Red Flag Rules?
2    A.   Regarding computer security, so different
3   things to look for and making sure you keep your data
4   safe.
5    Q.   Prior to 2007, had you taken any Web seminars?
6    A.   I'm sure I did, although I couldn't tell you
7   what I've taken.  Off and on I'll take them.
8    Q.   Have you ever taken an ACA Web seminar that
9   discussed Statute of Limitations?
10    A.   No, I don't think I have.
11    Q.   Have you ever attended any professional
12   organization meeting that discussed Statue of
13   Limitations?
14    A.   No, I don't think so.
15    Q.   Now, specifically looking at Exhibit A, do you
16   recall what you were concerned about when you reviewed
17   this document for approval?
18    A.   I think probably first thing that I would have
19   asked the operations is, you know, "do we place accounts
20   with attorneys for collection in our client's name?"  I
21   mean the idea is, we never misrepresent.  We always want
22   to state the truth.
23        I get the okay, "yes, we do this; yes, we
24   do that."  Then I say, "that that's fine."

Page 14

1        MS. COMBS:  Could you read back her last
2   answer?
3        (Record Read)
4        THE WITNESS:  Not very eloquent, I'm sorry.
5    Q.   Specifically, in your review process of
6   Exhibit A, did you consider any limitations on when this
7   letter should be sent to debtors?
8        MR. WIER:  I'm going to object to form.  May I
9   say something?
10        MS. COMBS:  Sure.
11        MR. WIER:  I think it may be misleading
12   perhaps.  "Limitations," do you mean limitations as
13   in Statute of --
14        MS. COMBS:  I do not mean Statute.  Let me
15   rephrase it because that's a good point.
16        MR. WIER:  Okay.
17   BY MS. COMBS:
18    Q.   When you reviewed Exhibit A, did you put any
19   requirements on who or when this document should be made
20   to debtors?
21    A.   No.
22    Q.   Have you ever done that?
23    A.   It depends on which letter.
24    Q.   But specifically with respect to this one, you

Page 15

1   don't recall listing requirements for the mailing of the
2   letter?
3    A.   Well, if it's in a series -- if letter No. 1
4   had gone out with the proper validation notice, then all
5   the regular procedures have taken place, then no, other
6   than the fact it falls into a sequence, in a series of
7   letters.
8    Q.   And in reviewing this document, Exhibit A, for
9   approval, did you consider or discuss where this letter
10   was mailed in what sequence?
11    A.   I don't recall any specific conversation to
12   that effect.  We -- in general, there's always a process
13   for following -- I think they call it tactics.  Letter
14   one had to have gone out within a certain period of
15   time.
16        Any letter after that, we would wait 35
17   days or more, you know, taking into consideration the
18   validation period.  So that type of thing we always
19   looked for.
20    Q.   Now, how is that implemented for collectors so
21   that, for example, they are instructed that before you
22   send Exhibit A, you have to have sent letter one, and
23   wait 35 days?
24    A.   I think that's -- it is all programmed into

Page 16

1   the IT programming of the way the letter tactics work.
2    Q.   And are you involved in working with the IT
3   people for the programming?
4    A.   Not with the programming, no, but they do ask
5   me, you know, "how many days between letter one" -- that
6   was asked and answered a long, long time ago.  So that
7   type of thing was asked.
8    Q.   Do you recall when Exhibit A was approved by
9   you, approximately?
10    A.   You know what, I couldn't tell you.  I know
11   typically if they send me a letter that, what will
12   usually happen is, I'll consult with some people.  And
13   once it's been approved through the people that I've
14   talked with, then I'll give approval.  I mean, you
15   know...
16    Q.   Now, above the tear-off portion, there's --
17   above the bars, there's a number.
18        Does that give you a clue as to when this
19   document was approved?
20    A.   It does not give me a clue, no.
21    Q.   Okay.  Now, previously, you mentioned that in
22   reviewing letters for approval, you sometimes contact
23   attorneys.
24        Who would you contact?

1    A.  Well, it could be -- I could talk to our
2  outside counsel or I could talk to someone on the MAP
3  list or if I had a question, I could have asked ACA
4  compliance officer.
5         I don't recall that I did that for this
6  particular letter.
7    Q.  And who was your outside counsel?
8    A.  Michael Kraft.
9    Q.  And has he been outside counsel for Collecto
10 since you've been working there?
11   A.  Yes, he was there before I got there.
12   Q.  And how frequently do you work with Michael
13 Kraft?
14   A.  He comes in once a week.
15   Q.  And do you usually see him on that visit?
16   A.  Yes, he comes in specifically to the
17 Compliance Department.
18   Q.  Okay.  And of the Compliance Department, who
19 else is employed there?
20   A.  We have a compliance manager and a compliance
21 assistant.
22   Q.  Who is your compliance manager?
23   A.  Mianne Schall.  M-I-A-N-N-E; Schall,
24 S-C-H-A-L-L.

1    Q.  And who is?
2    A.  Compliance assistant?
3    Q.  Yes.
4    A.  A gentleman named Uri, U-R-I, and the last
5  name is Spinn, S-P-I-N-N.
6    Q.  And do they both report to you?
7    A.  Yes -- well, Uri reports to Mianne, and Mianne
8  reports to me.
9    Q.  And generally, what is Mianne Schall
10 responsible for?
11   A.  Licensing, annual reports, making sure all the
12 licenses are up to date, correspondence with debtors,
13 answering complaints.
14   Q.  And Uri, what is he involved in?
15   A.  He's the assistant.  He's kind of overflow.
16 He does everything.
17   Q.  And generally, what issues are covered in the
18 once-a-week meeting with Michael Kraft?
19   A.  Well, all the litigation that's ongoing; you
20 know, any issues that come up.  When we have an issue
21 that comes up, I'm busy really investigating it, and
22 looking into it through operations, or whatever
23 department I need to work with, to uncover what the
24 problem is, and try to fix it; really just trying to fix

1  any problems we see that might arise.
2    Q.  Anything else that you talk with Michael Kraft
3  about?
4    A.  It could be any compliance issue.
5    Q.  Now, specifically, again, looking at Exhibit
6  A, was there any consideration when you reviewed this
7  document for approval of what impact, if any, the Statue
8  of Limitations would have on the sending of this letter?
9    A.  Not specifically.  As a general practice, CCA
10 does not litigate on out-of-statute debt.  So we
11 wouldn't have -- you know, I wouldn't have considered
12 that.  It's not our practice to do that.
13   Q.  Now, how is it determined by CCA -- and CCA is
14 Collecto Corporation of America; is that right?
15   A.  Collection Company of America.
16   Q.  Collection Company of America.
17        And what is Collecto?
18   A.  It's Collecto, Inc. doing business as
19 Collection Company of America or CCA.
20   Q.  Okay.  How is it determined what the Statute
21 of Limitations is for a particular debt?
22        MR. WIER:  Object to form.
23   A.  For a particular debt?
24        MR. WIER:  Object to form, but you can answer.

1    A.  We don't determine based on debt.  I think we
2  determine based on state, and that's based off the ACA
3  information we receive.
4    Q.  Okay.  Is it fair to say that in determining
5  the Statue of Limitations -- is determined on the
6  portfolio basis?
7    A.  No, I don't think so.
8        MR. WIER:  Object to form.
9  BY MS. COMBS:
10   Q.  What is the process by which a particular debt
11 is identified as in or out of statute?
12   A.  A particular debt?  I don't think that's how
13 it's determined.
14   Q.  All right.  How is it determined?
15   A.  I think it's determined based on state law.
16   Q.  Okay.  I'm trying to get to the process; all
17 right?
18   A.  Okay.
19   Q.  Okay.  So, for example, if you look at Exhibit
20 A, it's a debt -- US Asset Management debt, and it's
21 owed, apparently, by Nemesio Castro?
22   A.  Mm-hmm.
23   Q.  It was originally a Sprint PCS debt, correct?
24   A.  Yes, my understanding.

Page 21

1    Q.   And how would it be determined what the Statue
2  of Limitations of this debt owed by Nemesio Castro?
3    A.   I think because --
4        MR. WIER:  Object to form.
5    A.   I think because the debtor resides in Texas,
6  they would have applied -- operations would have applied
7  the four-year Statue of Limitations, which we believe is
8  the Statue of Limitations in Texas.
9    Q.   Okay.  And is there some mechanism for marking
10  debts as to when the debt expires?
11    A.   I don't know.  I think that would be maybe an
12  IT function.
13    Q.   Or would it be better to talk to someone from
14  operations?
15    A.   They might have the answer for you.
16    Q.   Okay.  Is there any mechanism that you're
17  aware of whereby CCA identifies a portfolio and the
18  Statute of Limitation?
19    A.   If there is, I'm just not aware of it.  I'm
20  probably not the right person to ask that question.
21    Q.   Okay.  So who would determine whether or not
22  to send Exhibit A to Nemesio Castro?
23    A.   I think this is the -- you know, I don't know
24  for sure.  I would say this is something that would be

Page 22

1  handled in our Legal-Forwarding Department.
2    Q.   And so as you sit here, you don't really know
3  what the mechanism is for determining when Exhibit A is
4  sent?
5    A.   No.
6    Q.   Let me rephrase that because that was a
7  negative, negative.
8        Do you know what the mechanism is for
9  determining when to send a document of the form of
10  Exhibit A to a debtor?
11    A.   No, I don't.
12    Q.   Do you know what the mechanism is for
13  evaluating -- strike that.
14        Other than your employment at CCA, did
15  you have, in any of your education or prior employment,
16  any experience in debt collection?
17    A.   No.
18    Q.   And other than your involvement in this
19  lawsuit, in your education or employment, did you have
20  any experience in communications or utility regulations?
21    A.   No.
22    Q.   Did you ever hear of the Federal
23  Communications Act before this lawsuit?
24    A.   I've heard of it.

Page 23

1    Q.   In connection with --
2    A.   With nothing -- not anything in particular.
3    Q.   When did you first become aware there was a
4  two-year federal Statue of Limitations on cell phone
5  debt?
6    A.   I don't think there is one.
7        MR. WIER:  Object to form.
8  BY MS. COMBS:
9    Q.   When did you become aware there was an issue
10  as to whether or not the Statue of Limitations on cell
11  phone debt was two years?
12    A.   With this lawsuit.
13    Q.   Does CCA do any collection of US Department of
14  Education debt?
15    A.   Yes.
16    Q.   And have you had any activity with respect to
17  the Statue of Limitations for US Department of Education
18  debt?
19    A.   There's a separate department that handled all
20  the Ed. Department debt.
21    Q.   What is that department?
22    A.   We call it the Ed. Department.
23    Q.   And who would be responsible for compliance in
24  the Ed. Department?

Page 24

1    A.   In the Ed. Department, Judy Commesso.
2    Q.   Can you spell her last name?
3    A.   C-O-M-M-E-S-S-O.
4    Q.   Are you aware as to what the Statue of
5  Limitations is for US Department of Education debt?
6    A.   No, I'm not.
7    Q.   Do you know whether or not the state Statue of
8  Limitations applied to US Department of Education debt?
9    A.   As I said before, it's a completely different
10  department that handles that.  I have no involvement in
11  that at all.
12    Q.   Do you know what information on the age of
13  debt is acquired from the sellers of portfolios?
14    A.   I'm sorry, can you repeat that?
15    Q.   Yes.  I'm asking when CCA is collecting on
16  portfolio debt?
17    A.   Mm-hmm.
18    Q.   Do you know what information is obtained from
19  the original creditor about the age of the debt?
20    A.   Well, they probably get a service date or a
21  charge-off date.
22    Q.   And would that be immediately available to the
23  collector on a particular portfolio?
24    A.   I think it's on every account note; the

Page 25

1   service date is.
2       Q.   Since when was that placed on every account?
3       A.   Oh, I don't know.  As long as I've been there,
4   as far as I know.
5       Q.   All right.  I'm going to have you look at
6   Exhibit B to Exhibit 1.
7            Do you recognize the form of this
8   document?
9       A.   Yes.
10      Q.   And were you involved in the approval process
11  of Exhibit B?
12      A.   I might have been.  You know, if I was with A,
13  I would have been with B as well.  Usually I'll only get
14  it -- get a review of a letter if there are any changes
15  made, you know, other than the name of the creditor.  If
16  it's something there are no changes made, and it's been
17  approved by the compliance department in the past, it
18  might not have come to me; but assuming that it did.
19      Q.   Is it fair to say that Exhibit A and Exhibit B
20  are more recently --
21      A.   Yeah, actually, they probably would have
22  because we haven't had purchased debt that long;
23  probably 2006, but I'm not positive of the date.
24           And so, I would have received this.

Page 26

1       Q.   Okay.  Let me finish my question before you
2   answer; okay?
3       A.   Okay.
4            MR. WIER:  That's all right.
5   BY MS. COMBS:
6       Q.   And you started in 2002?
7       A.   2004, November of '04.
8       Q.   And as you sit here today, do you recall what
9   you reviewed on Exhibit B before you approved it?
10      A.   No, this looks fairly generic.  I might have
11  asked them, you know, just to make sure everything is
12  accurate because I don't do the operations portion.  So
13  I rely on them when I'm asking them a question.  You
14  know, "does this happen?  Does this typically take
15  place?"
16           Like we have verified assets in your
17  name, I probably would have asked, "do we actually do
18  that?"  And they would have told me, "yes, we do do
19  that."  So that's the type of thing I would have asked.
20      Q.   And again, do you know whether this length of
21  the Statue of Limitations at all was considered when you
22  reviewed Exhibit B?
23      A.   No, it was not.
24      Q.   I'm going to hand you what's been marked as

Page 27

1   Exhibit 2.
2            Do you recognize the form of this
3   document?
4       A.   Yes.
5       Q.   And what is this document?
6       A.   The account note.
7       Q.   And is it normal for you in the context of
8   your responsibilities to review account notes?
9       A.   If a lawsuit came my way, yes, I would look at
10  it.
11      Q.   Okay.  Now, is there any information here that
12  refers to the charge-off date?
13      A.   I don't know if they use -- there's a service
14  date, which is the last date of service that the
15  consumer would have had with the original creditor.
16      Q.   And what line is that on?
17      A.   It's towards the top of the first page.  It's
18  on the line where you see list date.  It's the next
19  category in.  It says "SRV 2/2/05" for service date.
20           MS. COMBS:  Let's go off the record.
21           (Off Record Discussion)
22  BY MS. COMBS:
23      Q.   Now, is it 2/2/05 under LST?
24           MR. WIER:  Right here.

