# EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

CAUSE NO. EP08CA0215

- - - - - - - - - - - - - - - - - - - - x

NEMESIO CASTRO,

on behalf of himself and all others

similarly situated,

      Plaintiff,

  V.

COLLECTO, INC., doing business as

COLLECTION COMPANY OF AMERICA

and US ASSET MANAGEMENT, INC.,

      Defendants.

- - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF

CANDICE O'BRIEN

May 26, 2009

2:00 p.m.

Holiday Inn

929 Hingham Street

Hingham, Massachusetts

Rosemary F. Grogan, RPR, CLNR, CSR No. 112993

---

Page 2

1        APPEARANCES OF COUNSEL

2  On Behalf of the Plaintiff:

3      EDELMAN, COMBS, LATTURNER & GOODWIN, LLC

4      BY:  CATHLEEN M. COMBS, ESQUIRE

5      120 South LaSalle Street, 18th Floor

6      Chicago, IL  60603

7      312-739-4200

8      ccombs@edcombs.com

9

10  On Behalf of the Defendants:

11     BUSH & RAMIREZ L.L.C.

12     BY: KEITH WIER, ESQUIRE

13     24 Greenway Plaza, Suite 1700

14     Houston, TX 77046-2417

15     713-626-1555

16     kwier@bushramirez.com

17

18

19

20

21

22

23

24

---

Page 3

1       INDEX OF EXAMINATION

2  WITNESS: CANDICE O'BRIEN

3  EXAMINATION           PAGE NO.

4  By Ms. Combs         4

5

6       INDEX TO EXHIBITS

7

8       N O N E

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 4

1      CANDICE O'BRIEN, having been

2  satisfactorily identified by the production of a

3  driver's license, and duly sworn by the Notary Public,

4  was examined and testified as follows:

5

6       EXAMINATION

7  BY MS. COMBS:

8    Q.  Could you state your name for the record?

9    A.  Candice O'Brien.

10   Q.  Hi.

11     Where are you employed?

12   A.  CCA.

13   Q.  And that is Collection Company of America,

14  correct?

15   A.  Yes.

16   Q.  And what is your title?

17   A.  My current title is senior vice president of

18  business development.

19   Q.  And how long have you had that title?

20   A.  Since April 1st.

21   Q.  And what was your prior title?

22   A.  Vice president of operations.

23   Q.  How long did you hold that position?

24   A.  Oh, gosh.  I would say seven years.

Page 5

1   Q.   Prior to that, where were you employed?
2   A.   Same company.
3   Q.   Okay.  And what was your title?
4   A.   Regional vice president of operations.
5   Q.   And how long did you hold that position?
6   A.   Three years.
7   Q.   Prior to that, where were you employed?
8   A.   Same company.
9   Q.   And what was your title?
10  A.   Collection manager.
11  Q.   How long did you hold that position?
12  A.   I'd say about a year.
13  Q.   Prior to that, where were you employed?
14  A.   Same company.
15  Q.   Okay.  What was your position?
16  A.   Assistant collection manager.
17  Q.   How long did you hold that position?
18  A.   About two years.
19  Q.   Prior to that, where were you employed?
20  A.   Same company.
21  Q.   Position?
22  A.   Collector.
23  Q.   And how long were you a collector?
24  A.   Year and a half, maybe.

Page 6

1   Q.   And prior to that, where were you employed?
2   A.   IGS.
3   Q.   And what is IGS?
4   A.   International Government Systems.
5   Q.   And what is the nature of the business of
6   International Government Systems?
7   A.   They are a reseller of computer equipment.
8   Q.   And what was your position?
9   A.   Sales.
10  Q.   How long did you hold that position?
11  A.   A year; less than a year.
12  Q.   Prior to that, where were you employed?
13  A.   Barlett Consolidated.
14  Q.   What is the business of Barlett Consolidated?
15  A.   They fix roadway -- anything that's damaged on
16  a roadway from an auto accident.
17  Q.   And what was your position at Barlett?
18  A.   I'm not sure I can remember the title.  I was
19  just an associate.  I negotiated claims between Barlett
20  Consolidated and the insurance company -- insurance
21  companies.
22  Q.   So if someone in an automobile accident was
23  insured --
24  A.   If they had gone off the roadway and hit a

Page 7

1   guardrail or light post, or if they hit trees, Barlett
2   Consolidated was a company that would go out and repair
3   those damages that are owned by either the town, city,
4   or state.
5   Q.   And you then would be reimbursed by the
6   insurance company?
7   A.   Yes.
8   Q.   And how long were you at Barlett?
9   A.   Oh, gosh.  I'm going to say approximately four
10  years.  It was a while back.
11  Q.   Did you have the same position the whole time?
12  A.   Yes.
13  Q.   Prior to Barlett, where were you employed?
14  A.   I'm sure I don't remember.  Probably a
15  supermarket somewhere.
16  Q.   Do you have a college degree?
17  A.   I do.
18  Q.   And when did you get that?
19  A.   1999.
20  Q.   And where were you employed when you got the
21  college degree?
22  A.   CCA.
23  Q.   Oh, okay.
24       And where did you get your college

Page 8

1   degree?
2   A.   University of Phoenix.
3   Q.   In what area of study?
4   A.   MBA.
5   Q.   And do you have an undergraduate degree?
6   A.   I did.
7   Q.   What was that?
8   A.   That was a bachelor's in business.
9   Q.   From what institution?
10  A.   University of Phoenix as well.
11  Q.   What year did you get that degree?
12  A.   1997 approximately.
13  Q.   And when did you graduate from high school?
14  A.   I graduated from Plymouth-Carver High School
15  in 1987.
16  Q.   And after you left high school, where were you
17  working?
18  A.   After I left high school, where was I working?
19  It was actually Angelo's Supermarket way back when.
20  Q.   Let me ask you this:
21       At any time prior to your employment at
22  Barlett Consolidated --
23  A.   Yes.
24  Q.   -- did you have any jobs that involved

Page 9

1  collections?
2      A.   No.
3      Q.   All right.  Let's then focus on your
4  employment with CCA.
5      A.   Very good.
6      Q.   Could you generally describe your duties as a
7  collector?
8      A.   Sure.  As a collector, we would be assigned a
9  route, and in that route would be different accounts
10  that we would have to collect on.  And accounts would
11  move in and out of that route, depending on if the
12  account paid, if the account settled, if the client
13  recalled the account.
14          But my job primarily was just to make
15  outbound calls, as well as take inbound calls from
16  customers, and to assist them in trying to resolve their
17  debt.
18      Q.   And what year did you first begin working at
19  CCA?
20      A.   1994.
21      Q.   And when you became assistant collection
22  manager, what were your responsibilities in that
23  position?
24      A.   As assistant collection manager, you had a

Page 10

1  team of about -- anywhere between 7 and 12 collectors
2  that would report up to you, and your job was to make
3  sure they comply with all federal and state laws, to
4  cross any calls that might be -- that might require
5  additional assistance.  If there's any complaint calls,
6  you would handle that; make sure the customer received
7  the highest level of service we could give them.
8      Q.   Now, when you're talking about "customer,"
9  you're talking about the owner of the debt?
10      A.   Yes.
11      Q.   And any other general responsibilities as
12  assistant collector?
13      A.   Yeah, as assistant collection manager, you
14  would make sure that, you know, collectors were there on
15  time; that they made their appropriate number of calls.
16  We would track the monthly goal, client results, make
17  sure that everyone was on track.
18      Q.   And what would your responsibilities as
19  collection manager be?
20      A.   Collection manager, you would -- well, back
21  then, I probably had one or two assistant managers that
22  would report up to me.  And it was making sure the
23  assistant manager, as well as the collectors, were
24  complying within state and federal guidelines; any

Page 11

1  requirements that the client might have, cross-calls,
2  you know, any complaint.
3      Q.   Okay.  What were your responsibilities as
4  regional vice president of operations?
5      A.   As regional vice president of operation, I had
6  relocated to the Denver, Colorado office, and I oversaw
7  the California office, the Denver office, and the Texas
8  office.
9      Q.   And generally, can you describe your duties in
10  overseeing those three offices?
11      A.   Making sure all offices complied within state
12  and federal regulations as well as client requirements;
13  making sure that call operations were running
14  efficiently; making sure that staffing -- and all client
15  files were staffed correctly; managed correctly.
16      Q.   And --
17      A.   Handle site visits if the client came on to
18  the site.
19      Q.   What do you mean "site visit with the client"?
20  You went and actually visited the owners of the debt,
21  their businesses?
22      A.   I would do that as well, but what I was
23  speaking about was, if our client actually came to our
24  office to meet the team.

Page 12

1      Q.   All right.  What were your responsibilities --
2  oh, that was your most --
3      A.   No, that regional vice president.
4      Q.   Your responsibility as vice president of
5  operations?
6      A.   As vice president of operations, I had two
7  regional vice presidents underneath me, east and west,
8  and we would make sure that their offices met all client
9  requirements, complied with all laws, followed policies
10  and procedures.  I would attend outside collection
11  agency meetings.  We would go to some conferences within
12  the industry.
13      Q.   And currently what are your responsibilities
14  as senior vice president of business development?
15      A.   My job right now is to help develop the
16  business by expanding existing clients, as well as
17  signing new clients on board.  So the new business
18  development team, the sales and marketing team reports
19  up to me.
20          We're in charge of growing the business.
21      Q.   All right.  Who do you report to?
22      A.   Paul Leary, Junior, our CEO.
23      Q.   When you were vice president of operations,
24  who did you report to?

Page 13

1    A.   Paul Leary, Junior.
2    Q.   And I want to focus on your position as vice
3 president of operations.
4    A.   Okay.
5    Q.   Who reported to you in the years, 2007 to
6 2008, when you were acting as vice president of
7 operations?
8    A.   Kevin Bennick and Doug Carruthers.
9    Q.   Can you spell Kevin's last name?
10   A.   B-E-N-N-I-C-K.
11   Q.   And Mr. Carruthers?
12   A.   C-A-R-R-U-T-H-E-R-S.
13   Q.   What's his first name?
14   A.   Douglas.
15   Q.   And generally, what was Mr. Bennick
16 responsible for?
17   A.   Kevin was responsible for the west, so Dallas
18 and Denver.
19   Q.   And Douglas Carruthers?
20   A.   Kevin actually took over for Doug.  Doug was
21 doing the west, and then Steve Masters was doing the
22 east.
23        So Steve did the Norwell and the Chicago
24 office.

Page 14

1    Q.   Okay.  Were they then regional vice presidents
2 of operations?
3    A.   They were.
4    Q.   Okay.  In your position as vice president of
5 operations, did you work with John Burns?
6    A.   Yes.
7    Q.   What was your relationship with Johns Burns?
8    A.   He worked in our Compliance Department, Risk
9 Management Department.
10   Q.   And again, as vice president of operations,
11 what day-to-day contact would you have with John Burns?
12   A.   I don't know that I would have day-to-day
13 contact with him.
14   Q.   What kind of contact, work relations contact,
15 would you have with him?
16   A.   Any type of a complaint would go up through
17 his department.
18   Q.   When you were vice president of operations,
19 did you have any involvement with US Asset Management,
20 Inc.?
21   A.   Yes.
22   Q.   What was your involvement?
23   A.   US Asset Management placed accounts with CCA
24 for collections.

Page 15

1    Q.   And who represented US Asset Management, Inc.
2 in connection with the placement of accounts for
3 collection?
4    A.   John Burns.
5    Q.   Okay.  And in connection with the placing of
6 accounts for collection by US Asset Management, what was
7 your role?
8    A.   What was my role in collecting the accounts
9 or?
10   Q.   No, I mean generally, if you had a role in
11 collecting accounts, yes.  If you had any negotiation
12 about collecting accounts or any kind of involvement in
13 the practices or procedures of collecting the accounts.
14   A.   Okay.  US Asset Management would place the
15 accounts with CCA, and then my role would be to decide
16 which offices would collect on those accounts, how we
17 were going to go about collecting those accounts,
18 tracking the collections, working with the training team
19 to make sure the collectors were trained, that there was
20 no violation of laws, making sure goals were hit, staff
21 was on board.
22   Q.   When did CCA first begin collecting accounts
23 for US Asset Management?
24   A.   I think it was 2006; approximately 2006.

Page 16

1    Q.   I'm going to hand you what's been marked as
2 Deposition Exhibit No. 1, which is the complaint in this
3 case.
4        Have you ever seen that document before?
5    A.   I have not.
6    Q.   Oh, you haven't?
7    A.   No.
8    Q.   Well, could you look at Exhibit A and B, which
9 are the last four pages of Exhibit 1?
10        Do you recognize the form of that
11 document?
12   A.   This is a collection letter, yeah.
13   Q.   And what involvement, if at all, did you have
14 in the drafting of Exhibit A?
15   A.   I submitted this document to compliance for
16 approval and review.
17   Q.   When was that?
18   A.   I'm sure I don't remember.  I would guess
19 maybe late 2007.  I don't remember.  It was a long time
20 ago.
21   Q.   And did you actually draft it?
22   A.   I don't know who actually drafted it.  I think
23 it was really a lot of different input that came into
24 the drafting of the letter.

