**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **NEMESIO CASTRO, on behalf of himself** | § | |
| **and all others similarly situated,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-08-CA-215-FM** |
| | § | |
| **COLLECTO, INC. dba COLLECTION** | § | |
| **COMPANY OF AMERICA, and U.S.** | § | |
| **ASSET MANAGEMENT INC.,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION TO DISMISS THE COMPLAINT OR,
ALTERNATIVELY, FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

On this date, the Court considered Collecto, Inc. dba Collection Company of America

("Collecto"), and U.S. Asset Management Inc.'s ("U.S. Asset") (collectively, "Defendants")

"Defendants' Motion to Dismiss the Complaint or, Alternatively, for Judgment on the Pleadings"

("Motion to Dismiss") [Rec. No. 61], filed June 18, 2009; Defendants' "Memorandum in Support of

Defendants' Motion to Dismiss the Complaint or, Alternatively, for Judgment on the Pleadings"

("Memorandum in Support of Motion to Dismiss") [Rec. No. 61-4], filed June 18, 2009; Nemesio

Castro's ("Plaintiff") "Plaintiff's Response in Opposition to Defendants' Motion to Dismiss the

Complaint or, Alternatively for Judgment on the Pleadings" ("Response Opposing Motion to Dismiss")

[Rec. No. 65], filed June 29, 2009; Defendants' "Reply Memorandum in Support of Defendants' Motion

to Dismiss the Complaint, or Alternatively for Judgment on the Pleadings" ("Reply in Support of Motion

to Dismiss") [Rec. No. 73], filed July 10, 2009; "Plaintiff's Motion for Partial Summary Judgment as to

Liability" ("Motion for Partial Summary Judgment") [Rec. No. 57], filed June 16, 2009; Plaintiff's

"Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment as to Liability" [Rec. No.

57-2], filed June 16, 2009; "Defendants' Response in Opposition to Plaintiff's Motion for Partial

Summary Judgment" ("Response Opposing Partial Summary Judgment") [Rec. No. 66], filed June 29,

2009; and "Plaintiff's Reply in Support of Partial Summary Judgment as to Liability" ("Reply in Support

of Partial Summary Judgment") [Rec. No. 69], filed July 10, 2009.  Based upon the parties' briefs,

arguments, and the law, the Court will grant Defendants' Motion to Dismiss and deny Plaintiff's Motion

for Partial Summary Judgment.

## I.    __BACKGROUND__

     *A.    Procedural History*

On June 18, 2008, Plaintiff filed a class action lawsuit against Defendants, alleging violations of

the Federal Debt Collection Practices Act ("FDPCA"), 15 U.S.C. § 1692 et seq., and the Texas Finance

Code § 392.304.  In answer, Defendants denied any liability and asserted numerous defenses, including

good faith.  On March 4, 2009, the Court certified the class, defining it as

> (a) all individuals with Texas addresses (b) who were sent a letter in the form
> represented by <u>Exhibit A</u> to Plaintiff's Complaint, (c) seeking to collect a cellular
> telephone debt (d) which became delinquent more than 2 years prior to the sending of the
> letter in the form represented by <u>Exhibit A</u> to Plaintiff's Complaint, (e) which letter was
> sent between June 16, 2007, and July 6, 2008.

On June 19, 2009, the Court approved the form of Notice to be sent to putative class members [Rec. No.

63].  The Court continued the trial setting and stayed ruling on any dispositive motions until after July

27, 2009, the date on which putative class members were required to give notice as to whether they

wished to be excluded from the certified class.  The Court now addresses Defendants' Motion to Dismiss

and Plaintiff's Motion for Summary Judgment.

     *B.    Parties' Arguments*

          1.    <u>Defendants' Motion to Dismiss</u>

              *(a)    Defendants' Argument*s

Defendants argue the delinquent accounts, which they attempted to collect and are now the

subject of this lawsuit, are subject to Texas's four-year statute of limitations, not the two-year limitations

period of the Federal Communications Act of 1934 ("FCA"), section 415, Title 47 of the United States

Code.  Defendants assert section 415 only applies to tariffed charges.  Defendants explain section 332 of the FCA, as amended by Congress in the 1990s, only preempts state rate and market entry regulation as to cell phone carriers, not common law contract actions between carriers and their customers.  Defendants assert there is nothing in section 415, which would generally override state statutes of limitations.  Defendants point to cases in which plaintiffs litigated state actions for deceptive trade and advertising; failure to disclose charging practices; and rounding up cellular call charges.

Defendants explain that as a result of the Federal Communications Commission's ("FCC") 1990s detariffing, the filed-rate doctrine and section 415 do not apply to Commercial Mobile Radio Services providers ("CMRS providers"), which include cell phone and wireless carriers.  Defendants contend section 415 only applies to actions at law by "carriers" to collect "lawful charges."  Defendants assert the reference to "lawful charges" applies to the schedule of charges, or tariffs, which must be filed by common carriers and subjected to the review and approval of the FCC.  Defendants point out state laws affecting rates are preempted because they interfere with tariffs, which cannot be varied by either contract or tort.  On the other hand, Defendants explain that because cellular providers no longer have to file tariffs, the section 415 statute of limitations period no longer applies to them because rates are set by contract and are not subject to FCC regulatory approval.  Defendants contend the FCC has substituted state contract and consumer protection laws for federal remedies under the FCA.

In sum, Defendants argue the assignor of Defendants' debt, Sprint PCS ("Sprint"), is a CMRS provider, who is not subject to the tariff requirement.  Defendants explain Sprint's agreements with its customers embrace a choice-of-law provision, which encompasses the state for which a device's area code is set, in this case Texas.  Defendants argue Plaintiff's debt is subject to Texas's four-year limitations period, and thus, the collection action is not time-barred.  Accordingly, Defendants request the Court to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") or to enter judgment on the pleadings in favor of Defendants pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)").

3

Alternatively, Defendants contend state actions, which do not reach the question of the reasonableness of a carrier's rates, are not preempted.  Defendants argue their collection of a debt does not touch the nature or validity of the underlying service charges themselves, and therefore their debt collection action is not a federal issue.  Defendants assert only state law claims, which alter the terms of a tariff, are preempted.  According to Defendants, there are no such claims as Plaintiff has not called into question the reasonableness of the rates charged and has conceded there is no factual issue concerning the amounts charged or their reasonableness.  Thus, Defendants claim any action to collect the debt is governed by state law and the applicable state statute of limitations.

    *(b)*        *Plaintiff's Response Opposing Motion to Dismiss*

In response, Plaintiff contends section 415's language is plain and unambiguous.  Relying on the Court's previous discussion of section 415 in its "Order Granting Plaintiff's Motion for Class Certification" ("Order") [Rec. No. 44], filed March 4, 2009, Plaintiff argues the interstate nature of telecommunications makes apparent the obvious need for a uniform federal statute of limitations.  Plaintiff asserts the uniform limitation period avoids a "hodge-podge" of different limitations periods and prevents forum shopping and needless litigation over which law applies.

Plaintiff argues other courts have upheld the express language of section 415, and he notes Defendants point to no case in which a court permitted a carrier to ignore section 415's two-year limitations period.  Plaintiff contends there is no dispute Sprint is a carrier pursuant to the FCA and Defendants, as assignees, are bound by the same statute of limitations as Sprint.

Plaintiff argues the issue of the filed-tariff doctrine is a red herring because there is no basis to assert Congress intended to limit section 415 to filed tariffs and carrier-to-carrier interconnection contracts.  Plaintiff contends section 415's plain language refers to "lawful charges."  Plaintiff argues "lawful charges" is a phrase commonly used in the telecommunications field and simply means the amounts a carrier is entitled to collect, whether set by tariff or agreement.  Plaintiff contends it is inappropriate to ascribe "tariff" to "lawful charges" because Congress used the term "tariff" in the FCA

4

when that is what it meant.

Plaintiff further claims Congress's choice to deregulate CMRS providers does not mean Congress intended to abandon the goals of uniformity and nondiscrimination, with respect to the FCA's statute of limitations. Plaintiff argues detariffing simply changed the method by which prices were determined. Plaintiff contends state law may govern contract formation and construction, which are not expressly regulated by the FCA nor implicate federal policy, but the statute of limitations is governed by the FCA to ensure uniformity. Plaintiff explains Congress deliberately chose to use the phrase "all actions at law" in section 415, and so the Court should not change the statute to read "some actions at law." Plaintiff contends the extension permitted in section 415(d) makes clear Congress's intent to provide a shorter limitations period than what states generally permit. Finally, Plaintiff asserts section 414's savings clause does not overrule the plain language of section 415.

(c)    <em>Defendants' Reply in Support of Motion to Dismiss</em>

In reply, Defendants contend section 415 does not preempt state statute of limitations periods. Defendants argue the FCA does not preempt ordinary contract actions, and in this case, neither section 415 nor the FCA apply. Defendants request the Court to reconsider its March 4, 2009, Order, given the complexity of federal communications law and the fact that Plaintiff's counsel has been "shopping" the Order around to courts of other jurisdictions.

2.    <u>Plaintiff's Motion for Partial Summary Judgment</u>

(a)    <em>Plaintiff's Argument</em>

Plaintiff contends Defendants, who are debt collectors pursuant to the FDPCA, attempted to collect a debt from him more than three years and three months after the debt was charged off. Plaintiff argues section 415's statute of limitations applies to his Sprint debt. Plaintiff asserts Defendants' threats to collect the debt after the two-year statute of limitations had run are deceptive and unfair means to attempt to collect a debt, in violation of the FDPCA.

Furthermore, Plaintiff contends Defendants are not entitled to the bona fide error defense.

5

Plaintiff explains Defendants have not maintained reasonable procedures adapted to avoid the practice at issue here. Plaintiff argues Defendants have no compliance procedure to determine which statute of limitations period applies to a particular debt. Plaintiff points out Defendants did not rely on the opinion of a lawyer, nor did they seek legal advice from in-house counsel. Plaintiff asserts a chart provided by the ACA International – Association of Credit and Collection Professionals, upon which Defendants relied, is an insufficient procedure to raise the bona fide error defense. Plaintiff notes the chart provides numerous admonitions, including that it does not constitute legal advice and that it is meant to provide only general guidance. Plaintiff contends it was objectively unreasonable for Defendants to rely on the chart in determining the applicable statute of limitations for cellular debt. Accordingly, Plaintiff requests the Court to enter summary judgment in his favor as to liability pursuant to Federal Rule of Civil Procedure 56 ("Rule 56").