Page 28

1       Q.   Oh, I see.  All right.
2            Let's look at that line that begins list
3   01/07/07?
4       A.   Mm-hmm.
5       Q.   What does that refer to list?
6       A.   That's the day the account was placed with
7   CCA.
8       Q.   And then next is SRV?
9       A.   Mm-hmm.
10      Q.   And that's the?
11      A.   The service date.
12      Q.   And then after that, it says "LTRS6," what
13  does that refer to?
14      A.   There must have been six letters sent.
15      Q.   And then it says --
16      A.   Times.
17      Q.   "Times 54," what is that?
18      A.   I don't know what that means.
19      Q.   Do you know what "called 79" means?
20      A.   I would assume that's 79 calls.
21      Q.   And CON1?
22      A.   I don't know what that means.
23      Q.   Okay.
24           All right.  Specifically referring to

Page 29

1 Exhibit A, can you show me where on Exhibit 2 it shows
2 that Exhibit A was sent?
3     A.   This is awfully small, so you have to give me
4 a moment.  It was sent on May 14th of '08.
5     Q.   And what page are you looking at of Exhibit --
6     A.   Page 8 of Exhibit 2.
7     Q.   Okay.  And are we looking at the seventh line
8 from the bottom?  It starts "JQC"?
9     A.   Yep.
10     Q.   And that says, "LS No. 58"?
11     A.   Yep.
12     Q.   And is that --
13     A.   That's letter sent No. 58.  And if you look on
14 this Exhibit A, there's a little 58 here.
15     Q.   Again, we're referring to this code number
16 that is above the tear-off sheet, and it's after the
17 second dash, correct?
18     A.   Yes.
19     Q.   And does it show Exhibit B being sent,
20 Exhibit 2?
21     A.   Yes.
22     Q.   And where is that shown?
23     A.   Second line from the bottom.
24     Q.   And that's 6/03/08?

Page 30

1     A.   Correct.
2     Q.   And again "JQC"?
3     A.   Mm-hmm.
4     Q.   And then it looks like "LS No. 12"?
5     A.   Mm-hmm.
6     Q.   You have to say yes.
7     A.   Yes, mm-hmm.
8     Q.   And Exhibit B, again, if you look above the
9 tear off, the third -- in the code number, after the
10 second dash, there's a 12?
11     A.   Yes.
12     Q.   And that conforms --
13     A.   Corresponds, yep.
14     Q.   Do you know who JQC is?
15     A.   Yes, Jacqueline Chandler.  She's in our IT
16 Department.
17     Q.   And what is her part in the process?
18     A.   I don't really know.  She's sends out the
19 letters based on the tactics that are put in place in
20 operations.  She doesn't make the determination of when
21 to send the letter out.
22     Q.   And the entry "CB," would that be a collector,
23 if you look again --
24     A.   Yeah, I couldn't tell you.

Page 31

1     Q.   But if a letter was sent, it would be
2 indicated in the notes as LR and the number; is that
3 correct?
4     A.   LR is letter requested.  LS is letter sent.
5     Q.   And who requests the letter?  What type of
6 person?
7     A.   Someone from operations.
8     Q.   All right.  If you could look on the first
9 page of Exhibit 2, and if you could look at the notes
10 beginning with the entry and the initials GC?
11     A.   That's our GC dialer.  That's a dialer system.
12 That's not a person.
13     Q.   And what is involved in that first entry
14 2/15/07?  What happened?
15     A.   I'm not positive, but it looks like the GC
16 dialer would have tried to dial the person's number.
17     Q.   Is there any indication as to whether or not
18 there was contact?
19     A.   Usually it will say, "left a message."  So I
20 can't tell from this.  So that would be a question to
21 ask operations.  They would know the answer.
22     Q.   So on Exhibit 2, does it show anywhere that a
23 letter was sent to Mr. Castro?
24     A.   On 1/26/07, under the JQC, at 1/27, it says,

Page 32

1 "LS No. 11."
2     Q.   Do you know if that's the first letter?
3     A.   That's the first letter.
4     Q.   And again, I'm going to ask you -- if you
5 don't know, you don't know -- what does it mean when --
6 in the second entry for GC on page one on "2/15/07, 2000
7 DLC letter series answering machine," do you know what
8 that refers to?
9     A.   I do not.
10     Q.   Again, could you review this to see if there
11 were any contacts with Mr. Castro by phone?
12     A.   What do you mean by "contact"?  They actually
13 spoke to him?
14     Q.   Yes.
15     A.   Left message on an answering machine, but
16 that's not speaking with the person.  Looks like the
17 first one I see -- I don't know if the person spoke to
18 them.  It says, "left message with a third party" at a
19 particular number.
20     Q.   What page are you on?
21     A.   I'm on page five.  It could have been just
22 the -- the MGR, I think, might be a dialer.  I'm not
23 sure if it's an automatic message.  That would be an
24 operations question.

Page 33

1    But it might be the automated message
2  left a message on the machine, but I'm not sure.  "Left
3  message with third party at that number," that you would
4  have to check with operations on.
5    Q.  Okay.
6    A.  Because MGR might be an automated thing.  The
7  MGR -- I think that's the dialer manager, but you would
8  have to confirm, on December 5th.  I don't see a person
9  here.
10    Again, you know, I see a few more on
11  December 7th, '07, but I couldn't tell you if an actual
12  personal was spoken to or it was an automated message
13  left.  Typically, when a collector will speak to a
14  consumer, there would be a conversation, what took
15  place.  So that, I don't see, and I'm on the last page.
16    On June 9th of '08 -- oh, it says,
17  "debtor telephoned office."  That DTO means debtor
18  telephoned office, but we didn't call the debtor.  They
19  called in.  "Wife called in," it says.  So it looks like
20  maybe the first conversation with a person.
21    Q.  Could you look on page eight, the fourth line,
22  "MGR 12/13/07."  It says, "A3 attempt POSS fax"?
23    A.  Attempt possible fax.
24    Q.  At a particular number?

Page 34

1    A.  Yeah, and I'm not sure what A3 means.
2  Sometimes it could be a collector, and sometimes it can
3  be a code for something in the IT Department.
4    Q.  Then in the middle on "2/2/08 BEM" --
5    A.  Hold on.  2/2/08?
6    Q.  Again, on page eight.
7    A.  Okay.
8    Q.  It says, "no delinquency date.  Cannot
9  report."
10    Do you know what that means?
11    A.  I would assume that they're saying they don't
12  have a delinquency date and they can't report to the
13  Credit Bureau.
14    Q.  Is the delinquency date different from the --
15    Is there any entry on the first page of
16  Exhibit 2 that refers to a delinquency date?
17    A.  I don't think so, but I'm not positive.  It
18  would be a question for operations.
19    Q.  And again, on that same page, "5/8/08, 4,000
20  begin legal collect."
21    Do you know what that refers to?
22    A.  I would assume that's when the account goes
23  from regular collections over to the Legal-Forwarding
24  Department.  That's another question you can confirm

Page 35

1  with operations.
2    Q.  Okay.  I'm going to hand you a document that's
3  been marked as Deposition Exhibit No. 3.
4    Do you recognize this document or the
5  form of that document?
6    A.  Yes.
7    Q.  What is that document?
8    A.  Purchase and sale agreement between NCO (sic)
9  and UCM (sic).
10    Q.  Normally, in the context of CCA collecting on
11  a US Asset Management debt, would the purchase and sale
12  agreement be forwarded to US Asset Management -- or
13  strike that -- to CCA?
14    A.  I assume so, but, you know, I'm not involved
15  in that process, so I couldn't tell you.
16    Q.  So in the normal course of your
17  responsibilities at CCA, would you not see a purchase
18  and sale agreement if CCA were collecting a debt from a
19  U.S. Asset Management portfolio?
20    A.  I -- it would actually, I think, goes to
21  however is overseeing the UCM (sic) debts --
22  collections.
23    Q.  But it wouldn't be you?
24    A.  It wouldn't be me.  I don't oversee it.

Page 36

1    Q.  And are you ever involved in the negotiations
2  of the purchase and sale agreement for US Asset
3  Management?
4    A.  No, I'm not.
5    Q.  I'm handing you a document that's been marked
6  as Deposition Exhibit No. 4.
7    A.  Mm-hmm.
8    Q.  Do you recognize this document?
9    A.  I do.
10    Q.  What is this document?
11    A.  It's a Fastfax from ACA.
12    Q.  And how is this document used from CCA?
13    A.  Well, we would look at each state's Statue of
14  Limitations, and that would probably help us -- be one
15  of the things we would look at when determining whether
16  we can sue on an account.
17    Q.  What else would be looked at?
18    A.  What else, what do you mean?
19    Q.  You said that Fastfax was one of the things
20  that CCA would look at when determining whether or not
21  to sue on an account.
22    What other things would be looked at?
23    A.  Oh, okay.  Well, whatever attorney we forward
24  the account to would be looking at the Statue of

Page 37

1  Limitations for whatever state they're in. They would
2  be the people to know exactly what the Statue of
3  Limitations is in their state, what can be sued on, and
4  what cannot.
5      Q.  Is that determination made before the mailing
6  of Exhibit A or B to Exhibit 1?
7      A.  I don't know. I know they look at a variety
8  of things. You know, whether the person has assets and
9  probably I would assume that --
10          I'm assuming, so I don't know.
11     Q.  And who would make that determination?
12     A.  What, could you ask again?
13     Q.  Yes --
14     A.  Who determines if we sue on an account?
15     Q.  Who determines -- Answer that question:
16          Who determines if you sue on an account?
17     A.  Operations.
18     Q.  And do you know who in operations makes that
19  determination?
20     A.  It would probably be a combination of people,
21  but, you know, VP of ops. would definitely have a say in
22  there.
23     Q.  And again, are you typically involved in
24  making any determinations about Statue of Limitations in

Page 38

1  your general job responsibilities?
2      A.  No, I just give them -- if anyone is looking
3  for information, I will give them information.
4      Q.  And so if someone asks you on a case-by-case
5  basis?
6      A.  If someone asks, I would probably refer to
7  this document. I would look to Texas, or wherever it
8  happened to be. I would read them what it said, and
9  then they would often go to their counsel in whatever
10  state they're suing on, and that's probably how a
11  determination would be made.
12     Q.  Okay. Were you the person who secured
13  Exhibit 4 for use --
14     A.  No, I'm sorry.
15     Q.  -- by CCA?
16     A.  This particular one is April of '09, and I
17  think I had asked my compliance manager -- I was not
18  working from the office, and I asked her to pull off --
19  because we use ACA on-line.
20          And so she pulled off the latest version.
21  The Texas statute hasn't changed. If ACA has an update,
22  they typically will tell you when the latest update was.
23     Q.  So the actual Fastfax from ACA on Statue of
24  Limitations that is used by CCA is off of the updated

Page 39

1  Internet?
2      A.  Typically, mm-hmm.
3      Q.  And do you know who would check the Fastfax
4  Statue of Limitations off the Internet normally in the
5  normal process of evaluating a debt?
6      A.  We check it.
7          MR. WIER: Object to form, but you can answer.
8      A.  We try to keep up to date, you know, if we see
9  something coming along, I go on the MAP list or we're
10  looking at that website frequently; we probably every
11  day, a number of times a day.
12     Q.  Other than the document you have produced as
13  Exhibit A, are there any instructions on the Internet
14  about how to use the Statue of Limitations off of an ACA
15  Fastfax service?
16     A.  No, I think it's just as a reference.
17     Q.  Now, in the very beginning it says, "Now get
18  immediate access to ACA's compliance expertise. Visit
19  E-Compliance," and it tells where?
20     A.  Mm-hmm.
21     Q.  Do you ever use that?
22     A.  I have used it, yes.
23     Q.  And in what kind of circumstance?
24     A.  If I have a compliance question that I can't

Page 40

1  find an answer to on the Fastfax.
2      Q.  Have you ever used ACA's compliance expertise
3  on the question of Statue of Limitations, as you recall?
4      A.  Not --
5          MR. WIER: Object to form.
6      A.  Not on this type of thing. I'm not sure if
7  I've ever asked, but I definitely know not on the
8  two-year Statue of Limitations that you had asked
9  about.
10     Q.  Specifically, have you done any research about
11  the Statue of Limitations on the Federal Communications
12  Act?
13     A.  Not prior to this lawsuit. I have read a few
14  things after, but nothing that would suggest that there
15  is a two-year Statue of Limitations on cell phone debt.
16     Q.  And specifically, what did you do when this
17  lawsuit was filed and you became aware of it?
18     A.  Probably would have talked about it with
19  Michael Kraft, our outside counsel, and I would have
20  talked about it with John Burns, and our compliance
21  folks.
22     Q.  Do you recall having conversation with Michael
23  Kraft about the lawsuit, Castro versus Collecto?
24     A.  We talk about all lawsuits, yes.

Page 41

1  Q.  Do you recall the first conversation you had
2  with Michael Kraft about this?
3  A.  No, not specifically.  Just, in general, we
4  probably would be in long line of list of things we
5  talked about.  When we talk on Tuesdays, we talk about
6  each lawsuit we have.  So that would be one of the
7  lawsuits.
8  Q.  Do you recall talking with John Burns about
9  the Castro versus Collecto lawsuit?
10  A.  In general, I know I spoke with him about it.
11  Q.  Do you recall when you first time spoke to him
12  about?
13  A.  I do not.  Probably whenever we got -- as soon
14  as we got the complaint, I would have talked to him.
15  Q.  Do you recall what you said to him and what he
16  said to you?
17  MR. WIER:  Object to form.  That's party
18  investigation after the lawsuit has been filed.
19  That's privileged.  Our position is clear on the
20  case, and I'm not going to let her divulge
21  privileged communications.
22  BY MS. COMBS:
23  Q.  Are you going to follow your attorney's
24  instructions?