Page 17

1    Q.   What kinds of employees would have had input
2    into the drafting of Exhibit A to Exhibit 1?
3    A.   I would say myself and the collection
4    managers.
5    Q.   And in connection with submitting this
6    document to compliance, did you submit any other
7    information about how the document would be used other
8    than what the document looks like?
9    A.   No, if I understand that question correctly.
10   Q.   Did you speak with anyone in compliance about
11   Exhibit A?
12        MR. WIER:  Object to form.
13   A.   Yeah, I don't understand what you mean.
14        MR. WIER:  Time frame?  You mean back at the
15   time?
16        MS. COMBS:  Back at the time this was referred
17   to compliance for compliance review.
18   BY MS. COMBS:
19   Q.   Did you speak to anyone in compliance about
20   Exhibit A?
21   A.   Sure, I would have said to compliance -- I
22   don't remember exactly, but I would have said to them,
23   "here's a letter.  Can you approve this?"
24   Q.   And do you recall who you would have spoken

Page 18

1    to?
2    A.   It was probably Susan Giordano.
3    Q.   And do you recall what you told her about how
4    this document was going to be used, if anything?
5    A.   No, we would have just submitted it and said,
6    "here's a letter for review.  Could you let us know if
7    it was approved?"
8    Q.   Did you tell her under what circumstances this
9    letter would be sent to debtors?
10   A.   Not that I recall.
11   Q.   What was your intention -- strike that.  In
12   what manner would -- let me start all over.
13        How was it your intention that a
14   collector use this document in connection with the
15   collection of a debt?
16   A.   US Asset Management had authorized us to place
17   accounts with attorneys -- qualifying accounts with
18   attorneys.  So this letter was part of a process to
19   inform the customers, the debtors, that they may qualify
20   for legal action.
21   Q.   Was this form document used in connection with
22   any other creditor or owner?
23   A.   I don't believe so.
24   Q.   Did anyone from US Asset Management

Page 19

1    participate in the drafting of the document?
2    A.   I don't believe so.
3    Q.   Okay.  Do you recall when this document was
4    first used?
5    A.   I don't.  I think it was late 2007, but I
6    don't remember.
7    Q.   And do you recall what type of debt US Asset
8    Management had referred to CCA for collection using
9    Exhibit A?
10   A.   They didn't refer any accounts using Exhibit
11   A.  They just placed accounts with us for collections,
12   and then based on balances and other criteria, they may
13   or may not qualify to be reviewed by the
14   Legal-Forwarding Department.
15   Q.   Okay.  You had testified that US Asset
16   authorized the placing of accounts with attorneys.
17        Were these particular types of debts?
18   A.   Yes, they were Sprint accounts.
19   Q.   Did US Asset Management place any other types
20   of debt with CCA and give authority for collection for
21   placement with attorneys?
22   A.   They did not.
23   Q.   So this Exhibit A was only used in connection
24   with collection of Sprint debt?

Page 20

1    A.   That's the only time I believe this letter was
2    used, yes.
3    Q.   Okay.  Did you speak with John Burns in
4    connection with gaining the authorization to place these
5    US Asset Sprint accounts with attorneys?
6    A.   No, not that I -- I don't think I'm -- are you
7    asking me if I would go to John Burns, and ask him, "can
8    I sue this account?"
9    Q.   I'm asking, how was the process set up by
10   which you received authorization from US Asset
11   Management to refer the Sprint accounts to attorneys for
12   collection?
13   A.   US Asset Management would place the accounts
14   with CCA.  CCA would go through a collection process
15   where we would send out letters, and it would be an
16   initial notice with all the debtor's rights, trying to
17   get them to resolve the account.  We would make outbound
18   calls and we would receive inbound calls.
19        We would do a lot of skip tracing on the
20   accounts because a lot of the accounts, you couldn't
21   actually contact the customer.  So we would try to skip
22   trace the accounts, to locate the person responsible for
23   the debt, and then depending on balance size, accounts
24   may qualify to be reviewed by our Legal-Forwarding

1  Department, as well as other things; not just balance
2  size, but other things as well.
3      Q.  Is there someone out there to collect from?
4      A.  Yeah.  Can you contact the person?  Does the
5  person have assets?  Yes or no?  Again, if the balance
6  size warrant us looking into it further.
7      Q.  Do you recall with respect to the Sprint debt,
8  what balance size was large enough for it to be sent to
9  a collection agency?
10     A.  I think it was approximately $400; between 3
11 and $400.
12     Q.  Let me rephrase it.
13         Was 3 to $400 the balance size before you
14 referred it to an attorney for collection?
15     A.  No, the balance size of 3 to $400 would be the
16 balance size that would be required in order for the
17 Collections Department to forward an account to the
18 Legal-Forwarding Department.
19     Q.  Okay.
20     A.  Then the Legal-Forwarding Department would
21 review the account, and determine if they felt they
22 should forward it to an attorney, and then the attorney
23 would actually make the decision on whether to place it
24 legally, to take legal action on it.

1      Q.  Okay.  When, in this process, was Exhibit A
2  sent to the debtor?
3      A.  This, you would have had your initial notice
4  with all the debtor's rights sent out.  You would have
5  had outbound calls made, if we had any telephone numbers
6  available.  You probably would have had a second notice
7  sent on the accounts in a second attempt to collect the
8  account; more calls would have been made.
9          During this time frame, skip tracing
10 would continue to happen in an attempt to try to get
11 secondary or other possible telephone numbers to reach
12 the consumer.  And once the collection team felt like
13 they had exhausted their efforts both by letters and
14 phone calls, then at that point this letter would be
15 sent out.
16     Q.  Okay.  Who would determine whether to send
17 Exhibit A?  What kind of employee?
18     A.  Collection managers or higher.
19     Q.  Okay.  You've mentioned several times the
20 "Legal-Forwarding Department."
21         Could you describe what is the
22 "Legal-Forwarding Department"?
23     A.  The department that has direct contact with
24 attorneys in different states.  The collection team

1  might believe an account should qualify for legal
2  action.  They sent it to Legal-Forwarding Department,
3  and Legal-Forwarding Department will actually make the
4  decision on whether to have an attorney review the file
5  or not.
6      Q.  And what factors does the Legal-Forwarding
7  Department consider in determining whether or not to
8  forward an account to an attorney for collection?
9      A.  I think it begins with balance.  Are there any
10 assets available?  What state is the account located in?
11 The type of account, I guess.
12         They would look at a lot of different
13 factors before they make a decision.
14     Q.  Would every account where the debtor was sent
15 an Exhibit A or a document in the form of Exhibit A?
16     A.  Okay.
17     Q.  Would every one of those accounts be referred
18 to collections?
19     A.  They're already past collections.  What do you
20 mean?
21     Q.  Strike that and let me start over.
22         Would every debtor, who received Exhibit
23 A, have his account referred to an attorney for
24 collection or legal -- litigation?

1      A.  No, this would indicate that the account --
2  that the Legal-Forwarding Department would review the
3  account.
4      Q.  Okay.  I'm going to ask you to look at Exhibit
5  B to Exhibit 1.
6          Do you recognize the form of this
7  document?
8      A.  Yes.
9      Q.  And were you involved in the drafting process
10 of Exhibit B; the form of that document?
11     A.  No, I was not.
12     Q.  Do you know when CCA first started using a
13 document of the form of Exhibit B?
14     A.  I don't.
15     Q.  Do you know under what circumstances would
16 Exhibit B be sent to a collector?  And I'm really
17 focusing on between 2007 and 2008.
18     A.  Okay.  This would be sent if someone on the
19 collection team or Legal-Forwarding team had received
20 information that the consumer had assets in their name.
21 And that can be done through the tax assessor's office,
22 sometimes credit bureau data or other vendors that
23 provide this information.
24     Q.  And was this document, the form of Exhibit B,

1  used to collect debts other than the Sprint debts from
2  US Asset Management, Inc.?
3      A.  I believe it was.
4      Q.  And do you recall whether or not Exhibit B was
5  used when you first began working at CCA?
6      A.  I don't know if it was used when I first began
7  working, but I remember -- I don't know if it's this
8  exact letter, but a letter kind of like this being used
9  by different clients on different types of debt.
10     Q.  So it was used prior to the relationship
11  between CCA and US Asset Management?
12     A.  I believe so, mm-hmm.
13     Q.  Do you recall when CCA first began
14  collecting --
15     A.  Just to make sure, I don't know if it was this
16  identical letter.  I'm sorry?
17     Q.  Okay.  So to get back to your last question,
18  is it fair to say the letter you're referring to, was an
19  asset review type of letter; may have somehow differed
20  from Exhibit B?
21     A.  Yes, we have verified assets in your name
22  including ownership of property.  That letter has been
23  around and approved by a lot of different clients
24  throughout the years.  I remember this back when I was

1  assistant manager.
2      Q.  Okay.  And --
3      A.  I don't know if I remember the exact title on
4  it.  I think it said, "asset review," but the verbiage
5  is very similar.
6      Q.  Did someone from US Asset Management approve
7  the sending of Exhibit B in connection with the
8  collection of Sprint PCS debts?
9      A.  No, US Asset Management places the accounts
10  with CCA and CCA determines what letters are sent on the
11  account.
12     Q.  So I'm going to ask the same question about
13  Exhibit A.
14         Did anyone from US Asset Management
15  approve the sending of Exhibit A in connection with
16  collection on Sprint PCS debt owned by US Asset
17  Management?
18     A.  I did not receive approval from anyone at US
19  Asset Management.  I don't know if the Compliance
20  Department showed this to anyone over there.  I don't
21  know.
22         And I guess that would be the same thing
23  for Exhibit B.  I did not bring it to US Asset
24  Management for approval or anyone on my team did not

1  bring it, but compliance might have.
2      Q.  Now, I just want to get a clarification here.
3         You said that both Legal Forwarding and
4  Collection would use Exhibit B, correct?
5      A.  Exhibit B would be used, yes, by both
6  departments.
7      Q.  So whenever someone from either department saw
8  that there was an asset out there connected with the
9  debt, then this letter would be sent?
10     A.  Not 100 percent, but it could be.
11     Q.  Okay.  Let's go back to the question of the
12  placement by US Asset Management, Inc. in connection
13  with the Sprint PCS debts.
14         What information did CCA receive from US
15  Asset Management about the portfolio that contained the
16  Sprint PCS debt?
17     A.  I'm not sure what you mean.  What placement --
18  what information we received on the placement?
19     Q.  Yes.
20     A.  They told us the type of debt.  I mean they
21  didn't really tell us a lot about --
22     Q.  Did they tell you about the size of the debt?
23     A.  Yes, average balance on the account, yes.
24     Q.  And how about the age of the debt?

1      A.  Yes, that the accounts were approximately
2  within 18 months to 2 years of being written off.
3      Q.  Any other information?
4      A.  Not that I remember.
5      Q.  Does the type of debt affect the collection
6  procedures used by CCA in connection with the collection
7  of a portfolio?
8      A.  Does the type of debt impact the strategy that
9  we use to collect --
10     Q.  Correct?
11     A.  -- a portfolio?
12         I don't think so.
13     Q.  Does the size of the debt impact the
14  collection activity that --
15     A.  I mean the type of debt does impact the
16  strategy on the portfolio because you have medical
17  accounts, you're going to have to follow HIPPA laws.
18  And, you know, if you have education loans, someone that
19  might go -- you got tuition and education, so they have
20  their own set of laws, whether it's a loan or tuition,
21  and the time you have to keep the debt and transfer
22  back.
23         So I guess the type of debt impacts the
24  collection strategy.

Page 29

1  Q. Okay. Specifically, you mentioned education
2  loans. Is there any -- strike that.
3       Specifically, with respect to education
4  loans, how would the fact that a loan is an education
5  loan affect the collection activities undertaken by CCA?
6  A. Whether it's a loan or whether it's a tuition
7  account?
8  Q. Okay. How would that affect it?
9  A. Just whatever is required by the law or by the
10 client placing the account.
11 Q. And what do you mean by "required by the law,"
12 specifically with respect to the collection?
13 A. Education debt is not my area of expertise.
14 It's handled by people below me. But I know there's
15 something in place where certain type of a loan, you can
16 only keep it for one year, and then it has to go back to
17 the client.
18       But we have experts in that that would be
19 able to tell you more about how we collect on that debt.
20 Q. All right. I don't want to belabor this, but
21 what kind of employee is an expert in the education
22 loans?
23 A. Lynn Loring.
24 Q. And do you know --

Page 30

1  A. Patty Justice, Judy Commesso, Brittany Leary.
2  There are a lot of people that are experts on the
3  education side of the house.
4  Q. And you said that certain types of loans, the
5  collector can keep them only one year.
6       Do you understand what that --
7  A. This is not my area of expertise. You know,
8  the accounts come in, and this team will determine what
9  has to be done with the accounts to make sure we meet
10 all requirements.
11 Q. Okay. Does the size of the debt impact the
12 collection mechanisms used by CCA in connection with the
13 debt?
14 A. Mm-hmm. Yes.
15 Q. And how does it do that?
16 A. Well, if it's a small balance account less
17 than $5, they're not going to go after the collections
18 on it. In some cases, balances less than $25; the
19 client placing the accounts will help to determine.
20 Q. Okay. Who has the conversations with the
21 client about which debts are going to be collected, if
22 the amount -- the size of the debt varies?
23 A. There's multiple people within the company.
24 Usually the conversations probably begin with the

Page 31

1  salesperson in charge of that account, and then from
2  there, it would be client service people.
3  Q. Who are the "client service people;" part of
4  the sales department?
5  A. No, they're a team that handles questions that
6  the customer might have or that the client might have.
7  Q. Is that part of the Operations Department?
8  A. It was back then, mm-hmm.
9  Q. And who was in charge of that department?
10 A. Paula Barron.
11 Q. Can you spell the last name?
12 A. B-A-R-R-O-N. Patty Justice was also part of
13 that department.
14 Q. Does the age of the debt affect the collection
15 activity that takes place by CCA in connection with the
16 debt?
17 A. It does.
18 Q. And how is that?
19 A. Sometimes we're contracted to work on accounts
20 that are very early age. So it's a little bit of a
21 softer collection approach or even collecting on behalf
22 of the client.
23 Q. And what do you mean by "early age"?
24 A. Not written off yet; prewrite-off.

Page 32

1  Q. With respect to debts that have been written
2  off?
3  A. Mm-hmm.
4  Q. Does the age of the debt affect the collection
5  mechanism?
6  A. Not really, no.
7  Q. Are you familiar with the -- let me ask you
8  another question.
9       Do you recall who the salesperson was
10 with respect to the Sprint PCS debts collected on behalf
11 of US Asset Management?
12 A. There's not a salesperson on this.
13 Q. Is that because John Burns --
14 A. Yes.
15 Q. -- was the contact?
16 A. Yes.
17 Q. And do you recall whether you had any
18 conversations with John Burns about how the Sprint PCS
19 debts would be handled on behalf of US Asset Management?
20 A. I don't believe I've had any direct
21 conversations with him. In the past, we have had
22 executive meetings that would take place Tuesday
23 mornings, and in that meeting, I would probably get
24 updates or strategy or results for US Asset Management.