(b)    *Defendants' Response Opposing Partial Summary Judgment*

In response, Defendants contend the Sprint debt is governed by the Texas state four-year statute of limitations, rather than the FCA two-year statute of limitations. Defendants incorporate by reference their Memorandum in Support of Motion to Dismiss and contend Plaintiff's Motion for Partial Summary Judgment fails because the four-year statute of limitations applies to the Sprint debt.

Alternatively, Defendants argue there are two genuine issues of material fact that remain, making summary judgment inappropriate. First, Defendants contend a genuine issue remains as to whether the letters Defendants mailed to Plaintiff were a threat to file lawsuits against Texas consumers. Second, Defendants argue that whether Defendants had reasonable procedures in place to support a bona fide error defense is a genuine issue for trial. Defendants contend they maintained procedures, including reliance on a nationwide industry trade organization, to avoid attempting to collect a time-barred debt. Defendants explain that when collection matters are referred, the local referring lawyers are tasked with determining the applicable statute of limitations. Hence, Defendants maintain there are two triable issues for the jury.

6

(c)     *Plaintiff's Reply in Support of Partial Summary Judgment*

In reply, Plaintiff incorporates his Response Opposing Motion to Dismiss and argues a two-year statute of limitations applies to his Sprint debt. Plaintiff maintains Defendants do not dispute Collecto sent Plaintiff a letter to collect a debt on behalf of U.S. Asset. Plaintiff argues no inferential leap is required to construe the letters as a deceptive practice under the FDPCA. Plaintiff contends the letters Collecto sent him threaten litigation as a matter of law, and therefore, there is no issue of fact for the jury concerning the FDPCA violation.

Plaintiff again asserts Defendants' bona fide error defense fails as a matter of law. Plaintiff contends Defendants have no compliance procedure in place to entitle them to the defense and have not offered any material facts, which create a dispute for trial. Plaintiff points out the chart upon which Defendants purportedly rely does not discuss the FCA statute of limitations, contains no case law analysis, twice disclaims reliance on the chart, and advises seeking independent legal advice. Finally, Plaintiff argues the local referrals Defendants make occur only after Collecto sends the first letter.

## II.     APPLICABLE LAW

### A.     *Legal Standards*

#### 1.     Rule 12(b)(6): Failure to State a Claim upon Which Relief May Be Granted

Rule 12(b)(6) permits a party to request the Court to dismiss a complaint for "failure to state a claim upon which relief can be granted."[1] A "motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."[2] In addressing a Rule 12(b)(6) motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in

---

[1] Fed. R. Civ. P. 12(b)(6).

[2] *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (citation omitted) (internal quotation marks omitted).

the plaintiff's favor."[3]  Accordingly, in order "[t]o survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[4]  "A complaint which contains a bare bones allegation that a wrong occurred and which does not plead any of the facts giving rise to the injury" is insufficient to meet the federal pleading standard.[5]

"[P]laintiff's obligation to provide the 'grounds' of [its] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[6] "'Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'"[7]  "The task of the [C]ourt in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, [and] not to assay the weight of the evidence which might be offered in support thereof.'"[8]  Although the Court must accept well-pleaded allegations in a complaint as true, it does not afford conclusory allegations similar treatment.[9]  Therefore, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."[10]

2.    Rule 12(c): Judgment on the Pleadings

Rule 12(c) provides: "[a]fter the pleadings are closed – but early enough not to delay trial – a

---

[3] *Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 371-72 (5th Cir. 2008) (citation omitted).

[4] *Id.* at 372 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

[5] *Walker v. S. Cent. Bell Tel. Co.*, 904 F.2d 275, 277 (5th Cir. 1990).

[6] *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65 (citation omitted).

[7] *Elsensohn*, 530 F.3d at 372 (citing *Twombly,* 550 U.S. at 555-56, 127 S. Ct. at 1965).

[8] *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)).

[9] *See Kaiser Aluminum & Chem. Sales, Inc.*, 677 F.2d at 1050 (citation omitted).

[10] *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944 (1986) (citations omitted).

8

party may move for judgment on the pleadings."[11]  The legal standard for dismissal under Rule 12(c) is the same as the legal standard for dismissal under Rule 12(b)(6).[12]  "The motion to dismiss should not be granted unless the plaintiff would not be entitled to relief under any set of facts that he could prove consistent with the complaint."[13]

### 3.    Rule 56: Summary Judgment

Summary judgment should be granted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[14]  The party moving for summary judgment bears an initial burden of identifying those portions of the pleadings and any discovery on record, including any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.[15]  "If the moving party fails to meet this burden, the motion must be denied, regardless of the nonmovant's response."[16]  If the movant does meet this burden, however, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.[17]  "If the non-movant fails to meet this burden, then summary judgment is appropriate."[18]

When ruling on a Rule 56 motion, the Court must view factual questions and inferences in a light most favorable to the nonmovant.[19]  The party opposing a motion supported by evidence cannot discharge

---

[11] FED. R. CIV. P. 12(c).

[12] *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).

[13] *Id.* (citation omitted).

[14] FED. R. CIV. P. 56(c).

[15] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

[16] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

[17] *See Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553.

[18] *Tubacex, Inc.,* 45 F.3d at 954.

[19] *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1272 (5th Cir. 1994).

his burden by alleging mere legal conclusions.[20]  Instead, the party must present affirmative evidence in

order to defeat a properly supported motion for summary judgment.[21]

       *B.*    *Preemption*

       Article VI, clause 2 of the Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.[22]

The Supreme Court has "long recognized that state laws that conflict with federal law are 'without

effect.'"[23]  That is, "a valid federal law is substantively superior to a state law; 'if a state measure

conflicts with a federal requirement, the state provision must give way.'"[24]

       Federal law can preempt state law in three circumstances:

> when (1) Congress expressly preempts state law; (2) [c]ongressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes.[25]

The party asserting preemption of state law bears the burden of persuasion.[26]

       Complete preemption occurs when "the [preemptive] force of a statute is so 'extraordinary' that

it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the

well-pleaded complaint rule.'"[27]  "Once an area of state law has been completely pre-empted, any claim

---

[20] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986).

[21] *Id.*, 106 S. Ct. at 2510.

[22] U.S. Const. art. 6, cl. 2.

[23] *Altria Group, Inc. v. Good*, 555 U.S. —, —, 129 S. Ct. 538, 543 (2008) (citation omitted).

[24] *Haywood v. Drown*, 556 U.S. —, —, 129 S. Ct. 2108, 2123 (2009) (citation omitted).

[25] *AT&T Corp. v. Pub. Util. Comm'n of Tex.*, 373 F.3d 641, 645 (5th Cir. 2004) (citation omitted).

[26] *Id.* (citation omitted).

[27] *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393, 107 S. Ct. 2425, 2430 (1987) (citation omitted).

purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law."[28]  This is distinguishable from ordinary preemption.[29]  "[O]rdinary [preemption] simply declares the primacy of federal law[.]"[30]

Congress can preempt state law through the express language of a statute or through the statute's structure and purpose.[31]  Any analysis of the preemptive effect of a federal statute begins with the fundamental principle "that the historic police powers of the States [are] not to be superseded by [a federal act] unless that was the clear and manifest purpose of Congress."[32]  "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States."[33]  To determine a federal statute's preemptive effect, the Court first must always remember that "[t]he purpose of Congress is the ultimate touchstone in every [preemption] case."[34]  "Thus, when the text of a [preemption] clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors [preemption].'"[35]

"Under the implied preemption doctrines of field preemption and conflict preemption, a state claim is preempted where '[c]ongressional intent to preempt is inferred from the existence of a pervasive regulatory scheme' or where 'state law conflicts with federal law or interferes with the achievement of federal objectives.'"[36]  Conflict preemption arises in at least four instances: (1) when complying with

---

[28] *Id.* (citation omitted).

[29] *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 331 (5th Cir. 2008) (citation omitted).

[30] *Id.* (citation omitted) (internal quotation marks omitted).

[31] *Altria Group, Inc.*, 555 U.S. at —, 129 S. Ct. at 543 (citation omitted).

[32] *Id.*, 129 S. Ct. at 543 (citation omitted) (internal quotation marks omitted) (alteration in original).

[33] *Id.*, 129 S. Ct. at 543 (citations omitted).

[34] *Id.*, 129 S. Ct. at 543 (citations omitted) (internal quotation marks omitted) (alteration in original).

[35] *Id.*, 129 S. Ct. at 543 (citation omitted).

[36] *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004) (citation omitted).

11

federal and state law is impossible; (2) when state law interferes with the accomplishment and execution of objectives of federal law; (3) when state law compels or induces the violation of federal law; or (4) when federal law authorizes activities, which state law bars.[37]

Hence, even if Congress does preempt state law expressly, "it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains."[38]  That is, a preemption provision alone does not foreclose implied preemption.[39]  "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law."[40]  Accordingly, "pre-emption analysis is not '[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,' but an inquiry into whether the ordinary meanings of state and federal law conflict."[41]

C.     FDCPA

The purpose of the FDPCA is "to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."[42]  The FDPCA guards against "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt."[43]  It bars "[t]he false representation of . . . the character,

---

[37] *Pub. Util. Comm'n of Tex.*, 373 F.3d at 645 (citation omitted).

[38] *Altria Group, Inc.*, 555 U.S. at —, 129 S. Ct. at 543.

[39] *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 869, 120 S. Ct. 1913, 1919 (2000) (citations omitted).

[40] *Altria Group, Inc.*, 555 U.S. at —, 129 S. Ct. at 543 (citation omitted).

[41] *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 459, 125 S. Ct. 1788, 1807 (2005) (Breyer, J., concurring) (citation omitted) (alteration in original).

[42] 15 U.S.C. § 1692(e).