Page 42

1  A.  Certainly.
2  Q.  Okay.  Again, referring to Exhibit 4, and if
3  you could turn to the Texas section, which is page...
4  A.  Page 27.
5  Q.  Page 27 or CCA329; okay.
6  Instead, look to the very first page of
7  Exhibit 4, CCA303.
8  A.  Mm-hmm.
9  Q.  Page 1 of 34.
10  A.  Mm-hmm.
11  Q.  Under the Statue of Limitations, where it
12  says -- title, "Statue of Limitations," it says: "The
13  applicability of statues of limitations vary from
14  state-to-state and from case to case depending on the
15  cause of action in the lawsuit.  We have listed a few
16  general statute of limitations here.  They are provided
17  for information only.  Check with your own attorney to
18  determine which, if any, are applicable to a given
19  action."
20  Do you see that?
21  A.  I do.
22  Q.  Do you give any instructions to anyone at CCA
23  about when they ought to check with their attorney to
24  determine what Statue of Limitations is applicable to a

Page 43

1  given action?
2  MR. WIER:  Object to form, but you can answer.
3  A.  Well, I think we always do that.  We are
4  always checking with attorneys.  I mean we know this is
5  just a reference.
6  We've not relying on it as gospel, but we
7  take it as guidance.
8  Q.  But again, specifically, you're not the person
9  who makes the decision to send Exhibit A or Exhibit B
10  to --
11  A.  Correct.
12  Q.  -- to Exhibit 1?
13  So is there any instruction to the person
14  who determines whether to send Exhibit A or Exhibit B to
15  Exhibit 1, about when they need to consult with an
16  attorney about what Statue of Limitations apply?
17  MR. WIER:  Object to form, but you may answer.
18  A.  I think, you know, if they had asked me or any
19  of the compliance folks, they would have gotten the
20  answer that, "based on what we've seen at Fastfax -- on
21  the Fastfax, this is what we think."  We certainly have
22  always been allowed to consult an attorney, if need be.
23  But the Statue of Limitations, as I'm understanding it
24  in Texas especially, I don't think it has changed in a

Page 44

1  number of years.
2  So when we originally -- I think when the
3  original tactics went into place, the operations team
4  has known that -- well, they follow that.  They follow
5  what we say -- what we would have said, and we would
6  have said, "we rely on Fastfax;" and then they would
7  have probably gone to the attorney in, you know, in the
8  state and double-checked.
9  Q.  Okay.  Now, again, looking at page 33 of 34 of
10  Exhibit 4, also CCA335.
11  A.  Okay.
12  Q.  The very last paragraph above the copyright,
13  it says: "This information is not to be construed as
14  legal advice.  Legal advice must be tailored to the
15  specific circumstances of each case.  Every effort has
16  been made to assure that this information is up-to-date
17  as of the date of publication.  It is not intended to be
18  a full and exhaustive information of the law in any
19  area.  This information is not intended as legal advice
20  and may not be used as legal advice.  It should not be
21  used to replace the advice of your own legal counsel."
22  Do you see that?
23  A.  I do.
24  Q.  And were you aware of this, I would call,

1 disclaimer, in the ACA manual?
2     A.  Definitely.
3     Q.  And what, if anything, have you done to make
4 sure that the ACA manual is properly handled by
5 collectors at CCA?
6         MR. WIER:  Object to form, and ask for a
7     clarification, what do you mean by "properly
8     handled"?
9         MS. COMBS:  Handled pursuant to the
10     limitations that are expressly stated in the
11     document.
12     A.  The collectors don't get this.
13     Q.  The collectors do not have access to the
14 Fastfax?
15     A.  They get -- we give the information to the
16 operations staff, as far as I understand, the collection
17 managers, the vice presidents.  There are training
18 materials, but the Statue of Limitations would not be
19 something that they would be in charge of.
20     Q.  Who would be in charge of it, then?
21     A.  Probably the head of operations.
22     Q.  But who would be responsible for determining
23 whether Exhibit A or B to Exhibit 1 was sent; who makes
24 that determination?

1     A.  I think you had asked that question before and
2 it's the head of operations.
3     Q.  On an individual case?
4     A.  No, I assume it would be -- you know, I'm not
5 sure.
6     Q.  You're not sure, so I should ask?
7     A.  Yes.
8     Q.  All right.  Do you know whether any
9 information regarding the Statue of Limitations is
10 programmed into the consumer -- strike that.  Let me
11 start over.
12         Do you know whether any information
13 regarding the Statute of Limitations is programmed into
14 the computer?
15     A.  I don't know.
16     Q.  Again, if you want to refer to Exhibit 2, is
17 there a charge-off date listed in Exhibit 2?
18     A.  I don't know the answer to that.  I know the
19 service date and the list date.
20     Q.  And is there a purchase date of the debt
21 listed?
22     A.  I don't know that.
23     Q.  Is the SRV date, that we discussed earlier,
24 the date of last payment?

1     A.  It would be the late date of last service.
2     Q.  Do you know what that means?
3     A.  The service between the consumer and the
4 original creditor.  So I assume that it was the last
5 date they had service with the client, I guess.
6     Q.  Do you know if that means a payment?
7     A.  I don't know definitely, no.
8     Q.  Does it list anywhere who the original
9 creditor is on Exhibit 2?
10     A.  It lists the clients as UCM (sic).  You'll see
11 it says, "SPR."  That would be Sprint.  "450," I couldn't
12 tell you what that means, and then "US Asset
13 Management," which would be our client.
14         So it looks to be SPR.
15     Q.  Is it your responsibility in your position to
16 make a determination with respect to an individual debt
17 whether or not to file a lawsuit?
18     A.  No.
19     Q.  And is it your responsibility in your position
20 to determine whether or not a debt is within the
21 statute?
22     A.  No.
23     Q.  Is there anything on Exhibit 2 that would
24 indicate what state the debt was incurred?

1     A.  I don't know where it was incurred.  I just
2 see that the debtor resides in Texas.
3     Q.  Do you know how the information is inputted
4 into the computer for the first half of the first page
5 of Exhibit 2?
6     A.  Just a very general understanding, is that our
7 client probably has some sort of electronic file that
8 gets downloaded into our system.
9     Q.  Is there any information on Exhibit 2 that
10 indicates that the debt involved with Mr. Castro is a
11 cellular telephone debt?
12     A.  Well, I think just because we know it's
13 UCM(sic), they -- the Sprint debt is all cell phone.
14     Q.  Does the type of debt have any impact on how a
15 debt is handled?  What the collection processes are for
16 CCA?
17         MR. WIER:  Object to form.
18     A.  Could you restate that?
19     Q.  Yes.
20         I'm wondering, do you have different
21 processes for cell phone debt as opposed to medical
22 debt?
23     A.  There are different processes.  Operations is
24 in charge of how they handle each different type of

1  debt.  They separate it out in dealing with it.

2  Q.  That's not part of your responsibility?

3  A.  No, it's not.

4  Q.  Is there a contract between US Assets and

5  Collecto?

6  A.  I would assume so.

7  Q.  Do you know?

8  A.  I don't know.

9  Q.  Do you know who would know?

10  A.  John Burns.

11  Q.  Do you know whether any lawsuits have been

12  filed by US Asset in Texas?

13  A.  I don't know.

14  Q.  Is that part of your analysis, as to whether

15  or not to send Exhibit A or B?

16  MR. WIER:  Object to form, but you can answer.

17  A.  Can you state --

18  Q.  I'll rephrase it because it is a bit odd.

19  Now, you earlier determined, when you

20  reviewed Exhibit A and Exhibit B, that one of the

21  questions that you asked --

22  A.  Do we sue on debt?

23  Q.  Is there any instructions to the collectors

24  about whether or not to send Exhibit A or Exhibit B with

1  respect to the question of whether or not this creditor

2  has actually sued in Texas?

3  A.  Well, I don't think it's quite that way.  I

4  think, first, you have to have approval from our client

5  to be allowed to sue on debt, and I would -- that's an

6  agreement between the client and CCA, if we're allowed.

7  First, we need authorization to sue on,

8  and then if there were assets, I suppose, that's when

9  it's forwarded to whatever state attorney that deals

10  with the litigation in that particular state.  So, you

11  know, so if it was -- if CCA -- if the client had

12  authorized it, and there were assets, then it would be

13  forwarded to an attorney in that particular state, and

14  they would make the determination as to, you know, the

15  Statue of Limitations and when we would sue on it.

16  Q.  And the question I have is:

17  Prior to the sending of Exhibit A and a

18  particular debt, is there any instruction to the

19  collectors, or the person who determines whether to send

20  Exhibits A or B, to determine, whether the creditor, on

21  whose behalf Exhibit A and B are sent, had actually sued

22  in Texas?

23  A.  I don't know the answer.

24  Q.  Do you know who would?

1  A.  Probably Richard Manning or Candice.

2  Q.  Now, again, back to Exhibit 4, the Texas

3  statute --

4  MR. WIER:  Before we do that, could we take

5  just a quick break?

6  MS. COMBS:  Sure.

7  (Short Recess)

8  (Record Read)

9  BY MS. COMBS:

10  Q.  Looking at Exhibit 4 and Exhibit 2, and again

11  looking at the Texas Statute, which I believe is on page

12  CCA329 or 27 of 34?

13  A.  Mm-hmm.

14  Q.  And it says, "4 years debt."  And it says, "a

15  person must bring suit on the following actions not

16  later than four (4) years after the day the cause of

17  action accrues," with respect to, "debt."

18  Okay?

19  A.  (No verbal response.  Nods head).

20  Q.  How would it be determined when the four years

21  would expire on debt under the Texas Statute?

22  MR. WIER:  Objection, form.

23  A.  I don't know.

24  Q.  And specifically, is there any information on

1  Exhibit 2 that would indicate when that four-year period

2  would pass with respect to the Castro debt?

3  A.  I would assume the service date, but...

4  Q.  But you don't really know what the service

5  date is?

6  A.  No, the service date is right here.

7  Q.  No, I understand.

8  But you don't know what happened on that

9  date?

10  A.  I would assume that that's the last day a

11  payment made or a service to the client.

12  Q.  Would a service date also include the last

13  time there was contact with the client?

14  A.  I think it would have been more than that, no.

15  Q.  So it's your understanding that the service

16  date is the last date of a payment?

17  A.  Yeah, I couldn't tell you if my assumption is

18  correct, but that's how I understand it.

19  Q.  All right.  So for purposes of determining the

20  Texas Statue of Limitations with respect to the Castro

21  debt, what would be your understanding as to the last

22  date that a lawsuit could be filed?

23  A.  I would defer to the attorney that we would

24  use in Texas.

Page 53

1  Q. What information would the person who was
2  sending Exhibit A or B have with respect to whether or
3  not a debt could be pursued in litigation?
4  A. Well, I think that's done on a company-wide
5  basis. It's not done on an individual basis.
6  Q. And what do you mean by that, it's "done on a
7  company-wide basis"?
8  A. The determination of whether to sue on a
9  particular debt is based on criteria that's set up prior
10 to one particular account. It is a strategy by
11 operations on all debt; everything that we have in the
12 company.
13 Q. Does that strategy include the question of
14 whether or not there's been an expiration of the Statue
15 of Limitations date?
16 A. We don't sue on out-of-statute debt. So I
17 would assume that a determination is made once the
18 Statue of Limitations -- we won't sue on anything
19 outside of that.
20 Q. Do you know whether or not CCA collects --
21 other than phone litigation, collects on out-of-statute?
22 A. I don't know.
23 Q. What Statue of Limitations did CCA use for
24 cellular debt in Texas in June of 2007?

Page 54

1  A. I would assume the four-year Statue of
2  Limitations in Texas.
3  Q. Currently, what Statue of Limitations is CCA
4  using for cellular debt in Texas?
5  A. I don't think we specify for cellular debt. I
6  think we use all debt, four years, Texas.
7  Q. And again, in June of 2007, from what date is
8  the calculation of the Statue of Limitations dated from
9  with respect to debt collected by CCA?
10 A. I don't know.
11 Q. And who would know?
12 A. Candice O'Brien.
13 Q. Okay. Do you know whether any Statue of
14 Limitations types of dates were provided to CCA for the
15 purposes of the portfolio of which the Castro debt is a
16 portion?
17 A. I don't know how the portfolio is broken up.
18 I don't know if it's broken up by state.
19 Q. Okay. And again, looking at Exhibit 2, can
20 you tell what was the date that this debt was opened;
21 this collection activity was opened?
22 A. What do you mean, "opened"? It was listed
23 with CCA on 1/7/07.
24 Q. And that's the list date?

Page 55

1  A. That's the list date. That's the date when
2  UCM (sic) placed it with CCA.
3  Q. Do you know what was the date of the last
4  purchase with respect to the debt of Mr. Castro? Can
5  you tell that from Exhibit 2?
6  MR. WIER: Say again, date of last purchase?
7  MS. COMBS: Or last use?
8  A. Well, I'm assuming the service date, but...
9  Q. Okay. Do you know what was the date of the
10 last payment to the creditor?
11 A. I don't know.
12 Q. Do you know what the charge-off date is for
13 the Castro debt?
14 A. No.
15 Q. Have you done any research on the Statue of
16 Limitations for cell phone debt?
17 MR. WIER: Objection, form; asked and
18 answered.
19 BY MS. COMBS:
20 Q. You can answer again.
21 A. As far as I know, there is no two-year Statue
22 of Limitations on cell phone debt.
23 Q. But have you done research?
24 A. Only a little bit since the lawsuit; not prior

Page 56

1  to.
2  Q. Okay. Did you ever have -- strike that.
3  Did you have any discussions with anyone
4  prior to the list date 1/07 of the Castro date, as to
5  what the Statue of Limitations was on the portfolio of
6  which the Castro debt is included?
7  A. Not that I recall.
8  Q. Now, is it fair to say that the state law to
9  apply to the Statue of Limitations means there is
10 different Statue of Limitations depending on what state
11 law applies; is that fair to say?
12 MR. WIER: Object to form. Could you say that
13 again, I'm sorry?
14 MS. COMBS: All right. Let's make it more
15 concrete.
16 BY MS. COMBS:
17 Q. Looking at Alabama, it lists that "open
18 accounts," there's a three-year Statue of Limitations,
19 correct?
20 A. Mm-hmm. I see that, yes.
21 Q. And would that be the Statue of Limitations
22 that you would apply if a cellular phone debt had --
23 that the owner -- strike that.
24 A cellular debt from Alabama?