Page 33

1        I think it would just be general updates.
2    Q.  Were any minutes kept of these executive
3  meetings?
4    A.  I did not keep the minutes.
5    Q.  Have you ever seen minutes?
6    A.  If there are any minutes, it would have been
7  Ginny Berry that would have kept them.
8    Q.  Do you recall seeing any?
9    A.  No.
10   Q.  Are you familiar with the concept of a Statute
11 of Limitations clause?
12   A.  Yes.
13   Q.  What impact, if any, does the Statute of
14 Limitations of a debt have on the collection activities
15 undertaken by CCA?
16      MR. WIER:  I'm going to object to form, but
17    you may answer.
18   A.  The debt we receive from our clients -- I'm
19 not aware of any debt that we have that's out of the
20 Statute of Limitations when we receive it.
21   Q.  Is there any mechanism for conveying to the
22 collector what the Statute of Limitations is on a
23 particular debt?
24   A.  No, CCA would not typically work accounts that

Page 34

1  would be out of the Statute of Limitations.
2    Q.  If you had a debt that was two years since
3  charge off, did you have a mechanism for stopping
4  collecting when the debt got close to a Statute of
5  Limitations?
6      MR. WIER:  Object to form.  You may answer.
7    A.  No, because if an account owes beyond the
8  Statute of Limitations, we can still attempt collections
9  on it.
10   Q.  I agree.
11      My only question is:  Was there any
12 determinations at all in the process of what the Statue
13 of Limitations is for a particular debt?  And I'm
14 talking about between 2007 and 2008, and generally your
15 practices.
16   A.  The collection team, if they felt an account
17 could qualify for legal action, would forward it to the
18 Legal-Forwarding Department.  Then that team would
19 assess whether they felt it actually could be placed
20 with an attorney.
21      So I guess the Legal-Forwarding team
22 would assess the Statute of Limitations.  The final
23 decision on whether it is in statute or out of statute,
24 I would think, would be made by the attorney.

Page 35

1    Q.  So is it fair to say that the collection team
2  prior to Legal-Forwarding, would not consider the
3  question of Statute of Limitations at all?
4      MR. WIER:  Objection to form.
5    A.  I would have to check with the collection
6  managers, you know, "has the Legal-Forwarding Department
7  communicated back to the collections team, don't forward
8  accounts past X?  They may have; I don't recall.
9    Q.  Do you recall when you were in that position
10 getting any directions about Statute of Limitations?
11   A.  No.
12   Q.  And --
13   A.  The first I received was this lawsuit that
14 came up.
15   Q.  So the first time that the question of Statute
16 of Limitations was raised in connection with any of your
17 positions at CCA, was when the Castro lawsuit was filed?
18   A.  For this particular account, yes.
19   Q.  And do you recall having any discussions with
20 anyone about the Statute of Limitations on the Sprint
21 PCS accounts prior to the filing of this lawsuit?
22   A.  No.
23   Q.  And are you familiar with the ACA Statute of
24 Limitations publication?

Page 36

1    A.  I know there's one out there, yes.
2    Q.  When is the first time you became aware of it?
3    A.  Early on in my collection career, I was
4  introduced to ACA.  I don't remember exactly what year
5  or when.
6    Q.  Okay.  Let me backtrack a little bit.
7    A.  Okay.
8    Q.  Are you a member of any professional
9  organizations?
10   A.  I am.
11   Q.  Of what?
12   A.  I'm actually a director of membership chair
13 for NECA, which is a division of ACA.
14   Q.  What is NECA?
15   A.  New England Collectors Association.
16   Q.  Okay.
17   A.  Previously, I held a position at the
18 University of Phoenix.  It's not a professional
19 organization.
20   Q.  What was that position?
21   A.  Lead faculty.
22   Q.  Okay.  And did you teach?
23   A.  Part-time job.  No, I just taught at night and
24 on weekends.

1    Q.  And what did you teach?
2    A.  Different business courses.
3    Q.  Anything involving collection?
4    A.  No.
5    Q.  Anything involving legal --
6    A.  No.
7    Q.  Anything about Statute of Limitations?
8    A.  No.
9    Q.  All right.  Other than NECA, are you a member
10   of ACA?
11   A.  NECA is part of ACA, but no, I do not hold any
12   positions associated with ACA, other than the one
13   through NECA.
14   Q.  Have you attended any meetings or seminars
15   held by ACA?
16   A.  I attended the NECA conference last year --
17   was it last year or the year before?
18   Q.  And where was that conference held?
19   A.  Connecticut, Mohegan Sun.
20   Q.  Were there any discussions about Statue of
21   Limitations at that conference?
22   A.  Not that I remember.
23   Q.  Okay.  Have you attended any other
24   conferences?

1    A.  I do attend different conferences.  I attend a
2    lot of the outside collection agency conferences.
3    Q.  And what are those?
4    A.  That's when a client will bring in their
5    agencies, to review performance and other key areas of
6    interest on behalf of the agencies.
7    Q.  Have you ever had a discussion of Statute of
8    Limitations with any of the outside collection agency
9    meetings that you've attended?
10   A.  Not that I remember.  Most of the debt we
11   collected is pretty early on.  It's been 6 to 12 months
12   of charge-offs, so no.
13   Q.  Okay.  Do you receive any publications in the
14   collection area?
15   A.  Yes.
16   Q.  What publications?
17   A.  Gosh.  Their actual names?  The Collector
18   Magazine, I think is one.  That's actually what it's
19   called, Collectors Magazine.  I think there's another
20   one, Credit and collections, if I remember correctly.
21   I think that's it.  There's probably
22   more.
23   Q.  Do you receive emails regularly on
24   collections; training emails?

1    A.  We do, yeah.  Inside Arm will send an email.
2    I don't usually open them.
3    Q.  All right.  So I'll ask this question --
4    A.  We do when we have time.
5    Q.  -- whether you've ever reviewed any
6    information, email, or in the collection magazines or
7    circulars that you've received discussing Statute of
8    Limitations?
9    A.  I have not read any of the articles regarding
10   Statute of Limitations, no.
11   Q.  Prior to the filing of the Castro case, were
12   you aware that there was a Statute of Limitations under
13   the Federal Communications Act?
14   A.  No, we refer to our Compliance Department for
15   all that type of information.
16   Q.  So have you ever used the ACA Statute of
17   Limitations Manual in connection with any of your
18   positions?
19   A.  Me, personally, no.
20   Q.  Do you know if anyone that reports to you has
21   ever used the ACA Statute of Limitations Manual?
22        MR. WIER:  Object to form, but she can answer.
23   A.  I don't know if they have or have not.
24   Q.  No one has reported it to you?

1    A.  No.
2    Q.  Is this available to you on the computer at
3    CCA?
4    A.  Most managers, including myself, do have
5    access to Internet, so assuming it's on the Internet,
6    yes.
7    Q.  But other than that, it's not part of your
8    compliance information or anything like that?
9    A.  I don't know.  It might be.  I kind of defer
10   to Susan Giordano for all of that information.
11   Q.  Okay.  Do you have any experience in
12   communications or utility regulations?
13   A.  No.
14   Q.  Had you ever heard of the Federal
15   Communications Act before this Castro lawsuit was filed?
16   A.  I'm sure I've heard of it, but I don't have
17   the details on it, no.
18   Q.  Are you familiar with the collection lawyers
19   organization called NARCA?
20   A.  Very limited.
21   Q.  Have you ever attended any meetings?
22   A.  No.
23   Q.  Have you ever received any of their
24   information?

Page 41

1    A.   Just an invitation to their conference that
2  they recently held, but other than that, not that I
3  remember.
4    Q.   When did you become aware of the Castro
5  lawsuit?
6    A.   I don't remember when I became aware of it.  I
7  was actually traveling last week, and this is the first
8  time it's really been brought up to me.  I know that
9  we -- once it was filed, I know that all accounts were
10  kind of put on hold; that no accounts were allowed to
11  proceed any further.
12         And I don't remember the date of that.
13    Q.   At the time that the lawsuit was filed and all
14  accounts were put on hold, did you have any discussions
15  with anyone about the lawsuit?
16    A.   Have any discussions with anyone?
17         MR. WIER:  You can identify who, but not the
18    substance of your communication, if you recall
19    anybody.
20    A.   I received notice from Susan Giordano that
21  this was filed, and then the accounts put on hold.  I
22  don't know if that's communication or not.
23    Q.   That's communication.
24         Did you ever talk to John Burns about the

Page 42

1  Castro case?
2    A.   I have not, no.
3    Q.   Did you ever talk to an attorney, other than
4  counsel here?
5    A.   I have not.
6    Q.   -- about this lawsuit?
7    A.   No.
8    Q.   No; okay.
9         Did you ever talk to anyone else at CCA
10  about the lawsuit?
11    A.   Not that I recall, no.
12    Q.   Do you know why they put a hold on the
13  collection of the US Asset Management, Inc. Sprint
14  accounts?
15         MR. WIER:  I'm going to -- that's privilege.
16    We're going to assert a privilege.  Don't answer
17    that.
18         THE WITNESS:  Okay.
19         MS. COMBS:  About what her knowledge is?
20  BY MS. COMBS:
21    Q.   Are you going to follow your attorney's
22  instructions?
23    A.   Yes.
24    Q.   Do you recall any -- strike that.

Page 43

1         Did you review any documents in
2  connection with your preparation for this deposition?
3    A.   I received an email when I was -- I think I
4  got it when I was traveling.  I was traveling all last
5  week.
6         So they sent me an email about today's
7  deposition, asking me if I would be available, so yes.
8    Q.   And that's it?  That's the only document or
9  discussion you've had prior to today about this
10  deposition?
11    A.   Well, conversation I had with --
12         MR. WIER:  Don't tell her about what we talked
13    about, but she looked at these letters, Exhibits A
14    and B.
15  BY MS. COMBS:
16    Q.   Okay.
17    A.   Yeah, I haven't seen this.
18    Q.   But you did see Exhibits A and B?
19    A.   Yes.
20    Q.   And did you look at Mr. Castro's records?
21    A.   At lunch time, yes.
22    Q.   Anything else?
23    A.   No, this is what I had a chance to review.
24    Q.   And other than Mr. Wier, did you talk to any

Page 44

1  other attorneys?
2    A.   I don't think we have another attorney, do we?
3  I don't know, no.
4    Q.   Okay.
5         (Short Recess)
6  BY MS. COMBS:
7    Q.   I may have asked you this, and you can tell me
8  if I have:
9         When did you first become aware of the
10  Federal Communications Act Statute of Limitations?
11    A.   I'm not sure, was my answer.
12    Q.   Okay.
13    A.   I've heard of it, but, you know...
14    Q.   And you had no discussions with anyone about
15  how that may impact the collection of debts?
16    A.   Up until this case, no.
17    Q.   How about after the case?
18    A.   Yes, we were told to put the accounts on hold
19  and not proceed further with any action.  That the --
20  after talking about the Statute of Limitations is two
21  years versus what we were basing off of, which was, I
22  believe, four.
23    Q.   But just to get a clarification here, is it
24  fair to say that your testimony has been that until a

1 debt goes to the legal -- what do you call that
2 department?
3     A.  Legal-Forwarding.
4     Q.  Legal-Forwarding, there's no consideration of
5 the Statute of Limitations process?
6         MR. WIER:  Object to form, but you can answer.
7     A.  We don't collect on any debt that's -- the
8 collector should not have anything that are out of
9 Statute of Limitations.
10    Q.  And what is the mechanism to make sure that
11 that happens?
12    A.  Upon placement of accounts within the FACS
13 system, we look at the charge-off dates or the service
14 dates on the accounts.  And if there's anything that's
15 over three years that could possibly be past the Statute
16 of Limitations, then we probably wouldn't forward it
17 through the same channels, but we haven't had to do
18 that.
19    Q.  Okay.  Now, who does that review upon the
20 placement of accounts of charge-off dates to make sure
21 that nothing is over three years old?
22    A.  Myself and my team.
23    Q.  And again, between 2007 and 2008, can you
24 recall ever having undertaken to collect on behalf of a

1 portfolio and determined that you have to treat that
2 portfolio differently because the debts are more than
3 three years old?
4     A.  Not that I recall.
5     Q.  Okay.  And what do you look at in making a
6 determination as to the age of the debt?
7     A.  Charge-off date usually.
8     Q.  Okay.  I would like you to look at Exhibit 2.
9         Do you recognize the form of that
10 document?
11    A.  Yes, this is a screen printout of a FACS.
12    Q.  And what is FACS?
13    A.  Fully Automated Collection System.  It is the
14 Ontario collection system that we use.  We call it FACS,
15 F-A-C-S.
16    Q.  Now, if you look at the first page of
17 Exhibit 2 -- and this purports to be a screen printout
18 of the account of Nemesio Castro, correct?
19    A.  It appears to be, yes.
20    Q.  Can you tell me what the charge-off date is on
21 Mr. Castro's debt?
22    A.  I will have to double-check.  It says the list
23 date with our company was January 7, 2007.  So that's
24 the date it was loaded into FACS.  And then it says the

1 service date is February 2nd of 2005.
2         I have a lot of clients that place debt
3 with CCA.  So sometimes we'll receive the date service
4 was established; other times you'll receive date of last
5 payment; other times you'll receive a charge-off date.
6         I would think that that is the charge-off
7 date, but I would want to double-check it because I deal
8 with large number of clients.
9     Q.  So the information in that field --
10    A.  It's kind of blurred.  I think it says --
11    Q.  I think it's SRV?
12    A.  Yes.
13    Q.  The information -- what did you call it,
14 service field?
15    A.  SRV stands for service, and that's a hard
16 coded field by FACS.  You can't choose -- you can't
17 change that, at least not that I'm aware of.
18    Q.  But what will change is, depending on the
19 client and the portfolio, what information is conveyed
20 by that field, correct?
21    A.  It could.  I would have to research that.
22    Q.  Okay.  Do you remember having any discussions
23 about the age of the Sprint debt on or around January of
24 2007, when those debts were first loaded on the FACS

1 account or FACS machine?
2     A.  I can't say I recall a particular
3 conversation.  I know about loading them, you know, we
4 did assess that they were within the Statute of
5 Limitations.
6     Q.  Who made that assessment?
7     A.  The Compliance Department is usually who we
8 rely on.
9     Q.  And do you have a discussion with the
10 Compliance Department?
11    A.  If there's any question, then there would be a
12 discussion.  I do not recall a discussion because these
13 are within three years.  So that's kind of our
14 benchmark, that if it's over three years, then we
15 would -- you know, a red flag would be raised, and I
16 would go to Compliance and question it.
17         But I would not have questioned it.
18    Q.  And who in Compliance would review the
19 portfolio before it was loaded on to FACS with respect
20 to the question of the age of the debt or the Statute of
21 Limitations?
22    A.  You're asking who in Compliance would review
23 the accounts before they were loaded?
24    Q.  That was what I understood you to say, but let

Page 49

1  me rephrase it.
2          Who in Compliance would review the
3  portfolio in connection with referring it to your
4  collectors for collection with respect to the question
5  of Statute of Limitations?
6      A.  It would be Susan Giordano and her team, but I
7  wouldn't have had a question on this because it's within
8  three years.
9      Q.  Okay.  And what is your understanding of the
10 process that Compliance goes through in determining what
11 the Statute of Limitations is on the debts in a
12 portfolio?
13     A.  That's not my area, but how I understand the
14 process -- are you asking me, how they get their
15 information?  I know they communicated with MAP
16 attorneys.  I know they use NECA.  I know we have
17 Michael Kraft.
18         I'm not sure if that answers your
19 question at all.
20     Q.  I need your help in interpreting this
21 document.
22     A.  I'll do my best.
23     Q.  Okay.  You know a lot more than any of the
24 rest of us.