[43] *Id.* § 1692e(10).

amount, or legal status of any debt"[44] and "threat[ening] to take any action that cannot legally be taken or that is not intended to be taken."[45]  The FDPCA further provides that

> [a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt . . . [including] [t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.[46]

Hence, to maintain a cause of action pursuant to the FDPCA, a plaintiff must show he is a consumer, who was subjected to an abusive debt collection practice by a debt collector.[47]

To determine whether a particular collection practice violates the FDPCA, the Court "must evaluate any potential deception in the letter under an unsophisticated or least sophisticated consumer standard."[48]  The Court will "assume that the plaintiff-debtor is neither shrewd nor experienced in dealing with creditors."[49]  The Court does "not consider the debtor as tied to the very last rung on the [intelligence or] sophistication ladder."[50]  The Fifth Circuit has explained the unsophisticated or least sophisticated consumer standard is meant to protect all consumers from abusive or deceptive collection practices and to protect debt collectors from consumers who misinterpret collection materials.[51]  Numerous courts have found threatening legal action to collect a debt, which is time-barred, is an abusive

---

[44] *Id.* § 1692e(2).

[45] *Id.* § 1692e(5).

[46] *Id.* § 1692f(1).

[47] *Id.* §§ 1692a, 1692e, 1692f.

[48] *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. Aug. 3, 2009) (citations omitted) (internal quotations marks omitted).

[49] *Id.* (citation omitted) (internal quotation marks omitted).

[50] *Id.* (citation omitted) (alteration in original).

[51] *Id.* (citation omitted).

debt collection practice.[52]  The applicable limitations for determining whether the collection of debt is

time barred depends upon the nature of the debt at issue.[53]

Nonetheless, "[a] debt collector may not be held liable in any action brought under this

subchapter if the debt collector shows by a preponderance of evidence that the violation was not

intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably

adapted to avoid any such error."[54]  Some courts have concluded a mistake as to the applicable law is a

bona fide error, which bars an FDPCA action against a debt collector.[55]  One court found that whether a

debt collector believed a particular statute of limitations period applied or that what statute of limitations

applied was unclear, "it cannot be said that [it] knowingly or intentionally sought to misrepresent the

legal status of the underlying debt."[56]  On the other hand, another court found where the debt collector is

a law firm and the precedent for the statute of limitations has been established for twenty years, a court

---

[52] *See, e.g.*, *Freyermuth v. Credit Bureau Servs., Inc.*, 248 F.3d 767, 771 (8th Cir. 2001) ("[I]n the absence of a threat of litigation or actual litigation, no violation of the FDCPA has occurred when a debt collector attempts to collect on a potentially time-barred debt that is otherwise valid."); *see also Jenkins v. Gen. Collection Co.*, 538 F. Supp. 2d 1165, 1172 (D. Neb. 2008) ([I]t may be inferred . . . that a violation of the FDCPA has occurred when a debt collector attempts, through threatened or actual litigation, to collect on a time-barred debt that is otherwise valid."); *Larsen v. JBC Legal Group, P.C.*, 533 F. Supp. 2d 290, 302 (E.D.N.Y. 2008) ("'[A]n explicit threat of litigation or an implication that legal action is inevitable, when such is not the case, will violate [the FDPCA].'"); *Goins v. JBC & Assoc.*, 352 F. Supp. 2d 262, 272 (D. Conn. 2005) ("As the statute of limitations would be a complete defense to any suit, . . . the threat to bring suit under such circumstances can at best be described as a 'misleading' representation, in violation of [the FDPCA]."); *Beattie v. D.M. Collections, Inc.*, 754 F. Supp. 383, 393 (D. Del. 1991) ("[T]he threatening of a lawsuit which the debt collector knows or should know is unavailable or unwinnable by reason of a legal bar such as the statute of limitations is the kind of abusive practice the FDCPA was intended to eliminate."); *Kimber v. Fed. Fin. Corp.*, 668 F. Supp. 1480, 1489 (M.D. Ala. 1987) ("By threatening to sue [a debtor] on her alleged debt, [the debt collector] violated [the FDPCA]").

[53] *See Kimber*, 668 F. Supp. at 1488.

[54] 15 U.S.C. § 1692k(c).

[55] *See, e.g.*, *McCorriston v. L.W.T., Inc.*, 536 F. Supp. 2d 1268, 1277-78 (M.D. Fla. 2008) (holding bona fide error defense barred claim for FDPCA violation, which arose from mistake of law); *see also Pescatrice v. Orovitz*, 539 F. Supp. 2d 1375, 1379-80 (S.D. Fla. 2008) (permitting bona fide error defense where applicable statute of limitations unclear); *Simmons v. Miller*, 970 F. Supp. 661, 664-65 (S.D. Ind. 1997) (finding uncertainty as to law was valid good faith defense to FDPCA claim).

[56] *Simmons*, 970 F. Supp. at 665; s*ee also Almand v. Reynolds & Robin, P.C.*, 485 F. Supp. 2d 1361, 1367 (M.D. Ga. 2007) (finding no knowing and intentional violation where there was uncertainty as to which statute of limitations applied existed).

14

may not afford the debt collector the bona fide error defense.[57]  There has been some suggestion in the

Fifth Circuit that a mistake of law may warrant application of the bona fide error defense.[58]

The Tenth Circuit has explained that whether a debt collector has maintained reasonable

procedures is an objective test, which turns on the debt collector's due diligence practices.[59]  The Tenth

Circuit looks first to whether the debt collector actually employed a procedure and second to whether the

procedure was reasonably adapted to avoid the specific error at issue.[60]  The Sixth Circuit has found

where debt collectors do not present any "evidence that they perform ongoing FDCPA training, procure

the most recent case law, or have an individual responsible for continuing compliance with the FDCPA,"

they have failed to show they maintain reasonable procedures to avoid the type of error that occurred.[61]

The Ninth Circuit requires a debt collector to produce evidence of "'reasonable preventive procedures'

aimed at avoiding the errors."[62]  The Eighth Circuit has found the procedures need not be elaborate if the

error to be avoided is not complex.[63]  In a recent decision, the Seventh Circuit set forth the circumstances

in which a debt collector was entitled to the bona fide error defense with respect to a mistake of law.[64]

According to the Seventh Circuit,

> *if* the bona fide error defense is available at all for errors of law, it is available only to
> debt collectors who can establish that they reasonably relied on either: (1) the legal
> opinion of an attorney who has conducted the appropriate legal research, or (2) the

---

[57] *Hamid v. Blatt, Hasenmiller, Leibsker, Moore & Pellettieri*, 2001 WL 1035726, at *2 (N.D. Ill. 2001) (not reported).

[58] *Kay*, 577 F.3d at 609 n.3 (Jolly, J., dissenting) ("[Defendant's] reliance upon [a court's] opinion may warrant application of the bona fide mistake exception found in § 1692k(c).").

[59] *Johnson v. Riddle*, 443 F.3d 723, 729 (10th Cir. 2006) (citations omitted).

[60] *Id.* (citations omitted).

[61] *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 614-15 (6th Cir. 2009) (citation omitted).

[62] *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1006 (9th Cir. 2008) (citation omitted).

[63] *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 421 (8th Cir. 2008).

[64] *See Ruth v. Triumph P'ships*, 577 F.3d 790, 803-04 (7th Cir. 2009).

opinion of another person or organization with expertise in the relevant area of law – for example, the appropriate government agency.[65]

III.    **DISCUSSION**

    There is no dispute Defendants are debt collectors and Plaintiff is a consumer for purposes of FDPCA liability.  What is disputed is whether Defendants committed a debt collection practice violation under the FDPCA.  Whether Defendants have violated the FDPCA turns on the applicable statute of limitations for the Sprint debt, which Defendants attempted to collect.  Hence, the Court reviews first Defendants' Motion to Dismiss.

    A.    *Defendants' Motion to Dismiss*

    Section 415 states: "All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after."[66] Plaintiff contends the section 415 limitations period applies to his Sprint debt because it preempts any state statute of limitations period.  Plaintiff explains any attempt to collect the Sprint debt is time-barred because more than two years had passed since the debt was charged off, and hence, Defendants committed an FDPCA violation.  Defendants, on the other hand, argue section 415 does not apply because section 415 does not preempt its state action to collect the debt, and thus, Texas's four-year statute of limitations applies.

    Necessarily, determining any potential preemptive effect of section 415 begins with an inquiry into congressional intent, to include a review of the statutory structure of the FCA and the correlative legislative history.  The statutory language and scheme of the FCA, as well as its legislative history demonstrate an evolution in communications regulation from a uniformly-regulated industry to a deregulated, free market industry.  That is, in 1934, when Congress enacted the FCA, Congress primarily

---

[65] *Id.* at 804 (emphasis in original).

[66] Communications Act of 1934, Pub. L. 73-416, § 415(a), 48 Stat. 1064, 1099, *amended by* Act of Nov. 30, 1974, Pub. L. 93-507, 88 Stat. 1577, 1577-78 (codified as amended at 47 U.S.C. § 415(a)).

intended to universalize access to communication services through a uniform rate regulation process overseen by the FCC.  As communications services grew increasingly complex, congressional intent shifted to incentivizing the creation of new communications technologies through a free market regime of rate-setting, while still maintaining universal access to communications services as a goal.  Such a shift evinces that Congress did not intend section 415 to continue to apply to CMRS providers after Congress amended the FCA in the 1990s.  This interpretation of the statutory language, scheme, and the corresponding legislative history is bolstered by case law, which indicates the subsequent amendments of the FCA were meant to deregulate CMRS providers and preserve state law remedies.  It is further supported by the FCC's interpretation of the FCA, which is entitled to respect, if not deference.[67] Accordingly, as the following historical analysis reveals, section 415 no longer applies to CMRS providers.

### 1.    Overview of the FCA, as Passed in 1934

Congress passed the FCA in 1934 in order to consolidate the regulatory authority of communications services into one agency and to ensure all people of the United States, to the extent practicable, would have access to interstate communication by wire or radio.[68]  Congress specifically provided:

> [f]or the purpose of regulating interstate . . . commerce in communication by wire and radio so as to make available . . . to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, . . . and for the purpose of securing a more effective execution of this policy by centralizing authority . . .  and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is hereby created a commission to be known as the "Federal Communications Commission[.]"[69]

---

[67] *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662-63 (2000).

[68] Communications Act of 1934, § 1, 48 Stat. at 1064 (codified as amended at 47 U.S.C. § 151).