Page 57

1    A.  Well --
2      MR. WIER:  Object to form, but you may answer.
3    A.  I mean I'd have to read it and think about it,
4 between that and the contract law, but it wouldn't be
5 something that I would just apply.  It would be
6 something that there would be a determination made, not
7 just based on me reading the Statute of Limitations here
8 for three minutes.
9    Q.  Okay.
10    A.  I don't think it's a question that I could
11 answer at the moment.
12    Q.  Okay.  The question I have for you is:
13      If a phone call went from Texas to
14 Alabama, what state law would apply in Statute of
15 Limitations?
16    A.  Well, I think that's a procedural question
17 that probably our attorney would answer.
18    Q.  Would that determination be made before the
19 sending of Exhibit A and B on Exhibit 2?
20    A.  I'm not certain.
21    Q.  And how could we ascertain that?
22    A.  I'm not certain.  I think the procedures were
23 in place long before I got here.  So I'm not sure how it
24 was set up.

Page 58

1    Q.  Did CCA ever contact an attorney with respect
2 to the determination of what the Statute of Limitations
3 is for cell phone debt at any time?
4    A.  After the lawsuit?
5    Q.  Let's start with before the lawsuit.
6    A.  Not before the lawsuit, no, not that I know
7 of.
8    Q.  And subsequent to the lawsuit, other than
9 Mr. Wier, did you contact any attorney?
10    A.  Well --
11      MR. WIER:  Object to form; asked and answered,
12 but you can answer again.
13    A.  As we said before, it was Michael Kraft.
14    Q.  Anyone else?
15    A.  And he spoke to, I think, a couple of other
16 people.
17    Q.  Do you know who else he spoke to?
18    A.  Manny Newburger probably, and Greg (sic)
19 Manishin.
20    Q.  Did you yourself speak to Manny Newburger or
21 Greg --
22    A.  Manishin.  No.  I might have sat in on a call
23 once to one of them, but I'm not really sure.
24    Q.  Okay.  And did CCA ever get an opinion from an

Page 59

1 attorney about what the Statute of Limitations is on
2 cellular phone debt, a written opinion?
3    A.  No, not that I know of yet.
4    Q.  Were you involved in the briefing of the class
5 brief in the Castro case?
6    A.  Could you clarify what you're asking?
7    Q.  Are you aware that a motion for class
8 certification was filed?
9    A.  Yes.
10    Q.  And CCA had to respond to that motion in
11 connection with the litigation?
12    A.  Yes, I'm aware of that.
13    Q.  Did you participate in any discussions with
14 respect to responding to the class motion?
15    A.  I probably would have listened in.  I don't
16 think I would have really participated.
17    Q.  Did you do any research in connection with
18 that brief?
19    A.  Offhand, I can't recall.
20    Q.  Again, referring to Exhibit 2, does Exhibit 2
21 show what kind of debt the Castro debt is?
22      MR. WIER:  Objection, form; asked and
23 answered.
24    A.  We did talk about that before.

Page 60

1    Q.  Okay.  And is that where you referred to the
2 Sprint --
3    A.  Yes, you see on the document, yes.
4    Q.  Do you know whether or not, in connection with
5 the collection of Mr. Castro's debt, any underlying
6 documents were obtained; for example, billing statement?
7    A.  I don't know.
8    Q.  Who would know that?
9    A.  I would assume the Legal-Forwarding
10 Department.
11    Q.  Are you familiar with the bona fide error
12 defense that has been asserted by CCA in connection with
13 this litigation?
14    A.  In general, yes.
15    Q.  What is your understanding of the factual
16 basis for the bona fide error defense asserted by CCA in
17 this litigation?
18    A.  Well, I think as long as we have reasonable
19 procedures in place to prevent errors, and something
20 comes along that we hadn't foreseen, that we might be
21 able to raise the bona fide error defense; but I
22 couldn't tell you more specifically.
23    Q.  What procedures did CCA have in place to
24 prevent the error of sending a letter asserting a claim

Page 61

1 after Statute of Limitations had expired?
2     MR. WIER: Object to form, but you may answer.
3     A. Well, I think the review of any materials,
4 whether it's the ACA documents, trade publications,
5 speaking with attorneys, reviewing the MAP list,
6 procedures that were in place prior to my arrival when,
7 I think, other attorneys had been -- there were
8 discussions with other attorneys in the past, probably
9 when the company was first set up. I mean all the
10 structure was in place.
11     And I think in speaking to the attorneys
12 that deal with litigation on this particular issue, on
13 an ongoing basis are the procedures that we have.
14     Q. Now, but what, in your procedures did you do
15 prior to the sending of the letter to Mr. Castro,
16 specifically what procedures were in place to prevent a
17 violation of the Statute of Limitations?
18     MR. WIER: Object to form, but you may answer?
19     A. Well, I think the general principle that CCA
20 follows is, we don't litigate on any out-of-statute
21 debt. Therefore the legal letters that are going out
22 would only be on accounts that are within the statutes.
23     Q. And who determines in your procedures when a
24 debt is in statute?

Page 62

1     A. Well, I would assume when we first purchase
2 the debt, we wouldn't purchase it if it was
3 out-of-statute debt or it was close to being out of
4 statute. All the strategies are set up by operations,
5 you know, prior to working any of the debt.
6     Q. Now, it's fair to say that CCA didn't actually
7 purchase the debt, correct?
8     A. CCA did not.
9     Q. No.
10     So what is CCA's portion -- you said that
11 CCA wouldn't purchase a debt that was out of statute.
12 But what is CCA's procedure to make sure that debt, that
13 it is working, was not out of statute?
14     MR. WIER: Object to form, but you may answer
15 again.
16     A. UCM (sic) is the debt purchaser. CCA is the
17 third-party collection agency. UCM lists the accounts
18 with CCA to collect on behalf of them.
19     At some point -- and I'm not involved in
20 this process. I think I'm just giving you my
21 understanding. When it lists -- when any client lists
22 with CCA, it's reviewed with operations, and the
23 strategies are put in place for all the accounts at that
24 point in time.

Page 63

1     Q. Is there any procedure to review that
2 procedure to make sure that the Statute of Limitations
3 is correctly computed?
4     A. I don't know.
5     Q. Who would know?
6     A. Well, I assume John Burns and perhaps Candice.
7     Q. What is your understanding as to the --
8 current understanding as to the applicability of the
9 Federal Communications Act Statute of Limitations?
10     A. That it is applicable to carriers, and it's a
11 tariff, and tariff charges between carriers.
12     Q. And when did you first become aware of this
13 Statute of Limitations under the Federal Communications
14 Act?
15     A. After this lawsuit.
16     Q. And when did you first gain your understanding
17 as to what types of debt the Federal Communications Act
18 is applicable to?
19     A. Probably from the general discussions that
20 we've had since the lawsuit.
21     Q. And again, those have been with your in-house
22 counsel?
23     A. We don't have in-house counsel.
24     Q. Your outside counsel?

Page 64

1     A. Mm-hmm, yes.
2     Q. Anyone else that you haven't mentioned?
3     A. No.
4     Q. Have you ever talked to Glenn Manishin, you,
5 yourself?
6     A. No, I don't think so.
7     Q. And have you ever spoken with Manny Newburger?
8     A. Not specifically, myself, no.
9     Q. And have you ever spoken with Elizabeth Simon?
10     A. No. I might have sat in on a conversation
11 with any one of the three, but not specifically spoke to
12 them myself.
13     Q. When you were sitting in on the conversation,
14 who else was present?
15     A. John Burns, as I recall.
16     Q. Now, for purposes of the defense of bona fide
17 error, obviously there has to be an error; is that fair
18 to say?
19     A. I would assume so.
20     Q. And what is the error here?
21     A. Well, we don't think we committed an error,
22 but I think you're supposed to -- you know, I'm not a
23 litigator, but I understand you present all arguments.
24     Q. What do you mean, "present all arguments"?

Page 65

1    A.  You plan for all contingency.  We don't think
2  there's a two-year Statute of Limitations.  But if there
3  was one, we made the error in not understanding that
4  there was one.
5    Q.  Why was that error an a bona fide error?
6    A.  Well --
7        MR. WIER:  Object to form.  I've been doing
8  this for 20 years.  I'm not even sure what that
9  means.
10       MS. COMBS:  She's lawyer.  She can answer the
11  question.
12       MR. WIER:  No, don't answer that question.
13  BY MS. COMBS:
14   Q.  Are you going to follow your lawyer's
15  instructions?
16       MR. WIER:  Yes.
17  BY MS. COMBS:
18   Q.  Okay.  What were CCA's procedures to maintain
19  to avoid the error that occurred here, if an error
20  occurred?
21       MR. WIER:  Stop.  We've been over this about
22  10 times already.  She's already told you about the
23  ACA procedures, talking to their lawyers --
24       MS. COMBS:  I understand, and I'm asking

Page 66

1  specifically to what procedures were maintained to
2  avoid the error that took place here?
3        MR. WIER:  That is our answer.  That's what
4  she's been telling you, over and over again.
5        MS. COMBS:  Are you instructing her not to
6  answer?
7        MR. WIER:  No, answer one more time.
8    A.  We do not believe we committed an error.
9    Q.  Okay.  The procedures that you have testified
10  to with respect to the bona fide error defense, what is
11  your opinion as to whether or not they were reasonable?
12   A.  Are you asking me, are our procedures
13  reasonable?
14   Q.  Yes.
15   A.  Yes.
16   Q.  And why are they reasonable?
17   A.  Well, I would think between ACA, which is
18  knowledgeable in collections, and attorneys that have
19  been doing collections for a number of years and we've
20  consulted with them, and that the people who have been
21  dealing in the collection industry for many years have
22  never come across this, it seems to me that it would be
23  reasonable to assume that there is no Statue of
24  Limitations for two years for telephone debt.

Page 67

1    Q.  Did you read the opinion of the court in the
2  Castro case with respect to the class certification?
3    A.  Not that I recall at the moment.
4    Q.  Are you aware that in the analysis of
5  plaintiff's motion for class certification, the court,
6  in the Castro case, analyzed the question of whether or
7  not the Statute of Limitations for Mr. Castro's debt,
8  was the two-year Statute of Limitations under the
9  Federal Communications Act?
10       MR. WIER:  I'm going object to that.  Object
11  to form.  Obviously whatever the judge did with
12  regard to the motion speaks for itself, and it's
13  not an appropriate question to ask this witness
14  about what Judge Montalvo said in an opinion that
15  she hasn't even read.
16       So don't answer that question.
17  BY MS. COMBS:
18   Q.  Are you going to follow your attorney's
19  instructions?
20   A.  Yes.
21       MS. COMBS:  I'm going to take a quick break
22  and make sure I've covered everything.
23       MR. WIER:  Okay.
24       (Short Recess)

Page 68

1        MS. COMBS:  Let's start by marking this
2  Exhibit 5.
3        (Exhibit No. 5 marked for identification)
4  BY MS. COMBS:
5    Q.  Handing you a document that's been marked as
6  Exhibit 5, the first page of which -- do you recognize
7  the first page of it?
8    A.  It's a training manual.
9    Q.  And I've just given you page CCA59 from that
10  manual; okay?
11   A.  Mm-hmm.
12   Q.  Let me ask you generally about the training
13  manual.
14       Did you participate at all in the
15  drafting of the training manual?
16   A.  No, I think that was in place prior to me
17  coming on board.  We might have made some updates.
18       We're in the process of looking through
19  it now, but have not done so.
20   Q.  Okay.  Specifically to looking CCA page 59.
21   A.  Okay.
22   Q.  The last two sentences, it says:  "A Bona fide
23  error is an error made in good faith without fraud or
24  deceit.  Complete documentation is the key in proving

Page 69

1  that the violation was an innocent mistake.  If you make
2  an honest mistake, and it can be proved, you and the
3  company will not be held liable."
4       What documentation are you relying on in
5  order to show that the bona fide error defense asserted
6  with respect to Mr. Castro was an innocent mistake?
7       A.  What this is, this is talking to a collector
8  and just telling them, to not lie on the account notes.
9       Q.  Okay.
10      A.  It should be an extemporaneous understanding
11  of exactly what went on when they communicated with the
12  debtor.  So it's nothing more than telling them to make
13  sure you're doing everything properly.
14      Q.  Okay.
15          All right.  Let me just ask you a few
16  more questions.
17          In connection with the collection of a
18  debt referred by US Asset Management, does CCA receive
19  any documents that describe the nature of the portfolio
20  being collected on?
21      MR. WIER:  I object to form.
22      A.  I'm not sure what you're asking me.
23      Q.  I'm saying, is there any document that would
24  be conveyed to Collection Company of America perhaps

Page 70

1  saying, "these are all cellular phone debt"?
2       A.  I would assume in the contract.
3       Q.  In the original contract between CCA and --
4       A.  And USAM.
5       MS. COMBS:  Have we been produced that
6  contract?
7       MR. WIER:  I doubt it.  I don't think it --
8  no, I don't know that I knew it was asked for.
9       MS. COMBS:  Okay.  Just for point of
10  clarification, if there is a contract between CCA
11  and US --
12      THE WITNESS:  UCM.
13  BY MS. COMBS:
14      Q.  Is that what you call it?
15      A.  USAM, US Asset Management.  It's just an easy
16  way to say it.
17      MS. COMBS:  Can you produce that for us?
18      MR. WIER:  I don't see why not, but I need to
19  make sure it exists.
20      THE WITNESS:  If it exists, you would have to
21  check with John Burns.
22      MS. COMBS:  I don't think that will be
23  necessary, but we would reserve the right to ask
24  questions about that document.

Page 71

1       MR. WIER:  Okay.
2       MS. COMBS:  Otherwise, I have no further
3  questions at this time.
4       THE WITNESS:  Okay.
5       MR. WIER:  All right.  We'll reserve ours
6  until the time of trial.  Okay.  You're done.
7       THE WITNESS:  Thank you.
8       (Deposition concluded at 1:00 p.m.)