Page 50

1          Do you know what GC stands for?
2      A.  That's Guaranteed Contacts.  Guaranteed
3  Contacts is their Ontario dialer, which would attempt to
4  reach Mr. Castro to get him to talk to a collector.
5      Q.  Okay.  And if you look on 2/15/07 on the first
6  page of Exhibit 2, it says, "GC at 3:30 p.m.  There was
7  an unattended message" --
8      A.  I'm sorry, where are you?
9      Q.  GC?
10     A.  Okay, mm-hmm.
11     Q.  2/15/07, 3:30 p.m., it says, "residence" and a
12 phone number, and then it says, "unattended message."
13         What does that mean?
14     A.  It means they attempted to reach him at that
15 number, but he was not available.
16     Q.  And then there's another entry for 2/15 that
17 says, "2000 DLC letter series answering machine."
18         Do you know what that refers to?
19     A.  It's just stating that the account is in
20 disposition 2000, which is just the phase that it's in.
21     Q.  And above that, there's an entry "JQC."
22         Do you know what that refers to?
23     A.  That is, I think, Jackie Chandler's initials
24 who works in the IT Department that the initial notice

Page 51

1  with important rights has been sent.
2      MS. COMBS:  Okay.  Off the record.
3          (Off Record Discussion)
4  BY MS. COMBS:
5      Q.  Okay.  Can you look at page four?
6      MR. WIER:  We're back on, right?
7      MS. COMBS:  Oh, yes.
8      A.  Okay.
9      Q.  If you look at the first entry about five
10 lines down, "MGR"?
11     A.  Mm-hmm.
12     Q.  And then it says, "MGR underscore REV changed
13 DU77706 from," and then it says, "to 1"?
14         Do you know what that entry refers to?
15     A.  The MGR notes are from a different dialer
16 system that we use.  It's called soundbite.  It's a
17 dialer vendor, actually.  It's a little bit more
18 advanced technology, at least they would argue that.
19 I'm not sure we would agree.  It's a little bit more of
20 an advanced dialer to try to get better responses from
21 the dials, from the calls.
22         But I don't know specifically what
23 "DU77706 from blank to 1" means.
24     Q.  Okay.  If you could look at page eight?

Page 52

1      A.  Okay.
2      Q.  And if you could go down to the date 2/2/08?
3      A.  Mm-hmm.
4      Q.  There's an entry "BEM"?
5      A.  Mm-hmm.
6      Q.  Do you know who that is?
7      A.  I'm guessing here.  I think that might be
8  Brendan Malloy from the IT Department.
9      Q.  And then it says, "no delinquency date.
10 Cannot report."
11         What does that refer to?
12     A.  I believe he ran a program that checked for a
13 date within a field in order to update the credit
14 report, and it appears that that field was empty.  So
15 that the account was not reported to the credit report,
16 but I would want to verify that.
17         So I'm giving you my best guess, but I'm
18 pretty sure that that's what that means.
19     Q.  All right.  But then look down to 5/8/08, it's
20 got "CB."
21         What does "CB" refer to?
22     A.  That is Chris Banks.
23     Q.  And it says, "4000 begin legal collect."
24         What does that refer to?

Page 53

1    A.   That means that the phase 4000 is our
2 Legal-Forwarding Department.  The account is now being
3 referred to that department, so they can look at it, to
4 find out if they should, in fact, forward this to an
5 attorney for collections.
6         So the account is now officially in
7 review.
8    Q.   If you look at Exhibit A to Exhibit 1, that
9 shows a letter that was sent to Mr. Castro.
10   A.   Okay.
11   Q.   And I believe it's a 5/8 letter?
12   A.   Letter No. 58, okay.
13   Q.   And is there any entry that shows that
14 transaction; that is that a letter was sent out?
15         Was that after 5/8/08?
16   A.   It was.  It was sent out on 5/14.
17   Q.   And that's the entry, "JQC 5/14/08"?
18   A.   That is correct.
19   Q.   And then looking at "MGR 6/9/08," there's an
20 entry that says, "3LG - attempted possible fax," and
21 there's a number?
22   A.   Mm-hmm.
23   Q.   Do you know what that refers to?
24   A.   That means that when the dialer dialed the

Page 54

1 number, that they received a fax tone.
2    Q.   And then the next one, "P2I", do you know what
3 initials those are?
4    A.   I do not.  It appears that the customer called
5 into our office because it's saying "DTO," debtor
6 telephoned office.
7    Q.   Okay.  So from Exhibit 2, does anything in
8 Exhibit 2 tell you what was the charge-off date for
9 Mr. Castro's debt?
10   A.   I believe it is February 2nd of 2005.
11   Q.   And that's the SRV entry?
12   A.   Yes, I would like to verify that.
13   Q.   Can you tell from Exhibit 2, what the purchase
14 date of this debt was?
15   A.   No, you cannot.  The purchase date does not
16 show on these accounts because that transaction would
17 be -- that would be US Asset Management's transaction.
18         So that information would be before CCA
19 got involved in the account.  The accounts are placed
20 with CCA.  So CCA would not have the US Asset Management
21 purchase date.
22   Q.   And what about the date of last payment, is
23 there any information on Exhibit 2 about that?
24   A.   I do not see a date of last payment.  It

Page 55

1 doesn't appear there was any payment made to CCA.  It's
2 saying original.  It's saying current balance and
3 they're the same, so no.
4    Q.   And if there had been a payment made to US
5 Asset, where would that show on Exhibit 2?
6    A.   US Asset Management would forward that payment
7 to us, and you would be able to see that.  If you
8 look -- see where it says, "list date"?
9    Q.   Yes.
10   A.   If you follow that over to the right.
11   Q.   Yes.
12   A.   You would see, "balance 794.35."  Then above
13 that, "original 794.35."  You would see a discrepancy in
14 the balances.
15         So there's been no payments made.
16   Q.   Okay.  I know you've been asked this before,
17 but you're going to have to refresh my recollection:
18         When the Sprint PCS debts were referred
19 by US Asset Management to CCA, was there conveyance of
20 the information as to the age of those debts?
21   A.   Yes, I believe they were between 18 months and
22 2 years.
23   Q.   And how was that information conveyed?
24   A.   I assume I would have asked.  I always ask the

Page 56

1 same things.  What's the fee rate?  How old is it?  The
2 type of debt.  Those are just standard questions.
3         I don't remember who I asked it of or
4 when it was asked, but those are just standard questions
5 that I would have asked.
6    Q.   Okay.  Were you aware as to what types of
7 debts were being collected in the portfolio?
8    A.   Yes.
9    Q.   What information did you have?
10   A.   It's wireless debt.
11   Q.   Pardon?
12   A.   Cellular telephone, wireless accounts.
13   Q.   Is the collector aware that these are cellular
14 phone debts?
15   A.   Yes.
16   Q.   How is that information conveyed to them?
17   A.   In a training seminar.
18   Q.   And do you have a training seminar for the
19 collectors with respect to each portfolio?
20   A.   Yes, every collector is informed about the
21 type of debt, you know.
22   Q.   And whose responsibility -- just the level or
23 the description of the job title, whose responsibility
24 is it to convey that information to the collectors?

1   A.  Collection managers.
2   Q.  And who conveyed that information to the
3   collection managers?
4   A.  Usually me.
5   Q.  Okay.
6   A.  I mean it could come from me through Steve and
7   Kevin to the next level, is probably more the correct
8   channel.
9   Q.  What information, other than that which
10  appears on Exhibit 2, is obtained with respect to a
11  particular debt; for example, do you get hard copies of
12  any evidence of the debt?
13  A.  You can request itemized bills from different
14  clients.  Sometimes they're available; sometimes they're
15  not available.
16  Q.  Under what circumstance would you request
17  that?
18  A.  If the debtor requests it, usually would be
19  the only reason we would request something like that.
20  Q.  And do you ever get information about payments
21  made by the debtor in connection with a particular
22  account?
23  A.  We always get payment information -- any
24  payment that was received after the date of placement,

1   we always get that information.
2   Q.  And when you're referring to "the date of
3   placement," are you referring to the date of placement
4   with the purchaser of the debt or the date of placement
5   with CCA?
6   A.  With CCA.
7   Q.  Do you get payment information about payments
8   made prior to the date of placement?
9   A.  Sometimes you do; sometimes you don't.
10  Q.  Under what circumstance would you?
11  A.  It's dependent on the client on whether they
12  forward it or not.
13  Q.  And would that information be entered then on
14  the computer?
15  A.  It would.
16  Q.  Okay.  And do you know what field you would
17  have the information about any payment?
18  A.  I don't.
19  Q.  And how is it determined what debtors get
20  Exhibit A?
21  A.  Exhibit A, it starts with the balance.  So
22  they wouldn't do any type of a review on an account that
23  had a balance of less than $50, or anything like that.
24      So they review the balance, the state

1   that it's in, the type of debt.  Are we or are we not
2   going to have the Forwarding-Legal Department look at
3   this; yes or no?
4       So it's based on a couple of different
5   factors.
6   Q.  So the same thing you testified earlier about
7   when the Forwarding-Legal Department looks at these
8   accounts?
9   A.  Mm-hmm.
10  Q.  All right.  And Exhibit B, I believe you
11  testified, that that gets sent out if, in the process,
12  it's determined there are assets?
13  A.  It doesn't mean it will definitely get sent
14  out.  It could possibly be sent out, if they verify
15  assets.  I mean there is the occasion where there are
16  assets verified and this notice may not go out.
17  Q.  Is there a reason why the notice would not go
18  out even though assets are verified?
19  A.  Sure.  The account, you know, could be paid,
20  could be settled, be on hold, the client requests we
21  hold, the collector determines it's not necessary to
22  send that letter out.  They might be able to contact the
23  person via phone or the person may be on a payment plan.
24  Q.  But does the Statute of Limitations at all go

1   into the decision of whether Exhibit B is sent out?
2   A.  I'm going to say no because you usually don't
3   collect on an out-of-statute account.  If the account is
4   in a collector's row, it should be within the statute.
5       If it was out of statute, I would not
6   recommend sending the letter.
7   Q.  Right.
8   A.  Yeah.
9   Q.  Okay.  Now, you testified that, basically,
10  your evaluation of whether Statute of Limitations has
11  expired, is whether or not the debt is more than three
12  years old.
13      There are Statute of Limitations that are
14  less than three years, correct?
15  A.  I would refer to my Legal Department on that.
16  Q.  And how would --
17  A.  I'm sorry, Compliance Department; Susan
18  Giordano's department.
19  Q.  And when would you raise that question?
20      MR. WIER:  Object to form.  What question?
21  BY MS. COMBS:
22  Q.  I'm saying the question of -- let's assume
23  you've got the debt that's two and a half years old or
24  close to three years old, would you raise the question

Page 61

1  of the Statute of Limitations at that point?
2          MR. WIER:  Objection to form.
3      A.  Possibly, that's awful close to a date, so
4  that may possibly raise it, sure.
5      Q.  But when you're evaluating a portfolio, what
6  you're looking at, is it more than three years old; is
7  that fair to say?
8      A.  That's one of the guidelines that we use.
9      Q.  Do you ever not collect on a debt because it's
10  two years old?
11      A.  Do we never not collect if it's under two
12  years old?  Of course we collect on it, if it's under
13  two years old.
14          I don't think I'm understanding the
15  question.
16      Q.  Let me rephrase.
17          Would you ever change the mechanism for
18  collecting a debt because the debt was two years old?
19          MR. WIER:  Object to form.  You can answer, if
20  you can.
21  BY MS. COMBS:
22      Q.  If you can.
23      A.  I would say no.
24      Q.  Do you know what Statute of Limitations was

Page 62

1  used for calculating the Statute of Limitations on the
2  Sprint PCS accounts?
3      A.  We received it from the Compliance Department,
4  so no.
5      Q.  Have you ever received a note from the
6  collections or any communications from the Compliance
7  Department stating that the debts that you're collecting
8  on, are getting close to the expiration of statute?
9      A.  Have I ever received a note --
10      Q.  Or --
11      A.  -- just verbal communications.
12      Q.  You have?
13      A.  Sure.
14      Q.  When is the last time that happened?
15      A.  Oh, gosh.  I don't remember.
16      Q.  And normally, who would that come from?
17      A.  Susan Giordano or Mianne Schall.
18      Q.  Now, you said you wouldn't send out Exhibit B,
19  if you knew that the Statute of Limitations had expired.
20          Would you send out Exhibit A, if you knew
21  the Statute of Limitations was expired?
22      A.  It's hard to say what you would or would not
23  do because if we're going to do something like this,
24  it's going to go through the Legal-Forwarding Department

Page 63

1  or go through the Compliance Department.  If the Statute
2  of Limitations had passed, no, we would not send out
3  Exhibit A.  I would not recommend it.
4      Q.  And what is your understanding as to the
5  current Statue of Limitations that CCA is using with
6  respect to cellular phone debt in Texas?
7          MR. WIER:  I'm going to object to form.
8      A.  My Compliance Department told me it was four
9  years.
10      Q.  And when was that communicated to you?
11      A.  I really don't remember the date.
12      Q.  Approximately?
13      A.  I don't recall.
14      Q.  Was it in your former position?
15      A.  Oh, yeah.  Yes.
16      Q.  Did you have any discussions with any lawyer,
17  other than Mr. Wier here, about what the Statute of
18  Limitations is for cellular phone debt in Texas?
19      A.  No, I have not.
20      Q.  Now, you just testified that it has been your
21  experience that Susan Giordano has said that a certain
22  portfolio -- the Statute of Limitations has expired.
23          How is that information conveyed to
24  collectors?