[69] *Id.*, 48 Stat. at 1064.  Congress later amended the FCA to add the nondiscrimination principle, which states interstate communication by wire and radio, so far as possible, was to be made available to all people of the United States, "without discrimination on the basis of race, color, religion, national origin, or sex."

17

Pursuant to Title II of the FCA, Congress mandated that every common carrier shall provide communications services upon request; establish physical connections with other carriers; and "to establish through routes and charges applicable thereto and the divisions of such charges" in order to make such interstate communication services available.[70]  Under the FCA,

> "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter[.][71]

In Title II of the FCA, Congress further provided that all charges for communication services "shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is hereby declared to be unlawful."[72]  Hence, by enacting Title II of the FCA, Congress made it unlawful

> for any common carrier to make any unjust or unreasonable discrimination in charges, . . . , or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.[73]

According to Title II of the FCA,

> [c]harges or services, whenever referred to in [the FCA], include charges for, or services in connection with, the use of wires in chain broadcasting or incidental to radio communication of any kind.[74]

> In order to carry out the goals of the FCA, Congress mandated that the FCC "may perform any

and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as

---

Telecommunications Act of 1996, Pub. L. 104-104, § 104, 110 Stat. 56, 86 (codified as amended at 47 U.S.C. § 151).

[70] Communications Act of 1934, § 201(a), 48 Stat. at 1070 (codified as amended at 47 U.S.C. § 201(a)).

[71] *Id.* § 3(h), 48 Stat. at 1066 (codified as amended at 47 U.S.C. § 153(10)).

[72] *Id.* § 201(b), 48 Stat. at 1070 (codified at 47 U.S.C. § 201(b)).

[73] *Id.* § 202(a), 48 Stat. at 1070 (codified at 47 U.S.C. § 202(a)).

[74] *Id.* § 202(b), 48 Stat. at 1070 (codified at 47 U.S.C. § 202(b)).

may be necessary in the execution of its functions."[75]  In order to ensure a common carrier's rates were reasonable, in Title II of the FCA Congress required common carriers to "file with the [FCC] . . . schedules showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication."[76]  Under Title II of the FCA, if a common carrier proposed an unreasonable rate or otherwise violated the FCA, Congress empowered the FCC "to determine and prescribe what will be the just and reasonable charge."[77]  Congress mandated common carriers could be liable to person or persons injured for the full amount of damages and attorney's fees when "any common carrier shall do, or cause or permit to be done, any act, matter, or thing in [the FCA] prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in [the FCA] required to be done"[78] in Title II.  Finally, in Title II of the FCA, Congress provided that

> [a]ny person claiming to be damaged by any common carrier subject to the provisions of [the FCA] may either make complaint to the [FCC] . . . or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of [the FCA] in any district court of the United States of competent jurisdiction.[79]

The FCA's savings clause of section 414 states "[n]othing in [the FCA] contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of [the FCA] are in addition to such remedies."[80]

Section 415 of the FCA prescribed the period for which common carriers and other persons or entities could recover lawful charges, overcharges, and damages.  For actions to collect lawful charges, Congress specifically provided: "All actions at law by carriers for recovery of their lawful charges, or

---

[75] *Id.* § 4(i), 48 Stat. at 1068 (codified as amended at 47 § 154(i)).

[76] *Id.* § 203(a), 48 Stat. at 1070-71 (codified at 47 U.S.C. § 203(a)).

[77] *Id.* § 205(a), 48 Stat. at 1072 (codified at 47 U.S.C. § 205(a)).

[78] *Id.* § 206, 48 Stat. at 1072 (codified at 47 U.S.C. § 206).

[79] *Id.* § 207, 48 Stat. at 1073 (codified at 47 U.S.C. § 207).

[80] *Id.* § 414, 48 Stat. at 1099 (codified at 47 U.S.C. § 414).

19

any part thereof, shall be begun within one year from the time the cause of action accrues, and not after."[81]  For the recovery of damages not based upon overcharges, Congress limited bringing any action to within one year from the time the cause of action accrues.[82]  An action at law for the recovery of overcharges had to commence within one year from the time the cause of action accrued, with limited exceptions.[83]  Congress defined "overcharges" as those "charges for services in excess of those applicable thereto under the schedules of charges lawfully on file with the [FCC]."[84]

2.      The Filed-Rate Doctrine and Preemption

All courts acknowledge Congress modeled the FCA, in part, on provisions of the Interstate Commerce Act ("ICA"), which was designed to prevent unreasonable and discriminatory charges[85] and "to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination."[86]  The purpose of the provisions of Title II of the FCA, in which Congress required common carriers to file their schedules of rates with the FCC and to charge customers only those rates on file, was meant to prevent unreasonable and discriminatory charges.[87]  Just as rate filing was Congress's preferred choice for regulating rates in the ICA, "rate filing was Congress's chosen means of preventing unreasonableness and discrimination in charges" by

---

[81] *Id.* § 415(a), 48 Stat. at 1099 (codified as amended at 47 U.S.C. § 415(a)).

[82] *Id.* § 415(b), 48 Stat. at 1100 (codified as amended at 47 U.S.C. § 415(b)).

[83] *Id.* § 415(c), 48 Stat. at 1100 (codified as amended at 47 U.S.C. § 415(c)).

[84] *Id.* § 415(g), 48 Stat. at 1100 (codified at 47 U.S.C. § 415(g)).

[85] *See, e.g., AT&T Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 222, 118 S. Ct. 1956, 1962 (1998) (citation omitted) (explaining Congress modeled the FCA after the ICA).

[86] *New York, New Hampshire & Hartford R.R. Co. v. ICC*, 200 U.S. 361, 391, 26 S. Ct. 272, 277 (1906).

[87] *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 220, 114 S. Ct. 2223, 2226 (1994).

common carriers under the FCA.[88]  Hence, the filed-rate doctrine came to be applied to the FCA.[89]

In the time following the FCA's enactment, courts determined the "strict application [of the filed-rate doctrine] [wa]s necessary to 'prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts,' the very evil the filing requirement seeks to prevent."[90] "It is that anti-discriminatory policy which lies at 'the heart of the common-carrier section of the Communications Act.'"[91]  Accordingly, the Fifth Circuit has made clear: "a tariff, required by law to be filed, is not a mere contract.  It is the law."[92]

Relying upon the Supreme Court's decision in *AT&T v. Central Office Telephone, Inc.*, the Fifth Circuit has found "federal law preempts claims concerning the price at which service is to be offered, and . . . claims concerning the services that are offered."[93]  The Fifth Circuit concluded breach of contract claims related to filed tariffs, which also went to additional or better services, are preempted.[94]  On the other hand, when a claim is not derivative of a contract claim, "[i]t does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not derivative of any phone services."[95]  The Fifth Circuit concluded the filed rate doctrine did not preempt a plaintiff's tortious interference claim.[96]

---

[88] *Id.* at 230, 114 S. Ct. at 2231.

[89] *See id.*, 114 S. Ct. at 2231.

[90] *Central Office Tel., Inc.*, 524 U.S. at 223, 118 S. Ct. at 1963 (citation omitted).

[91] *Id.*, 118 S. Ct. at 1963 (citation omitted).

[92] *Carter v. AT&T Co.*, 365 F.2d 486, 496 (5th Cir. 1966) (citations omitted).

[93] *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 711 (5th Cir. 1999).

[94] *Id.*

[95] *Id.*

[96] *Id.*

3.    <u>Amendments to the FCA</u>

By the early 1970s, the increasing complexity of communications services demonstrated Congress's statutory scheme for making such services available was working, while at the same time creating a quagmire for carriers, persons, or entities to recover their charges, overcharges, or damages based on the provision of those services.[97]  In March 1973, the House of Representatives proposed to extend the section 415 statute of limitations period for complaints against carriers for the recovery of damages not based on overcharges from one to two years, as it did the recovery of overcharges.[98]  A similar amendment was before the Senate in 1974.[99]  The Senate version, however, proposed to extend the statute of limitations for all actions at law by carriers for recovery of lawful charges to two years.[100] In March 1974, relying on an FCC report, Senator Pastore pointed out that "the sophisticated state of the [FCA] makes the present [one]-year limitation for recovery of overcharges of [sic] undercharges too short in many categories of communications services."[101]  FCC Chairman Richard Wiley ("Wiley") stated "that such a modification is fair and would avoid inequities which might otherwise arise when setoffs or counterclaims are involved."[102]

In September 1974, FCC Chairman Dean Burch submitted an "Explanation of Proposed Amendment to Subsections 415(b) and 415(c) of the Communications Act of 1934, as Amended," in which the FCC expressed the opinion that the one year period was too short for a user to discover an

---

[97] *See Hearing before the Subcomm. on Commc'ns of the Comm. on Commerce*, 93d Cong. 1 (1974).

[98] *Hearing before the Subcomm. on Commc'ns & Power of the Comm. on Interstate & Foreign Commerce H.R.*, 93d Cong. 4-5 (1974).

[99] *See id.* at 6-7.

[100] *See id.* at 6.

[101] *Hearing before the Subcomm. on Commc'ns of the Comm. on Commerce* at 1 (statement of Sen. Pastore).

[102] *Id.* at 11 (statement of Richard Wiley, Chairman, FCC).

incorrect charge and to file a complaint or bring suit.[103]   According to the FCC, because communication services were becoming more complex and "the computation of the proper charge under the tariff is often an involved undertaking," a two-year statute of limitations was more appropriate.[104]   In September 1974, when the proposed amendments came before the House Subcommittee on Communications and Power, Wiley stated "the [one]-year period is often too short for a user of communications services to discover that he has been incorrectly charged or otherwise damaged and to file a complaint or bring suit" because when the FCA was passed in 1934, there were primarily only two forms of interstate communications.[105]   Wiley explained the FCC did not want to cut off anybody from receiving a valid refund or claim for overcharges simply because of cumbersome bookkeeping due to increasing complexity in interstate communications.[106]   Ultimately, Congress passed the Senate version, extending the statute of limitations period to two years for all actions of law related to the collection of lawful charges by a common carrier, recovery of damages that are not overcharges, and the recovery of overcharges.[107]

In 1982, as communications grew even more complex, Congress declared the FCC must take into consideration numerous factors for managing private land mobile services.[108]   Congress mandated providers of private land mobile services were not common carriers for purposes of the FCA.[109]   Congress stated "[n]o State or local government shall have any authority to impose any rate or entry

---

[103] *See Hearing before the Subcomm. on Commc'ns & Power of the Comm. on Interstate & Foreign Commerce H.R.* at 15.