Page 72

1          C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS )
3                               )
4  COUNTY OF PLYMOUTH            )
5       I, Rosemary F. Grogan, a Registered
6  Professional Reporter and Notary Public duly
7  commissioned and qualified in and for the Commonwealth
8  of Massachusetts, do hereby certify:
9       That SUSAN P. GIORDANO, the witness whose
10  deposition is hereinbefore set forth, was duly
11  identified and sworn by me, and that the foregoing
12  transcript is a true record of the testimony given by
13  such witness to the best of my ability.
14      I further certify that I am not related to any
15  of the parties in this matter by blood or marriage, and
16  that I am in no way interested in the outcome of this
17  matter.
18      IN WITNESS WHEREOF, I have hereunto set my
19  hand and affixed my notarial seal this 28th day of May,
20  2009.
21          _____
22          Rosemary F. Grogan, RPR
23          CSR No. 112993
24  My Commission Expires:  January 7, 2011

Page 73

1    ERRATA SHEET DISTRIBUTION INFORMATION

2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4    ERRATA SHEET DISTRIBUTION INFORMATION

5         The original of the Errata Sheet has

6    been delivered to Keith Wier, Esquire.

7    When the Errata Sheet has been completed by

8    the deponent and signed, a copy thereof should

9    be delivered to each party of record and the

10   Original forwarded to Cathleen Combs,

11   Esquire, to whom the original deposition

12   transcript was delivered.

13

14   INSTRUCTIONS TO DEPONENT

15        After reading this volume of your

16   deposition, please indicate any corrections or

17   changes to your testimony and the reasons

18   therefor on the Errata Sheet supplied to you

19   and sign it.  DO NOT make marks or notations n

20   on the transcript volume itself.  Add

21   additional sheets, if necessary.   Please

22   refer to above instructions for errata sheet

23   distribution information.

24

Page 74

1    SIGNATURE / ERRATA SHEET

2    Re:  Castro Vs. Collecto, Inc., et al.

3    DEPOSITION OF:  Susan P. Giordano  5/26/09

4         I, SUSAN P. GIORDANO, do hereby certify that I

5    have read the foregoing transcript of my testimony, and

6    I further certify that said transcript it is a true and

7    accurate record of said testimony (with the exception of

8    the corrections that are noted below).

9    PAGE     LINE(S)     READS        SHOULD READ

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17        Signed under the pains and penalties of

18   perjury this _____day of _____, 2009.

19   _____

20   SUSAN P. GIORDANO                  Date

21        Subscribed and sworn to before me this ____day

22   of _____, 2009.

23   _____

24   Notary Public       My Commission Expires:_____

SUSAN P. GIORDANO    MAY 26, 2009

## A

**ability** 72:13
**able** 60:21
**ACA** 7:11,19 11:4,9
11:10 12:5 13:8
17:3 20:2 36:11
38:19,21,23 39:14
45:1,4 61:4 65:23
66:17
**ACA's** 39:18 40:2
**access** 39:18 45:13
**account** 24:24 25:2
27:6,8 28:6 34:22
36:16,21,24 37:14
37:16 53:10 69:8
**accounts** 13:19
56:18 61:22 62:17
62:23
**accrues** 51:17
**accurate** 26:12 74:7
**acquired** 24:13
**Act** 22:23 40:12
63:9,14,17 67:9
**action** 3:8 42:15,19
43:1 51:17
**actions** 51:15
**activity** 23:16 54:21
**actual** 33:11 38:23
**Add** 73:20
**additional** 73:21
**addressing** 8:24
**advice** 44:14,14,19
44:20,21
**aerobics** 6:8
**affixed** 72:19
**age** 24:12,19
**agency** 62:17
**ago** 12:9 16:6
**agreement** 3:12
35:8,12,18 36:2
50:6
**al** 74:2
**Alabama** 56:17,24
57:14
**allowed** 43:22 50:5
50:6
**America** 1:12 3:10
19:14,15,16,19
69:24
**analysis** 49:14 67:4
**analyzed** 67:6
**annual** 18:11
**answer** 14:2 19:24
21:15 26:2 31:21
37:15 39:7 40:1

43:2,17,20 46:18
49:16 50:23 55:20
57:2,11,17 58:12
61:2,18 62:14
65:10,12 66:3,6,7
67:16
**answered** 16:6
55:18 58:11 59:23
**answering** 18:13
32:7,15
**apparently** 20:21
**APPEARANCES**
2:1
**applicability** 42:13
63:8
**applicable** 12:21
42:18,24 63:10,18
**applied** 21:6,6 24:8
**applies** 56:11
**apply** 43:16 56:9,22
57:5,14
**appropriate** 67:13
**approval** 10:6,16
13:17 15:9 16:14
16:22 19:7 25:10
50:4
**approved** 16:8,13
16:19 25:17 26:9
**approximately**
12:13,18 16:9
**April** 38:16
**area** 44:19
**areas** 6:5
**arguments** 64:23,24
**arrival** 61:6
**arts** 6:9
**ascertain** 57:21
**asked** 13:19 16:6,7
17:3 26:11,17,19
38:17,18 40:7,8
43:18 46:1 49:21
55:17 58:11 59:22
70:8
**asking** 24:15 26:13
59:6 65:24 66:12
69:22
**asks** 38:4,6
**asserted** 60:12,16
69:5
**asserting** 60:24
**Asset** 1:13 3:14 8:7
8:10,15 9:1 20:20
35:11,12,19 36:2
47:12 49:12 69:18
70:15
**assets** 26:16 37:8

49:4 50:8,12
**assistant** 5:1 17:21
18:2,15
**Association** 11:14
**assume** 28:20 34:11
34:22 35:14 37:9
46:4 47:4 49:6
52:3,10 53:17
54:1 60:9 62:1
63:6 64:19 66:23
70:2
**assuming** 25:18
37:10 55:8
**assumption** 52:17
**assure** 44:16
**attached** 3:21
**Attachments** 3:9
**attempt** 33:22,23
**attend** 12:16
**attended** 12:5,8,8
12:18,22 13:11
**attorney** 10:12
11:10,11 36:23
42:17,23 43:16,22
44:7 50:9,13
52:23 57:17 58:1
58:9 59:1
**attorneys** 9:8 11:12
13:20 16:23 43:4
61:5,7,8,11 66:18
**attorney's** 41:23
67:18
**Authority** 4:22,24
**authorization** 50:7
**authorized** 50:12
**automated** 33:1,6
33:12
**automatic** 32:23
**available** 24:22
**avoid** 65:19 66:2
**aware** 21:17,19
23:3,9 24:4 40:17
44:24 59:7,12
63:12 67:4
**awfully** 29:3
**a.m** 1:19
**A3** 33:22 34:1

## B

**B** 10:2 25:6,11,13
25:19 26:9,22
29:19 30:8 37:6
43:9,14 45:23
49:15,20,24 50:20
50:21 53:2 57:19
**back** 11:6 14:1 51:2

**Bar** 11:14
**bars** 16:17
**based** 7:3 20:1,2,2
20:15 30:19 43:20
53:9 57:7
**basis** 20:6 38:5 53:5
53:5,7 60:16
61:13
**Bates** 3:11,15,17,19
**beginning** 31:10
39:17
**begins** 28:2
**behalf** 1:7 2:2,10
50:21 62:18
**believe** 21:7 51:11
66:8
**Belmont** 6:15
**BEM** 34:4
**Bentley** 6:11
**best** 72:13
**better** 21:13
**bid** 5:11
**big** 6:8
**billing** 60:6
**bit** 11:6 49:18 55:24
**blood** 72:15
**board** 68:17
**bona** 60:11,16,21
64:16 65:5 66:10
68:22 69:5
**Boncore** 5:14
**Boston** 5:21,23
**bottom** 29:8,23
**break** 51:5 67:21
**brief** 59:5,18
**briefing** 59:4
**bring** 51:15
**brings** 9:23
**broken** 54:17,18
**Bureau** 34:13
**Burns** 8:1,2 40:20
41:8 49:10 63:6
64:15 70:21
**bus** 6:8
**BUSH** 2:11
**business** 1:11 19:18
**busy** 18:21
**B-O-N-C-O-R-E**
5:16

## C

**C** 72:1,1
**calculation** 54:8
**call** 15:13 23:22
33:18 44:24 57:13
58:22 70:14

**called** 11:11 28:19
33:19,19
**calls** 28:20
**Candice** 8:22 51:1
54:12 63:6
**Capital** 3:13
**carriers** 63:10,11
**case** 7:11,22 9:22
41:20 42:14,14
44:15 46:3 59:5
67:2,6
**cases** 9:6
**case-by-case** 38:4
**Castro** 1:6 7:11
20:21 21:2,22
31:23 32:11 40:23
41:9 48:10 52:2
52:20 54:15 55:4
55:13 56:4,6 59:5
59:21 61:15 67:2
67:6 69:6 74:2
**Castro's** 60:5 67:7
**category** 27:19
**Cathleen** 2:4 73:10
**cause** 1:4 42:15
51:16
**CB** 30:22
**CCA** 3:18 19:9,13
19:13,19 21:17
22:14 23:13 24:15
28:7 35:10,13,17
35:18 36:12,20
38:15,24 42:22
45:5 48:16 50:6
50:11 53:20,23
54:3,9,14,23 55:2
58:1,24 59:10
60:12,16,23 61:19
62:6,8,11,16,18
62:22 68:20 69:18
70:3,10
**CCA's** 62:10,12
65:18
**CCA0001** 3:19
**CCA00275** 3:11
**CCA000284** 3:15
**CCA000303** 3:17
**CCA00059** 3:19
**CCA303** 42:7
**CCA329** 42:5 51:12
**CCA335** 44:10
**CCA59** 68:9
**ccombs@edcomb...**
2:8
**cell** 23:4,10 40:15
48:13,21 55:16,22

58:3
**cellular** 48:11 53:24
  54:4,5 56:22,24
  59:2 70:1
**certain** 15:14 57:20
  57:22
**certainly** 42:1
  43:21
**certification** 59:8
  67:2,5
**certify** 72:8,14 74:4
  74:6
**Chandler** 30:15
**changed** 38:21
  43:24
**changes** 25:14,16
  73:17
**charge** 8:21,22 9:12
  45:19,20 48:24
**charges** 63:11
**charge-off** 24:21
  27:12 46:17 55:12
**check** 33:4 39:3,6
  42:17,23 70:21
**checking** 43:4
**Chicago** 2:6 12:12
  12:13
**circumstance** 39:23
**circumstances**
  44:15
**claim** 60:24
**clarification** 45:7
  70:10
**clarify** 59:6
**class** 3:8 59:4,7,14
  67:2,5
**clear** 41:19
**client** 47:5,13 48:7
  50:4,6,11 52:11
  52:13 62:21
**clients** 47:10
**client's** 13:20
**CLNR** 1:24
**close** 62:3
**clue** 16:18,20
**code** 29:15 30:9
  34:3
**collect** 8:18 34:20
  62:18
**collected** 9:7 54:9
  69:20
**collecting** 24:15
  35:10,18
**collection** 1:12 3:10
  6:24 10:12 13:20
  19:15,16,19 22:16

23:13 45:16 48:15
  54:21 60:5 62:17
  66:21 69:17,24
**collections** 6:24 7:1
  11:23 34:23 35:22
  66:18,19
**Collecto** 1:11 4:13
  6:20 8:5,12,18 9:7
  17:9 19:14,17,18
  40:23 41:9 49:5
  74:2
**collector** 11:24 12:1
  24:23 30:22 33:13
  34:2 69:7
**collectors** 11:9,21
  15:20 45:5,12,13
  49:23 50:19
**collects** 53:20,21
**College** 5:23 6:11
**combination** 37:20
**Combs** 2:3,4 3:4 4:9
  14:1,10,14,17
  20:9 23:8 26:5
  27:20,22 41:22
  45:9 51:6,9 55:7
  55:19 56:14,16
  65:10,13,17,24
  66:5 67:17,21
  68:1,4 70:5,9,13
  70:17,22 71:2
  73:10
**come** 7:3 8:13 11:19
  12:2 18:20 25:18
  66:22
**comes** 8:11 17:14
  17:16 18:21 60:20
**coming** 4:19 7:3
  39:9 68:17
**Commesso** 24:1
**Commission** 72:24
  74:24
**commissioned** 72:7
**committed** 64:21
  66:8
**Commonwealth**
  72:2,7
**communicated**
  69:11
**communications**
  22:20,23 40:11
  41:21 63:9,13,17
  67:9
**company** 1:12 3:10
  6:22 7:2 8:12 9:5
  19:15,16,19 53:12
  61:9 69:3,24

**company-wide** 53:4
  53:7
**complaint** 3:8 7:22
  9:22 41:14
**complaints** 7:4,5
  18:13
**Complete** 68:24
**completed** 73:7
**completely** 24:9
**compliance** 4:16
  6:20,23 8:5 17:4
  17:17,18,20,20,22
  18:2 19:4 23:23
  25:17 38:17 39:18
  39:24 40:2,20
  43:19
**compliant** 11:3
**computed** 63:3
**computer** 12:17
  13:2 46:14 48:4
**concerned** 13:16
**concluded** 71:8
**concrete** 56:15
**confirm** 33:8 34:24
**conforms** 30:12
**connection** 23:1
  59:11,17 60:4,12
  69:17
**consider** 14:6 15:9
**consideration** 15:17
  19:6
**considered** 19:11
  26:21
**considering** 10:11
**construction** 5:9
**construed** 44:13
**consult** 16:12 43:15
  43:22
**consulted** 66:20
**consumer** 7:4 27:15
  33:14 46:10 47:3
**contact** 16:22,24
  31:18 32:12 52:13
  58:1,9
**contacts** 32:11
**context** 27:7 35:10
**contingency** 65:1
**contract** 5:1,10,11
  49:4 57:4 70:2,3,6
  70:10
**contracts** 5:9
**conversation** 15:11
  33:14,20 40:22
  41:1 64:10,13
**conveyed** 69:24
**CONI** 28:21