Page 64

1          MR. WIER:  I'm going to object to form.
2      You're paraphrasing of what she said is not exactly
3      what was said earlier.  She didn't say expired.
4      She said about to expire.
5  BY MS. COMBS:
6      Q.  Okay.  And again, in that circumstance, how
7  would you convey that information to collectors?
8          MR. WIER:  Do you remember that line of
9      questioning from before?
10      A.  On this particular situation or on any
11  situation?
12      Q.  The hypothetical situation that we talked
13  about where you recall that Susan Giordano said the
14  Statute of Limitations is close to expiring on these
15  debts.
16          How would you convey that information to
17  the collectors?
18      A.  Our collectors should not be working on
19  out-of-statute accounts.  If we identified a portfolio
20  as being out of statute, we would probably separate that
21  out, and give it to a separate team.
22          But again, it's hard to say what you
23  would do if a situation actually occurred.
24      Q.  And do you recall ever doing that?

Page 65

1    A.  No, because I think the first time it's come
2  up, was this.  Yes, I guess that's my answer.  We would
3  put the accounts on hold, which is what happened in this
4  case.
5        If you look at the notes, you'll see the
6  account, when it was conveyed.  The accounts were put on
7  hold until we figured it out.  It was put into 3600 --
8    Q.  So you're referring to Exhibit 2?
9    A.  Yes.
10    Q.  And is that the 3600, the very last entry on
11  page --
12    A.  Right.
13    Q.  -- nine?
14    A.  Yes.
15    Q.  "3600 cease communication"?
16    A.  Right.  I mean there's many different ways to
17  communicate.  You can communicate your disposition, your
18  training seminar, a written document.
19        MS. COMBS:  I'm going to take a quick break
20     and just check things out; okay?
21        MR. WIER:  Sure.
22        (Short Recess)
23        MS. COMBS:  Okay.  Back on the record.
24  BY MS. COMBS:

Page 66

1    Q.  When we reviewed your various job titles in
2  CCA, you mentioned that some of your responsibilities --
3  or several of your jobs via assistant collector, the
4  collection manager, that one of your responsibilities
5  was making sure that collectors comply with all state
6  and federal law?
7    A.  Yes.
8    Q.  Specifically, was it a part of any of your
9  responsibilities to make sure that collectors were not
10  pursuing or sending into litigation -- strike that.  Let
11  me start over.
12        As part of the state and federal law that
13  you were making sure that collectors complied with, was
14  the issue of Statue of Limitations something you
15  considered or felt responsible for enforcing?
16    A.  It would be, yes, but the type of debt and the
17  age of the debt that we were collecting on -- or that we
18  collected on didn't come into play.
19    Q.  And about what portion of the debt during
20  2007, 2008 involved debts that were over two years?
21    A.  Oh, gosh --
22    Q.  If you could give me an estimate?
23        MR. WIER:  Object to form, but you can answer.
24    A.  I would say it's got to be single digits,

Page 67

1  under nine percent -- under five percent.
2    Q.  That were older than two years?
3    A.  That's, I would say, yeah.  That's an
4  estimate.
5        MS. COMBS:  All right.  I have no further
6  questions.
7        MR. WIER:  We'll reserve ours until the time
8  of trial.
9        MS. COMBS:  Thank you very much.
10        (Deposition concluded at 3:40 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 68

1        C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS )
3                               )
4  COUNTY OF PLYMOUTH           )
5        I, Rosemary F. Grogan, a Registered
6  Professional Reporter and Notary Public duly
7  commissioned and qualified in and for the Commonwealth
8  of Massachusetts, do hereby certify:
9        That CANDICE O'BRIEN, the witness whose
10  deposition is hereinbefore set forth, was duly
11  identified and sworn by me, and that the foregoing
12  transcript is a true record of the testimony given by
13  such witness to the best of my ability.
14        I further certify that I am not related to any
15  of the parties in this matter by blood or marriage, and
16  that I am in no way interested in the outcome of this
17  matter.
18        IN WITNESS WHEREOF, I have hereunto set my
19  hand and affixed my notarial seal this 28th day of May,
20  2009.
21        _____
22        Rosemary F. Grogan, RPR
23        CSR No. 112993
24  My Commission Expires:  January 7, 2011

Page 69

```
 1        ERRATA SHEET DISTRIBUTION INFORMATION
 2        DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
 3
 4        ERRATA SHEET DISTRIBUTION INFORMATION
 5             The original of the Errata Sheet has
 6        been delivered to Keith Wier, Esquire.
 7        When the Errata Sheet has been completed by
 8        the deponent and signed, a copy thereof should
 9        be delivered to each party of record and the
10        Original forwarded to Cathleen Combs,
11        Esquire, to whom the original deposition
12        transcript was delivered.
13
14        INSTRUCTIONS TO DEPONENT
15             After reading this volume of your
16        deposition, please indicate any corrections or
17        changes to your testimony and the reasons
18        therefor on the Errata Sheet supplied to you
19        and sign it.  DO NOT make marks or notations n
20        on the transcript volume itself.  Add
21        additional sheets, if necessary.   Please
22        refer to above instructions for errata sheet
23        distribution information.
24
```

Page 70

```
 1        SIGNATURE / ERRATA SHEET
 2   Re:  Castro Vs. Collecto, Inc., et al.
 3   DEPOSITION OF:  Candice O'Brien  5/26/09
 4        I, CANDICE O'BRIEN, do hereby certify that I
 5   have read the foregoing transcript of my testimony, and
 6   I further certify that said transcript it is a true and
 7   accurate record of said testimony (with the exception of
 8   the corrections that are noted below).
 9   PAGE     LINE(S)     READS        SHOULD READ
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17        Signed under the pains and penalties of
18   perjury this _____day of _____, 2009.
19   _____
20   CANDICE O'BRIEN                    Date
21        Subscribed and sworn to before me this _____day
22   of _____, 2009.
23   _____
24   Notary Public       My Commission Expires:_____
```

18 (Pages 69 to 70)

**A**

**ability** 68:13
**able** 29:19 55:7
  59:22
**ACA** 35:23 36:4,13
  37:10,11,12,15
  39:16,21
**access** 40:5
**accident** 6:16,22
**account** 9:12,12,13
  20:8,17 21:17,21
  22:8 23:1,8,10,11
  23:14,23 24:1,3
  26:11 27:23 29:7
  29:10 30:16 31:1
  34:7,16 35:18
  46:18 48:1 50:19
  52:15 53:2,6
  54:19 57:22 58:22
  59:19 60:3,3 65:6
**accounts** 9:9,10
  14:23 15:2,6,8,11
  15:12,13,15,16,17
  15:22 18:17,17
  19:10,11,16,18
  20:5,11,13,20,20
  20:22,23 22:7
  23:17 26:9 28:1
  28:17 30:8,9,19
  31:19 33:24 35:8
  35:21 41:9,10,14
  41:21 42:14 44:18
  45:12,14,20 48:23
  54:16,19 56:12
  59:8 62:2 64:19
  65:3,6
**accurate** 70:7
**Act** 39:13 40:15
  44:10
**acting** 13:6
**action** 18:20 21:24
  23:2 34:17 44:19
**activities** 29:5
  33:14
**activity** 28:14 31:15
**actual** 38:17
**Add** 69:20
**additional** 10:5
  69:21
**advanced** 51:18,20
**affect** 28:5 29:5,8
  31:14 32:4
**affixed** 68:19
**age** 27:24 31:14,20
  31:23 32:4 46:6

47:23 48:20 55:20
  66:17
**agencies** 38:5,6
**agency** 12:11 21:9
  38:2,8
**ago** 16:20
**agree** 34:10 51:19
**al** 70:2
**allowed** 41:10
**America** 1:12 4:13
**amount** 30:22
**Angelo's** 8:19
**answer** 33:17 34:6
  39:22 42:16 44:11
  45:6 61:19 65:2
  66:23
**answering** 50:17
**answers** 49:18
**anybody** 41:19
**appear** 55:1
**APPEARANCES**
  2:1
**appears** 46:19
  52:14 54:4 57:10
**approach** 31:21
**appropriate** 10:15
**approval** 16:16
  26:18,24
**approve** 17:23 26:6
  26:15
**approved** 18:7
  25:23
**approximately** 7:9
  8:12 15:24 21:10
  28:1 63:12
**April** 4:20
**area** 8:3 29:13 30:7
  38:14 49:13
**areas** 38:5
**argue** 51:18
**Arm** 39:1
**articles** 39:9
**asked** 44:7 55:16,24
  56:3,4,5
**asking** 20:7,9 43:7
  48:22 49:14
**assert** 42:16
**assess** 34:19,22 48:4
**assessment** 48:6
**assessor's** 24:21
**asset** 1:13 14:19,23
  15:1,6,14,23
  18:16,24 19:7,15
  19:19 20:5,10,13
  25:2,11,19 26:4,6
  26:9,14,16,19,23

27:8,12,15 32:11
  32:19,24 42:13
  54:17,20 55:5,6
  55:19
**assets** 21:5 23:10
  24:20 25:21 59:12
  59:15,16,18
**assigned** 9:8
**assist** 9:16
**assistance** 10:5
**assistant** 5:16 9:21
  9:24 10:12,13,21
  10:23 26:1 66:3
**associate** 6:19
**associated** 37:12
**Association** 36:15
**assume** 55:24 60:22
**assuming** 40:3
**attempt** 22:7,10
  34:8 50:3
**attempted** 50:14
  53:20
**attend** 12:10 38:1,1
**attended** 37:14,16
  37:23 38:9 40:21
**attorney** 21:14,22
  21:22 23:4,8,23
  34:20,24 42:3
  44:2 53:5
**attorneys** 18:17,18
  19:16,21 20:5,11
  22:24 44:1 49:16
**attorney's** 42:21
**authority** 19:20
**authorization** 20:4
  20:10
**authorized** 18:16
  19:16
**auto** 6:16
**Automated** 46:13
**automobile** 6:22
**available** 22:6
  23:10 40:2 43:7
  50:15 57:14,15
**average** 27:23
**aware** 33:19 36:2
  39:12 41:4,6 44:9
  47:17 56:6,13
**awful** 61:3

**B**

**B** 16:8 24:5,10,13
  24:16,24 25:4,20
  26:7,23 27:4,5
  43:14,18 59:10
  60:1 62:18

**bachelor's** 8:8
**back** 7:10 8:19
  10:20 17:14,16
  25:17,24 27:11
  28:22 29:16 31:8
  35:7 51:6 65:23
**backtrack** 36:6
**balance** 20:23 21:1
  21:5,8,13,15,16
  23:9 27:23 30:16
  55:2,12 58:21,23
  58:24
**balances** 19:12
  30:18 55:14
**Banks** 52:22
**Barlett** 6:13,14,17
  6:19 7:1,8,13 8:22
**Barron** 31:10
**based** 19:12 59:4
**basically** 60:9
**basing** 44:21
**began** 25:5,6,13
**begins** 23:9
**behalf** 1:7 2:2,10
  31:21 32:10,19
  38:6 45:24
**belabor** 29:20
**believe** 18:23 19:2
  20:1 23:1 25:3,12
  32:20 44:22 52:12
  53:11 54:10 55:21
  59:10
**BEM** 52:4
**benchmark** 48:14
**Bennick** 13:8,15
**Berry** 33:7
**best** 49:22 52:17
  68:13
**better** 51:20
**beyond** 34:7
**bills** 57:13
**bit** 31:20 36:6 51:17
  51:19
**blank** 51:23
**blood** 68:15
**blurred** 47:10
**board** 12:17 15:21
**break** 65:19
**Brendan** 52:8
**bring** 26:23 27:1
  38:4
**Brittany** 30:1
**brought** 41:8
**bureau** 24:22
**Burns** 14:5,7,11
  15:4 20:3,7 32:13

32:18 41:24
**BUSH** 2:11
**business** 1:11 4:18
  6:5,14 8:8 12:14
  12:16,17,20 37:2
**businesses** 11:21
**B-A-R-R-O-N**
  31:12
**B-E-N-N-I-C-K**
  13:10

**C**

**C** 68:1,1
**calculating** 62:1
**California** 11:7
**call** 11:13 45:1
  46:14 47:13
**called** 38:19 40:19
  51:16 54:4
**calls** 9:15,15 10:4,5
  10:15 20:18,18
  22:5,8,14 51:21
**Candice** 1:17 3:2
  4:1,9 68:9 70:3,4
  70:20
**career** 36:3
**Carruthers** 13:8,11
  13:19
**case** 16:3 39:11
  42:1 44:16,17
  65:4
**cases** 30:18
**Castro** 1:6 35:17
  39:11 40:15 41:4
  42:1 46:18 50:4
  53:9 70:2
**Castro's** 43:20
  46:21 54:9
**Cathleen** 2:4 69:10
**CAUSE** 1:4
**CB** 52:20,21
**CCA** 4:12 7:22 9:4
  9:19 14:23 15:15
  15:22 19:8,20
  20:14,14 24:12
  25:5,11,13 26:10
  26:10 27:14 28:6
  29:5 30:12 31:15
  33:15,24 35:17
  40:3 42:9 47:3
  54:18,20,20 55:1
  55:19 58:5,6 63:5
  66:2
**ccombs@edcomb...**
  2:8
**cease** 65:15

cellular 56:12,13 63:6,18
CEO 12:22
certain 29:15 30:4 63:21
certify 68:8,14 70:4 70:6
chair 36:12
chance 43:23
Chandler's 50:23
change 47:17,18 61:17
changed 51:12
changes 69:17
channel 57:8
channels 45:17
charge 12:20 31:1,9 34:3
charge-off 45:13,20 46:7,20 47:5,6 54:8
charge-offs 38:12
check 35:5 65:20
checked 52:12
Chicago 2:6 13:23
choose 47:16
Chris 52:22
circulars 39:7
circumstance 57:16 58:10 64:6
circumstances 18:8 24:15
city 7:3
claims 6:19
clarification 27:2 44:23
clause 33:11
client 9:12 10:16 11:1,12,14,17,19 11:23 12:8 29:10 29:17 30:19,21 31:2,3,6,22 38:4 47:19 58:11 59:20
clients 12:16,17 25:9,23 33:18 47:2,8 57:14
CLNR 1:24
close 34:4 60:24 61:3 62:8 64:14
coded 47:16
collect 9:10 15:16 21:3 22:7 25:1 28:9 29:19 45:7 45:24 52:23 60:3 61:9,11,12
collected 30:21