[104] *Id.*

[105] *Id.* at 19 (statement of Richard Wiley, Chairman, FCC).

[106] *Id.*

[107] Act of Nov. 30, 1974, 88 Stat. at 1577-78 (codified as amended at 47 U.S.C. § 415(a)-(c)).

[108] Communication Amendments Act of 1982, Pub. L. 97-259, § 120(a), 96 Stat. 1087, 1096 (codified as amended at 47 U.S.C. § 332).

[109] *Id.*, 96 Stat. at 1097 (codified as amended at 47 U.S.C. § 332).

regulation upon any private land mobile service."[110]  It appears at this time Congress began to focus less on ensuring such services were available to everyone and more on incentivizing the creation of new technologies and services.  In 1983, Congress provided that "[i]t shall be the policy of the United States to encourage the provision of new technologies and services to the public."[111]

In 1993, Congress reversed its policy of not regulating private land mobile service and amended section 332 to provide that "[a] person engaged in the provision of a service that is a commercial mobile service shall . . . be treated as a common carrier for purposes of [the FCA], except for such provisions of title II as the Commission may specify by regulation as inapplicable to that service or person."[112]  Hence, even private land mobile services engaged in the provision of commercial mobile services were considered common carriers if the FCC so chose to subject them to Title II of the FCA.[113]  The House Report concerning the proposed amendments to section 332 indicates section 332(c) was meant to ensure "that services that provide equivalent mobile services are regulated in the same manner"[114] by classifying all providers of commercial mobile services as common carriers.[115]  According to the House Report, "the legislation establishes uniform rules to govern the offering of all commercial mobile services."[116]  Uniformity, according to the House Report, was necessary "to ensure that all carriers providing such services are treated as common carriers under the Communications Act of 1934."[117]  Specifically, the

---

[110] *Id.*, 96 Stat. at 1097 (codified as amended at 47 U.S.C. § 332).

[111] Federal Communication Commission Appropriations Authorization Act of 1983, Pub. L. 98-214, § 12, 97 Stat. 1467, 1471 (codified as amended at 47 U.S.C. § 157(a)).

[112] Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, § 6002(b)(2)(A), 107 Stat. 312, 393 (codified as amended at 47 U.S.C. § 332).

[113] *See id.*, 107 Stat. at 393 (codified as amended at 47 U.S.C. § 332).

[114] H.R. REP. 103-111, at 259 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 586.

[115] *Id.* at 260, 1993 U.S.C.C.A.N. at 587.

[116] *Id.*, 1993 U.S.C.C.A.N. at 587.

[117] *Id.*, 1993 U.S.C.C.A.N. at 587.

House Report pointed out that private carriers were statutorily exempt from Title II of the FCA and state regulation of rates and services, whereas common carriers were still subject to those requirements.[118] The House Report concluded "the disparities in the current regulatory scheme could impede the continued growth and development of commercial mobile services and deny consumers the protections they need if new services . . . were classified as private."[119]

The House Conference Report on the proposed amendments to section 332 reiterates that they were meant to treat any person or entity providing commercial mobile services as a common carrier, subject to the requirements of Title II of the FCA.[120] The House Conference Report points out the amended section 332 was intended to provide the FCC with the authority to determine which provisions of Title II, with the exception of sections 201, 202, and 208, would not apply to such persons.[121] The House, however, did not give the FCC the authority to obviate any provisions, which were "necessary to ensure charges are just and reasonable and not unjustly or unreasonably discriminatory, or otherwise in the public interest."[122] The Senate's amendments to section 332, unlike the House version, expressly provided for the specific Title II sections the FCC could and could not waive.[123]

In Conference, the House version of section 332 was adopted with modifications.[124] According to the House Conference Report, "[t]he intent of this provision, as modified, is to establish a [f]ederal regulatory framework to govern the offering of all commercial mobile services."[125] The Conference

---

[118] *Id.* at 259-60, 1993 U.S.C.C.A.N. at 586-87.

[119] *Id.* at 260, 1993 U.S.C.C.A.N. at 587.

[120] H.R. REP. 103-213, at 490 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1088, 1179.

[121] *Id.*, 1993 U.S.C.C.A.N. at 1179.

[122] *Id.*, 1993 U.S.C.C.A.N. at 1179.

[123] *Id.*, 1993 U.S.C.C.A.N. at 1179.

[124] *Id.*, 1993 U.S.C.C.A.N. at 1179.

[125] *Id.*, 1993 U.S.C.C.A.N. at 1179.

found "[d]ifferential regulation of providers of commercial mobile services is permissible but is not required in order to fulfill the intent of this section."[126]  The House Conference Report acknowledged "that market conditions may justify differences in the regulatory treatment of some providers of commercial mobile services."[127]  Accordingly, "[w]hile this provision does not alter the treatment of all commercial mobile services as common carriers, this provision permits the [FCC] some degree of flexibility to determine which specific regulations should be applied to each carrier."[128]  The House Report further explained that in order "[t]o foster the growth and development of mobile services that, by their nature, operate without regard to state lines as an integral part of the national telecommunications infrastructure, [the proposed amendment to section 332] also would [preempt] state rate and entry regulation of all commercial mobile services."[129]

Despite the House's intention to ensure that states did not interfere with market entry or rate regulation, the House version of section 332 expressly provided "that nothing here shall preclude a state from regulating the other terms and conditions of commercial mobile services."[130]  The House intended "that the states still would be able to regulate the terms and conditions of these services."[131]  "Terms and conditions," according to the House Committee, included

> such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (e.g., zoning); transfers of control; the bundling of services and equipment . . . .  This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under 'terms and conditions.[132]

---

[126] *Id.* at 491, 1993 U.S.C.C.A.N. at 1180.

[127] *Id.*, 1993 U.S.C.C.A.N. at 1180.

[128] *Id.*, 1993 U.S.C.C.A.N. at 1180.

[129] H.R. REP. 103-111, at 260, 1993 U.S.C.C.A.N. at 587.

[130] *Id.* at 261, 1993 U.S.C.C.A.N. at 588.

[131] *Id.*, 1993 U.S.C.C.A.N. at 588.

[132] *Id.*, 1993 U.S.C.C.A.N. at 588.

The House Conference Report explained the House version of the bill was meant to prevent state or local governments from imposing rate or entry regulation on commercial mobile services,[133] but also stated the amendment to section 332 was not meant to "preclude a state from regulating the other terms and conditions of commercial mobile services."[134]

4.    The FCC's Execution of the FCA and Its Amendments

In identifying Congress's intent for purposes of the FCA, the Court may review the history of federal regulation of the telecommunications industry.[135]  According to the Supreme Court, the FCC, "during the first several decades of its history, used this authority to develop a traditional regulatory system much like the systems other commissions had applied when regulating railroads, public utilities, and other common carriers."[136]  Upon section 322's enactment, however, the FCC acted on Congress's delegation and by regulation required CMRS[137] providers to comply with

> sections 201, 202, 206, 207, 208, 209, 216, 217, 223, 225, 226, 227, and 228 of the Communications Act, 47 U.S.C. 201, 202, 206, 207, 208, 209, 216, 217, 223, 225, 226, 227, 228; part 68 of this chapter, 47 CFR part 68; and §§ 1.701-1.748, and 1.815 of this

---

[133]  H.R. Rep. 103-213, at 492, 1993 U.S.C.C.A.N. at 1181.

[134]  *Id.*, 1993 U.S.C.C.A.N. at 1181.

[135]  *See Wyeth v. Levine*, 555 U.S. —, —, 129 S. Ct. 1187, 1195 (2009).

[136]*Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48, 127 S. Ct. 1513, 1516 (2007).

[137]  The FCC defined a CMRS as:

A mobile service that is:

    (a)    (1) provided for profit, i.e., with the intent of receiving compensation or monetary gain;
(2) An interconnected service; and
(3) Available to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public; or

    (b)  The functional equivalent of such a mobile service described in paragraph (a) of this section.

47 C.F.R. § 20.3.  The FCC treated a CMRS provider of "Cellular Radiotelephone Service" as "common carriage services" and therefore subject to section 332.  47 C.F.R. § 20.9(a)(7).

chapter, 47 CFR 1.701-1.748, 1.815.[138]

The FCC, however, exempted CMRS providers from "[f]il[ing] with the Commission copies of contracts entered into with other carriers or comply with other reporting requirements, or with §§ 1.781 through 1.814 and 43.21 of this chapter."[139]   Hence, a CMRS provider is not required to file copies of its "carrier contracts, agreements, concessions, licenses, authorizations[,] or other arrangements";[140] "[a]n annual financial report"; [141] "reports regarding proposed changes in depreciation rates";[142] "reports regarding pensions and benefits";[143] "reports regarding interstate rates of return";[144] "quarterly or semiannual reports";[145] and reports of "reductions in service which had previously been expanded on an experimental basis for a temporary period."[146]

Furthermore, the FCC provided

[CMRS] providers shall not file tariffs for international and interstate service to their customers, interstate access service, or international and interstate operator service. Sections 1.771 through 1.773 and part 61 of this chapter are not applicable to international and interstate services provided by commercial mobile radio service providers. [CMRS] providers shall cancel tariffs for international and interstate service to their customers, interstate access service, and international and interstate operator service.[147]

This meant the FCC exempted CMRS providers from filing "[s]chedules of charges, and classifications,

---

[138] *Id.* § 20.15(a).

[139] *Id.* § 20.15(b)(1).

[140] *Id.* § 1.783.

[141] *Id.* § 1.785.

[142] *Id.* § 1.787.

[143] *Id.* § 1.788.

[144] *Id.* § 1.795.

[145] *Id.* § 1.802.

[146] *Id.* § 1.803.

[147] *Id.* § 20.15(c).

practices, and regulations affecting such charges."[148]  CMRS providers no longer had to seek "special tariff permission."[149]

    5.    Courts', FCC's, and the Parties' Interpretations of the FCA Amendments

The amendment of section 332 ushered in a new era of detariffing for mobile service providers, which preserved state actions that otherwise would not have been available to plaintiffs if the FCC regulated CMRS providers in the same manner as other communications services.