**copy** 73:8
**copyright** 44:12
**Corporation** 19:14
**correct** 8:15 9:23
  20:23 29:17 30:1
  31:3 43:11 52:18
  56:19 62:7
**corrections** 73:16
  74:8
**correctly** 63:3
**correspondence**
  18:12
**Corresponds** 30:13
**counsel** 2:1 11:5
  17:2,7,9 38:9
  40:19 44:21 63:22
  63:23,24
**COUNTY** 72:4
**couple** 12:9 58:15
**course** 35:16
**court** 1:1 67:1,5
**cover** 6:17
**covered** 18:17
  67:22
**Credit** 11:20,23
  34:13
**creditor** 24:19
  25:15 27:15 47:4
  47:9 50:1,20
  55:10
**criteria** 53:9
**CSR** 1:24 72:23
**current** 63:8
**Currently** 54:3
**C-O-M-M-E-S-S-...**
  24:3

       **D**

**dash** 29:17 30:10
**data** 13:3
**date** 18:12 24:20,21
  25:1,23 27:12,14
  27:14,18,19 28:11
  34:8,12,14,16
  39:8 44:17 46:17
  46:19,19,20,23,24
  47:1,5 52:3,5,6,9
  52:12,16,16,22
  53:15 54:7,20,24
  55:1,1,3,6,8,9,12
  56:4,4 74:20
**dated** 54:8
**dates** 54:11
**day** 28:6 39:11,11
  51:16 52:10 72:19
  74:18,21

**days** 15:17,23 16:5
**deal** 61:12
**dealing** 49:1 66:21
**deals** 50:9
**debt** 8:14,17 9:1
  19:10,21,23 20:1
  20:10,12,20,20,23
  21:2,10 22:16
  23:5,11,14,18,20
  24:5,8,13,16,19
  25:22 35:11,18
  39:5 40:15 46:20
  47:16,20,24 48:10
  48:11,13,14,15,21
  48:22 49:1,22
  50:5,18 51:14,17
  51:21 52:2,21
  53:3,9,11,16,24
  54:4,5,6,9,15,20
  55:4,13,16,22
  56:6,22,24 58:3
  59:2,21,21 60:5
  61:21,24 62:2,3,5
  62:7,11,12,16
  63:17 66:24 67:7
  69:18 70:1
**debtor** 21:5 22:10
  33:17,18,18 48:2
  69:12
**debtors** 14:7,20
  18:12
**debts** 8:7 21:10
  35:21
**deceit** 68:24
**December** 33:8,11
**decision** 43:9
**Defendants** 1:14
  2:10
**defense** 60:12,16,21
  64:16 66:10 69:5
**defer** 52:23
**definitely** 37:21
  40:7 45:2 47:7
**delinquency** 34:8
  34:12,14,16
**delivered** 73:6,9,12
**department** 7:4
  9:11 12:2 17:17
  17:18 18:23 22:1
  23:13,17,19,20,21
  23:22,24 24:1,5,8
  24:10 25:17 30:16
  34:3,24 60:10
**depending** 42:14
  56:10
**depends** 12:20

14:23
deponent 73:8,14
DEPONENT'S
  73:2
deposition 1:16 7:6
  7:14,24 9:18 35:3
  36:6 71:8 72:10
  73:11,16 74:3
describe 5:7 6:21
  69:19
DESCRIPTION
  3:7
determination
  30:20 37:5,11,19
  38:11 45:24 47:16
  50:14 53:8,17
  57:6,18 58:2
determinations
  37:24
determine 20:1,2
  21:21 42:18,24
  47:20 50:20
determined 19:13
  19:20 20:5,13,14
  20:15 21:1 49:19
  51:20
determines 37:14
  37:15,16 43:14
  50:19 61:23
determining 9:6
  20:4 22:3,9 36:15
  36:20 45:22 52:19
dial 31:16
dialer 31:11,11,16
  32:22 33:7
different 7:2 10:19
  13:2 24:9 34:14
  48:20,23,24 56:10
directly 8:24
disability 9:14
disclaimer 45:1
discovery 7:17,18
discuss 15:9
discussed 13:9,12
  46:23
Discussion 27:21
discussions 56:3
  59:13 61:8 63:19
distribution 73:1,4
  73:23
DISTRICT 1:1,2
DIVISION 1:3
divulge 41:20
DLC 32:7
document 3:18 9:20
  10:7,9,24 13:17

14:19 15:8 16:19
  19:7 22:9 25:8
  27:3,5 35:2,4,5,7
  36:5,8,10,12 38:7
  39:12 45:11 60:3
  68:5 69:23 70:24
documentation
  68:24 69:4
documents 3:11,16
  7:7,11,13 11:4
  60:6 61:4 69:19
doing 1:11 7:2
  19:18 65:7 66:19
  69:13
double-checked
  44:8
doubt 70:7
downloaded 48:8
drafting 68:15
driver 6:8
driver's 4:5
DTO 33:17
duly 4:5 72:6,10
duties 8:4

          E
E 72:1,1
earlier 46:23 49:19
East 5:21
easy 70:15
Ed 23:20,22,24 24:1
EDELMAN 2:3
education 22:15,19
  23:14,17 24:5,8
effect 15:12
effort 44:15
efforts 10:12
eight 33:21 34:6
EL 1:3
electronic 48:7
Elizabeth 64:9
eloquent 14:4
employed 4:12,20
  5:12 6:2 17:19
employment 22:14
  22:15,19
entire 5:4
entry 30:22 31:10
  31:13 32:6 34:15
EP08CA0215 1:4
errata 73:1,2,4,5,7
  73:18,22 74:1
error 60:11,16,21
  60:24 64:17,17,20
  64:21 65:3,5,5,19
  65:19 66:2,8,10

68:23,23 69:5
errors 60:19
especially 43:24
Esquire 2:4,12 73:6
  73:11
et 74:2
evaluate 7:1
evaluating 22:13
  39:5
events 12:5,15
exactly 37:2 69:11
EXAMINATION
  3:1,3 4:8
examined 4:6
example 15:21
  20:19 60:6
exception 74:7
exhausted 10:13
exhaustive 44:18
Exhibit 4:1 9:18
  10:1,1,2,4,17
  13:15 14:6,18
  15:8,22 16:8 19:5
  20:19 21:22 22:3
  22:10 25:6,6,11
  25:19,19 26:9,22
  27:1 29:1,1,2,5,6
  29:14,19,20 30:8
  31:9,22 34:16
  35:3 36:6 37:6,6
  38:13 39:13 42:2
  42:7 43:9,9,12,14
  43:14,15 44:10
  45:23,23 46:16,17
  47:9,23 48:5,9
  49:15,20,20,24,24
  50:17,21 51:2,10
  51:10 52:1 53:2
  54:19 55:5 57:19
  57:19 59:20,20
  68:2,3,6
exhibits 3:6,21
  50:20
exists 70:19,20
experience 22:16
  22:20
expertise 39:18
  40:2
expiration 53:14
expire 51:21
expired 61:1
expires 21:10 72:24
  74:24
expressly 45:10
extemporaneous
  69:10

E-Compliance
  39:19

          F
F 1:24 72:1,5,22
fact 15:6
factual 60:15
fair 20:4 25:19 56:8
  56:11 62:6 64:17
fairly 26:10
faith 68:23
falls 15:6
familiar 11:15
  60:11
far 25:4 45:16
  55:21
Fastfax 3:16 36:11
  36:19 38:23 39:3
  39:15 40:1 43:20
  43:21 44:6 45:14
fax 33:22,23
federal 6:23 22:22
  23:4 40:11 63:9
  63:13,17 67:9
fide 60:11,16,21
  64:16 65:5 66:10
  68:22 69:5
file 47:17 48:7
filed 9:22 40:17
  41:18 49:12 52:22
  59:8
find 40:1
fine 13:24
finish 26:1
first 13:18 23:3
  27:17 31:8,13
  32:2,3,17 33:20
  34:15 41:1,11
  42:6 48:4,4 50:4,7
  61:9 62:1 63:12
  63:16 68:6,7
five 4:18 5:13 32:21
fix 18:24,24
Flag 12:23 13:1
Floor 2:5
folks 40:21 43:19
follow 41:23 44:4,4
  65:14 67:18
following 15:13
  51:15
follows 4:6 61:20
foregoing 72:11
  74:5
foreseen 60:20
form 10:4 14:8
  19:22,24 20:8

21:4 22:9 23:7
  25:7 27:2 35:5
  39:7 40:5 41:17
  43:2,17 45:6
  48:17 49:16 51:22
  55:17 56:12 57:2
  58:11 59:22 61:2
  61:18 62:14 65:7
  67:11 69:21
forth 72:10
forward 7:4 36:23
forwarded 35:12
  50:9,13 73:10
four 5:13 6:7 10:2
  51:16,20 54:6
fourth 33:21
four-year 21:7 52:1
  54:1
fraud 68:23
frequently 17:12
  39:10
full 44:18
full-time 6:3
function 21:12
further 71:2 72:14
  74:6

          G
gain 63:16
GC 31:10,11,15
  32:6
general 5:19 15:12
  19:9 38:1 41:3,10
  42:16 48:6 60:14
  61:19 63:19
generally 5:7 6:5,21
  18:9,17 68:12
generic 26:10
gentleman 18:4
Giordano 1:17 3:2
  4:3,11 72:9 74:3,4
  74:20
give 10:19 16:14,18
  16:20 29:3 38:2,3
  42:22 45:15
given 42:18 43:1
  68:9 72:12
gives 8:17
giving 62:20
Glenn 64:4
go 6:3,10 27:20
  38:9 39:9
goes 34:22 35:20
going 9:17 14:8
  25:5 26:24 32:4
  35:2 41:20,23

61:21 65:14 67:10
67:18,21
**good** 14:15 68:23
**GOODWIN** 2:3
**gospel** 43:6
**gotten** 43:19
**graduate** 5:22
**graduated** 5:16
6:13
**graduating** 6:14
**Greenway** 2:13
**Greg** 58:18,21
**Grogan** 1:24 72:5
72:22
**guess** 6:22 8:11
47:5
**guidance** 43:7

**H**

**half** 5:3 48:4
**hand** 9:17 26:24
35:2 72:19
**handing** 36:5 68:5
**handle** 48:24
**handled** 22:1 23:19
45:4,8,9 48:15
**handles** 24:10
**happen** 10:18 16:12
26:14
**happened** 31:14
38:8 52:8
**happens** 8:17
**head** 45:21 46:2
51:19
**hear** 22:22
**heard** 22:24
**held** 4:17 69:3
**help** 36:14
**hereinbefore** 72:10
**hereunto** 72:18
**high** 5:22 6:14,15
**Hingham** 1:22,23
**hold** 5:2 34:5
**Holiday** 1:21
**honest** 69:2
**Houston** 2:14

**I**

**idea** 13:21
**identification** 4:1
68:3
**identified** 4:4 20:11
72:11
**identifies** 21:17
**IL** 2:6
**immediate** 39:18

**immediately** 24:22
**impact** 19:7 48:14
**implemented** 15:20
**include** 8:10 52:12
53:13
**included** 56:6
**Incorporated** 4:13
**incurred** 47:24 48:1
**INDEX** 3:1,6
**indicate** 47:24 52:1
73:16
**indicated** 31:2
**indicates** 48:10
**indication** 31:17
**individual** 46:3
47:16 53:5
**industry** 66:21
**information** 20:3
24:12,18 27:11
38:3,3 42:17
44:13,16,18,19
45:15 46:9,12
48:3,9 51:24 53:1
73:1,4,23
**initials** 31:10
**Inn** 1:21
**innocent** 69:1,6
**inputted** 48:3
**instructed** 15:21
**instructing** 66:5
**instruction** 43:13
50:18
**instructions** 39:13
41:24 42:22 49:23
65:15 67:19 73:2
73:14,22
**instructor** 6:8,9
**intended** 44:17,19
**interested** 72:16
**International** 11:9
**Internet** 39:1,4,13
**investigating** 18:21
**investigation** 41:18
**involved** 8:6,16,18
8:24 9:6,9,10 10:6
16:2 18:14 25:10
31:13 35:14 36:1
37:23 48:10 59:4
62:19
**involvement** 10:14
10:16 22:18 24:10
**in-house** 63:21,23
**issue** 18:20 19:4
23:9 61:12
**issues** 7:3 8:6,24
18:17,20

**J**

**Jacqueline** 30:15
**January** 72:24
**job** 5:7 6:21 8:9
38:1
**jobs** 6:4,6,7
**John** 8:1,2 40:20
41:8 49:10 63:6
64:15 70:21
**JQC** 29:8 30:2,14
31:24
**judge** 67:11,14
**Judy** 24:1
**juggling** 6:12
**June** 33:16 53:24
54:7

**K**

**keep** 6:22 13:3 39:8
**Keith** 2:12 73:6
**key** 68:24
**kind** 18:15 39:23
59:21
**knew** 70:8
**know** 6:12 9:14
12:21 13:19 15:17
16:5,10,10,15
18:20 19:11 21:11
21:23,23 22:2,8
22:12 24:7,12,18
25:3,4,12,15
26:11,14,20 27:13
28:18,19,22 30:14
30:18 31:21 32:2
32:5,5,7,17 33:10
34:10,21 35:14
37:2,7,7,8,10,18
37:21 39:3,8 40:7
41:10 43:4,18
44:7 46:4,8,12,15
46:18,18,22 47:2
47:6,7 48:1,3,12
49:7,8,9,9,11,13
50:11,14,23,24
51:23 52:4,8
53:20,22 54:10,11
54:13,17,18 55:3
55:9,11,12,21
58:6,17 59:3 60:4
60:7,8 62:5 63:4,5
64:22 70:8
**knowledgeable**
66:18
**known** 44:4
**Kraft** 17:8,13 18:18