32:10 38:11 56:7 66:18
collecting 15:8,11 15:12,13,17,22 25:14 31:21 34:4 61:18 62:7 66:17
collection 1:12 4:13 5:10,16 9:21,24 10:13,19,20 12:10 15:3,6 16:12 17:3 18:15 19:8,20,24 20:12,14 21:9,14 22:12,18,24 23:8 23:24 24:19 26:8 26:16 27:4 28:5,6 28:14,24 29:5,12 30:12 31:14,21 32:4 33:14 34:16 35:1,5 36:3 37:3 38:2,8,14 39:6 40:18 42:13 44:15 46:13,14 49:4 57:1,3 66:4
collections 9:1 14:24 15:18 19:11 21:17 23:18,19 30:17 34:8 35:7 38:20,24 53:5 62:6
Collecto 1:11 70:2
collector 5:22,23 9:7,8 10:12 18:14 24:16 30:5 33:22 38:17 45:8 50:4 56:13,20 59:21 66:3
collectors 10:1,14 10:23 15:19 36:15 38:19 49:4 56:19 56:24 63:24 64:7 64:17,18 66:5,9 66:13
collector's 60:4
college 7:16,21,24
Colorado 11:6
Combs 2:3,4 3:4 4:7 17:16,18 42:19,20 43:15 44:6 51:2,4 51:7 60:21 61:21 64:5 65:19,23,24 67:5,9 69:10
come 30:8 57:6 62:16 65:1 66:18
Commesso 30:1
Commission 68:24 70:24

commissioned 68:7
Commonwealth 68:2,7
communicate 65:17 65:17
communicated 35:7 49:15 63:10
communication 41:18,22,23 65:15
communications 39:13 40:12,15 44:10 62:6,11
companies 6:21
company 1:12 4:13 5:2,8,14,20 6:20 7:2,6 30:23 46:23
complaint 10:5 11:2 14:16 16:2
completed 69:7
compliance 14:8 16:15 17:6,10,17 17:17,19,21 26:19 27:1 39:14 40:8 48:7,10,16,18,22 49:2,10 60:17 62:3,6 63:1,8
complied 11:11 12:9 66:13
comply 10:3 66:5
complying 10:24
computer 6:7 40:2 58:14
concept 33:10
concluded 67:10
conference 37:16 37:18,21 41:1
conferences 12:11 37:24 38:1,2
connected 27:8
Connecticut 37:19
connection 15:2,5 17:5 18:14,21 19:23 20:4 26:7 26:15 27:12 28:6 30:12 31:15 35:16 39:17 43:2 49:3 57:21
consider 23:7 35:2
consideration 45:4
considered 66:15
Consolidated 6:13 6:14,20 7:2 8:22
consumer 22:12 24:20
contact 14:11,13,14 14:14 20:21 21:4

22:23 32:15 59:22
Contacts 50:2,3
contained 27:15
continue 22:10
contracted 31:19
conversation 43:11 48:3
conversations 30:20,24 32:18,21
convey 56:24 64:7 64:16
conveyance 55:19
conveyed 47:19 55:23 56:16 57:2 63:23 65:6
conveying 33:21
copies 57:11
copy 69:8
correct 4:14 27:4 28:10 46:18 47:20 53:18 57:7 60:14
corrections 69:16 70:8
correctly 11:15,15 17:9 38:20
counsel 2:1 42:4
COUNTY 68:4
couple 59:4
course 61:12
courses 37:2
COURT 1:1
credit 24:22 38:20 52:13,15
creditor 18:22
criteria 19:12
cross 10:4
cross-calls 11:1
CSR 1:24 68:23
current 4:17 55:2 63:5
currently 12:13
customer 10:6,8 20:21 31:6 54:4
customers 9:16 18:19
C-A-R-R-U-T-H-... 13:12

_____
D
Dallas 6:15
damaged 6:15
damages 7:3
data 24:22
date 41:12 46:7,20 46:23,24 47:1,3,4 47:5,7 52:2,9,13

54:8,14,15,21,22 54:24 55:8 57:24 58:2,3,4,8 61:3 63:11 70:20
dates 45:13,14,20
day 68:19 70:18,21
day-to-day 14:11 14:12
deal 47:7
debt 9:17 10:9 11:20 18:15 19:7 19:20,24 20:23 21:7 25:9 26:16 27:9,16,20,22,24 28:5,8,13,15,21 28:23 29:13,19 30:11,13,22 31:14 31:16 32:4 33:14 33:18,19,23 34:2 34:4,13 38:10 45:1,7 46:6,21 47:2,23 48:20 54:9,14 56:2,10 56:21 57:11,12 58:4 59:1 60:11 60:23 61:9,18,18 63:6,18 66:16,17 66:19
debtor 22:2 23:14 23:22 54:5 57:18 57:21
debtors 18:9,19 58:19
debtor's 20:16 22:4
debts 19:17 25:1,1 26:8 27:13 30:21 32:1,10,19 44:15 46:2 47:24 49:11 55:18,20 56:7,14 62:7 64:15 66:20
decide 15:15
decision 21:23 23:4 23:13 34:23 60:1
Defendants 1:14 2:10
defer 40:9
definitely 59:13
degree 7:16,21 8:1 8:5,11
delinquency 52:9
delivered 69:6,9,12
Denver 11:6,7 13:18
department 14:8,9 14:17 19:14 21:1 21:17,18,20 22:20

22:22,23 23:2,3,7
24:2 26:20 27:7
31:4,7,9,13 34:18
35:6 39:14 45:2
48:7,10 50:24
52:8 53:2,3 59:2,7
60:15,17,18 62:3
62:7,24 63:1,8
**departments** 27:6
**dependent** 58:11
**depending** 9:11
20:23 47:18
**deponent** 69:8,14
**DEPONENT'S**
69:2
**deposition** 1:16
16:2 43:2,7,10
67:10 68:10 69:11
69:16 70:3
**describe** 9:6 11:9
22:21
**description** 56:23
**details** 40:17
**determination** 46:6
**determinations**
34:12
**determine** 21:21
22:16 30:8,19
**determined** 46:1
58:19 59:12
**determines** 26:10
59:21
**determining** 23:7
49:10
**develop** 12:15
**development** 4:18
12:14,18
**dialed** 53:24
**dialer** 50:3 51:15
51:17,20 53:24
**dials** 51:21
**differed** 25:19
**different** 9:9 16:23
22:24 23:12 25:9
25:9,23 37:2 38:1
51:15 57:13 59:4
65:16
**differently** 46:2
**digits** 66:24
**direct** 22:23 32:20
**directions** 35:10
**director** 36:12
**discrepancy** 55:13
**discussing** 39:7
**discussion** 38:7
43:9 48:9,12,12

51:3
**discussions** 35:19
37:20 41:14,16
44:14 47:22 63:16
**disposition** 50:20
65:17
**distribution** 69:1,4
69:23
**DISTRICT** 1:1,2
**division** 1:3 36:13
**DLC** 50:17
**document** 16:4,11
16:15 17:6,7,8
18:4,14,21 19:1,3
23:15 24:7,10,13
24:24 43:8 46:10
49:21 65:18
**documents** 43:1
**doing** 1:11 13:21,21
64:24
**double-check** 46:22
47:7
**Doug** 13:8,20,20
**Douglas** 13:14,19
**draft** 16:21
**drafted** 16:22
**drafting** 16:14,24
17:2 19:1 24:9
**driver's** 4:3
**DTO** 54:5
**duly** 4:3 68:6,10
**duties** 9:6 11:9
**DU77706** 51:13,23

_____

**E**

**E** 3:8 68:1,1
**earlier** 59:6 64:3
**early** 31:20,23 36:3
38:11
**east** 12:7 13:22
**EDELMAN** 2:3
**education** 28:18,19
29:1,3,4,13,21
30:3
**efficiently** 11:14
**efforts** 22:13
**eight** 51:24
**either** 7:3 27:7
**EL** 1:3
**email** 39:1,6 43:3,6
**emails** 38:23,24
**employed** 4:11 5:1
5:7,13,19 6:1,12
7:13,20
**employee** 22:17
29:21

**employees** 17:1
**employment** 8:21
9:4
**empty** 52:14
**enforcing** 66:15
**England** 36:15
**entered** 58:13
**entry** 50:16,21 51:9
51:14 52:4 53:13
53:17,20 54:11
65:10
**EP08CA0215** 1:4
**equipment** 6:7
**errata** 69:1,2,4,5,7
69:18,22 70:1
**Esquire** 2:4,12 69:6
69:11
**established** 43:4
**estimate** 66:22 67:4
**et** 70:2
**evaluating** 61:5
**evaluation** 60:10
**evidence** 57:12
**exact** 25:8 26:3
**exactly** 17:22 36:4
64:2
**EXAMINATION**
3:1,3 4:6
**examined** 4:4
**example** 57:1
**exception** 70:7
**executive** 32:22
33:2
**exhausted** 22:13
**Exhibit** 16:2,8,9,14
17:2,2,11,20 19:9
19:10,23 22:1,17
23:15,15,22 24:4
24:5,10,13,16,24
25:4,20 26:7,13
26:15,23 27:4,5
46:8,17 50:6 53:8
53:8 54:7,8,13,23
55:5 57:10 58:20
58:21 59:10 60:1
62:18,20 63:3
65:8
**Exhibits** 3:6 43:13
43:18
**existing** 12:16
**expanding** 12:16
**experience** 40:11
63:21
**expert** 29:21
**expertise** 29:13
30:7

**experts** 29:18 30:2
**expiration** 62:8
**expire** 64:4
**expired** 60:11 62:19
62:21 63:22 64:3
**Expires** 68:24
70:24
**expiring** 64:14

_____

**F**

**F** 1:24 68:1,5,22
**FACS** 45:12 46:11
46:12,14,24 47:16
47:24 48:1,19
**fact** 29:4 53:4
**factors** 23:6,13 59:5
**faculty** 36:21
**fair** 25:18 35:1
44:24 61:7
**familiar** 32:7 33:10
35:23 40:18
**fax** 53:20 54:1
**February** 47:1
54:10
**federal** 10:3,24
11:12 39:13 40:14
44:10 66:6,12
**fee** 56:1
**felt** 21:21 22:12
34:16,19 66:15
**field** 47:9,14,16,20
52:13,14 58:16
**figured** 65:7
**file** 23:4
**filed** 35:17 40:15
41:9,13,21
**files** 11:15
**filing** 35:21 39:11
**final** 34:22
**find** 53:4
**first** 9:18 13:13
15:22 19:4 24:12
25:5,6,13 35:13
35:15 36:2 41:7
44:9 46:16 47:24
50:5 51:9 65:1
**five** 51:9 67:1
**fix** 6:15
**flag** 48:15
**Floor** 2:5
**focus** 9:3 13:2
**focusing** 24:17
**follow** 28:17 42:21
55:10
**followed** 12:9
**follows** 4:4

**foregoing** 68:11
70:5
**form** 16:10 17:12
18:21 23:15 24:6
24:10,13,24 33:16
34:6 35:4 39:22
45:6 46:9 60:20
61:2,19 63:7 64:1
66:23
**former** 63:14
**forth** 68:10
**forward** 21:17,22
23:8 34:17 35:7
45:16 53:4 55:6
58:12
**forwarded** 69:10
**Forwarding** 27:3
**Forwarding-Legal**
59:2,7
**four** 7:9 16:9 44:22
51:5 63:8
**frame** 17:14 22:9
**Fully** 46:13
**further** 21:6 41:11
44:19 67:5 68:14
70:6
**F-A-C-S** 46:15

_____

**G**

**gaining** 20:4
**GC** 50:1,6,9
**general** 10:11 33:1
**generally** 9:6 11:9
13:15 15:10 34:14
**getting** 35:10 62:8
**Ginny** 33:7
**Giordano** 18:2
40:10 41:20 49:6
62:17 63:21 64:13
**Giordano's** 60:18
**give** 10:7 19:20
64:21 66:22
**given** 68:12
**giving** 52:17
**go** 7:2 12:11 14:16
15:17 20:7,14
27:11 28:19 29:16
30:17 48:16 52:2
59:16,17,24 62:24
63:1
**goal** 10:16
**goals** 15:20
**goes** 45:1 49:10
**going** 7:9 15:17
16:1 18:4 24:4
26:12 28:17 30:17

30:21 33:16 42:15
42:16,21 55:17
59:2 60:2 62:23
62:24 63:7 64:1
65:19
**good** 9:5
**GOODWIN** 2:3
**gosh** 4:24 7:9 38:17
62:15 66:21
**Government** 6:4,6
**graduate** 8:13
**graduated** 8:14
**Greenway** 2:13
**Grogan** 1:24 68:5
68:22
**growing** 12:20
**Guaranteed** 50:2,2
**guardrail** 7:1
**guess** 16:18 23:11
26:22 28:23 34:21
52:17 65:2
**guessing** 52:7
**guidelines** 10:24
61:8