        (a)    Courts' Interpretations

The Northern District of Alabama has recognized the implications of the 1993 congressional modification of the FCA.[150]  The Northern District of Alabama held section 332, along with the section 414 savings clause, preserve state law causes of action, which do not touch upon rates or market entry.[151] The Northern District of Alabama concluded the section 414 savings clause of the FCA "evidences Congress's intent to save state-law actions [and] precludes complete preemption within the Eleventh Circuit."[152]  It explained "[t]his conclusion is bolstered by the plain language of [section] 332, which excludes from its preemptive force state regulation of 'the other terms and conditions' of commercial mobile service"[153] and the legislative history, which explained section 332's preemptive language did not go to other terms and conditions, which could include billing information and practices and billing disputes and other consumer protection matters.[154]

Courts universally have found the express language of the FCA completely preempts state

---

[148] *Id.* § 1.771.

[149] *Id.* § 1.772.

[150] *See Lewis v. Nextel Communications, Inc.*, 281 F. Supp. 2d 1302 (N.D. Ala. 2003).

[151] *Id.* at 1305-06.

[152] *Id.*

[153] *Id.* at 1306 (citing 47 U.S.C. § 332(c)(3)(A)).

[154] *Id.* (citations omitted).

regulation of mobile telecommunications rates and market entry.[155]  Several courts, however, have made

clear that "while a state may not regulate a wireless carrier's rates, it may regulate the 'other terms and

conditions' of wireless telephone service."[156]  The Eastern District of Texas concluded the FCA does not

preempt a customer's state law claims for breach of contract with respect to particular billing practices

because the customer's claims did not implicate the reasonableness of the rates charged.[157]  The Northern

District of Texas concluded that when a claim does not touch on the rate of a contract, which implicates

federal law, the FCA does not pre-empt the claim.[158]  In *AT&T Corp. v. Galler Investments, Inc.,* a CMRS

provider sued a corporation for breach of contract and quantum meruit because the corporation failed to

pay for telecommunications services.[159]  The Northern District of Texas concluded

> that unlike the plaintiffs in [Seventh Circuit cases], [CMRS providers'] claims and [the corporation's] defenses do not implicate any rate, term, or condition of the contract that is subject to federal law.  Instead, this case is a breach of contract and unjust enrichment dispute that arises under Texas law and does not implicate the FCA."[160]

The Northern District of Texas explained "[n]o party challenges the terms, rates, or conditions that are

affected by the FCA; rather, the parties disagree about who is liable for charges for certain services."[161]

---

[155] *See, e.g., Vorhees v. Naper Aero Club, Inc.,* 272 F.3d 398, 404 (7th Cir. 2001) (citing 47 U.S.C. § 332(c)(3)) (barring states from regulating market entry or rates of mobile services providers); *see also Phillips v. AT & T Wireless,* 2004 WL 1737385, at *6 (S.D. Iowa July 29, 2004) ("[A] case that challenges the reasonableness of the rate charged or the legality of the rate structure would be preempted by section 332.") (not reported); *Lewis,* 281 F. Supp. 2d at 1303 ("The FCA expressly preempts any state regulation of rates or market entry into telecommunications."); *Brown v. Washington/Baltimore Cellular, Inc.,* 109 F. Supp. 421, 423 (D. Md. 2000) ("Congress did not preempt all claims that would influence rates, but only those that involve the reasonableness or lawfulness of the rates themselves.").

[156] *See, e.g., Peck v. Cingular Wireless, LLC* , 535 F.3d 1053, 1056 (9th Cir. 2008) (citation omitted) (finding state may regulate "terms and conditions" but not "rates" or "market entry").

[157] *See Threadgill v. Cingular Wireless, L.L.C.,* 223 F. Supp. 2d 786, 788 (E.D. Tex. 2002).

[158] *AT&T Corp. v. Galler Investments, Inc.,* 2008 WL 3874704, at *1-5 (N.D. Tex. Aug. 13, 2008) (not reported).

[159] *Id.* at *1.

[160] *Id.* at *4.

[161] *Id.*

It found the CMRS provider's claims arose under state law.[162]

Similarly, the Western District of Missouri concluded "the statutory text of the FCA lacks the extraordinary preemptive power required to convert a state-law complaint 'into one stating a federal claim for purposes of the well-pleaded complaint rule.'"[163]  It held the FCA "does not provide the exclusive cause of action for consumer protection claims" and thus were not preempted by federal law.[164] The Eastern District of Arkansas, in recognizing the distinction Congress made between wire-line providers and CMRS providers, found Congress did not intend to apply complete preemption to CMRS providers.[165]  The Seventh Circuit acknowledged the FCC's distinction between claims that would require the courts to evaluate the reasonableness of a rate and claims that would require courts only to examine rates with respect to an assessment of damages.[152]

(b)    <em>FCC's Interpretation</em>

In the FCC's decision <em>In re Wireless Consumers Alliance, Inc.</em>, a case which arose in the context of consumer protection claims, the FCC held section 332 "does not generally preempt the award of monetary damages by state courts based on state consumer protection, tort, or contract claims."[153]  The FCC was asked to determine whether the FCA preempts state courts from awarding consumers monetary relief for a communications provider's violations of state consumer protection, tort, or contract laws.[154]

---

[162] *Id.* at *5.

[163] *In re Wireless Telephone Federal Cost Recovery Fees Litigation*, 343 F. Supp. 2d 838, 850 (W.D. Mo. 2004) (citation omitted).

[164] *Id.* at 851-52.

[165] *Moriconi v. AT&T Wireless PCS, LLC*, 280 F. Supp. 2d 867, 875-76 (E.D. Ark. 2003) (finding Congress did not intend to preempt CMRS providers completely based upon section 332(c)(3)(A)).

[152] *Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069, 1073 (7th Cir. 2004) (citation omitted).

[153] *In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17021, 17022 ¶ 2, 2000 WL 1140570, at *1 ¶ 2 (F.C.C. Aug. 14, 2000).

[154] *Id.* at 17023 ¶ 5, 2000 WL 1140570 at * 2 ¶ 5 (footnote omitted).

The FCC concluded "whether a specific damage calculation is prohibited by [s]ection 332 will depend on the specific details of the award and the facts and circumstances of a particular case."[155]  However, the FCC explained "[s]ection 332 does not generally preempt the award of monetary damages by state courts based on state tort or contract claims."[156]

The FCC "f[oun]d that the filed rate doctrine is inapposite because there are no filed rates or tariffs for CMRS services."[157]  The FCC determined "the purposes behind the filed rate doctrine do not apply to CMRS services," and therefore, "the analysis and logic of the filed rate cases regarding the issue of whether awarding monetary damages is tantamount to ratemaking are inapplicable in cases dealing with [s]ection 332."[158]  Hence, the "primary inquiry becomes: Is the award of monetary damages necessarily equivalent to rate regulation and thus preempted, or does awarding damages generally fall under allowable state action on terms and conditions?"[159]

The FCC declined to "support the view that state courts are, as a general matter, prevented by [s]ection 332(c)(3)(A) from awarding damages to customers of CMRS providers based on violations of state contract or consumer fraud laws."[160]  The FCC reasoned because "there are no filed rates for CMRS services, [then] the filed rate doctrine does not preclude a state court's ability to award monetary relief against wireless telephone companies."[161]  The FCC explained "the very structure of [s]ection 332 limits the scope of its preemption by distinguishing nonjusticiable rates from terms and conditions which are

---

[155] *Id*. at 17022 ¶ 2, 2000 WL 1140570 at *1 ¶ 2.

[156] *Id*. at 17026 ¶ 9, 2000 WL 1140570 at *3 ¶ 9.

[157] *Id*., 2000 WL 1140570 at *3 ¶ 9.

[158] *Id*., 2000 WL 1140570 at *3 ¶ 9.

[159] *Id*. at 17028 ¶ 13, 2000 WL 1140570 at *4 ¶ 13.

[160] *Id*. at 17029 ¶ 14, 2000 WL 1140570 at *4 ¶ 14.

[161] *Id*. at 17031 ¶ 19, 2000 WL 1140570 at *6 ¶ 19 (footnote omitted).

subject to state jurisdiction."[162]  The FCC further pointed out "the filed rate cases arose under a totally different regulatory regime, one in which carriers file tariffs with a regulatory agency that are subject to scrutiny by the agency and the public, and under which carriers are bound to charge only the filed rate for the services they provide."[163]  The FCC explained CMRS

> ha[ve] a different regime, in which the CMRS-customer relationship is not governed by terms set out by carriers in regulatory tariff filings, but by the mechanisms of a competitive marketplace.  There is a distinction between rates that are filed with an agency and are subject to public and regulatory review, and prices that are determined and published by the carrier in a competitive marketplace.[164]

Further, "[a] mandatory detariffing regime, when applied to both CMRS and other nondominant carriers, constitutes a totally different framework for fulfilling our statutory responsibilities."[165]

        The FCC explained that CMRS providers enter into service contracts with customers rather than file tariffs.[166]  The FCC relies "on the competitive marketplace to ensure that CMRS carriers do not charge rates that are unjust or unreasonable, or engage in unjust or unreasonable discrimination."[167]  The FCC stated it "agree[d] . . . that [s]ection 332 was designed to promote the CMRS industry's reliance on competitive markets in which private agreements and other contract principles can be enforced."[168]  Accordingly, the FCC logically concluded "if CMRS providers are to conduct business in a competitive marketplace, and not in a regulated environment, then state contract and tort law claims should generally be enforceable in state courts."[169]  The FCC explained a plaintiff may in fact question whether a CMRS

---

[162] *Id.* at 17032 ¶ 19, 2000 WL 1140570 at *6 ¶ 19.

[163] *Id.* ¶ 20, 2000 WL 1140570 at *6 ¶ 20 (footnote omitted).

[164] *Id.*, 2000 WL 1140570 at *6 ¶ 20.

[165] *Id.* at 17033 ¶ 21, 2000 WL 1140570 at *6 ¶ 21.

[166] *Id.*, 2000 WL 1140570 at *6 ¶ 21.