19:2 40:19,23
41:2 58:13
kwier@bushrami...
2:16

**L**

**large** 5:9
**LaSalle** 2:5
**late** 47:1
**latest** 38:20,22
**LATTURNER** 2:3
**law** 5:13,16,23 6:24
11:3 20:15 44:18
56:8,11 57:4,14
**laws** 6:23
**lawsuit** 8:11 9:2,4
22:19,23 23:12
27:9 40:13,17,23
41:6,9,18 42:15
47:17 52:22 55:24
58:4,5,6,8 63:15
63:20
**lawsuits** 7:5 40:24
41:7 49:11
**lawyer** 65:10
**lawyers** 65:23
**lawyer's** 65:14
**left** 31:19 32:15,18
33:2,2,13
**legal** 10:10 11:5,18
11:19 34:20 44:14
44:14,19,20,21
61:21
**Legal-Forwarding**
9:11 22:1 34:23
60:9
**length** 26:20
**letter** 10:19 14:7,23
15:2,3,9,13,16,22
16:1,5,11 17:6
19:8 25:14 29:13
30:21 31:1,4,4,5
31:23 32:2,3,7
60:24 61:15
**letters** 15:7 16:22
28:14 30:19 61:21
**Let's** 11:6 27:20
28:2 56:14 58:5
68:1
**liable** 69:3
**license** 4:5
**licenses** 18:12
**Licensing** 18:11
**lie** 69:8
**Limitation** 21:18
**limitations** 7:20

13:9,13 14:6,12
14:12 19:8,21
20:5 21:2,7,8 23:4
23:10,17 24:5,8
26:21 36:14 37:1
37:3,24 38:24
39:4,14 40:3,8,11
40:15 42:11,12,13
42:16,24 43:16,23
45:10,18 46:9,13
50:15 52:20 53:15
53:18,23 54:2,3,8
54:14 55:16,22
56:5,9,10,18,21
57:7,15 58:2 59:1
61:1,17 63:2,9,13
65:2 66:24 67:7,8
**line** 27:16,18 28:2
29:7,23 33:21
41:4
**LINE(S)** 74:9
**list** 11:9,10,12 17:3
27:18 28:2,5 39:9
41:4 46:19 47:8
54:24 55:1 56:4
61:5
**listed** 42:15 46:17
46:21 54:22
**listened** 59:15
**listing** 15:1
**lists** 47:10 56:17
62:17,21,21
**litigate** 19:10 61:20
**litigation** 9:5 18:19
50:10 53:3,21
59:11 60:13,17
61:12
**litigator** 64:23
**little** 11:6 29:14
55:24
**LLC** 2:3
**located** 5:20
**long** 4:17 5:2 16:6,6
25:3,22 41:4
57:23 60:18
**look** 7:7,19,23,24
10:1 11:4 13:3
20:19 25:5 27:9
28:2 29:13 30:8
30:23 31:8,9
33:21 36:13,15,20
37:7 38:7 42:6
**looked** 7:8,9,13,15
7:23 15:19 36:17
36:22
**looking** 11:1 13:15

SUSAN P. GIORDANO   MAY 26, 2009

18:22 19:5 29:5,7
36:24 38:2 39:10
44:9 51:10,11
54:19 56:17 68:18
68:20
looks 10:10 26:10
30:4 31:15 32:16
33:19 47:14
LR 31:2,4
LS 29:10 30:4 31:4
32:1
LST 27:23
LTRS6 28:12
L.L.C 2:11

---

**M**

M 2:4
machine 32:7,15
33:2
Magazine 12:1
magazines 12:2
mailed 15:10
mailing 15:1 37:5
maintain 65:18
maintained 66:1
making 13:3 18:11
37:24
manage 9:4
management 1:13
3:14 4:15 6:20
8:5 9:3 20:20
35:11,12,19 36:3
47:13 69:18 70:15
manager 5:1 17:20
17:22 33:7 38:17
managers 45:17
Manishin 58:19,22
64:4
Manning 9:13 51:1
Manny 58:18,20
64:7
manual 45:1,4 68:8
68:10,13,15
MAP 11:9,11 17:2
39:9 61:5
marked 9:18 26:24
35:3 36:5 68:3,5
marking 21:9 68:1
marks 73:19
marriage 72:15
martial 6:9
Mass 5:21 11:14
Massachusetts 1:23
4:21,23 72:2,8
materials 45:18
61:3

matter 72:15,17
mean 7:11 13:21
14:12,14 16:14
32:5,12 36:18
43:4 45:7 53:6
54:22 57:3 61:9
64:24
means 28:18,19,22
33:17 34:1,10
47:2,6,12 56:9
65:9
mechanism 21:9,16
22:3,8,12
medical 48:21
meeting 13:12
18:18
member 11:7
Members 11:11
mentioned 16:21
64:2
message 31:19
32:15,18,23 33:1
33:2,3,12
MGR 32:22 33:6,7
33:22
Mianne 17:23 18:7
18:7,9
Michael 17:8,12
18:18 19:2 40:19
40:22 41:2 58:13
middle 34:4
minutes 57:8
misleading 14:11
misrepresent 13:21
mistake 69:1,2,6
mm-hmm 10:3
20:22 24:17 28:4
28:9 30:3,5,7 36:7
39:2,20 42:8,10
51:13 56:20 64:1
68:11
moment 29:4 57:11
67:3
Montalvo 67:14
months 5:13
mother 6:3
motion 59:7,10,14
67:5,12
MWRA 4:21 5:8
M-A-P 11:10
M-I-A-N-N-E
17:23

---

**N**

n 73:19
name 4:10 5:15

11:22 12:10 13:20
18:5 24:2 25:15
26:17
named 18:4
NARCA 11:15
naturally 11:2
nature 5:18 69:19
NCO 35:8
NCOP 3:13
necessary 70:23
73:21
need 18:23 43:15
43:22 50:7 70:18
negative 22:7,7
negotiations 36:1
Nemesio 1:6 20:21
21:2,22
never 13:21 66:22
Newburger 58:18
58:20 64:7
nights 6:11
Nods 51:19
normal 27:7 35:16
39:5
normally 35:10
39:4
Nos 3:11,15,17 4:1
notarial 72:19
Notary 4:5 72:6
74:24
notations 73:19
note 24:24 27:6
noted 74:8
notes 27:8 31:2,9
69:8
notice 10:10 15:4
November 4:18
26:7
number 16:17
29:15 30:9 31:2
31:16 32:19 33:3
33:24 39:11 44:1
66:19

---

**O**

object 14:8 19:22
19:24 20:8 21:4
23:7 39:7 40:5
41:17 43:2,17
45:6 48:17 49:16
56:12 57:2 58:11
61:2,18 62:14
65:7 67:10,10
69:21
Objection 51:22
55:17 59:22

obtained 24:18 60:6
obviously 64:17
67:11
occurred 65:19,20
odd 49:18
Offhand 59:19
office 5:14 33:17,18
38:18
officer 17:4
oh 7:15 25:3 28:1
33:16 36:23
okay 9:17,19 10:14
10:21,24 11:13
13:23 14:16 16:21
17:18 19:20 20:4
20:16,18,19 21:9
21:16,21 26:1,2,3
27:11 28:23 29:7
33:5 34:7 35:2
36:23 38:12 42:2
42:5 44:9,11
51:18 54:13,19
55:9 56:2 57:9,12
58:24 60:1 65:18
66:9 67:23 68:10
68:20,21 69:9,14
70:9 71:1,4,6
once 16:13 17:14
53:17 58:23
once-a-week 18:18
ones 12:22
ongoing 18:19
61:13
on-line 38:19
open 56:17
opened 54:20,21,22
operations 8:20,21
9:16 10:22 13:19
18:22 21:6,14
26:12 30:20 31:7
31:21 32:24 33:4
34:18 35:1 37:17
37:18 44:3 45:16
45:21 46:2 48:23
53:11 62:4,22
opinion 58:24 59:2
66:11 67:1,14
opposed 48:21
ops 37:21
order 69:5
organization 11:18
11:20 13:12
organizations 11:8
11:13
original 3:21,21
24:19 27:15 44:3

47:4,8 70:3 73:5
73:10,11
originally 20:23
44:2
ought 42:23
outcome 72:16
outside 17:2,7,9
40:19 53:19 63:24
out-of-statute
19:10 53:16,21
61:20 62:3
overflow 18:15
oversee 35:24
overseeing 9:15
35:21
owed 20:21 21:2
owner 56:23
O'Brien 8:22 54:12

---

**P**

P 1:17 3:2 4:3 72:9
74:3,4,20
page 3:3,7 27:17
29:5,6 31:9 32:6
32:20,21 33:15,21
34:6,15,19 42:3,4
42:5,6,9 44:9 48:4
51:11 68:6,7,9,20
74:9
pages 10:2
pains 74:17
paragraph 44:12
part 30:17 49:2,14
participate 59:13
68:14
participated 59:16
particular 7:15
17:6 19:21,23
20:10,12 23:2
24:23 32:19 33:24
38:16 50:10,13,18
53:9,10 61:12
parties 72:15
party 32:18 33:3
41:17 73:9
part-time 6:4,6,7
6:11
PASO 1:3
pass 52:2
payment 46:24 47:6
52:11,16 55:10
PCS 20:23
penalties 74:17
people 16:3,12,13
37:2,20 58:16
66:20

---

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

period 15:14,18
52:1
perjury 74:18
person 21:20 31:6
31:12 32:16,17
33:8,20 37:8
38:12 43:8,13
50:19 51:15 53:1
personal 33:12
person's 31:16
Philip 5:14
phone 23:4,11
32:11 40:15 48:13
48:21 53:21 55:16
55:22 56:22 57:13
58:3 59:2 70:1
place 12:11 13:19
15:5 26:15 30:19
33:15 44:3 57:23
60:19,23 61:6,10
61:16 62:23 66:2
68:16
placed 25:2 28:6
55:2
placement 10:10
placing 10:11
Plaintiff 1:9 2:2
plaintiff's 67:5
plan 65:1
Plaza 2:13
please 73:16,21
PLYMOUTH 72:4
point 14:15 62:19
62:24 70:9
portfolio 8:14 20:6
21:17 24:16,23
35:19 54:15,17
56:5 69:19
portfolios 8:7 24:13
portion 8:9 16:16
26:12 54:16 62:10
position 4:17,23 5:2
5:4 6:19 41:19
47:15,19
positive 25:23
31:15 34:17
POSS 33:22
possible 33:23
practice 5:18,19
19:9,12
premarked 4:1
preparation 7:6,14
present 64:14,23,24
president 4:15 8:4
presidents 45:17
pretty 6:17

prevent 60:19,24
61:16
previously 16:21
principle 61:19
prior 4:20 5:12 6:2
10:20 13:5 22:15
40:13 50:17 53:9
55:24 56:4 61:6
61:15 62:5 68:16
privileged 41:19,21
probably 7:10
10:12 12:14 13:18
21:20 24:20 25:21
25:23 26:17 36:14
37:9,20 38:6,10
39:10 40:18 41:4
41:13 44:7 45:21
48:7 51:1 57:17
58:18 59:15 61:8
63:19
problem 18:24
problems 19:1
procedural 57:16
procedure 62:12
63:1,2
procedures 15:5
57:22 60:19,23
61:6,13,14,16,23
65:18,23 66:1,9
66:12
process 5:11 9:9
10:7,17 11:3 14:5
15:12 20:10,16
25:10 30:17 35:15
39:5 62:20 68:18
processes 48:15,21
48:23
procurement 5:11
produce 70:17
produced 39:12
70:5
production 4:4
professional 5:10
11:7 13:11 72:6
Program 11:10,11
programmed 15:24
46:10,13
programming 16:1
16:3,4
proper 15:4
properly 45:4,7
69:13
proved 69:2
provided 42:16
54:14
proving 68:24

Public 4:5 72:6
74:24
publication 11:21
44:17
publications 11:17
61:4
pull 38:18
pulled 38:20
purchase 3:12 35:8
35:11,17 36:2
46:20 55:4,6 62:1
62:2,7,11
purchased 25:22
purchaser 62:16
purchases 8:6
purpose 10:9
purposes 52:19
54:15 64:16
pursuant 45:9
pursued 53:3
put 5:11 12:21
14:18 30:19 62:23
p.m 71:8

_____

**Q**

qualified 72:7
question 17:3 21:20
26:1,13 31:20
32:24 34:18,24
37:15 39:24 40:3
46:1 50:1,16
53:13 57:10,12,16
65:11,12 67:6,13
67:16
questions 49:21
69:16 70:24 71:3
quick 51:5 67:21
quite 7:12 50:3
69:22

_____

**R**

R 72:1
raise 60:21
RAMIREZ 2:11
read 14:1,3 38:8
40:13 51:8 57:3
67:1,15 74:5,9
reading 57:7 73:15
READS 74:9
really 8:8 18:21,24
22:2 30:18 52:4
58:23 59:16
reasonable 60:18
66:11,13,16,23
reasons 73:17
recall 7:9 10:15

12:11 13:16 15:1
15:11 16:8 17:5
26:8 40:3,22 41:1
41:8,11,15 56:7
59:19 64:15 67:3
receive 11:17 20:3
69:18
received 7:10 25:24
Recess 51:7 67:24
recognize 9:20 10:4
25:7 27:2 35:4
36:8 68:6
record 4:10 14:3
27:20,21 51:8
72:12 73:9 74:7
Red 12:23 13:1
refer 28:5,13 38:6
46:16 73:22
reference 39:16
43:5
referred 8:14 9:1,7
60:1 69:18
referring 28:24
29:15 42:2 59:20
refers 27:12 32:8
34:16,21
regard 67:12
regarding 6:24 13:2
46:9,13
Registered 72:5
regular 15:5 34:23
regularly 11:17
regulations 6:24
22:20
related 7:8 72:14
relation 8:12,12
rely 26:13 44:6
relying 43:6 69:4
repeat 24:14
rephrase 14:15
22:6 49:18
replace 44:21
report 18:6 34:9,12
Reporter 72:6
reports 9:16 18:7,8
18:11
request 12:21
requested 31:4
requests 31:5
requirements 14:19
15:1
research 7:2 40:10
55:15,23 59:17
reserve 70:23 71:5
resides 21:5 48:2
resourceful 6:16

Resources 4:21,24
respect 8:10,24
14:24 23:16 47:16
50:1 51:17 52:2
52:20 53:2 54:9
55:4 58:1 59:14
66:10 67:2 69:6
respond 59:10
responding 59:14
response 51:19
responsibilities 5:8
6:21 27:8 35:17
38:1
responsibility 8:9
8:15 47:15,19
49:2
responsible 18:10
23:23 45:22
restate 48:18
review 10:22,23,24
11:3 14:5 25:14
27:8 32:10 61:3
63:1
reviewed 5:9 13:16
14:18 19:6 26:9
26:22 49:20 62:22
reviewing 15:8
16:22 61:5
Richard 9:13 51:1
right 6:19 19:14
20:14,17 21:20
25:5 26:4 27:24
28:1,24 31:8 46:8
52:6,19 56:14
69:15 70:23 71:5
risk 4:15 6:19 7:2
8:5
Rosemary 1:24
72:5,22
RPR 1:24 72:22
Rules 12:24 13:1