**H**

**half** 5:24 60:23
**hand** 16:1 68:19
**handle** 10:6 11:17
**handled** 29:14
32:19
**handles** 31:5
**happen** 22:10
**happened** 62:14
65:3
**happens** 45:11
**hard** 47:15 57:11
62:22 64:22
**heard** 40:14,16
44:13
**held** 36:17 37:15,18
41:2
**help** 12:15 30:19
49:20
**hereinbefore** 68:10
**hereunto** 68:18
**Hi** 4:10
**high** 8:13,14,16,18
**higher** 22:18
**highest** 10:7
**Hingham** 1:22,23
**HIPPA** 28:17
**hit** 6:24 7:1 15:20
**hold** 4:23 5:5,11,17
6:10 37:11 41:10
41:14,21 42:12

44:18 59:20,21
65:3,7
**Holiday** 1:21
**house** 30:3
**Houston** 2:14
**hypothetical** 64:12

**I**

**identical** 25:16
**identified** 4:2 64:19
68:11
**identify** 41:17
**IGS** 6:2,3
**IL** 2:6
**impact** 28:8,13,15
30:11 33:13 44:15
**impacts** 28:23
**important** 7:1
**inbound** 9:15 20:18
**including** 25:22
40:4
**INDEX** 3:1,6
**indicate** 24:1 69:16
**industry** 12:12
**inform** 18:19
**information** 17:7
24:20,23 27:14,18
28:3 39:6,15 40:8
40:10,24 47:9,13
47:19 49:15 54:18
54:23 55:20,23
56:9,16,24 57:2,9
57:20,23 58:1,7
58:13,17 63:23
64:7,16 69:1,4,23
**informed** 56:20
**initial** 20:16 22:3
50:24
**initials** 50:23 54:3
**Inn** 1:21
**input** 16:23 17:1
**Inside** 39:1
**institution** 8:9
**instructions** 42:22
69:2,14,22
**insurance** 6:20,20
7:6
**insured** 6:23
**intention** 18:11,13
**interest** 38:6
**interested** 68:16
**International** 6:4,6
**Internet** 40:5,5
**interpreting** 49:20
**introduced** 36:4
**invitation** 41:1

**involved** 8:24 24:9
54:19 66:20
**involvement** 14:19
14:22 15:12 16:13
**involving** 37:3,5
**issue** 66:14
**itemized** 57:13

**J**

**Jackie** 50:23
**January** 46:23
47:23 68:24
**job** 9:14 10:2 12:15
36:23 56:23 66:1
**jobs** 8:24 66:3
**John** 14:5,11 15:4
20:3,7 32:13,18
41:24
**Johns** 14:7
**JQC** 50:21 53:17
**Judy** 30:1
**Junior** 12:22 13:1
**Justice** 30:1 31:12

**K**

**keep** 28:21 29:16
30:5 33:4
**Keith** 2:12 69:6
**kept** 33:2,7
**Kevin** 13:8,17,20
57:7
**Kevin's** 13:9
**key** 38:5
**kind** 14:14 15:12
22:17 25:8 29:21
40:9 41:10 47:10
48:13
**kinds** 17:1
**knew** 62:19,20
**know** 10:14 11:2
14:12 16:22 18:6
24:12,15 25:6,7
25:15 26:3,19,21
28:18 29:14,24
30:7 35:6 36:1
39:20,23 40:9
41:8,9,22 42:12
44:3,13 48:3,3,15
49:15,16,16,23
50:1,18,22 51:14
51:22 52:6 53:23
54:2 55:16 56:21
58:16 59:19 61:24
**knowledge** 42:19
**Kraft** 49:17
**kwier@bushrami...**

2:16

**L**

**large** 21:8 47:8
**LaSalle** 2:5
**late** 16:19 19:5
**LATTURNER** 2:3
**law** 29:9,11 66:6,12
**laws** 10:3 12:9
15:20 28:17,20
**lawsuit** 35:13,17,21
40:15 41:5,13,15
42:6,10
**lawyer** 63:16
**lawyers** 40:18
**Lead** 36:21
**Leary** 12:22 13:1
30:1
**left** 8:16,18
**legal** 18:20 21:24
23:1,24 27:3
34:17 37:5 45:1
52:23 60:15
**legally** 21:24
**Legal-Forwarding**
19:14 20:24 21:18
21:20 22:20,22
23:2,3,6 24:2,19
34:18,21 35:2,6
45:3,4 53:2 62:24
**letter** 16:12,24
17:23 18:6,9,18
20:1 22:14 25:8,8
25:16,18,19,22
27:9 50:17 53:9
53:11,12,14 59:22
60:6
**letters** 20:15 22:13
26:10 43:13
**let's** 9:3 27:11
60:22
**level** 10:7 56:22
57:7
**license** 4:3
**light** 7:1
**Limitations** 33:11
33:14,20,22 34:1
34:5,8,13,22 35:3
35:10,16,20,24
37:7,21 38:8 39:8
39:10,12,17,21
44:10,20 45:5,9
45:16 48:5,21
49:5,11 59:24
60:10,13 61:1,24
62:1,19,21 63:2,5

63:18,22 64:14
66:14
**limited** 40:20
**line** 64:8
**lines** 51:10
**LINE(S)** 70:9
**list** 46:22 55:8
**litigation** 23:24
66:10
**little** 31:20 36:6
51:17,19
**LLC** 2:3
**loaded** 46:24 47:24
48:19,23
**loading** 48:3
**loan** 28:20 29:4,5,6
29:15
**loans** 28:18 29:2,4
29:22 30:4
**locate** 20:22
**located** 23:10
**long** 4:19,23 5:5,11
5:17,23 6:10 7:8
16:19
**look** 16:8 23:12
24:4 43:20 45:13
46:5,8,16 50:5
51:5,9,24 52:19
53:3,8 55:8 59:2
65:5
**looked** 43:13
**looking** 21:6 53:19
61:6
**looks** 17:8 59:7
**Loring** 29:23
**lot** 16:23 20:19,20
23:12 25:23 27:21
30:2 38:2 47:2
49:23
**lunch** 43:21
**Lynn** 29:23
**L.L.C** 2:11

**M**

**M** 2:4
**machine** 48:1 50:17
**Magazine** 38:18,19
**magazines** 39:6
**making** 10:22 11:11
11:13,14 15:20
46:5 66:5,13
**Malloy** 52:8
**managed** 11:15
**Management** 1:13
14:9,19,23 15:1,6
15:14,23 18:16,24

| | | | | |
|---|---|---|---|---|
| 19:8,19 20:11,13 25:2,11 26:6,9,14 26:17,19,24 27:12 27:15 32:11,19,24 42:13 54:20 55:6 55:19 | mm-hmm 25:12 30:14 31:8 32:3 50:10 51:11 52:3 52:5 53:22 59:9 | obtained 57:10 occasion 59:15 occurred 64:23 office 11:6,7,7,8,24 13:24 24:21 54:5 54:6 | oversaw 11:6 overseeing 11:10 owes 34:7 owned 7:3 26:16 owner 10:9 18:22 | Phoenix 8:2,10 36:18 phone 22:14 50:12 56:14 59:23 63:6 63:18 |
| **Management's** 54:17 | Mohegan 37:19 monthly 10:16 months 28:2 38:11 55:21 | offices 11:10,11 12:8 15:16 | owners 11:20 ownership 25:22 O'Brien 1:17 3:2 | place 15:14 18:16 19:19 20:4,13 21:23 29:15 31:15 |
| **manager** 5:10,16 9:22,24 10:13,19 10:20,23 26:1 66:4 | mornings 32:23 move 9:11 multiple 30:23 | officially 53:6 oh 4:24 7:9,23 12:2 16:6 51:7 62:15 63:15 66:21 | 4:1,9 68:9 70:3,4 70:20 | 32:22 47:2 placed 14:23 19:11 34:19 54:19 |
| **managers** 10:21 17:4 22:18 35:6 40:4 57:1,3 | **N** n 3:8,8 69:19 | okay 5:3,15 7:23 11:3 13:4 14:1,4 15:5,14 19:3,15 | **P** page 3:3 46:16 50:6 51:5,24 65:11 | placement 15:2 19:21 27:12,17,18 45:12,20 57:24 58:3,3,4,8 |
| **manner** 18:12 Manual 39:17,21 MAP 49:15 | name 4:8 13:9,13 24:20 25:21 31:11 names 38:17 | 20:3 21:19 22:1 22:16,19 23:16 24:4,18 25:17 | 70:9 pages 16:9 paid 9:12 59:19 | places 26:9 placing 15:5 19:16 29:10 30:19 |
| **marked** 16:1 marketing 12:18 marks 69:19 | NARCA 40:19 nature 6:5 NECA 36:13,14 | 26:2 27:11 29:1,8 30:11,20 36:6,7 36:16,22 37:23 | pains 67:17 paraphrasing 64:2 Pardon 56:11 | Plaintiff 1:9 2:2 plan 59:23 play 66:18 |
| **marriage** 68:15 Massachusetts 1:23 68:2,8 | 37:9,11,13,16 49:16 necessary 59:21 | 38:13 40:11 42:8 42:18 43:16 44:4 44:12 45:19 46:5 | part 18:18 31:3,7 31:12 37:11 40:7 66:8,12 | Plaza 2:13 please 69:16,21 PLYMOUTH 68:4 |
| **Masters** 13:21 matter 68:15,17 MBA 8:4 | 69:21 need 49:20 negotiated 6:19 | 46:8 47:22 49:9 49:23 50:5,10 51:2,5,8,24 52:1 | participate 19:1 particular 19:17 33:23 34:13 35:18 | Plymouth-Carver 8:14 point 22:14 61:1 |
| **mean** 11:19 15:10 17:13,14 23:20 27:17,20 28:15 29:11 31:23 50:13 57:6 59:13,15 65:16 | negotiation 15:11 Nemesio 1:6 46:18 never 61:11 new 12:17,17 36:15 night 36:23 nine 65:13 67:1 | 53:10,12 54:7 55:16 56:6 57:5 58:16 60:9 64:6 65:20,23 old 45:21 46:3 56:1 60:12,23,24 61:6 | 48:2 57:11,21 64:10 parties 68:15 party 69:9 Part-time 36:23 PASO 1:3 passed 63:2 | policies 12:9 portfolio 27:15 28:7 28:11,16 46:1,2 47:19 48:19 49:3 49:12 56:7,19 61:5 63:22 64:19 |
| **means** 50:14 51:23 52:18 53:1,24 | normally 62:16 Norwell 13:23 | 61:10,12,13,18 older 67:2 | Patty 30:1 31:12 Paul 12:22 13:1 | portion 66:19 position 4:23 5:5,11 |
| **mechanism** 32:5 33:21 34:3 45:10 61:17 | notarial 68:19 Notary 4:3 68:6 70:24 | once 22:12 41:9 Ontario 46:14 50:3 open 39:2 | Paula 31:10 payment 47:5 54:22 54:24 55:1,4,6 | 5:15,17,21 6:8,10 6:17 7:11 9:23 13:2 14:4 35:9 |
| **mechanisms** 30:12 medical 28:16 meet 11:24 30:9 | notations 69:19 note 62:5,9 noted 70:8 | operation 11:5 operations 4:22 5:4 11:4,13 12:5,6,23 | 57:23,24 58:7,17 59:23 payments 55:15 | 36:17,20 63:14 positions 35:17 37:12 39:18 |
| **meeting** 32:23 meetings 12:11 32:22 33:3 37:14 38:9 40:21 | notes 51:15 65:5 notice 20:16 22:3,6 41:20 50:24 59:16 59:17 | 13:3,7 14:2,5,10 14:18 31:7 order 21:16 52:13 organization 36:19 | 57:20 58:7 PCS 26:8,16 27:13 27:16 32:10,18 35:21 55:18 62:2 | possible 22:11 53:20 possibly 45:15 59:14 61:3,4 post 7:1 |
| **member** 36:8 37:9 membership 36:12 mentioned 22:19 29:1 66:2 | number 10:15 47:8 50:12,15 53:21 54:1 numbers 22:5,11 | 40:19 organizations 36:9 original 55:2,13 69:5,10,11 | penalties 70:17 people 29:14 30:2 30:23 31:2,3 percent 27:10 67:1 | practices 15:13 34:15 preparation 43:2 president 4:17,22 |
| **message** 50:7,12 met 12:8 MGR 51:10,12,15 53:19 | **O** O 3:8 object 17:12 33:16 | outbound 9:15 20:17 22:5 outcome 68:16 outside 12:10 38:2 | 67:1 performance 38:5 perjury 70:18 | 5:4 11:4,5 12:3,4 12:6,14,23 13:3,6 14:4,10,18 presidents 12:7 |
| **Mianne** 62:17 Michael 49:17 minutes 33:2,4,5,6 | 34:6 39:22 45:6 60:20 61:19 63:7 64:1 66:23 Objection 35:4 61:2 | 38:8 out-of-statute 60:3 64:19 | person 20:22 21:4,5 59:23,23 personally 39:19 phase 50:20 53:1 | 14:1 pretty 38:11 52:18 |

CANDICE O'BRIEN     MAY 26, 2009

**Previously** 36:17
**prewrite-off** 31:24
**primarily** 9:14
**printout** 46:11,17
**prior** 4:21 5:1,7,13
5:19 6:1,12 7:13
8:21 25:10 35:2
35:21 39:11 43:9
58:8
**privilege** 42:15,16
**probably** 7:14
10:21 18:2 22:6
30:24 32:23 38:21
45:16 57:7 64:20
**procedures** 12:10
15:13 28:6
**proceed** 41:11
44:19
**process** 18:18 20:9
20:14 22:1 24:9
34:12 45:5 49:10
49:14 59:11
**production** 4:2
**professional** 36:8
36:18 68:6
**program** 52:12
**property** 25:22
**provide** 24:23
**Public** 4:3 68:6
70:24
**publication** 35:24
**publications** 38:13
38:16
**purchase** 54:13,15
54:21
**purchaser** 58:4
**purports** 46:17
**pursuing** 66:10
**put** 41:10,14,21
42:12 44:18 65:3
65:6,7
**p.m** 1:19 50:6,11
67:10
**P2I** 54:2

**Q**
**qualified** 68:7
**qualify** 18:19 19:13
20:24 23:1 34:17
**qualifying** 18:17
**question** 17:9 25:17
26:12 27:11 32:8
34:11 35:3,15
39:3 48:11,16,20
49:4,7,19 60:19
60:20,22,24 61:15