[167] *Id.*, 2000 WL 1140570 at *6 ¶ 21 (footnote omitted).

[168] *Id.* at 17034 ¶ 24, 2000 WL 1140570 at *7 ¶ 24 (footnote omitted).

[169] *Id.*, 2000 WL 1140570 at *7 ¶ 24.

33

provider fulfilled its obligations according to the terms and conditions of a contract.[170]  The FCC

concluded "[s]uch a case could present breach of contract . . . claims appropriately reviewable by a state

court."[171]

Relying on *Bastien v. AT&T Wireless Services, Inc.*,[172] the FCC stated "that it is the substance,

not merely the form of the state claim or remedy, that determines whether it is preempted under [s]ection

332."[173]  In *Bastien*, the Seventh Circuit determined the consumer's purported claims actually challenged

the rates and level of service of the CMRS provider and were preempted.[174]  On the other hand, the FCC

concluded "the award of monetary damages in these types of causes of action would generally fall under

the terms and conditions provisions of [s]ection 332, which can be the subject of state action."[175]  In

reaching this conclusion, the FCC did not consider the section 414 savings clause.[176]  The District of

Kansas has criticized the Seventh Circuit's decision in *Bastien* because it did not analyze removal intent,

as directed by the Supreme Court.[177]

> *(c)     Parties' Interpretations*

Though Defendants do not address *Bastien*, they dispute the logic of the Seventh Circuit's

---

[170] *Id.* at 17035 ¶ 26, 2000 WL 1140570 at *8 ¶ 26.

[171] *Id.*, 2000 WL 1140570 at *8 ¶ 26.

[172] 205 F.3d 983 (7th Cir. 2000).

[173] *Id.* at 17036-37 ¶ 28, 2000 WL 1140570 at *8 ¶ 28 (footnote omitted).

[174] 205 F.3d at 989-90.

[175] *In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. at 17040 ¶ 36, 2000 WL 1140570 at *10 ¶ 36.

[176] *Id.* ¶ 37, 2000 WL 1140570 at *11 ¶ 37.

[177] *Russell v. Sprint Corp.*, 264 F. Supp. 2d 955, 961 (D. Kan. 2003).

reasoning of *Boomer v. AT & T Corp.*[178] and *Dreamscape Design, Inc. v. Affinity Network, Inc.*,[179] pointing out the Seventh Circuit's decisions on preemption are not binding on the Court. Plaintiff contends he does not rely on these Seventh Circuit's precedents and instead points to the plain language of section 415(a). In *Boomer*, the Seventh Circuit found a plaintiff's challenge to the validity of an arbitration clause was preempted by the FCA based on: 1) congressional intent that consumers receive uniform terms and conditions of service; 2) to allow a state to invalidate an arbitration clause would affect rates, which the FCA prohibits; and 3) congressional intent that federal law govern the validity of a long-distance service contract based on the FCA's provision that unlawful rates and terms and conditions that are unjust and unreasonable are prohibited.[180] The Seventh Circuit pointed out the filed-rate doctrine and tariff-filing requirement of the FCA manifest congressional intent to preempt state law challenges to conditions in a tariff.[181] But the Seventh Circuit explained congressional detariffing was not meant to upset the substantive requirements of prohibiting and punishing unequal rates and preventing discrimination and ensuring uniformity in terms and conditions for all localities.[182]

In *Dreamscape Design Inc.*, the plaintiff sued for breach of contract and fraud.[183] The Seventh Circuit stated "there is no question that Congress intended the FCA to displace state law with respect to long-distance telephone service terms and conditions."[184] The Seventh Circuit concluded there was no way a court could review the plaintiff's claims without invalidating the contractual rates, and therefore,

---

[178] 309 F.3d 404 (7th Cir. 2002).

[179] 414 F.3d 665 (7th Cir. 2005).

[180] 309 F.3d at 418.

[181] *Id.* at 421.

[182] *Id.* at 421-22 (citations omitted).

[183] 414 F.3d at 666.

[184] *Id.* at 671 (citing *Boomer*, 309 F.3d at 423).

the plaintiff's claim was preempted by the FCA, which intended federal law to control ratemaking for telecommunicaties services.[185]  The Seventh Circuit refused to adopt the Ninth Circuit's reasoning in *Ting v. AT&T*, in which the Ninth Circuit held state law claims of unfair practices were not preempted by the FCA in a detariffing regime because the claims did not stand as an obstacle to ensuring the uniformity and reasonableness of rates.[186]  The Ninth Circuit concluded that while "the substantive principles of reasonableness and nondiscrimination remain intact[,] . . . the same cannot be said of the principle of preemption, which was a product of the filed rate doctrine which, by definition, did not survive detariffing."[187]

Defendants point to the Ninth Circuit's decision in *In re NOS Communications*, in which plaintiffs in multidistrict litigation asserted numerous state law claims.[188]  The Ninth Circuit pointed out "there is no indication that Congress intended every state law cause of action within the scope of the FCA to be preempted."[189]  Relying on the Second Circuit's decision in *Marcus v. AT&T Corp.*,[190] the Ninth Circuit explained that if Congress had intended to field preempt all state law causes of action within the scope of the FCA, the savings clause of section 414 would be rendered surplusage.[191]  The Ninth Circuit found state law actions were preempted only when they implicated a tariff.[192]  The Ninth

---

[185] *Id.* at 672-73.

[186] 319 F.3d 1126, 1137-38 (9th Cir. 2003).

[187] *Id.* at 1139 (footnote omitted).

[188]  495 F.3d 1052, 1055 (9th Cir. 2007).

[189] *Id.* at 1058.

[190] 138 F.3d 46, 54 (2d Cir. 1998) ("The FCA not only does not manifest a clear [c]ongressional intent to preempt state law actions prohibiting deceptive business practices, false advertisement, or common law fraud, it evidences Congress's intent to allow such claims to proceed under state law.").

[191] 495 F.3d at 1058 (citing 47 U.S.C. § 414).

[192] *Id.* at 1059 (citation omitted).

Circuit held that the "state law claims are preempted to the extent that they attempt to challenge the terms of the filed-rate doctrine" and "where the measure of damages requires comparing the rates charged under the filed-rate with the rate that allegedly should have been charged, the state claims are preempted."[193]

Defendants also point to the Fifth Circuit's decision in *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, in which the Fifth Circuit determined the validity of three arbitration clauses by applying state law.[194]  Defendants point out district courts have been critical of the Seventh Circuit's decision in *Boomer* and *Dreamscape*, pointing to the Eastern District of Michigan's decision in *Manasher v. NECC Telecom*[195] and the Middle District of Florida's decision in *Eyler v. ILD Telecomms., Inc.*[196]

In *Manasher*, the Eastern District of Michigan concluded the plaintiff's state law claims were only preempted to the extent they implicated "the reasonableness or discriminatory effect of a rate, term or condition in the contract."[197]  The Eastern District of Michigan held "[a]ctions based on state law that do not challenge the reasonableness of a rate, term or condition, such as claims based on contract formation and breach of contract are not preempted."[198]  In *Eyler*, the Middle District of Florida, relying on the Eleventh Circuit's decision in *Smith v. GTE Corp.*,[199] concluded

> Congress expressly recognized the continued viability of state common law and statutory remedies, negating any notion that Congress intended to displace entirely any state cause of action relating to telephone billing; section 414 makes clear that the causes of action

---

[193] *Id.* at 1060.

[194] 379 F.3d 159 (5th Cir. 2004).

[195] 2007 WL 2713845 (E.D. Mich. Sept. 18, 2007) (not reported).

[196] 2008 WL 5110754 (M.D. Fla. Nov. 25, 2008) (not reported).

[197] 2007 WL 2713845 at *10.

[198] *Id.*

[199] 236 F.3d 1292 (11th Cir. 2001).

in the federal statute are cumulative to available state-law actions.[200]

In *Smith*, the Eleventh Circuit held "that Congress . . . did not intend to preempt completely state causes of action or remedies concerning the subject matter of the [FCA]."[201]  The Eleventh Circuit's decision was based, in part, on the section 414 savings clause.[202]

Plaintiff explains Defendants' reliance on these district court decisions is misplaced because the decisions address the application of state law to contract formation issues and deceptive billing practices, neither of which the FCA regulates specifically.  Plaintiff points to the District of Minnesota's decision in *Firstcom, Inc. v. Qwest Communications*[203] and the Northern District of Illinois's dictum in *Martin v. Cavalry Portfolio Services, LLC*[204] to argue section 415(a) means exactly what it says.  In *Firstcom, Inc.*, a plaintiff carrier sought to recover damages against a defendant carrier.[205]  The District of Minnesota concluded section 415 applied because the plaintiff's

> state claims f[e]ll within the [FCA's, as amended] broad definition of claims against carriers – that is, because they are actions at law related to the recovery of overcharges as defined by [section] 415(c) – they must be filed within two years from the time the cause of action accrues.[206]

For *Martin*, Plaintiff attaches a transcript, which shows his attorneys directed the Northern District of Illinois to the Court's March 4, 2009, Order.

Plaintiff also contests Defendants' assertion section 415(a) applies only to tariffed charges, and instead argues it applies to "lawful charges," which is a phrase many state statutes also use.  Plaintiff

---

[200] 2008 WL 5110754 at *7 (citation omitted).

[201] 236 F.3d at 1312 (citation omitted).

[202] *See id.* at 1313.

[203] 618 F. Supp. 2d 1001 (D. Minn. 2007).

[204] No. 07-4745 (N.D. Ill. Mar. 23, 2009).

[205] 618 F. Supp. 2d at 1003.

[206] *Id.* at 1005.

does note *Boomer*'s usefulness for his contention that when Congress detariffed CMRS providers, it did not intend to abandon its goals of uniformity and nondiscrimination "with respect to the statutes of limitations." Plaintiff relies on the Seventh Circuit's decision in *Bastien* for the proposition that the Court should read the savings clause of section 414 narrowly.