_____

**S**

safe 13:4
sale 3:12 35:8,11,18
36:2
sat 58:22 64:10
satisfactorily 4:4
saying 34:11 69:23
70:1
says 27:19 28:12,15
29:10 31:24 32:18
33:16,19,22 34:8
39:17 42:12,12
44:13 47:11 51:14
51:14 68:22

SUSAN P. GIORDANO   MAY 26, 2009

**Schall** 17:23,23
  18:9
**school** 5:17,22,23
  6:4,8,14,15
**seal** 72:19
**second** 12:23 29:17
  29:23 30:10 32:6
**section** 42:3
**secured** 38:12
**security** 13:2
**see** 7:3 17:15 19:1
  27:18 28:1 32:10
  32:17 33:8,10,15
  35:17 39:8 42:20
  44:22 47:10 48:2
  56:20 60:3 70:18
**seen** 43:20
**sellers** 24:13
**seminar** 13:8
**seminars** 12:16,19
  13:5
**send** 15:22 16:11
  21:22 22:9 30:21
  43:9,14 49:15,24
  50:19
**sending** 19:8 50:17
  53:2 57:19 60:24
  61:15
**sends** 30:18
**sent** 14:7 15:22
  22:4 28:14 29:2,4
  29:13,19 31:1,4
  31:23 45:23 50:21
**sentences** 68:22
**separate** 23:19 49:1
**sequence** 15:6,10
**series** 15:3,6 32:7
**service** 24:20 25:1
  27:13,14,19 28:11
  39:15 46:19 47:1
  47:3,5 52:3,4,6,11
  52:12,15 55:8
**services** 5:10
**set** 53:9 57:24 61:9
  62:4 72:10,18
**seven** 5:3
**seventh** 29:7
**sheet** 29:16 73:1,4,5
  73:7,18,22 74:1
**sheets** 73:21
**Short** 51:7 67:24
**show** 29:1,19 31:22
  59:21 69:5
**shown** 29:22
**shows** 29:1
**sic** 8:17 11:21 35:8

35:9,21 47:10
  55:2 58:18 62:16
**sign** 73:19
**SIGNATURE** 73:2
  74:1
**signed** 73:8 74:17
**similarly** 1:8
**Simon** 64:9
**sit** 22:2 26:8
**sitting** 64:13
**situated** 1:8
**situation** 8:23
**six** 28:14
**small** 29:3
**soon** 41:13
**sorry** 14:4 24:14
  38:14 56:13
**sort** 48:7
**South** 2:5
**speak** 33:13 58:20
**speaking** 32:16
  61:5,11
**speaks** 67:12
**specific** 15:11 44:15
**specifically** 8:4
  13:15 14:5,24
  17:16 19:5,9
  28:24 40:10,16
  41:3 43:8 51:24
  60:22 61:16 64:8
  64:11 66:1 68:20
**specify** 54:5
**spell** 5:15 24:2
**Spinn** 18:5
**spoke** 32:13,17
  41:10,11 58:15,17
  64:11
**spoken** 33:12 64:7,9
**SPR** 47:11,14
**Sprint** 20:23 47:11
  48:13 60:2
**SRV** 27:19 28:8
  46:23
**staff** 45:16
**start** 46:11 58:5
  68:1
**started** 26:6
**starts** 29:8
**state** 4:10 6:23
  13:22 20:2,15
  24:7 37:1,3 38:10
  44:8 47:24 49:17
  50:9,10,13 54:18
  56:8,10 57:14
**stated** 45:10
**statement** 60:6

**STATES** 1:1
**state's** 36:13
**state-to-state** 42:14
**Statue** 13:12 19:7
  20:5 21:1,7,8 23:4
  23:10,17 24:4,7
  26:21 36:13,24
  37:2,24 38:23
  39:4,14 40:3,11
  40:15 42:11,12,24
  43:16,23 45:18
  46:9 50:15 52:20
  53:14,18,23 54:3
  54:8 55:15,21
  66:23
**statues** 42:13
**statute** 7:19 13:9
  14:13,14 19:20
  20:11 21:18 38:21
  40:8 42:16 46:13
  47:21 51:3,11,21
  54:1,13 56:5,9,10
  56:18,21 57:7,14
  58:2 59:1 61:1,17
  61:24 62:4,11,13
  63:2,9,13 65:2
  67:7,8
**statutes** 61:22
**Stop** 65:21
**strategies** 62:4,23
**strategy** 53:10,13
**Street** 1:22 2:5
**strike** 10:15 22:13
  35:13 46:10 56:2
  56:23
**structure** 61:10
**Subscribed** 74:21
**subsequent** 58:8
**sue** 36:16,21 37:14
  37:16 49:22 50:5
  50:7,15 53:8,16
  53:18
**sued** 37:3 50:2,21
**suggest** 40:14
**suing** 38:10
**suit** 51:15
**Suite** 2:13
**supplied** 73:18
**suppose** 50:8
**supposed** 64:22
**sure** 7:12 11:2,22
  12:9 13:3,6 14:10
  18:11 21:24 26:11
  32:23 33:2 34:1
  40:6 45:4 46:5,6
  51:6 57:23 58:23

62:12 63:2 65:8
  67:22 69:13,22
  70:19
**surrounding** 8:6
**Susan** 1:17 3:2 4:3
  4:11 72:9 74:3,4
  74:20
**sworn** 4:5 72:11
  74:21
**system** 31:11 48:8
**S-C-H-A-L-L** 17:24
**S-P-I-N-N** 18:5

       **T**

**T** 72:1,1
**tactics** 15:13 16:1
  30:19 44:3
**tailored** 44:3
**take** 13:7 26:14
  43:7 51:4 67:21
**taken** 13:5,7,8 15:5
**talk** 11:5 17:1,2
  19:2 21:13 40:24
  41:5,5 59:24
**talked** 16:14 40:18
  40:20 41:5,14
  64:4
**talking** 41:8 65:23
  69:7
**tariff** 63:11,11
**TCPA** 12:23
**team** 44:3
**tear** 30:9
**tear-off** 16:16 29:16
**telephone** 48:11
  66:24
**telephoned** 33:17
  33:18
**tell** 9:15 13:6 16:10
  30:24 31:20 33:11
  35:15 38:22 47:12
  52:17 54:20 55:5
  60:22
**telling** 66:4 69:8,12
**tells** 39:19
**testified** 4:6 66:9
**testimony** 72:12
  73:17 74:5,7
**Texas** 1:2 21:5,8
  38:7,21 42:3
  43:24 48:2 49:12
  50:2,22 51:2,11
  51:21 52:20,24
  53:24 54:2,4,6
  57:13
**Thank** 71:7

**therefor** 73:18
**thereof** 73:8
**thing** 13:18 15:18
  16:7 26:19 33:6
  40:6
**things** 13:3 36:15
  36:19,22 37:8
  40:14 41:4
**think** 7:15 11:19,20
  12:1,8 13:10,14
  13:18 14:11 15:13
  15:24 20:1,7,12
  20:15 21:3,5,11
  21:23 23:6 24:24
  32:22 33:7 34:17
  35:20 38:17 39:16
  43:3,18,21,24
  44:2 46:1 48:12
  50:3,4 52:14 53:4
  54:5,6 57:3,10,16
  57:22 58:15 59:16
  60:18 61:3,7,11
  61:19 62:20 64:6
  64:21,22 65:1
  66:17 68:16 70:7
  70:22
**third** 30:9 32:18
  33:3
**third-party** 7:1
  62:17
**three** 57:8 64:11
**three-year** 56:18
**time** 5:5 9:14 15:15
  16:6 41:11 52:13
  58:3 62:24 66:7
  71:3,6
**times** 28:16,17
  39:11 65:22
**title** 4:14 42:12
**today** 7:6,23 9:23
  26:8
**told** 26:18 65:22
**top** 27:17
**trade** 11:21 61:4
**training** 45:17 68:8
  68:12,15
**transcript** 3:21
  72:12 73:12,20
  74:5,6
**trial** 71:6
**tried** 31:16
**true** 72:12 74:6
**truth** 13:22
**try** 18:24 39:8
**trying** 6:22 7:1
  18:24 20:16

SUSAN P. GIORDANO   MAY 26, 2009

**Tuesdays** 41:5
**turn** 42:3
**two** 12:1,20 23:11
  66:24 68:22
**two-year** 23:4 40:8
  40:15 55:21 65:2
  67:8
**TX** 2:14
**type** 15:18 16:7
  26:19 31:5 40:6
  48:14,24
**types** 54:14 63:17
**typically** 10:18
  16:11 26:14 33:13
  37:23 38:22 39:2

**U**

**UCM** 8:17 35:9,21
  47:10 55:2 62:16
  62:17 70:12
**UCM(sic)** 48:13
**uncover** 18:23
**undergrad** 6:10
**underlying** 60:5
**understand** 45:16
  52:7,18 64:23
  65:24
**understanding** 9:13
  20:24 43:23 48:6
  52:15,21 60:15
  62:21 63:7,8,16
  65:3 69:10
**UNITED** 1:1
**update** 38:21,22
**updated** 38:24
**updates** 68:17
**up-to-date** 44:16
**Uri** 18:4,7,14
**USAM** 70:4,15
**use** 27:13 38:13,19
  39:14,21 52:24
  53:23 54:6 55:7
**usually** 16:12 17:15
  25:13 31:19
**utility** 22:20
**U-R-I** 18:4
**U.S** 3:14 35:19

**V**

**V** 1:10
**validation** 15:4,18
**variety** 37:7
**vary** 42:13
**verbal** 51:19
**verified** 26:16
**version** 38:20

**versus** 40:23 41:9
**vice** 4:15 8:4 45:17
**violation** 61:17 69:1
**visit** 17:15 39:18
**volume** 73:15,20
**VP** 6:19 37:21
**Vs** 74:2

**W**

**wait** 15:16,23
**waitress** 6:7
**want** 11:2 13:21
  46:16
**Water** 4:21,24
**way** 8:13 16:1 27:9
  50:3 70:16 72:16
**Web** 12:16,19 13:5
  13:8
**website** 39:10
**week** 17:14
**Welcome** 3:18
**went** 5:10 44:3
  57:13 69:11
**WESTERN** 1:2
**We'll** 71:5
**we're** 29:15 39:9
  50:6 68:18
**we've** 10:20 43:6,20
  63:20 65:21 66:19
**WHEREOF** 72:18
**Wier** 2:12 7:17 14:8
  14:11,16 19:22,24
  20:8 21:4 23:7
  26:4 27:24 39:7
  40:5 41:17 43:2
  43:17 45:6 48:17
  49:16 51:4,22
  55:6,17 56:12
  57:2 58:9,11
  59:22 61:2,18
  62:14 65:7,12,16
  65:21 66:3,7
  67:10,23 69:21
  70:7,18 71:1,5
  73:6
**Wife** 33:19
**witness** 3:2 14:4
  67:13 70:12,20
  71:4,7 72:9,13,18
**wondering** 48:20
**work** 6:4 16:1
  17:12 18:23
**working** 16:2 17:10
  38:18 62:5,13
**wouldn't** 19:11,11
  35:23,24 57:4

  62:2,11
**written** 59:2

**X**

**x** 1:5,15

**Y**

**Yeah** 25:21 30:24
  34:1 52:17
**year** 5:24 12:13
**years** 4:18 5:3 12:9
  23:11 44:1 51:14
  51:16,20 54:6
  65:8 66:19,21,24
**yellow** 6:8
**yep** 29:9,11 30:13

**0**

**01/07/07** 28:3
**04** 4:18 26:7
**07** 33:11
**08** 29:4 33:16
**09** 38:16

**1**

**1** 3:8 4:1 9:18 10:2
  15:3 25:6 37:6
  42:9 43:12,15
  45:23
**1st** 4:18
**1/07** 56:4
**1/26/07** 31:24
**1/27** 31:24
**1/7/07** 54:23
**1:00** 71:8
**10** 65:22
**11** 32:1
**11:00** 1:19
**112993** 1:24 72:23
**12** 30:4,10
**12/13/07** 33:22
**120** 2:5
**14th** 29:4
**1700** 2:13
**18th** 2:5
**1976** 6:15
**1996** 6:1

**2**

**2** 3:10 27:1 29:1,6
  29:20 31:9,22
  34:16 46:16,17
  47:9,23 48:5,9
  51:10 52:1 54:19
  55:5 57:19 59:20
  59:20

**2/15/07** 31:14 32:6
**2/2/05** 27:19,23
**2/2/08** 34:4,5
**20** 65:8
**2000** 32:6
**2002** 26:6
**2004** 26:7
**2005** 12:14
**2006** 25:23
**2007** 13:5 53:24
  54:7
**2009** 1:18 72:20
  74:18,22
**2011** 72:24
**24** 2:13
**26** 1:18
**27** 42:4,5 51:12
**28th** 72:19
**283** 3:11

**3**

**3** 3:12 35:3
**302** 3:15
**312-739-4200** 2:7
**33** 44:9
**336** 3:17
**34** 42:9 44:9 51:12
**35** 15:16,23

**4**

**4** 3:4,8,10,12,16,16
  4:1 36:6 38:13
  42:2,7 44:10 51:2
  51:10,14,16
**4,000** 34:19
**450** 47:11

**5**

**5** 3:18 68:2,3,6
**5th** 33:8
**5/26/09** 74:3
**5/8/08** 34:19
**54** 28:17
**58** 29:10,13,14
**59** 68:20

**6**

**6/03/08** 29:24
**60603** 2:6
**68** 3:18

**7**

**7** 72:24
**7th** 33:11
**713-626-1555** 2:15
**77046-2417** 2:14

**79** 28:19,20

**8**

**8** 29:6

**9**

**9th** 33:16
**91** 6:13
**929** 1:22