**questioned** 48:17
**questioning** 64:9
**questions** 31:5 56:2
56:4 67:6
**quick** 65:19

**R**
**R** 68:1
**raise** 60:19,24 61:4
**raised** 35:16 48:15
**RAMIREZ** 2:11
**ran** 52:12
**rate** 56:1
**reach** 22:11 50:4,14
**read** 39:9 70:5,9
**reading** 69:15
**READS** 70:9
**really** 16:23 24:16
27:21 32:6 41:8
63:11
**reason** 57:19 59:17
**reasons** 69:17
**recall** 17:24 18:3,10
19:3,7 21:7 25:4
25:13 32:9,17
33:8 35:8,9,19
41:18 42:11,24
45:24 46:4 48:2
48:12 63:13 64:13
64:24
**recalled** 9:13
**receive** 20:18 26:18
27:14 33:18,20
38:13,23 47:3,4,5
41:20 43:3 54:1
57:24 62:3,5,9
**Recess** 44:5 65:22
**recognize** 16:10
24:6 46:9
**recollection** 55:17
**recommend** 60:6
63:3
**record** 4:8 51:2,3
65:23 68:12 69:9
70:7
**records** 43:20
**red** 48:15
**refer** 19:10 20:11
39:14 52:11,21,24
60:15 69:22
**referred** 17:16 19:8
21:14 23:17,23
53:3 55:18

**referring** 25:18
49:3 58:2,3 65:8
**refers** 50:18,22
51:14 53:23
**refresh** 55:17
**regarding** 39:9
**regional** 5:4 11:4,5
12:3,7 14:1
**Registered** 68:5
**regularly** 38:23
**regulations** 11:12
40:12
**reimbursed** 7:5
**related** 68:14
**relations** 14:14
**relationship** 14:7
25:10
**relocated** 11:6
**rely** 48:8
**remember** 6:18
7:14 16:18,19
17:22 19:6 25:7
25:24 26:3 28:4
36:4 37:22 38:10
38:20 41:3,6,12
47:22 56:3 62:15
63:11 64:8
**repair** 7:2
**rephrase** 21:12
49:1 61:16
**report** 10:2,22
12:21,24 52:10,14
52:15
**reported** 13:5 39:24
52:15
**Reporter** 68:6
**reports** 12:18 39:20
**represented** 15:1
**request** 57:13,16,19
**requests** 57:18
59:20
**require** 10:4
**required** 21:16 29:9
29:11
**requirements** 11:1
11:12 12:9 30:10
**research** 47:21
**reseller** 6:7
**reserve** 67:7
**residence** 50:11
**resolve** 9:16 20:17
**respect** 21:7 29:3
29:12 32:1,10
48:19 49:4 56:19
57:10 63:6
**responses** 51:20

**responsibilities**
9:22 10:11,18
11:3 12:1,13 66:2
66:4,9
**responsibility** 12:4
56:22,23
**responsible** 13:16
13:17 20:22 66:15
**rest** 49:24
**results** 10:16 32:24
**REV** 51:12
**review** 16:16 17:17
18:6 21:21 23:4
24:2 25:19 26:4
38:5 43:1,23
45:19 48:18,22
49:2 53:7 58:22
58:24
**reviewed** 19:13
20:24 39:5 66:1
**right** 9:3 12:1,15,21
29:20 37:9 39:3
51:6 52:19 55:10
59:10 60:7 65:12
65:16 67:5
**rights** 20:16 22:4
51:1
**Risk** 14:8
**roadway** 6:15,16,24
**role** 15:7,8,10,15
**Rosemary** 1:24
68:5,22
**route** 9:9,9,11
**row** 60:4
**RPR** 1:24 68:22
**running** 11:13

**S**
**sales** 6:9 12:18 31:4
**salesperson** 31:1
32:9,12
**satisfactorily** 4:2
**saw** 27:7
**saying** 54:5 55:2,2
60:22
**says** 46:22,24 47:10
50:6,11,12,17
51:12,13 52:9,23
53:20 55:8
**Schall** 62:17
**school** 8:13,14,16
8:18
**screen** 46:11,17
**seal** 68:19
**second** 22:6,7
**secondary** 22:11

**see** 43:18 54:24
55:7,8,12,13 65:5
**seeing** 33:8
**seen** 16:4 33:5
43:17
**seminar** 56:17,18
65:18
**seminars** 37:14
**send** 20:15 22:16
39:1 59:22 62:18
62:20 63:2
**sending** 26:7,15
60:6 66:10
**senior** 4:17 12:14
**sent** 18:9 21:8 22:2
22:4,7,15 23:2,14
24:16,18 26:10
27:9 43:6 51:1
53:9,14,16 59:11
59:13,14 60:1
**separate** 64:20,21
**series** 50:17
**service** 10:7 31:2,3
45:13 47:1,3,14
47:15
**set** 20:9 28:20 68:10
68:18
**settled** 9:12 59:20
**seven** 4:24
**sheet** 69:1,4,5,7,18
69:22 70:1
**sheets** 69:21
**Short** 44:5 65:22
**show** 54:16 55:5
**showed** 26:20
**shows** 53:9,13
**side** 30:3
**sign** 69:19
**SIGNATURE** 69:2
70:1
**signed** 69:8 70:17
**signing** 12:17
**similar** 26:5
**similarly** 1:8
**single** 66:24
**site** 11:17,18,19
**situated** 1:8
**situation** 64:10,11
64:12,23
**size** 20:23 21:2,6,8
21:13,15,16 27:22
28:13 30:11,22
**skip** 20:19,21 22:9
**small** 30:16
**softer** 31:21
**sorry** 25:16 50:8

CANDICE O'BRIEN     MAY 26, 2009

60:17
soundbite 51:16
South 2:5
speak 17:10,19 20:3
speaking 11:23
specifically 29:1,3
29:12 51:22 66:8
spell 13:9 31:11
spoken 17:24
Sprint 19:18,24
20:5,11 21:7 25:1
26:8,16 27:13,16
32:10,18 35:20
42:13 47:23 55:18
62:2
SRV 47:11,15
54:11
staff 15:20
staffed 11:15
staffing 11:14
standard 56:2,4
stands 47:15 50:1
start 18:12 23:21
66:11
started 24:12
starts 58:21
state 4:8 7:4 10:3
10:24 11:11 23:10
58:24 66:5,12
states 1:1 22:24
stating 50:19 62:7
Statue 34:12 37:20
63:5 66:14
statute 33:10,13,20
33:22 34:1,4,8,22
34:23,23 35:3,10
35:15,20,23 37:7
38:7 39:7,10,12
39:16,21 44:10,20
45:5,9,15 48:4,20
49:5,11 59:24
60:4,5,10,13 61:1
61:24 62:1,8,19
62:21 63:1,17,22
64:14,20
Steve 13:21,23 57:6
stopping 34:3
strategy 28:8,16,24
32:24
Street 1:22 2:5
strike 18:11 23:21
29:2 42:24 66:10
study 8:3
submit 17:6
submitted 16:15
18:5

submitting 17:5
Subscribed 70:21
substance 41:18
sue 20:8
Suite 2:13
Sun 37:19
supermarket 7:15
8:19
supplied 69:18
sure 6:18 7:14 9:8
10:3,6,14,17,22
11:11,13,14 12:8
15:19,20 16:18
17:21 25:15 27:17
30:9 40:16 44:11
45:10,20 49:18
51:19 52:18 59:19
61:4 62:13 65:21
66:5,9,13
Susan 18:2 40:10
41:20 49:6 60:17
62:17 63:21 64:13
sworn 4:3 68:11
70:21
system 45:13 46:13
46:14 51:16
Systems 6:4,6

T
T 68:1,1
take 9:15 21:24
32:22 65:19
takes 31:15
talk 41:24 42:3,9
43:24 50:4
talked 43:12 64:12
talking 10:8,9 34:14
44:20
taught 36:23
tax 24:21
teach 36:22 37:1
team 10:17 14:24
12:18,18 15:18
22:12,24 24:19,19
26:24 30:8 31:5
34:16,18,21 35:1
35:7 45:22 49:6
64:21
technology 51:18
telephone 22:5,11
56:12
telephoned 54:6
tell 18:8 27:21,22
29:19 43:12 44:7
46:20 54:8,13
testified 4:4 19:15

59:6,11 60:9
63:20
testimony 44:24
68:12 69:17 70:5
70:7
Texas 1:2 11:7 63:6
63:18
Thank 67:9
therefor 69:18
thereof 69:8
thing 26:22 59:6
things 21:1,2 56:1
65:20
think 15:24 16:22
19:5 20:6 21:10
23:9 26:4 28:12
33:1 34:24 38:18
38:19,21 43:3
44:2 47:6,10,11
50:23 52:7 61:14
65:1
three 5:6 11:10
45:15,21 46:3
48:13,14 49:8
60:11,14,24 61:6
time 7:11 8:21
10:15 16:19 17:14
17:15,16 20:1
22:9 28:21 35:15
36:2 39:4 41:8,13
43:21 62:14 65:1
67:7
times 22:19 47:4,5
title 4:16,17,19,21
5:3,9 6:18 26:3
56:23
titles 66:1
today 43:9
today's 43:6
told 18:3 27:20
44:18 63:8
tone 54:1
town 7:3
trace 20:22
tracing 20:19 22:9
track 10:16,17
tracking 15:18
trained 15:19
training 15:18
38:24 56:17,18
65:18
transaction 53:14
54:16,17
transcript 68:12
69:12,20 70:5,6
transfer 28:21

traveling 41:7 43:4
43:4
treat 46:1
trees 7:1
trial 67:8
true 68:12 70:6
try 20:21 22:10
51:20
trying 9:16 20:16
Tuesday 32:22
tuition 28:19,20
29:6
two 5:18 10:21 12:6
34:2 44:20 60:23
61:10,11,13,18
66:20 67:2
TX 2:14
type 14:16 19:7
23:11 25:19 27:20
28:5,8,15,23
29:15 39:15 56:2
56:21 58:22 59:1
66:16
types 19:17,19 25:9
30:4 56:6
typically 33:24

U
unattended 50:7,12
undergraduate 8:5
underneath 12:7
underscore 51:12
understand 17:9,13
30:6 49:13
understanding 49:9
61:14 63:4
understood 48:24
undertaken 29:5
33:15 45:24
UNITED 1:1
University 8:2,10
36:18
update 52:13
updates 32:24 33:1
use 18:14 27:4 28:9
46:14 49:16 51:16
61:8
usually 30:24 39:2
46:7 48:7 57:4,18
60:2
utility 40:12

V
V 1:10
varies 30:22
various 66:1

vendor 51:17
vendors 24:22
verbal 62:11
verbiage 26:4
verified 25:21
59:16,18
verify 52:16 54:12
59:14
versus 44:21
vice 4:17,22 5:4
11:4,5 12:3,4,6,7
12:14,23 13:2,6
14:1,4,10,18
violation 15:20
visit 11:19
visited 11:20
visits 11:17
volume 69:15,20
Vs 70:2

W
want 13:2 27:2
29:20 47:7 52:16
warrant 21:6
way 8:19 68:16
ways 65:16
week 41:7 43:5
weekends 36:24
went 11:20
west 12:7 13:17,21
WESTERN 1:2
we'll 47:3 67:7
we're 12:20 31:19
42:16 51:6 62:23
WHEREOF 68:18
Wier 2:12 17:12,14
33:16 34:6 35:4
39:22 41:17 42:15
43:12,24 45:6
51:6 60:20 61:2
61:19 63:7,17
64:1,8 65:21
66:23 67:7 69:6
wireless 56:10,12
witness 3:2 42:18
68:9,13,18
work 14:5,14 31:19
33:24
worked 14:8
working 8:17,18
9:18 15:18 25:5,7
64:18
works 50:24
wouldn't 45:16
49:7 58:22 62:18
written 28:2 31:24

32:1 65:18

---
**X**
**x** 1:5,15 35:8

---
**Y**
**yeah** 10:13 16:12
  17:13 21:4 39:1
  43:17 60:8 63:15
  67:3
**year** 5:12,24 6:11
  6:11 8:11 9:18
  29:16 30:5 36:4
  37:16,17,17
**years** 4:24 5:6,18
  7:10 13:5 25:24
  28:2 34:2 44:21
  45:15,21 46:3
  48:13,14 49:8
  55:22 60:12,14,23
  60:24 61:6,10,12
  61:13,18 63:9
  66:20 67:2

---
**$**
**$25** 30:18
**$400** 21:10,11,13
  21:15
**$5** 30:17
**$50** 58:23

---
**1**
**1** 16:2,9 17:2 24:5
  51:13,23 53:8
**1st** 4:20
**100** 27:10
**112993** 1:24 68:23
**12** 10:1 38:11
**120** 2:5
**1700** 2:13
**18** 28:2 55:21
**18th** 2:5
**1987** 8:15
**1994** 9:20
**1997** 8:12
**1999** 7:19

---
**2**
**2** 28:2 46:8,17 50:6
  54:7,8,13,23 55:5
  55:22 57:10 65:8
**2nd** 47:1 54:10
**2/15** 50:16
**2/15/07** 50:5,11
**2/2/08** 52:2
**2:00** 1:19

**2000** 50:17,20
**2005** 47:1 54:10
**2006** 15:24,24
**2007** 13:5 16:19
  19:5 24:17 34:14
  45:23 46:23 47:24
  66:20
**2008** 13:6 24:17
  34:14 45:23 66:20
**2009** 1:18 68:20
  70:18,22
**2011** 68:24
**24** 2:13
**26** 1:18
**28th** 68:19

---
**3**
**3** 21:10,13,15
**3LG** 53:20
**3:30** 50:6,11
**3:40** 67:10
**312-739-4200** 2:7
**3600** 65:7,10,15

---
**4**
**4** 3:4
**4000** 52:23 53:1

---
**5**
**5/14** 53:16
**5/14/08** 53:17
**5/26/09** 70:3
**5/8** 53:11
**5/8/08** 52:19 53:15
**58** 53:12

---
**6**
**6** 38:11
**6/9/08** 53:19
**60603** 2:6

---
**7**
**7** 10:1 46:23 68:24
**713-626-1555** 2:15
**77046-2417** 2:14
**794.35** 55:12,13

---
**9**
**929** 1:22