Congress made the principle of nondiscrimination explicit when it passed the Telecommunications Act of 1996, mandating interstate communication by wire and radio, so far as possible, was to be made available to all people of the United States, "without discrimination on the basis of race, color, religion, national origin, or sex."[207] At the same time, however, Congress permitted the FCC to detariff long distance providers who were not CMRS. Congress provided that

> the [FCC] shall forbear from applying any regulation or any provision of [the FCA] to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the [FCC] determines that –
>
>> (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;
>>
>> (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and
>>
>> (3) forbearance from applying such provision or regulation is consistent with the public interest.[208]

The continued movement of Congress towards deregulation demonstrates Congress's, and accordingly the FCC's, preferred method for ensuring the reasonableness of a common carrier's charges should be market forces, rather than artificial measures imposed by the FCC.

        7.    <u>Analysis</u>

As the foregoing review demonstrates, the determination of which statute of limitations applies

---

[207] Telecommunications Act of 1996, § 104, 110 Stat. At 86 (codified as amended at 47 U.S.C. § 151).

[208] *Id.* § 401, 110 Stat. at 128 (codified as amended at 47 U.S.C. § 160(a)).

to the Sprint debt is not simply a matter of reading the text of section 415 in isolation.  The FCA's statutory scheme and legislative history evince congressional intent that CMRS providers retain state law remedies in the event that issues arise relating to billing practices, which do not touch on rates of market entry.  This is supported by the decisions of numerous federal courts, as well as the FCC's own interpretation of section 332, which merits respect, if not *Chevron* deference.[209]

When Congress enacted the FCA in 1934, its quintessential purpose clearly was to make available communication services to as many individuals and entities as possible across the United States.  Congress endeavored to do this through the FCA by ensuring the basis for which such services were charged were uniform.  That is, Congress meant to ensure carriers did not charge individuals or entities in one particular location more or less for the services they were provided.  In doing so, Congress incentivized carriers to expand their networks of services, while at the same time ensuring such services would be affordable.

Hence, it appears Congress's ultimate concern was to ensure equal access to communication services, while the preferred method of achieving this goal was through a transparent system of rate publication in the form of tariffs, for which common carriers could be held accountable because those tariffs were "the law."[210]  The amendments of the FCA describe an evolution from regulating communication services providers for the principle purpose of ensuring equal access, in keeping with the ICA model, to deregulating communication services in order to let market forces control rates and to foster new technologies.  Under the ICA, and subsequently under the FCA, "lawful charges" were those which were included in tariffs.  "Overcharges" were charges in excess of those provided for in the tariffs.[211]

---

[209] *See Christensen*, 529 U.S. at 587, 120 S. Ct. at 1662-63.

[210] *See Carter*, 365 F.2d at 496.

[211] *See* Communications Act of 1934, § 415(g), 48 Stat. at 1100.

In 1993, Congress made CMRS providers, which include wireless companies, subject to the requirement that their rates be reasonable and that they refrain from discriminating. However, when it amended section 332, Congress concurrently gave the FCC the authority to waive the requirement that wireless companies and other CMRS providers file tariffs, which the FCC promptly did. In doing so, CMRS providers no longer accrued "lawful charges" because, historically, "lawful charges" were those set in tariffs, which common carriers filed with the FCC, as the case law well supports. While allowing the FCC to abrogate the tariff-filing requirement, Congress intended other provisions of the FCA would still apply, including that CMRS providers set reasonable rates; however, by section 415's own language, it no longer applied for the very reason that CMRS providers no longer accrued such "lawful charges."

It is also apparent in other provisions within section 332 that Congress intended that section 415 would no longer apply to CRMS providers. While permitting the FCC to deregulate such providers, Congress simultaneously barred states from regulating rates and market entry. Congress, however, specifically preserved to the states the power to regulate other terms and conditions. As the legislative history clearly indicates, other terms and conditions include billing practices and disputes. Noticeably, Congress did not carve out this exception for state regulation simply in the context of preserving consumer remedies. Nothing in the legislative history suggests this is the case. Congress intended states to continue to regulate billing disputes between consumers and providers. Implicitly then, Congress intended states to continue to regulate contracts, to the extent such contracts did not implicate rates or market entry, because billing disputes could only arise in the context of a contractual relationship, given the FCC's choice to eliminate the tariff-filing requirement. It would be illogical to conclude Congress intended the section 415 statute of limitations to apply to a contract dispute, when Congress gave that power to states to regulate contracts by their own substantive laws.

Furthermore, the legislative history of the amendments to section 415 likewise evince congressional intent to relieve CMRS providers from the two-year limitations periods. When Congress extended the statute of limitations period from one year to two years in 1974, it did so because of the

41

increasing complexity of communication services, as well as the quagmire of computing charges. Congress has since explicitly encouraged the fostering of new technologies, which has only led to ever increasing complexity in the field of communications. As demonstrated in the legislative history of the section 415 amendments, increasing complexity merits larger limitations periods.

The FCC's decision in *In re Wireless Consumers Alliance, Inc.* supports the conclusion section 415 does not apply to Defendants' debt collection action. The FCC made clear Congress did not intend to eliminate a consumer's state law action against a CMRS provider for breach of contract when it amended section 332. In finding a state could award damages to a consumer for breach of contract, the FCC implicitly acknowledged a comparable remedy is available to a CMRS provider, so long as the provider's action does not touch on rates or market entry. The FCC's statement that "[s]ection 332 does not generally preempt the award of monetary damages by state courts based on state tort or contract claims" leaves this option open for CMRS providers. Likewise, the FCC explicitly concluded the filed rate doctrine, which courts previously relied on to find a state action was preempted, no longer applied to CMRS providers because the FCC waived the tariff-filing requirement for CMRS providers.

Numerous courts have reached the same conclusion. By providing the express exception that states may regulate other terms and conditions, courts properly conclude such state actions based on those terms or conditions are not preempted. To conclude otherwise would render such statutory language surplusage. "[I]nterpretations which render parts of a statute inoperative or superfluous are to be avoided."[212]

Plaintiff only points to two cases, which he states apply section 415. The first decision involved common carriers. Given the nature of the relief the plaintiff sought, it is no surprise that the District of Minnesota found section 415 applied to the action. In the second case, Plaintiff's attorneys called the

---

[212] *United States v. Chen*, 913 F.2d 183, 190 (5th Cir. 1990) (citations omitted) (internal quotation marks omitted).

Northern District of Illinois's attention to the Court's March 4, 2009, Order. The most the Northern District of Illinois does with this Court's Order is to read verbatim from it. The Northern District of Illinois's passing comment does not further Plaintiff's contention, given the Court's previous analysis is under reconsideration here.

Because the FCA's statutory scheme and legislative history manifestly evince that Congress did not intend to preempt a CMRS providers' state law remedies when the action does not touch on rates or entry market and because the FCC has eliminated the tariff requirement for such providers, the Court concludes section 415 does not apply to a CMRS provider who is attempting to collect a debt from a consumer and is not preemptive. Rather, the state law governing the debt collection action provides the applicable statute of limitations. In this case, Plaintiff has not made any allegations, which implicate Sprint's rates or market entry. Hence, Texas law governs the debt collection action.

The applicable statute of limitations for collection of a debt in Texas is four years.[213] Because the debt Defendants attempted to collect was not more than four years old, their attempt to collect it was valid and does not present an FDCPA violation. Accordingly, Defendants are entitled to judgment in their favor.

> B.    *Plaintiff's Motion for Partial Summary Judgment*

Even if the Court had found the section 415 statute of limitations period applies to the Sprint debt, the proceedings of this case aptly demonstrate Defendants are entitled to a bona fide error defense as a matter of law. Plaintiff suggests that Defendants should have relied on the opinion of a lawyer or should have sought legal advice from in-house counsel. Whether Defendants consulted with a lawyer on which statute of limitations applies to the Sprint debt, however, is irrelevant because reasonable lawyers, as this case well demonstrates, readily disagree on whether the federal or state statute of limitations period applies.

---

[213] TEX. CIV. PRAC. & REM. CODE § 16.004(a)(3) (Vernon 2002).

When Plaintiff filed "Plaintiff's Motion for Class Certification" [Rec. No. 25], Defendants responded that their attempts to collect the Sprint debt were not time-barred because the Texas state four-year statute of limitations applied to the debt collection.  In reply, Plaintiff argued section 415 preempted the state limitations period.  The Court concluded on March 4, 2009, that Plaintiff's contention was correct, without the benefit of the briefing Defendants provided in their Motion to Dismiss, and found the section 415 two-year limitation applied to Defendants' debt collection action.  A read of section 415 in isolation, or solely in the context of Title II of the FCA, could lead a reasonable attorney who does not practice in the communications field to conclude section 415 applied to the debt collection here.

On the other hand, as the foregoing discussion about Defendants' Motion to Dismiss demonstrates, a reasonable attorney can (and should) conclude Congress abrogated the application of section 415 to CMRS providers when it permitted, and the FCC so undertook, the detariffing of such providers.  Given the Fifth Circuit's intimation it would permit a mistake of law to support the bona fide error defense, this is exactly the case that merits its application.

Defendants relied on the chart of a nationwide industry trade organization, which listed various state statute of limitations periods with caveats of legal disclaimer.  This alone would be insufficient because the chart itself recommended Defendants consult an attorney.  However, Defendants here also referred the collection actions to local attorneys.  This practice, coupled with the chart, are reasonably calculated to avoiding an application of the incorrect statute of limitations.  This conclusion is only compelled, however, because reasonable attorneys can and do disagree on which statute of limitations applies.

More pointedly, even this Court had to delve deeply into the FCA's legislative history for several months in reconsidering the issue before coming to its own conclusion the state limitations period applies to the debt collection action, rather than section 415.  Hence, there is literally no other procedure Defendants could have implemented to avoid collection of the debt, other than to simply refrain from collecting cellular phone debts.  Because Defendants are entitled to the bona fide error defense as a

44

matter of law, the Court will deny Plaintiff's Motion for Partial Summary Judgment.

**IV.    ORDERS**

Based upon the foregoing discussion and analysis, the Court enters the following Orders:

1.    "Defendants' Motion to Dismiss the Complaint or, Alternatively, for Judgment on the Pleadings" [Rec. No. 61] should be, and hereby is, **GRANTED**.

2.    "Plaintiff's Motion for Partial Summary Judgment as to Liability" [Rec. No. 57] should be, and hereby is, **DENIED**.

**SO ORDERED.**

**SIGNED** this **27**[th] day of **October, 2009**.

_____

**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**